GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
Kevin S. Rosen (pro hac vice to be filed)
Craig H. Millet (pro hac vice to be filed)
Matthew S. Kahn (MK-5426)
MKahn@gibsondunn.com

*Attorneys for Defendant DLA Piper LLP (US)*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ICP STRATEGIC CREDIT INCOME FUND LTD., *et al.*,<br><br>           Debtors in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 13-12116 (REG)<br><br>(Jointly Administered) |
| ICP STRATEGIC CREDIT INCOME MASTER FUND LTD., ICP STRATEGIC CREDIT INCOME FUND LTD., and HUGH DICKSON and STEPHEN AKERS, solely in their capacity as the Foreign Representatives and Joint Official Liquidators of ICP Strategic Credit Income Fund Ltd. and ICP Strategic Credit Income Master Fund Ltd.,<br><br>           Plaintiffs,<br>   -against-<br><br>DLA PIPER LLP (US),<br><br>           Defendant. | Adv. Pro. No. 14-01835 (REG)<br><br>(Procedurally Consolidated Under This Matter) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT DLA PIPER LLP (US)'S MOTION TO DISMISS THE COMPLAINT**

New York, New York
January 24, 2014

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................. 1

PROCEDURAL HISTORY ..................................................................................... 4

BRIEF STATEMENT OF FACTS ............................................................................ 4

   I.    BACKGROUND OF THE CDO TRANSACTION ....................................... 4

   II.   OCTOBER 2008 MARGIN CALL AND PAYMENT BY SCIF MASTER .............. 5

   III.  ALL PARTIES UNDERSTOOD SCIF MASTER'S PAYMENTS WERE
        LOANS ........................................................................................ 8

   IV.  SEC'S AND PLAINTIFFS' LAWSUITS AGAINST ICP AND PRIORE .................. 9

ARGUMENT ................................................................................................... 10

   I.    STANDARDS ON A MOTION TO DISMISS ........................................... 10

   II.   ALL OF PLAINTIFFS' CLAIMS ARE BARRED UNDER THE *IN PARI
        DELICTO* DOCTRINE AND THE *WAGONER* RULE .............................. 11

        A.    The *In Pari Delicto* Doctrine And The *Wagoner* Rule .................. 11

        B.    Priore's And ICP's Alleged Misconduct Is Imputed To Plaintiffs
             And Bars Any Recovery ....................................................... 12

        C.    The Limited Exceptions To Imputation Are Inapplicable Here And
             Cannot Defeat The Absolute *In Pari Delicto* Bar To Plaintiffs'
             Claims ............................................................................ 14

            1.    The Adverse Interest Exception Is Inapplicable ................. 14

            2.    Even If The Adverse Interest Exception Is Applied, It Is
                Negated By The Sole Actor Rule ...................................... 17

            3.    Plaintiffs Cannot Defeat Imputation By Claiming Innocent
                Insiders Existed ........................................................... 18

   III.  PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND
        ABETTING FRAUD OR AIDING AND ABETTING BREACH OF
        FIDUCIARY DUTY ........................................................................ 21

        A.    Plaintiffs Do Not Plead An Underlying Fraud ............................. 21

        B.    Plaintiffs Do Not Plead An Underlying Breach Of Fiduciary Duty .............. 22

        C.    Plaintiffs Do Not Allege Facts Reasonably Suggesting That DLA
             Had Actual Knowledge Of The Alleged Misconduct ..................... 24

            1.    DLA Believed SCIF Master's Margin Payments Were
                 Loans .......................................................................... 25

2. DLA Believed SCIF Master's Margin Payments Were Permissible Under The CDO Transactional Structure And That There Was A Mechanism For Repayment ................................ 27

3. Plaintiffs' Remaining Conclusory And Speculative "Actual Knowledge" Allegations Fail .............................................................. 29

D. Plaintiffs Do Not Allege Facts Reasonably Suggesting That DLA Substantially Assisted The Alleged Misconduct ............................................. 31

E. Plaintiffs Do Not Allege Facts Reasonably Suggesting That DLA Proximately Caused The Funds' Harm .......................................................... 36

IV. PLAINTIFFS' CAYMAN LAW CLAIM IS INCURABLY DEFICIENT ............... 37

A. Principles Of Comity Warrant Dismissal Of The Cayman Law Claim ......................................................................................................................... 37

B. The Cayman Law Claim Also Fails As A Matter of Law .............................. 38

CONCLUSION ...................................................................................................................... 40

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Albion Alliance Mezzanine Fund, L.P. v. State St. Bank & Trust Co.*,
   8 Misc.3d 264 (Sup. Ct. N.Y. Cty. 2003), *aff'd*, 2 A.D.3d 162 (1st Dep't 2003) .......... 29, 31

*Allen Morris Commercial Real Estate Servs. Co. v. Numismatic Collectors Guild, Inc.*,
   1993 WL 183771 (S.D.N.Y. May 27, 1993) ........................................................ 9

*Art Capital Grp., LLC v. Neuhaus*,
   70 A.D.3d 605 (1st Dep't 2010) .......................................................................... 22

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
   472 U.S. 299 (1985) ............................................................................................ 11

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................................................................... 10, 34

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
   754 F.2d 57 (2d Cir. 1985) ................................................................................. 36

*Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
   369 F.3d 212 (2d Cir. 2004) ................................................................................. 6

*Breeden v. Kirkpatrick & Lockhart, LLP (In re Bennett Funding Grp., Inc.)*,
   268 B.R. 708 (S.D.N.Y. 2001), *aff'd*, 336 F.3d 94 (2d Cir. 2003) ............. 13, 18, 21

*Broad-Bussel Family LP v. Bayou Grp. LLC (In re Bayou Hedge Funds Inv. Litig.)*,
   472 F. Supp. 2d 528 (S.D.N.Y. 2007) .......................................................... 32, 35

*Bullmore v. Ernst & Young Cayman Is.*,
   20 Misc.3d 667 (Sup. Ct. N.Y. Cty. 2008) ............................ 13, 14, 15, 16, 18, 20

*Chem-Age Indus. v. Glover*,
   652 N.W.2d 756 (S.D. 2002) .............................................................................. 32

*Cobalt Multifamily Investors I, LLC v. Arden*,
   857 F. Supp. 2d 349 (S.D.N.Y. 2011) ........................................................... 13, 15

*Concord Capital Mgmt., LLC v. Fifth Third Bank*,
   2011 WL 10564345 (Sup. Ct. N.Y. Cty. Dec. 1, 2011),
   *aff'd*, 102 A.D.3d 406 (1st Dep't 2013),
   *lv to appeal denied*, 21 N.Y.3d 851 (2013) ..................................... 12, 14, 15, 16

*CRT Investments, Ltd v. BDO Seidman, LLP*,
   85 A.D.3d 470 (1st Dep't 2011) .......................................................................... 32

*Ditlya v. Grinberg*,
   36 Misc.3d 1233(A) (Sup. Ct. Kings Cty. 2012) ................................................ 23

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
    12 N.Y.3d 553 (2009) ............................................................................. 25, 29, 31

*Fahlenbach v. Trans Pac. Capital*,
    1996 WL 22602 (S.D.N.Y. Jan. 19, 1996) ............................................................ 24

*First Keystone Consultants, Inc. v. DDR Const. Servs.*,
    74 A.D.3d 1135 (2d Dep't 2010) ........................................................................... 23

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*,
    479 F. Supp. 2d 349 (S.D.N.Y. 2007),
    *reconsideration denied*, 2007 WL 1138866 (S.D.N.Y. Apr. 17, 2007) ......................... 24, 36

*Goodman v. Kennedy*,
    18 Cal.3d 335 (1976) ........................................................................................... 32

*Grubin v. Rattet (In re Food Mgmt. Group, LLC)*,
    380 B.R. 677 (Bankr. S.D.N.Y. 2008) ..................................................................... 6

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947) ........................................................................................... 38

*Hayden v. Feldman*,
    753 F. Supp. 116 (S.D.N.Y. 1990) ...................................................................... 24

*Highland Capital Mgmt., LP v. UBS Secs. LLC (In re Lyondell Chemical Co.)*,
    491 B.R. 41 (Bankr. S.D.N.Y. 2013) ..................................................................... 6

*ICP Strategic Credit Income Master Fund Ltd. et al. v. DLA Piper LLP (US)*,
    14-cv-351 (AKH) (S.D.N.Y.) ................................................................................ 4

*In re Arbco Capital Mgmt., LLP*,
    498 B.R. 32 (Bankr. S.D.N.Y. 2013) ..................................................................... 19

*In re Augustus Barnett & Sons Ltd.*,
    2 B.C.C. 98904 (Ch. D. 1985) .............................................................................. 40

*In re Bennett Funding Grp., Inc.*,
    336 F.3d 94 (2d Cir. 2003) ......................................................................... 19, 20, 21

*In re Bernard Madoff Inv. Secs., LLC*,
    721 F.3d 54 (2d Cir. 2013) ......................................................................... 13, 14, 17

*In re Cal. TD Inv. LLC*,
    489 B.R. 124 (Bankr. C.D. Cal. 2013) ................................................................... 14

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ................................................................................... 34

*In re Magnesium*,
    399 B.R. 722 (Bankr. S.D.N.Y. 2009) ......................................................... 7, 13, 19, 20

*In re Maidstone Buildings Provisions Ltd.*,
    1 W.L.R. 1085 (Ch. D. 1971) ............................................................................... 39

*In re Manville Forest Products Corp.,*
225 B.R. 862 (Bankr. S.D.N.Y. 1998), *aff'd*, 209 F.3d 125 (2d Cir. 2000) .......................... 9

*In re Mediators, Inc.,*
105 F.3d 822 (2d Cir. 1997) ............................................................. 12, 14, 17, 18

*In re the 1031 Tax Group, LLC,*
420 B.R. 178 (Bankr. S.D.N.Y. 2009) ......................................................... 19, 20

*Jana Master Fund, Ltd. v. JPMorgan Chase & Co.,*
19 Misc.3d 1106(A) (Sup. Ct. N.Y. Cty. 2008) ................................................... 22

*Kaufman v. Cohen,*
307 A.D.2d 113 (1st Dep't 2003)............................................................... 21, 22

*Kiobel v. Royal Dutch Petroleum Co.,*
621 F.3d 111 (2d Cir. 2010), *aff'd*, 133 S. Ct. 1659 (2013)...................................... 10

*Kirschner v. KPMG, LLP,*
15 N.Y.3d 446 (2010), *answer to certified question conformed to Kirschner v.
KPMG, LLP*, 626 F.3d 673 (2d Cir. 2010)...................................... 11, 12, 13, 16

*Lerner v. Fleet Bank, N.A.,*
459 F.3d 272 (2d Cir. 2006) ............................................................. 10, 21, 24

*Mateo v. Senterfitt,*
82 A.D.3d 515 (1st Dep't 2011)............................................................. 25, 29, 31

*Matsumura v. Benihana Nat'l Corp.,*
542 F. Supp. 2d 245 (S.D.N.Y. 2008) ........................................................... 11

*Maxwell Commc'ns Corp. v. Société Générale (In re Maxwell Commc'ns Corp.),*
93 F.3d 1036 (2d Cir. 1996) ................................................................... 38

*Morphitis v. Bernasconi,*
[2003] EWCA Civ 289 (Ct. of App., Ch. D. 2003)................................................ 40

*North Fork Preserve, Inc. v. Kaplan,*
68 A.D.3d 732 (2d Dep't 2009)................................................................. 23

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,*
267 F.3d 340 (3d Cir. 2001) ................................................................... 17

*Official Comm. of Unsecured Creditors v. Transpac. Cor. Ltd. (In re Commodore
Int'l Ltd.),*
242 B.R. 243 (Bankr. S.D.N.Y. 1999), *aff'd*, 2000 WL 977681 (S.D.N.Y. Jul.
17, 2000)...................................................................................... 38

*Palmetto Partners, L.P. v. AJW Qualified Partners, LLC,*
83 A.D.3d 804 (2d Dep't 2011).................................................................. 23

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC,*
446 F. Supp. 2d 163 (S.D.N.Y. 2006) ........................................................... 36

Page(s)

*Pollux Holding Ltd. v. Chase Manhattan Bank,*
329 F.3d 64 (2d Cir. 2003), *cert. denied*, 540 U.S. 1149 (2004) ........................................ 37

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945) ................................................................................................ 11

*Reynolds v. Schrock*,
341 Ore. 338 (2006) ................................................................................................ 32

*Roni LLC v. Arfa*,
72 A.D.3d 413 (1st Dep't 2010), *aff'd*, 15 N.Y.3d 826 (2010) .......................................... 31

*Ross v. Bolton*,
904 F.2d 819 (2d Cir. 1990) ................................................................................................ 11

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007) .......................................................................................... 6, 30

*Ryan v. Hunton & Williams*,
2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ................................................................. 24

Shearson Lehman Hutton, Inc. v. Wagoner,
944 F.2d 114 (2d Cir. 1991) ................................................................................................ 12

*Tot v. United States*,
319 U.S. 463 (1943) ................................................................................................ 22

*VictoriaTea.com v. Cott Beverages, Canada*,
239 F. Supp. 2d 377 (S.D.N.Y. 2003) ................................................................................ 38

*Winn v. Schafer*,
499 F. Supp. 2d 390 (S.D.N.Y. 2007) ................................................................................ 39

*Witzman v. Lehrman, Lehrman & Flom*,
601 N.W.2d 179 (Minn. 1999) ................................................................................ 32

**Statutes**

28 U.S.C. § 1334 ................................................................................................ 4

**Other Authorities**

3A Collier on Bankruptcy, § 63.30 ................................................................................ 9

Cayman Islands Companies Law § 2(1) ................................................................................ 37

Cayman Islands Companies Law § 147 ......................................................................... 37, 38, 40

**Rules**

Fed. R. Bankr. P. 7008 ................................................................................................ 1

Fed. R. Bankr. P. 7009 ................................................................................................ 1

Page(s)

Fed. R. Bankr. P. 7012 .................................................................................................... 1

Fed. R. Civ. P. 9 ............................................................................................................. 10

Fed. R. Civ. P. 44 ........................................................................................................... 39

Defendant DLA Piper LLP (US) ("**DLA**"), by its undersigned attorneys, respectfully submits this memorandum of law in support of its motion, pursuant to Rules 8(a), 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, made applicable here by Rules 7008, 7009, and 7012 of the Federal Rules of Bankruptcy Procedure, for an order dismissing with prejudice the complaint in the above-captioned adversary proceeding filed by Plaintiffs Strategic Credit Income Master Fund, Ltd. ("**SCIF Master**") and Strategic Credit Income Fund, Ltd. ("**SCIF Feeder**") (together, the "**Funds**") and Hugh Dickson and Stephen Akers, in their capacities as the Funds' Foreign Representatives and Joint Official Liquidators (all four together, "**Plaintiffs**").

## PRELIMINARY STATEMENT

This is an aiding and abetting case, not a legal malpractice case, against the law firm of DLA. As such, Plaintiffs must plead facts showing ***actual knowledge*** of the alleged underlying fraud and breach of fiduciary duty and ***knowing*** substantial assistance in that fraud and breach. Nothing of the sort has been pled beyond rhetoric and conclusions because nothing of the sort happened. Moreover, as a matter of law, DLA cannot be liable for aiding and abetting the alleged underlying misconduct that has been pled in the Complaint because, under the well-established doctrine of *in pari delicto,* that misconduct is imputed to Plaintiffs as a matter of law.

Plaintiffs' claims focus on the transfer of $36.5 million from SCIF Master to pay margin calls in a structured transaction involving mortgage-backed securities in which Plaintiffs SCIF Master and SCIF Feeder were significant investors ("**CDO Transaction**"). Absent those margin payments, there would have been an Event of Default in the CDO Transaction; the underlying collateral would have been seized and sold; and, consequently, in October 2008 Plaintiffs and the other investors in the CDO Transaction would have lost tens of millions of dollars of their investment.

Plaintiffs allege that SCIF Master's $36.5 million payments were not authorized but instead were stolen by ICP Asset Management LLC ("**ICP**") and its principal Thomas C. Priore, which, it is

further alleged, together completely controlled both SCIF Master and SCIF Feeder. Plaintiffs seek to hold DLA responsible for this alleged misconduct as a deep pocket. However, the Complaint *admits* that DLA had *no role whatsoever* in this purported theft from SCIF Master; had *no knowledge* that the $36.5 million allegedly was stolen; and *never represented* the Funds as their attorneys. DLA's *only* role was in providing basic transactional legal services in connection with the CDO Transaction for its clients Triaxx Funding High Grade I, Ltd. ("**Triaxx**") and ICP. The Complaint's factual allegations make clear that, in providing those services, DLA believed SCIF Master's payments were permitted under the CDO Transaction structure and would be repaid when market conditions improved. In other words, DLA did not know of any alleged misconduct by ICP and Priore, much less knowingly assist such alleged misconduct.

In view of the foregoing, Plaintiffs' claims are incurably flawed for myriad independent reasons. Most fundamentally, all of Plaintiffs' claims are completely barred by the doctrine of *in pari delicto* and the *Wagoner* rule, which preclude wrongdoers and their successors in interest from bringing claims arising out of their own misconduct. The alleged misconduct here is imputed to Plaintiffs as a matter of law because the Complaint establishes that Priore and ICP were vested with unfettered discretion over the Plaintiff Funds' investment activities, and the Plaintiff Joint Official Liquidators stand in the Funds' shoes.

Plaintiffs' Complaint acknowledges that *in pari delicto* applies and thus attempts to avoid the consequences of imputation by invoking the limited exceptions to *in pari delicto*. But none of these exceptions applies. The "adverse interest" exception does not apply as a matter of law because the Complaint concedes that the alleged misconduct *benefitted* the Funds in several ways, including by bringing money directly into the Funds' coffers and avoiding an Event of Default in the CDO Transaction that would have wiped out the Funds' investment. Even if the adverse interest exception did apply, it would be negated by the "sole actor" rule because the Complaint also admits that ICP

and Priore had full and unfettered discretion over the Funds' investment decisions and were the Funds' sole agents. Finally, Plaintiffs cannot invoke the "innocent insider" exception because (a) this exception *only* comes into to play if the adverse interest exception applies (it does not) *and* the sole actor rule does not apply (it does), and (b) the Complaint fails to identify any innocent insiders who had actual power to prevent the alleged misconduct.

Independent of *in pari delicto*, the Complaint fails because Plaintiffs come nowhere close to pleading the requisite elements of their aiding and abetting claims under the strictures of FRCP 9(b). *First*, leaving aside the Complaint's failure to plead an underlying fraud or breach of fiduciary duty with the required particularity, Plaintiffs utterly fail to plead facts demonstrating that DLA had actual knowledge of ICP's and Priore's alleged misconduct. Plaintiffs' knowledge allegations are nothing more than conclusory assertions unsupported by any specific facts and mere "should have known" allegations that fail to meet New York's rigorous "actual knowledge" test. Indeed, the Complaint's factual allegations make clear that, far from knowing of the alleged misconduct, at all relevant times DLA believed—based on what ICP, Priore and others had told it—that (1) SCIF Master's payments were loans; (2) those loans were permissible under the CDO Transaction's structure; (3) there was a mechanism imbedded in that transactional structure for SCIF Master to be repaid; and (4) no party to the CDO Transaction believed it was improper for SCIF Master to make the margin payments.

*Second*, Plaintiffs do not plead "substantial assistance" by DLA in the alleged misconduct. To the contrary, the Complaint makes clear that DLA did nothing more than provide routine transactional counsel services with respect to the CDO Transaction, which as a matter of law never can be "substantial assistance." Fatally, the Complaint admits that DLA played *no role at all in the central event* of the alleged misconduct—ICP's and Priore's purported theft of $36.5 million from SCIF Master—because ICP and Priore alone caused that theft. DLA never interacted with anyone from the Funds nor took any steps to effect the actual transfers from SCIF Master's bank account.

For this reason, nothing DLA did could have proximately caused Plaintiffs' alleged harm here, an independent failing of the aiding and abetting claims.

Finally, Plaintiffs' Cayman law claim cannot be pursued in this Court under principles of comity, and it otherwise fails for the same reasons the aiding and abetting claims fail as noted above. Accordingly, this Motion should be granted, and the Complaint should be dismissed with prejudice.

## PROCEDURAL HISTORY

On June 28, 2013, Plaintiffs filed a verified petition in this Court pursuant to Chapter 15 of the United States Bankruptcy Code seeking recognition of the Funds' liquidation proceedings pending in the Grand Court of the Cayman Islands (the "**Chapter 15 Proceeding**").  (ECF No. 3.)[1] On August 8, 2013, the Court entered an order granting recognition to the Cayman Islands liquidation of the Funds as a foreign main proceeding.  (ECF No. 17.)

On December 6, 2013, Plaintiffs filed this action against DLA in New York State Supreme Court, and on January 17, 2014, pursuant to 28 U.S.C. § 1334(b), DLA removed to federal court. (*See ICP Strategic Credit Income Master Fund Ltd. et al. v. DLA Piper LLP (US)*, 14-cv-351 (AKH) (S.D.N.Y.), ECF No. 1 & Ex. A ("**Compl.**").)[2]

## BRIEF STATEMENT OF FACTS[3]

### I.     BACKGROUND OF THE CDO TRANSACTION

DLA represented Triaxx and ICP, in its role as Triaxx's collateral manager, in the CDO Transaction.  (Compl. ¶ 43.)  Triaxx was the issuer of certain collateralized debt obligations consisting of residential mortgage-backed securities in the CDO Transaction in which the Funds,

---

[1]   All references to "ECF" are to the ECF in the Chapter 15 Proceeding unless otherwise indicated.

[2]   As of the date DLA served this Motion on Plaintiffs, the instant action had not yet been referred to this Court.

[3]   The facts set forth herein are taken from the Complaint, documents referenced therein, and other documents subject to judicial notice.  For purposes of this Motion only, and consistent with the applicable standard of review, DLA accepts the Complaint's well-pled factual allegations as true.  Nevertheless, if this case proceeds past this Motion (it should not), DLA will vigorously dispute and prove utterly false the Complaint's allegations and characterizations.

among others, were investors.  (*Id.* ¶ 2.)  As the collateral manager to Triaxx in connection with the CDO Transaction, ICP was responsible for running Triaxx's day-to-day business.  (*Id.* ¶ 1.)  Priore served as ICP's President, Chief Executive Officer, and senior portfolio manager.  (*Id.* ¶ 34.)

In 2007, Triaxx entered into a Master Repurchase Agreement ("**MRA**") with Barclays Bank PLC ("**Barclays**").  (*Id.* ¶ 31.)  Pursuant to the MRA, Barclays provided Triaxx with financing in exchange for collateral provided by Triaxx; that collateral was a portfolio of residential mortgage-backed securities related to the CDO Transaction ("**Collateral**").  (*Id.*)

Under the MRA, Barclays regularly "marked to market" the value of the Collateral.  (*Id.*)  If the value of the Collateral dropped below a certain level, Barclays issued a "margin call" requiring Triaxx to post additional collateral.  (*Id.*)  If Triaxx failed to meet a margin call, Barclays could declare an "Event of Default" and seize the Collateral and sell it to satisfy Triaxx's obligations under the MRA, effectively ending the CDO Transaction.  (*Id.*)  Conversely, if the value of the Collateral increased above a certain point, Barclays would transfer money—known under the MRA as "margin excess" funds—to Triaxx.  (*Id.*)

Starting in late 2007, ICP and Priore periodically caused Triaxx to meet Barclays's margin calls in different ways.  (*See id.* ¶ 40.)  For example, in November 2007, ICP structured a transaction whereby certain existing Triaxx noteholders purchased "Designated Senior Counterparty Credit Enhancement Notes" ("**CENs**"), the proceeds of which then were used to satisfy Barclays's margin calls.  (*See id*. ¶ 41.)  There is no allegation that DLA had anything to do with the CENs.

## II.     OCTOBER 2008 MARGIN CALL AND PAYMENT BY SCIF MASTER

In October 2008, Barclays issued a margin call that Triaxx was unable to pay using processes ICP previously had employed.  (*See id*. ¶¶ 40-42.)  ICP could no longer use CENs to satisfy the margin calls and, because of the declining market conditions that existed in late 2008, was not able to raise sufficient funds by selling Triaxx-issued bonds on the open market.  (*Id.*)

Accordingly, to address the October 2008 margin call, which threatened the funds of myriad investors (including the Plaintiff Funds), on October 28, 2008 ICP asked DLA, and specifically attorney Lucien White, whether it was possible for Triaxx's margin payment to be made by an entity ***other*** than Triaxx, *i.e.*, a payment that was "not part of the deal structure." (*Id.* ¶¶ 43-44.) Contrary to Plaintiffs' conclusory (and false) rhetoric (*e.g.*, "White's plan" (*id.*)), the Complaint concedes that it was ICP who first raised this possibility, ***not*** DLA. (*Id.*) White responded to ICP that, based on his review of the CDO Transaction documents, ICP's proposed business solution was not specifically addressed by the deal documents, and thus it was not forbidden; therefore, in White's legal judgment, a third party could make the margin payment. (Transcript of Deposition of L. White, dated May 6, 2010 at 6 (cited in Compl. ¶¶ 102-05; attached as Exhibit A to the Appendix of Documents Cited in the Complaint and Foreign Authorities Submitted with Motion to Dismiss the Complaint filed herewith ("**Appendix**")); *see also* Oct. 28, 2008 email ("it should work") (cited in Compl. ¶ 44; Appendix, Ex. B).)[4]

The next day, October 29, 2008, White conveyed to Barclays's counsel at Cadwalader, Wickersham & Taft ("**Cadwalader**") ICP's potential business solution for satisfying the October 2008 margin call. Specifically, White conveyed to Cadwalader ICP's proposal that "an icp affiliate post the cash [for the margin payment] in lieu of Triaxx Funding doing it." (Compl. ¶ 45.) Despite

---

[4] In ruling on a motion to dismiss, the Court may consider the facts contained in documents incorporated into the complaint by reference. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004). The Court also may consider documents "upon which [the complaint] solely relies and which [are] integral to the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks, citation and emphasis omitted); *see also Grubin v. Rattet (In re Food Mgmt. Group, LLC)*, 380 B.R. 677, 690 (Bankr. S.D.N.Y. 2008) (holding that court may consider document that has "not been incorporated by reference where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint") (internal quotation omitted). As this Court previously explained in a case where the Court considered on a motion to dismiss, among other extrinsic documents, email communications among the parties that had been referenced in the complaint: "if the plaintiff purports to characterize . . . extrinsic matter in its complaint, . . . a moving defendant still may rely on that extrinsic matter in moving to dismiss, and the Court need not subject that defendant, and the Court system, to the additional expense and burden of considering that same matter later on a motion for summary judgment." *Highland Capital Mgmt., LP v. UBS Secs. LLC (In re Lyondell Chemical Co.)*, 491 B.R. 41, 50 n.48 (Bankr. S.D.N.Y. 2013). The nine documents included in the Appendix may be considered by the Court under these standards.

Plaintiffs' conclusory (and false) rhetoric here too,[5] the facts actually alleged in the Complaint confirm that White did ***not*** know at this time what entity this "icp affiliate" would be; that was a business decision ICP would make later on its own, and, as the Complaint further admits, it was only "***[a]fter*** [DLA] sen[t] the email to Barclays's counsel" that ICP told White for the first time that the margin payment would be made "from our Hedge Fund [SCIF Master]." (*Id.* ¶ 46 (emphasis added).)

ICP and Priore completely controlled SCIF Master (as well as SCIF Feeder). ICP was the Investment Manager for both Funds, and Priore served as the Funds' Executive Director and managed the Funds' day-to-day operations through ICP. (*See id.* ¶¶ 26-27, 34.) But DLA ***never*** represented the Funds (the only real Plaintiffs here), as Plaintiffs concede. (*Id.* ¶¶ 29, 101.) Nor, significantly, does the Complaint allege that DLA ever represented ICP in its capacity as the Funds' Investment Manager.

Barclays and its counsel at Cadwalader agreed to ICP's proposal to accept a margin payment from SCIF Master to satisfy the October 2008 margin call. On October 29, 2008, ICP caused SCIF Master to pay Barclays $7.2 million, thus avoiding a catastrophic Event of Default. (*Id.* ¶ 47.)

This payment by SCIF Master ***furthered*** both Funds' (*i.e.*, Plaintiffs') interests. As the Complaint repeatedly admits, the Funds were heavily invested in the CDO Transaction and therefore had a very strong interest in ensuring that Barclays did not declare an Event of Default that would have wiped out their sizeable position. (*Id.* ¶¶ 3, 33 ("SCIF Master purchased ***tens of millions of dollars*** in various tranches of Triaxx Funding 'mezzanine notes'" and "approximately ***50% of the SCIF Funds' net asset value*** was invested in Triaxx Funding") (emphasis added).) Thus, it was in

---

[5]  *E.g.*, White "told them that they could use money from the SCIF Funds to pay Triaxx Funding's margin obligations" and "White, Priore and ICP agreed to use SCIF Master's assets." (Compl. ¶¶ 5, 10.) As this Court has explained, "[w]here general conclusory allegations are belied by more specific allegations of the complaint, they cannot be credited by the Court." *In re Magnesium*, 399 B.R. 722, 768 (Bankr. S.D.N.Y. 2009) (quotations and citation omitted).

both Funds' interests to make sure that Barclays's October 2008 margin call was satisfied so that Barclays did not foreclose on the Collateral.

## III.    ALL PARTIES UNDERSTOOD SCIF MASTER'S PAYMENTS WERE LOANS

From the very beginning, it was understood by all parties to the CDO Transaction that SCIF Master's margin payments were intended to be loans. As the Complaint concedes, on October 29, 2008, White told Barclays that there would be "a short letter agt between Barclays and the funder of the cash." (*Id*. ¶ 45.) On October 31, 2008, "White sent Barclays a draft letter agreement between SCIF Master and Barclays" memorializing the terms of the loan. (*Id.* ¶ 56.)

On November 5, 2008, Barclays informed DLA that it would not execute the draft agreement White had sent (*id.* ¶ 57), but that did ***not*** mean Barclays ceased to understand that SCIF Master's margin payments were loans. To the contrary, Barclays ***confirmed*** the existence of a loan by proposing an alternative mechanism for repayment of SCIF Master. (*Id.* ¶ 104 ("Barclays subsequently said we're not signing that document and a different method of repayment was discussed . . . [t]he mechanics of the repayment are what became different.").)

In the same conversation in which Barclays stated that it would not sign the draft agreement, Barclays's counsel at Cadwalader proposed to White that (1) when "margin excess" developed due to Collateral appreciation, Barclays would transfer the margin excess funds to Triaxx (as Barclays already was required to do under the MRA); and then (2) ICP would direct LaSalle, as trustee for Triaxx, to transfer those margin excess funds to SCIF Master to repay the loan (as ICP was authorized to do under the MRA). (*Id.* ¶¶ 103-04 (referencing "the suggestion by [Barclays's counsel] that a transfer of these funds from Barclays to the issuer could be then subsequently transferred pursuant to an instruction from the collateral manager to SCIF"); Nov. 5, 2008 email (cited in Compl. ¶ 57; Appendix, Ex. C).) Thus, Barclays made clear to DLA and ICP on November

5, 2008 that it continued to understand that SCIF Master's margin payments were loans.[6]

White told ICP that in his judgment Barclays's alternative proposal for how the loan would be repaid was a workable solution under the CDO Transaction structure. (Nov. 5, 2008 email (cited in Compl. ¶ 57; Appendix, Ex. C).) ICP agreed, and pursuant to this agreement, ICP subsequently made the business decision to cause SCIF Master to fund an additional nine margin payments to Barclays for a total of $36.5 million. (Compl. ¶ 111.) DLA's role in connection with those nine additional payments was limited: ICP would inform White that Barclays had issued a margin call and that SCIF Master was going to loan funds to pay that margin call; White would prepare the form paperwork required by the CDO Transaction documents; and, without any involvement by DLA or White, ICP would cause SCIF Master to transfer the funds to Barclays. (*See, e.g.*, *id.* ¶¶ 59-61, 63-65, 67-70.)

The CDO Transaction continued until early 2010. At that time, Barclays declared an Event of Default and subsequently foreclosed on the Triaxx Collateral. (*Id.* ¶ 114.)

## IV.    SEC'S AND PLAINTIFFS' LAWSUITS AGAINST ICP AND PRIORE

On June 21, 2010, the SEC filed a civil suit against ICP and Priore for alleged misconduct relating to the CDO Transaction. (ECF No. 4, Ex. E (June 30, 2011 Amended Complaint and Sept. 6, 2012 Judgment in SEC proceedings).) The SEC did ***not*** institute (and to this day has not instituted) proceedings against DLA or White. In September 2012, defendants in the SEC action consented to entry of judgment without admitting or denying any of the SEC's allegations. (*Id.*)

---

[6]  Plaintiffs suggest that this arrangement "was far from a loan" because the Funds would be repaid "only if the market turned around." (Compl. ¶ 56.) But Plaintiffs do not and cannot deny that a loan or other debt that is contingent on the occurrence of some future event—which was exactly what Barclays described—is still valid debt, even if that future event is not certain to occur. *See In re Manville Forest Products Corp.*, 225 B.R. 862, 865-66 (Bankr. S.D.N.Y. 1998) (under Bankruptcy Code "all legal obligations of the debtor" include "contingent and unmatured rights of payment") (quotations and citation omitted), *aff'd*, 209 F.3d 125 (2d Cir. 2000); *Allen Morris Commercial Real Estate Servs. Co. v. Numismatic Collectors Guild, Inc.*, 1993 WL 183771, at *8 (S.D.N.Y. May 27, 1993) (under New York's Debtor and Creditor Law "[a] debt includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent") (quotations and citation omitted); 3A Collier on Bankruptcy, § 63.30, p. 1912.1 ("A 'contingent' obligation includes 'all debts that, either as to their existence or as to their amount, depend upon some future event uncertain either as to its occurrence altogether or as to the time of the occurrence.'").

On February 8, 2012, Plaintiffs filed a lawsuit against Priore, ICP, and Triaxx in New York State Supreme Court.  (ECF No. 4, Ex. F (state court complaint).)  In that action, Plaintiffs assert three claims:  breach of fiduciary duty against Priore; breach of contract against ICP; and unjust enrichment against Triaxx.  (*Id.* ¶¶ 63-85.)  Importantly, Plaintiffs have ***not*** sued ICP for breach of fiduciary duty; nor have they sued ***any*** defendant in that action for fraud, despite attempting in the instant case to hold DLA liable for aiding and abetting ICP's purported breach of fiduciary duty and both ICP's and Priore's purported fraud.[7]

## ARGUMENT

## I.      STANDARDS ON A MOTION TO DISMISS

To survive a motion to dismiss, a complaint must contain "allegations plausibly suggesting (not merely consistent with)" an "entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).  Unless a complaint "raise[s] a right to relief above the speculative level," it should be dismissed.  *Id.* at 555.  Thus, a complaint must contain more than "[c]onclusory allegations or legal conclusions masquerading as factual conclusions," or it "will not suffice to [defeat] a motion to dismiss."  *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 191 (2d Cir. 2010), *aff'd*, 133 S. Ct. 1659 (2013).

Further, Plaintiffs' claims here must do much more than meet just those exacting FRCP Rule 8 standards; they also must satisfy the heightened pleading requirements of FRCP Rule 9(b), made applicable here through Federal Rule of Bankruptcy Procedure 7009.  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with ***particularity*** the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b) (emphasis added).  Rule 9(b) applies to claims of aiding and abetting fraud, *Lerner v. Fleet Bank, N.A.*, 459 F.3d 272, 292-93 (2d Cir. 2006), as well as "any claim that

---

[7]  As set forth in the Request for Judicial notice filed concurrently herewith, the Court can take judicial notice of both the pleadings from the SEC proceedings and Plaintiffs' state court complaint because (1) all of these documents already have been filed with the Court and (2) they also are pleadings on file in other courts.

'sounds in fraud,' regardless of whether fraud is an element of claim," including claims like Plaintiffs' Cayman law claim and claims for aiding and abetting breach of fiduciary duty. *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251-52 (S.D.N.Y. 2008) (holding Rule 9(b) applied to claim against attorney for aiding and abetting breach of fiduciary duty).

## II. ALL OF PLAINTIFFS' CLAIMS ARE BARRED UNDER THE *IN PARI DELICTO* DOCTRINE AND THE *WAGONER* RULE

One reason Plaintiffs' Complaint fails is simply that, under the doctrine of *in pari delicto* and the *Wagoner* rule, Plaintiffs cannot sue DLA for aiding and abetting ICP's and Priore's alleged misconduct[8] because the law holds ***Plaintiffs themselves*** responsible for those wrongful acts.

### A. The *In Pari Delicto* Doctrine And The *Wagoner* Rule

The doctrine of *in pari delicto* prevents a party from suing others for a wrong in which the party participated or is deemed through imputation to have participated. *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir. 1990); *Kirschner v. KPMG, LLP*, 15 N.Y.3d 446, 464 (2010), *answer to certified question conformed to Kirschner v. KPMG, LLP*, 626 F.3d 673 (2d Cir. 2010). *In pari delicto* "is grounded on two premises: first, that the courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985). "This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945).

Under the *Wagoner* rule, *in pari delicto* applies equally to certain successors in interest of

---

[8] As discussed *infra* pp. 21-36, the Complaint does not plead ICP's and Priore's alleged fraud and breaches of fiduciary duty with the required particularity, which independently requires dismissal of Plaintiffs' claims. But even assuming the Complaint did adequately plead the alleged misconduct, Plaintiffs' claims are barred by *in pari delicto* as demonstrated below.

wrongdoers, including bankruptcy trustees and foreign liquidators, who stand "in the shoes of the bankrupt corporation" and can only maintain those actions "that the corporation could have instituted prior to filing its petition for bankruptcy proceeding." *In re Mediators, Inc.*, 105 F.3d 822, 825-26 (2d Cir. 1997). Thus, for example, "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage." *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (trustee not permitted to assert aiding and abetting claim against third party); *accord Kirschner*, 15 N.Y.3d at 477.

**B.  Priore's And ICP's Alleged Misconduct Is Imputed To Plaintiffs And Bars Any Recovery**

Any alleged misconduct by Priore or ICP is imputed to all four Plaintiffs here, which means that *in pari delicto* bars all of their claims against DLA arising from that misconduct. As to the Plaintiff Funds themselves, it is well-established that "acts—including fraudulent ones—committed by corporate agents [here, ICP and Priore] acting with the scope of their authority are ***presumptively*** imputed to their principals [here, the Plaintiff Funds]" and the principals are bound by such conduct. *Concord Capital Mgmt., LLC v. Fifth Third Bank*, 2011 WL 10564345, at \*7 (Sup. Ct. N.Y. Cty. Dec. 1, 2011) (emphasis added, internal quotations and citations omitted), *aff'd*, 102 A.D.3d 406 (1st Dep't 2013), *lv to appeal denied*, 21 N.Y.3d 851 (2013); *see also Kirschner*, 15 N.Y.3d at 465 ("imputation is the 'general rule'" in *in pari delicto* analysis) (internal quotation omitted).

Plaintiffs repeatedly admit that Priore and ICP were the Funds' agents and managers and that in those capacities Priore and ICP engaged in the misconduct alleged here. (*See, e.g.*, Compl. ¶¶ 1, 6, 8-9, 11-14, 16, 18, 26-28, 35-42, 50, 55, 68-69, 90, 95, 101, 107, 109-14, 123(a)-(e), 129(a)-(e), 134.) Plaintiffs admitted the same facts in their separate lawsuit against Priore and ICP. (ECF No. 4, Ex. F ¶¶ 2-3.) Therefore, because Priore and ICP committed the purported fraud and breaches of fiduciary duty alleged here while managing the business of the Plaintiff Funds, ***all*** of that alleged misconduct is imputed to the Funds. *Cobalt Multifamily Investors I, LLC v. Arden*, 857 F. Supp. 2d 349, 364

(S.D.N.Y. 2011) ("New York law recognizes that when a corporation's managers act within the scope of their employment, their actions may generally be imputed to the corporation."); *Bullmore v. Ernst & Young Cayman Is.*, 20 Misc.3d 667, 672 (Sup. Ct. N.Y. Cty. 2008) ("[T]he investment managers' alleged wrongdoing is imputable to the Fund based on agency principles.").

Priore's and ICP's misconduct likewise is imputed to the other Plaintiffs here—the Funds' Joint Official Liquidators—because they stand in the Funds' shoes. As this Court has explained:

> *Wagoner* and its progeny, applying what is in substance a rule of agency law . . . , impute the wrongful conduct of predecessor management to the corporation itself ***and then to the bankruptcy trustee or other estate representative***. Even if (as is normally the case), the trustee did nothing wrong, and is instead an innocent fiduciary trying to recover for the injured corporation . . . , former management's imputed misconduct gives rise to an *in pari delicto* defense.

*In re Magnesium*, 399 B.R. 722, 761-62, 768-69 (Bankr. S.D.N.Y. 2009) (emphasis added) (granting motion to dismiss; "Under existing *Wagoner* Rule doctrine, which the Court is bound to follow, the Trustee lacks standing under the *Wagoner* Rule, and is also barred by principles of *in pari delicto* from asserting claims against the Outsider Defendants."). *See also Breeden v. Kirkpatrick & Lockhart, LLP (In re Bennett Funding Grp., Inc.)*, 268 B.R. 708, 709 (S.D.N.Y. 2001) ("Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in."), *aff'd*, 336 F.3d 94 (2d Cir. 2003).

Courts in this Circuit regularly apply these principles at the pleading stage to bar debtor companies like the Funds and the trustees and liquidators standing in their shoes from asserting claims against third parties like DLA for allegedly assisting in misconduct where, as here, the complaint admits that corporate management actively participated in that same misconduct. *See, e.g.*, *In re Bernard Madoff Inv. Secs., LLC*, 721 F.3d 54, 64 (2d Cir. 2013) ("***BLMIS***") (affirming dismissal based on *in pari delicto* and *Wagoner* rule of trustee's claims for, *inter alia*, aiding and abetting breach of fiduciary duty and fraud); *Kirschner v. KPMG, LLP*, 626 F.3d 673, 674 (2d Cir.

2010) (affirming dismissal of trustee's claims because insider's misconduct was imputed to trustee pursuant to *Wagoner* rule); *In re Mediators*, 105 F.3d at 825-27 (affirming dismissal of creditor committee's aiding and abetting claims against law firm and accountants based on *Wagoner* rule). Consistent with these numerous authorities, this Court too should dismiss all of Plaintiffs' claims.

## C. The Limited Exceptions To Imputation Are Inapplicable Here And Cannot Defeat The Absolute *In Pari Delicto* Bar To Plaintiffs' Claims

Obviously recognizing that *in pari delicto* is fatal to their claims, Plaintiffs attempt to plead around the doctrine through conclusory allegations designed to invoke certain very limited exceptions to imputation. (*See, e.g.*, Compl. ¶¶ 27, 116-19.) None of those exceptions is applicable here.

### 1. The Adverse Interest Exception Is Inapplicable

The adverse interest exception to imputation applies ***only*** when the guilty manager has "***totally abandoned***" the interests of the corporation. *In re Mediators*, 105 F.3d at 827 (emphasis added). This is the "***most narrow of exceptions*** . . . reserved for cases of outright theft or looting or embezzlement," and courts in the Second Circuit require an extraordinarily heightened standard of self-dealing before they will apply it. *BLMIS*, 721 F.3d at 64 (quotations and citation omitted); *see also In re Cal. TD Inv. LLC*, 489 B.R. 124, 130 (Bankr. C.D. Cal. 2013) (describing New York's requirement "that the agent has 'totally abandoned' the principal's interests" as a "heightened standard of self-dealing" compared to California and Ninth Circuit law).

As long as the corporation received ***some benefit*** from the manager's misconduct, the adverse interest exception does ***not*** apply, regardless of how small the benefit to the corporation or how great the benefit to the manager; ***and***, this is so ***even if*** the primary motivation for the manager's acts was inimical to the corporation. *Concord Capital Mgmt.*, 2011 WL 10564345, at *7 ("[I]f a fraud brings money into the company's own coffers, the adverse interest exception is unavailable, irrespective of whether the benefit to the agent is great and the benefit to the company is small."); *Bullmore*, 20 Misc.3d, at 672 ("[W]here a corporation benefits to any extent from the alleged wrongful acts of its

14

agents, the agents cannot be said to have 'totally' abandoned the interests of the corporation.").

Plaintiffs' one-paragraph attempt to invoke this "most of narrow of exceptions" falls well short of this exacting requirement for two independent reasons. (*See* Compl. ¶ 116.) *First*, the Complaint makes clear that Priore's and ICP's alleged misconduct actually conferred several ***benefits*** on the Funds. This fact conclusively defeats any argument that the adverse interest exception could apply here. *See, e.g.*, *Cobalt Multifamily Investors*, 857 F. Supp. 2d at 364 (adverse interest exception did not apply where agents' "offer and sale of unregistered securities, though ultimately intended for their personal gain, clearly enriched the Cobalt entities as well").

Initially, Plaintiffs admit that SCIF Master's margin payments enabled Triaxx to make quarterly interest payments to its Noteholders, ***which included the Funds***. (*See* Compl. ¶¶ 1, 9.) *See Concord Capital Mgmt.*, 2011 WL 10564345, at *7 (granting motion to dismiss and holding "it is clear that Concord's top executives did not 'totally' abandon the interests of the company" where complaint admitted that the alleged misconduct brought money into the company; "Concord itself benefitted from the Insiders' fraudulent activity, as a result of the substantial fees it received."). The fact that Priore and ICP also benefitted from the alleged misconduct by obtaining additional management fees (Compl. ¶ 5) is irrelevant and cannot constitute "total abandonment" in the face of this unquestionable benefit to the Funds. *Bullmore*, 20 Misc.3d, at 672 ("The JOL point out that the investment managers personally stood to benefit from higher valuations, insofar as every dollar invested in the Fund translated into higher management incentive fees for themselves. Nonetheless, where a corporation benefits to any extent from the alleged wrongful acts of its agents, the agents cannot be said to have 'totally' abandoned the corporation's interests.").

Plaintiffs also admit that "[i]n the event that Triaxx Funding failed to make a required margin payment, Barclays could foreclose and liquidate the collateral." (Compl. ¶ 31; *see also id.* ¶ 2.) Thus, by causing SCIF Master to make margin payments on Triaxx's behalf, thereby avoiding

liquidation of the Collateral, ICP and Priore clearly conferred a benefit on the Funds, which had

invested "approximately 50% of [their] net asset value . . . in Triaxx Funding," including by

"purchas[ing] tens of millions of dollars in various tranches of Triaxx Funding 'mezzanine' notes."

(*Id.* ¶¶ 3, 33.)  Without SCIF Master's margin payments, the Funds (and all other Triaxx

Noteholders) would have suffered tremendous losses when Barclays declared an Event of Default and

foreclosed on the Collateral.  *Concord Capital Mgmt.*, 2011 WL 10564345, at *8 ("[S]o long as the

corporate wrongdoer's fraudulent conduct enables the business to survive, even where the fraud can

be said to have caused the company's ultimate bankruptcy, it does not follow that the insiders 'totally

abandoned' the company.") (quotations, citation and alteration omitted); *Bullmore*, 20 Misc.3d, at

671 ("it is readily apparent that the Fund stood to receive some degree of financial benefit on account

of the investment managers' alleged wrongdoing, that is reflected in the JOL's allegations").[9]

This clear benefit to the Funds is spelled out in black and white in a contemporaneous email

in May 2009 that is cited in the Complaint:

> You have also indicated to us that, absent these advances [by SCIF Master], there was
> a substantial likelihood that Barclays would have declared an Event of Default . . . ,
> triggering liquidation of the collateral by Barclays, possibly leaving the Noteholders,
> particularly the junior noteholders, with a principal shortfall.  Because of these facts,
> ***you have indicated that it was ICP AM's good faith judgment that ICP SCIMF's
> making of these advances was in the best interests of the Senior Counterparties and
> the Noteholders***.

(May 21, 2009 email (cited in Compl. ¶ 85; Appendix, Ex. D) (emphasis added).)

*Second*, and independently, Plaintiffs do not allege **any** facts showing that Priore and ICP

looted the Funds for personal gain, engaged in pure self-dealing, or otherwise "totally abandoned" the

Funds' interests.  The Complaint alleges only (and conclusorily) that Priore and ICP "(i) placed their

---

[9]  While Barclays did eventually foreclose on the Collateral a year and a half after SCIF Master's first margin payment,
that future event is irrelevant to the analysis here.  The benefit to the Funds must be analyzed by the facts as they
existed contemporaneously, ***not*** through impermissible hindsight.  *See Kirschner*, 15 N.Y.3d at 468 ("[T]he mere fact
that a corporation is forced to file for bankruptcy does not determine whether its agents' conduct was, at the time it
was committed, adverse to the company.").

own interests, or the interests of Triaxx Funding, ahead of the SCIF Funds' interests; [and] (ii) acted in their own best interests to the detriment of the SCIF Fund." (Compl. ¶ 116.) This is ***not*** the same as pleading ***facts*** demonstrating that ICP and Priore ***totally abandoned*** the Funds' interests (as opposed to merely subordinating those interests).

In sum, Plaintiffs admit that ICP's and Priore's alleged misconduct benefitted the Funds in several ways, and, as well, the Complaint fails to allege facts demonstrating that ICP and Priore totally abandoned the Funds' interests. Therefore, the adverse interest exception to imputation cannot apply here for these alternative reasons, and *in pari delicto* bars Plaintiffs' claims.

## 2. Even If The Adverse Interest Exception Is Applied, It Is Negated By The Sole Actor Rule

Even assuming Plaintiffs somehow could establish that ICP and Priore engaged in pure self-dealing that conferred no benefit on the Funds in order to invoke the adverse interest exception (they cannot), the "sole actor rule" nevertheless prohibits application of the adverse interest exception here, and thus *in pari delicto* still bars Plaintiffs' claims. Where, as here, the agent completely controls the corporation, then the corporation and the agent are considered to be "one and the same," and the sole actor rule ***negates*** the adverse interest exception (thus once again making *in pari delicto* applicable)—meaning that even pure self-dealing conduct without any benefit to the Funds (which undisputedly is not the case here) still is imputed to the principal. *BLMIS*, 721 F.3d at 64 n.14; *In re Mediators*, 105 F.3d at 827 (sole actor rule applied where agent was corporation's "sole . . . decision-maker, and therefore whatever decisions he made were, by definition, authorized by, and made on behalf of, the corporation") (quotations omitted). It is axiomatic that "if an agent is the sole representative of a principal, then the agent's fraudulent conduct is imputable to the principal ***regardless of whether the agent's conduct was adverse to the principal's interest***." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 359 (3d Cir. 2001) (emphasis added); *see also BLMIS*, 721 F.3d at 64 n.14 (sole actor rule "'imputes the agent's knowledge to the principal

notwithstanding the agent's self-dealing'") (quoting *In re Mediators*, 105 F.3d at 827).

The Complaint and documents cited in it establish that Priore and ICP (which Priore controlled) were the sole actor and decision-maker on behalf of the Funds when it came to how the Funds' assets were managed. (*See, e.g.*, Compl. ¶¶ 26-27, 34.) Indeed, the Funds **expressly granted** this status to Priore and ICP in writing, giving them full and unfettered discretion over the Funds' day-to-day investment activities. "ICP served as SCIF Master's investment manager" (*id.* ¶ 26), and as set forth in the Funds' respective Offering Memoranda:

> **The Board of Directors** has overall responsibility to manage the Fund, but **has delegated investment discretion over the Fund's assets to the Investment Manager** pursuant to the terms of Fund Investment Management Agreement . . . . **The Board of Directors is not responsible for the day-to-day conduct of the Fund's trading activities**.

(Offering Memoranda at 68 (cited in Compl. ¶ 25; Appendix, Ex. E) (emphasis added).

As a result, the sole actor rule applies, and Plaintiffs cannot avoid imputation of Priore's and ICP's alleged misconduct by relying on the adverse interest exception (which is inapplicable in any event for the reasons noted above). *See Breeden*, 268 B.R. at 709 ("The sole actor rule applies where . . . the corporation bestows upon its agent unfettered control and allows the agent to operate without meaningful supervision with respect to a particular type of transaction.") (citations omitted); *Bullmore*, 20 Misc.3d at 676-77 ("[T]he investment managers *were* senior management: they effectively controlled every aspect of the Fund's operations, and for agency purposes, were the Fund's sole agents.") (emphasis in original).

### 3. Plaintiffs Cannot Defeat Imputation By Claiming Innocent Insiders Existed

Plaintiffs' attempt to invoke the "innocent insiders" exception to the sole actor rule similarly falls flat. (*See* Compl. ¶¶ 117-19.) At the outset, it is crucial to recognize that the innocent insiders exception **only** comes into play if the Court concludes (which it should not) **both** that (1) the adverse interest exception **does** apply, and (2) the sole actor rule does **not** apply. This is well-established

under New York law. *See, e.g.*, *In re Arbco Capital Mgmt., LLP*, 498 B.R. 32, 48 (Bankr. S.D.N.Y. 2013) (refusing to consider trustee's innocent insider argument after finding that adverse interest exception did not apply); *In re the 1031 Tax Group, LLC*, 420 B.R. 178, 203 (Bankr. S.D.N.Y. 2009) ("New York state cases do not recognize 'innocent insider' as an independent exception that stands alone from the adverse interest exception."); *In re Magnesium*, 399 B.R. at 767 n.150 (innocent insiders exception only "operates as an exception to the Adverse Interest Exception"). As demonstrated above, the adverse interest exception ***does not*** apply here, but even if it did, the sole actor rule ***does*** apply. Thus, there is no need even to consider the innocent insiders exception.

But ***even if*** the innocent insiders exception were potentially relevant (it is not), the Complaint utterly fails to plead the facts necessary to invoke it. This exception applies to avoid imputation ***only*** if Plaintiffs can plead facts demonstrating that there were actual corporate decision-makers at the Funds who were not involved in the wrongdoing ***and*** who had authority and the ability to stop it. *In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 101 (2d Cir. 2003) ; *see also In re Arbco*, 498 B.R. at 48 ("The touchstone of the innocent insider exception is control—whether the innocent person or persons inside the corporation had the power to stop the fraud."). The Complaint makes clear that no such decision-makers existed here.

Plaintiffs conclusorily contend that the Funds had two purportedly independent directors in the Cayman Islands; that "Priore and ICP concealed . . . their wrongdoing from these Independent Directors;" and that had the "Independent Directors learned of Priore's and ICP's fraud and breaches of fiduciary duty, they could have and would have taken actions to stop it." (Compl. ¶ 28.) But Plaintiffs fail to allege, as they must to invoke the innocent insiders exception, facts demonstrating what ***actual role*** the purportedly "Independent Directors" had in the Funds' business operations, much less ***how*** the Independent Directors somehow were capable of stopping the alleged wrongdoing. *See In re the 1031 Tax Group*, 420 B.R. at 205-06 (granting motion to dismiss and

rejecting "innocent insider" allegations contained in a "scant three paragraphs of the Complaint" because "while the Trustee has identified at least two purportedly innocent insiders, the Complaint does not indicate how these persons would have ended the fraud, or whether they had the power to do so" and "is barren of any factual allegations regarding their respective corporate powers or what earlier acts they could have taken to end the fraud").

As the Second Circuit has explained, purportedly innocent insiders must have a more than a merely "metaphysical" ability to stop the fraud for the exception to avoid imputation. *In re Bennett Funding*, 336 F.3d at 101. "[F]or the innocent insider exception to apply the insiders must have had ***actual power*** to stop the alleged fraud." *In re the 1031 Tax Group*, 420 B.R. at 205 (emphasis added; citation omitted); *see also In re Magnesium*, 399 B.R. at 767 & 768 n.158 (holding that "Trustee's allegations in the Complaint with a view to satisfying the innocent decision maker exception are conclusory and unsupported by any facts" such as the required allegations of "who was innocent and how the wrongful conduct could have been stopped").

Nor could Plaintiffs ever make the required factual allegations here, because as established above, Priore and ICP had ***full and unfettered*** discretion over the Funds' day-to-day investment activities. *See supra* pp. 17-18. The "Independent Directors" thus had no practical ability at all to stop Priore's and ICP's alleged misconduct relating to investment activities. Instead, just as in *In re Bennett Funding*, "each so-called independent director was impotent to actually do anything." 336 F.3d at 101. *See also Bullmore*, 20 Misc.3d at 673-75 (innocent insiders exception did not apply because "the investment managers exercised nearly unfettered control over the fund's day-to-day activities and operations," rendering the directors "passive corporate actors"). Plaintiffs, by alleging nothing more than what the Independent Directors theoretically might have done if they theoretically had power, "seem[] to believe that the *Wagoner* rule is defeated by a would-a, could-a, should-a test,

but that is simply not the law." *In re Bennett Funding*, 336 F.3d at 101.[10]

Accordingly, *in pari delicto* bars all of Plaintiffs' claims. DLA's Motion should be granted.

## III. PLAINTIFFS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING FRAUD OR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

Plaintiffs' aiding and abetting claims fail as a matter of law because Plaintiffs do not and

cannot plead *any*, much less all, of the required elements of either claim. To adequately plead a

claim for aiding and abetting fraud, Plaintiffs must allege particularized facts demonstrating: (1) an

underlying fraud; (2) actual knowledge of the fraud on the part of the aider and abettor; (3) that the

aider and abettor provided substantial assistance to advance the fraud's commission; and (4) that the

substantial assistance proximately caused the alleged harm. *Lerner*, 459 F.3d at 292. Similarly, to

plead a claim for aiding and abetting breach of fiduciary duty, Plaintiffs must allege specific facts

demonstrating: (1) an underlying breach of fiduciary duty; (2) the aider and abettor's knowing

participation in the breach; (3) substantial assistance in accomplishing the breach of duty; and

(4) proximate causation. *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003).

### A. Plaintiffs Do Not Plead An Underlying Fraud

Plaintiffs' fraud allegations are wholly deficient, providing an independent reason for

dismissal of the aiding and abetting fraud claim. The Complaint asserts conclusory allegations

regarding a purported "fraudulent scheme" (*see, e.g.*, Compl. ¶¶ 5-6, 9, 26), but it never pleads any

particularized *facts* establishing the existence of a fraud on the Funds. Among other failings, the

Complaint does not identify a single alleged misrepresentation made by ICP or Priore to the Funds,

---

[10]  Plaintiffs' conclusory allegations regarding the existence of purported "innocent investors" (Compl. ¶ 119) likewise
fail for the related though independent reason that Plaintiffs neither identify a single specific "innocent investor" nor,
crucially, explain how such innocent investors allegedly had such decision-making power that they "could and would
have taken action to stop the fraud on the SCIF Funds." (*Id.*) *See Breeden*, 268 B.R. at 710 (rejecting argument that
"the presence of *any* innocent officer, director, or shareholder avoids the imputation of fraudulent acts" because
"[o]nly management that exercises total control over the corporation—or that exercises total control over the type of
transactions involved in the particular fraudulent activity at issue—are relevant") (emphasis in original). While the
Complaint identifies three shareholders of SCIF Master, Plaintiffs admit that all three of those shareholders were
controlled by Priore, thus negating any alleged "innocence." (*See* Compl. ¶¶ 18, 34.)

much less a statement made with intent to defraud, nor reliance by the Funds on that statement.  *See*

*Kaufman*, 307 A.D.2d at 119.  This failure dooms the aiding and abetting fraud claim at the outset.

*See, e.g.*, *Art Capital Grp., LLC v. Neuhaus*, 70 A.D.3d 605, 607 (1st Dep't 2010) (dismissing claims

against attorney for aiding and abetting fraud where plaintiffs failed to allege any misrepresentations

and thus failed to plead underlying fraud); *Jana Master Fund, Ltd. v. JPMorgan Chase & Co.*, 19

Misc.3d 1106(A), at *5 (Sup. Ct. N.Y. Cty. 2008) (dismissing claim for aiding and abetting fraud

where allegations of an underlying fraud "have been pleaded in a conclusory fashion" only).

Notably, Plaintiffs have ***not*** asserted a fraud claim against either ICP or Priore in their

separate New York State action.  (*See* ECF No. 4, Ex. F.)  In other words, while Plaintiffs allege in

this case that DLA aided and abetting a fraud by ICP and Priore, they have not asserted a fraud claim

against those primary parties in the first instance.  This omission itself is fatal.  It also confirms that

Plaintiffs never could plead a claim for aiding and abetting fraud even if given leave to amend.[11]

### B.        Plaintiffs Do Not Plead An Underlying Breach Of Fiduciary Duty

Plaintiffs' claim that ICP and Priore breached fiduciary duties to the Funds rests ***entirely*** on

the unsupported assumption that somehow it was inherently improper for SCIF Master to loan money

to satisfy Triaxx's margin call obligations.  But Plaintiffs never explain ***how*** or ***why*** it is improper for

an investor (SCIF Master) in a complex transaction (the CDO Transaction) to make a business

decision to loan funds necessary to keep the transaction afloat and avoid an Event of Default that

would wipe out that investor's (SCIF Master's) substantial, multi-million dollar investment.

Certainly Plaintiffs never plead any ***facts*** demonstrating the supposed impropriety of the margin

---

[11]   Plaintiffs cannot satisfy their obligation to plead with particularity an underlying fraud by referencing the SEC's
complaint against Priore and ICP.  (*See, e.g.*, Compl. ¶ 15.)  The court in that case never made a finding of fraud as to
Priore or ICP, and the case was settled without any admission of wrongdoing.  (*See* ECF No. 4, Ex. E.)  Thus, the
SEC's unproven allegations provide no support for Plaintiffs and cannot be used to satisfy their high burden to plead
particularized factual allegations establishing an underlying fraud.  *Cf. Tot v. United States*, 319 U.S. 463, 466 (1943)
("An indictment charges the defendant with action or failure to act contrary to the law's command.  It does not
constitute proof of the commission of the offense.").  That is particularly so where Plaintiffs have not alleged any
fraud against Priore or ICP in their pending state court case.  (*See* ECF No. 4, Ex. F.)

payments.  At best, they attack the business judgment behind making these loans without a written, non-contingent right of repayment (*see* Compl. ¶¶ 56-58, 91), which does not establish a breach of fiduciary duty.  *See Ditlya v. Grinberg*, 36 Misc.3d 1233(A), at *3 (Sup. Ct. Kings Cty. 2012) (dismissing claims for breach of fiduciary duty where plaintiff failed to allege facts showing that transaction at issue "was made in bad faith or was not for a legitimate business purpose"); *see also North Fork Preserve, Inc. v. Kaplan*, 68 A.D.3d 732, 733 (2d Dep't 2009) (affirming dismissal of breach of fiduciary duty claims "based on the business judgment rule") (internal citations and quotations omitted).

Moreover, it is clear from the Complaint that SCIF Master's margin payments were ***not*** inherently improper.  For example, ***none*** of the parties to the CDO Transaction—including Barclays, its outside counsel at Cadwalader, LaSalle, its outside counsel at Alston & Bird, Bank of America (which became Trustee later in the CDO Transaction (*see* Compl. ¶ 32)), and DLA—exhibited any misgivings about the propriety of SCIF Master making the margin payments to avoid an Event of Default.  (*See id*. ¶¶ 6-7, 47-51, 53, 55.)  The fact that these six highly sophisticated parties each vetted and universally accepted the margin payments as appropriate under the CDO Transaction's structure stands in marked contrast to the Complaint's complete failure to allege any facts demonstrating that the payments were inherently improper.  Accordingly, not only were the loans ***not*** improper, as demonstrated *supra* pp. 8-9, 22-23, they actually benefitted the Funds in several ways.  The claim for aiding and abetting breach of fiduciary duty thus fails for lack of an underlying violation.  *See, e.g.*, *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 808 (2d Dep't 2011) (dismissing aiding and abetting claim where plaintiffs failed to plead underlying breach of fiduciary duty); *First Keystone Consultants, Inc. v. DDR Const. Servs.*, 74 A.D.3d 1135, 1137-38 (2d Dep't 2010) (same).

### C. Plaintiffs Do Not Allege Facts Reasonably Suggesting That DLA Had Actual Knowledge Of The Alleged Misconduct

Even if Plaintiffs had pled an underlying fraud or breach of fiduciary duty (they have not), the Complaint comes nowhere close to pleading specific facts demonstrating that DLA had "actual knowledge" of such misconduct. The pleading bar for actual knowledge is "a heavy one." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007), *reconsideration denied*, 2007 WL 1138866, at *1 (S.D.N.Y. Apr. 17, 2007). Plaintiffs must plead facts demonstrating that DLA ***actually knew*** that Priore and ICP allegedly were committing fraud or breaching their fiduciary duties. Allegations of mere constructive knowledge or recklessness, including allegations that DLA "should have known" of the misconduct due to purported "red flags," are ***not*** sufficient. *Lerner*, 459 F.3d at 294; *Ryan v. Hunton & Williams*, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000).

Significantly, "[t]he existence of the attorney-client relationship in itself is an insufficient factual basis for [alleging] fraudulent knowledge." *Fahlenbach v. Trans Pac. Capital*, 1996 WL 22602, at *3 (S.D.N.Y. Jan. 19, 1996) (dismissing claims because plaintiff did not sufficiently plead law firm's knowledge of fraud); *see also Hayden v. Feldman*, 753 F. Supp. 116, 120 (S.D.N.Y. 1990) (dismissing complaint because attorney's knowledge of client's fraud could not be inferred from attorney's mere "ongoing relationship" with client).

The Complaint is ***entirely devoid*** of a single factual allegation demonstrating that DLA had actual knowledge of an alleged fraud or breach of fiduciary duty. To the contrary, as discussed below, the limited facts the Complaint alleges as to DLA's knowledge demonstrate not only that DLA had no such "actual knowledge," it instead believed in good faith that SCIF Master's margin payments were loans permitted by the CDO Transaction documents and that the payments would be repaid if the Collateral appreciated.

1. **DLA Believed SCIF Master's Margin Payments Were Loans**

Plaintiffs' claims all require well-pled factual allegations that DLA knew ICP and Priore were stealing money from the Funds. But far from pleading such facts, the Complaint makes clear that DLA believed at all relevant times—from at least October 29, 2008 through May 2010—that Barclays and ICP had agreed that SCIF Master's margin payments would be repaid if the Collateral appreciated. In other words, DLA believed a loan existed.

The Complaint admits that DLA repeatedly conveyed this belief to numerous third parties, including Barclays; at least four different ICP personnel; the Funds' administrator; and the SEC. (*See, e.g.*, Compl. ¶¶ 45, 50, 56, 79, 90, 101-02, 104.) And Plaintiffs never plead a single fact suggesting that DLA did not hold this belief. To the contrary, the Complaint expressly **admits** that DLA believed "that ***Barclays would pay money to Triaxx Funding*** . . . if there was excess margin," which in turn would be paid back to SCIF Master under the terms of the loan as DLA understood them. (*See id.* ¶ 90 (emphasis added; Plaintiffs' emphasis omitted).)

This last admission alone is fatal to Plaintiffs' claims, yet the Complaint goes further and contains at least ***ten*** additional admissions demonstrating that DLA believed that a loan existed. These admissions further make clear that DLA derived this belief from what ICP and Barclays had told Mr. White, on which information Mr. White was permitted to rely. *See Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 560-61 (2009) (affirming dismissal of aiding and abetting claims and holding that law firm was not required to confirm that information it had been provided was truthful); *Mateo v. Senterfitt*, 82 A.D.3d 515, 517 (1st Dep't 2011) (holding claim against law firm for aiding and abetting client's fraud failed to "allege that defendant had actual knowledge of any fraud" where all plaintiffs alleged was that law firm incorporated client's misrepresentations into documents law firm drafted without taking "steps to verify" information client supplied).

Those additional ten admissions further demonstrate DLA's belief that a loan existed:

- October 29, 2008: DLA told Barclays that there would be "a short letter agt between Barclays and the funder of cash," *i.e.*, a loan agreement. (Compl. ¶ 45.)

- October 31, 2008: DLA told ICP's Parseghian—who Plaintiffs contend "assisted Priore and others at ICP in defrauding the SCIF Funds" (*id.* ¶ 37), and thus to whom DLA could not have had any motivation to lie—that there was going to be a loan agreement: a "letter agreement between the fund [SCIF Master] and Barclays" memorializing the terms of the loan. (*Id.* ¶ 50 (alteration in original).)

- October 31, 2008: DLA "sent Barclays a draft" loan agreement (*id.* ¶ 56); DLA plainly would not have done this unless it believed a loan existed.

- November 5, 2008: After Barclays informed DLA that "they [didn't] want to sign the side letter," ***Barclays proposed to DLA an alternative structure for the loan***. Barclays's proposal was to "hav[e] the collateral manager [ICP] give a direction letter to the Trustee [LaSalle] to take the first dollars if there's margin excess and ship them to [SCIF Master]" as repayment for the loan. (Nov. 5, 2008 email (cited in Compl. ¶ 57; Appendix, Ex. C).) DLA's White told ICP that he believed this approach—which had been suggested by Barclays, ***not*** by DLA—was a potentially workable solution to ensure SCIF Master was repaid on the loan. (*Id.*) Thus, DLA still believed at this time, ***based on what Barclays had told it***, that a loan existed, just with a different repayment mechanism than initially had been contemplated.

- April 29, 2009: DLA "drafted a document for ICP describing the transfers to Barclays as a loan." (Compl. ¶ 79.) Significantly, DLA's document details the exact same loan and repayment structure that Barclays had proposed to DLA on November 5, 2008: "ICP . . . will direct the Trustee to repay advances to the Fund . . . from funds transferrable by [Barclays] to Triaxx." (Apr. 29, 2009 letter (cited in Compl. ¶ 79; Appendix, Ex. F).)

- May 21, 2009: DLA drafted a detailed email to ICP describing the terms of the loan as they had been described to White by Barclays and ICP: "you [ICP] have indicated that Barclays and [SCIF Master] view these transaction . . . as advances by [SCIF Master] to Barclays," and for repayment Barclays "will transfer all amounts, including any Margin Excess, to the Trustee," who in turn will repay the advances to SCIF Master when "direct[ed]" by ICP to do so. (May 21, 2009 email (citied in Compl. ¶ 85; Appendix, Ex. D).)

- May 22, 2009: White told Woroniecki, ICP's Director of Fund Operations, that DLA's "perception is that there [was] a 'Undocumented Verbal Loan' in place between SCIF and Barclays" and that DLA "was under the assumption that [Priore] had that conversation with Barclays." (May 22, 2009 email (cited in Compl. ¶ 87; Appendix, Ex. G).) White once more reiterated DLA's understanding of the terms of the loan based on information provided by Barclays and ICP: "Barclays will repay the loan plus fed funds to the trustee when there is Excess Margin." (*Id.*)

- July 2009: DLA again repeated what Barclays and ICP had told White about the loan when it informed the Funds' administrator that "the transfers from the Scif Funds" were "a 'loan' between SCIF Master and Barclays." (Compl. ¶ 90.)

- <u>April 16, 2010</u>:  White told the SEC under oath that he believed there was a loan agreement between SCIF Master and Barclays:  "It was my understanding that this was the agreement that had been made by SCIF and Barclays."  (*Id.* ¶ 101.)

- <u>May 6, 2010</u>:  White again told the SEC that he believed there was a loan agreement between SCIF Master and Barclays:  "The fact of an agreement to repay a loan was always there."  (*Id.* ¶ 104.)[12]

These admissions stand in stark contrast to the Complaint's failure to allege a single fact suggesting (much less demonstrating with particularity) that DLA ever learned there was ***not*** a loan.[13]

> ### 2. DLA Believed SCIF Master's Margin Payments Were Permissible Under The CDO Transactional Structure <u>And</u> That There Was A Mechanism For Repayment

The Complaint makes clear that DLA did not just believe in good faith that a loan existed—it also believed that (a) a loan was appropriate in the context of the CDO Transaction's structure ***and*** (b) the transactional structure provided a mechanism for repayment to SCIF Master.  The Complaint's admissions on these points further confirm the insufficiency and futility of Plaintiffs' "actual knowledge" allegations.

---

[12]  Plaintiffs' weak contention that "[a]pparently, the SEC did not consider White's testimony" to be "credible" because the SEC still filed a lawsuit against Priore and ICP is baseless.  (*See* Compl. ¶ 106.)  Even if the SEC may have thought there was no loan, there is nothing to suggest the SEC disbelieved White's testimony that ***DLA believed*** that a loan did exist.  Notably, the SEC never sued DLA or White; nor did the SEC ever pursue perjury charges against White.  The SEC's failure to take any action against DLA or White is particularly relevant in light of Plaintiffs' repeated reliance on the SEC's complaint against ICP and Priore.

[13]  Plaintiffs' conclusory contentions that DLA somehow knew SCIF Master never would be repaid on the loans are unavailing.  For example, Plaintiffs assert that "White knew that Triaxx Funding had no liquidity to repay the SCIF Funds and he had no reason to believe Triaxx Funding would get any additional funds," and further "that even if Barclays paid some excess margin to Triaxx Funding, it was unlikely that Triaxx Funding would pay these funds to SCIF Master."  (Compl. ¶¶ 8, 87.)  However, "no reason to believe" is ***not*** the appropriate test as discussed above (*see* cases cited in §§ C. & C.1 above), and in any event, Plaintiffs identify absolutely no factual basis as to either Triaxx's actual and expected future liquidity or DLA's knowledge thereof.  Nor do they point to any basis for why it would be "unlikely" that Triaxx would use funds transferred to it by Barclays repay SCIF Master.  To the contrary, the only factual material in the Complaint supports the opposite conclusion:  DLA believed payment was likely because ICP was authorized to direct the Trustee to cause Triaxx to use those funds to repay SCIF Master by making "an irrevocable direction . . . as Collateral Acquirer under the Indenture, to the Trustee to" do so.  (*Id.* ¶¶ 53, 85, 90.)  As another example, Plaintiffs allege irrelevantly that White knew SCIF Master "would have no recourse against Triaxx Funding for repayment outside of litigation" and "nothing in the [October 2008] Direction Letter required LaSalle . . . to repay SCIF Master."  (*Id.* ¶¶ 44, 54.)  Of course, the Funds, which again were not White's or DLA's clients, did not need "recourse against Triaxx Funding" because the mechanism for repayment depended on Barclays, ICP and the Trustee—not Triaxx.  (*See id.* ¶¶ 51-53.)  Likewise, the October 2008 Direction Letter is irrelevant because repayment was going to be effected by a subsequent direction letter, not the October 2008 one.  (*See id.* ¶¶ 59-62.)

*First*, the Complaint admits that DLA believed it was permissible under the CDO Transaction's structure for ICP to make the business decision to cause a third party to loan funds to meet margin calls and provided this advice to ICP. (Compl. ¶¶ 5, 44, 46, 59, 63.) While Plaintiffs unfairly and inaccurately attempt to portray this fact as nefarious, they do not and cannot deny that DLA believed this advice was correct. Neither do they allege a single fact demonstrating that DLA's advice purportedly was incorrect under the CDO Transaction's governing documents.

*Second*, DLA believed that, should SCIF Master make such margin loans, the CDO Transaction provided a mechanism for repayment: Barclays would transfer any margin excess to Triaxx, whereupon ICP would instruct the Trustee to cause Triaxx to use the margin excess to repay SCIF Master ("**Repayment Mechanism**"). As demonstrated *supra* p. 26, Barclays and its counsel at Cadwalader first proposed the Repayment Mechanism on November 5, 2008, and DLA concurred with that proposal. While Plaintiffs conclusorily assert that DLA "knew that there was nothing in the Triaxx Funding Indenture" authorizing the Repayment Mechanism (Compl. ¶ 105), Plaintiffs never allege a single fact suggesting that DLA did not believe in good faith that the Repayment Mechanism existed. In fact, the Complaint's factual allegations utterly refute this baseless assertion. They demonstrate that DLA actually believed that the Repayment Mechanism *did* exist. For example:

- November 2008: After Barclays first proposed the Repayment Mechanism, White wrote to ICP: "I think we should be able to get there with a formulation like that." (Nov. 5, 2008 email (cited in Compl. ¶ 57; Appendix, Ex. C).)

- April 2009: Repeating DLA's advice that Barclays's proposal was workable under the CDO Transaction documents, Priore wrote an internal ICP email stating that the Repayment Mechanism is "imbedded in the Triaxx document itself as to how the transaction operates," as "the **direction from counsel**" (*i.e.*, DLA) had confirmed. (Compl. ¶ 77 (emphasis added).)

- April 2009: White drafted a document detailing once again how, in DLA's view, the Repayment Mechanism worked: "ICP . . . will direct the Trustee to repay advances to the Fund . . . from funds transferrable by [Barclays] to Triaxx." (Apr. 29, 2009 letter (cited in Compl. ¶ 79; Appendix, Ex. F).)

- May 2009: White drafted a detailed email yet again confirming DLA's view as to how the Repayment Mechanism worked: "[T]o 'the extent that [SCIF Master's] advances are

28

subsequently transferred by Barclays to the Trustee [B of A],' ICP could direct B of A 'to transfer those advances back to [SCIF Master] outside of the Priority of Payments under the [Triaxx Funding] Indenture.'" (Compl. ¶ 85 (bracketed language in original).)

- July 2009: White repeated DLA's opinion to the Funds' outside administrator: "Repayment of the Loans will occur upon direction by [ICP] to [B of A], pursuant to the terms of the [Triaxx Funding] Indenture, to transfer to [SCIF Master] . . .certain funds received by [B of A] from [Barclays] in respect of the Loans." (*Id.* ¶ 90.)

DLA's belief that (1) a loan existed, (2) it was permissible under the CDO Transaction's structure, and (3) there was a mechanism for SCIF Master to be repaid is ***fatal*** to Plaintiffs' aiding and abetting claims. Plaintiffs simply have not established and cannot, consistent with FRCP 11, establish that DLA had actual knowledge of ICP's and Priore's alleged misconduct.[14] *See Eurycleia Partners*, 12 N.Y.3d at 560-61 (law firm did not have actual knowledge of alleged fraud because it believed offering memoranda it prepared were accurate based on information provided by third party); *Albion Alliance Mezzanine Fund, L.P. v. State St. Bank & Trust Co.*, 8 Misc.3d 264, 273 (Sup. Ct. N.Y. Cty. 2003) (bank did not have "actual knowledge" of the alleged fraud when it believed in good faith that its conduct was appropriate), *aff'd*, 2 A.D.3d 162 (1st Dep't 2003). *See also Mateo*, 82 A.D.3d at 517 (aiding and abetting fraud claim did not allege "defendant had actual knowledge of any fraud" where all plaintiffs alleged was that law firm incorporated client's misrepresentations into documents law firm drafted without taking "steps to verify" information client supplied).

### 3. Plaintiffs' Remaining Conclusory And Speculative "Actual Knowledge" Allegations Fail

Despite the foregoing admissions that defeat their aiding and abetting claims, Plaintiffs nonetheless attempt to plead DLA's purported "actual knowledge" of the alleged misconduct in other ways. Those tactics too are all unavailing.

For example, the bald conclusion that "White knew Barclays recognized the impropriety of

---

[14]   The fact that DLA openly described its work in the invoices it sent to Triaxx—"negotiating and drafting documents in connection with [SCIF Master] funding of margin payments under the Barclays MRA"—further confirms that DLA did not believe there was anything improper about SCIF Master's payments. (*See* Compl. ¶ 71.)

taking the SCIF Funds' money" easily can be disregarded. (Compl. ¶¶ 48-49.) There is absolutely nothing in the Complaint supporting the contention that Barclays thought SCIF Master's margin payments were improper. To the contrary, Barclays accepted SCIF Master's $36.5 million in margin payments, something a sophisticated party like Barclays with sophisticated counsel like Cadwalader never would have done if it "recognized the impropriety" of the payments. (*Id.*) Moreover, it was Barclays that proposed the Repayment Mechanism in the first place. *See supra* pp. 26. Further, even if Barclays believed the margin loans were improper (which the Complaint does not plead), there is nothing in the Complaint suggesting that DLA somehow knew that Barclays had such a view.[15]

Equally unavailing is Plaintiffs' utterly false contention that "DLA knew that the SCIF Funds were not represented by counsel in this multi-million dollar transaction." (Compl. ¶ 54.) The ostensible support for this allegation shows only that "White testified that he was not focused on whether SCIF was represented by counsel," and Plaintiffs further admit that White told the SEC under oath that he knew SCIF Master **was** represented by counsel at some point. (*Id.* ¶¶ 29, 101 ("SCIF had . . . at one point been represented by the law firm of Schulte Roth.").) Moreover, even if pled (it is not), DLA's knowledge that the Funds purportedly were not represented by counsel still would not constitute the required actual knowledge of ICP's and Priore's misconduct.

Also unavailing are the allegations that "White was aware that it made no commercial sense for the SCIF Funds to make the transfers to Barclays" and that "there was no good commercial reason for the SCIF Funds to make the transfers." (*Id.* ¶¶ 8, 81.) Allegedly knowing that something "made no commercial sense" is not the same as knowing it is a fraud or breach of fiduciary duty. Lawyers, who, like Mr. White, generally are not steeped in their clients' financial affairs, are not responsible

---

[15] That Barclays asked for standard "waiver language" is a red herring. (*See* Compl. ¶¶ 48-49.) It is clear from the waiver letter itself that Barclays merely and appropriately sought this waiver language to protect its right to proceed against Triaxx in the event that SCIF Master, for any reason, prematurely sought repayment of the loan. (Oct. 30, 2008 letter (cited in Compl. ¶ 52; Appendix, Ex. H).)

for second-guessing potentially inadvisable business judgments, and are not held liable for aiding and abetting if those business judgments turn out, unbeknownst to the lawyer, to be fraudulent. That is precisely why the standard for aiding and abetting is actual knowledge and not negligence. *See Roni LLC v. Arfa*, 72 A.D.3d 413, 414 (1st Dep't 2010) (affirming dismissal of aiding and abetting claims against lawyers where they merely "structured and organized entities that acted as the brokers on the property acquisitions . . . activities which are part of ordinary real estate lawyering" and had no actual knowledge that the transactions were part of an alleged fraud), *aff'd*, 15 N.Y.3d 826 (2010). *See also Eurycleia Partners*, 12 N.Y.3d at 560-61 (dismissing aiding and abetting claims where law firm lacked actual knowledge of fraud); *Mateo*, 82 A.D.3d at 517 (same); *Albion Alliance*, 8 Misc.3d at 273 (dismissing aiding and abetting claims where bank lacked actual knowledge of fraud).

Aside from the foregoing dispositive point, there was an overarching valid commercial reason for SCIF Master to make these loans to satisfy Triaxx's margin payments: the Funds stood to lose the many millions of dollars they had invested in the CDO Transaction if Barclays declared an Event of Default. *See supra* pp. 7, 16. Plaintiffs cannot hide from this undisputed fact behind rhetoric and conclusory allegations. Thus, for all of these reasons, the Complaint fails to plead that DLA had actual knowledge of ICP's and Priore's alleged misconduct.[16]

### D.      Plaintiffs Do Not Allege Facts Reasonably Suggesting That DLA Substantially Assisted The Alleged Misconduct

The Complaint makes clear that DLA did nothing more than provide routine transactional counsel services with respect to the CDO Transaction. Stripped of its hyperbolic rhetoric and

---

[16] In addition to all of the deficiencies detailed above, it is particularly telling that Plaintiffs never allege (nor could they) that DLA knew anything about the circumstances under which ICP and Priore actually caused SCIF Master to make the transfers to Barclays. That is, while Plaintiffs allege DLA was told that the transfers would happen, and DLA learned about the transfers after they occurred, there is ***no contention that DLA had any involvement whatsoever in actually effecting the transfers of money out of SCIF Master.*** Accordingly, the Complaint contains no plausible basis for its mere conclusions of actual knowledge of any fraud or breach of fiduciary duty. The only plausible conclusion is that DLA believed ICP and Priore were permitted to make the margin payments with SCIF Master's funds.

conclusory assertions, the Complaint pleads only that DLA (1) advised on whether a third party could make margin payments under the CDO Transaction's structure; (2) interfaced with Barclays and the Trustee regarding margin payments that ICP independently arranged for SCIF Master to make; and (3) "drafted documents" and "prepared" letters memorializing those payments after the fact. (*See, e.g.*, Compl. ¶¶ 6-8, 44, 58.) These allegations are facially insufficient to plead substantial assistance. *See, e.g.*, *Broad-Bussel Family LP v. Bayou Grp. LLC (In re Bayou Hedge Funds Inv. Litig.)*, 472 F. Supp. 2d 528, 534 (S.D.N.Y. 2007) (attorneys' legal services documenting and sending false valuation reports not substantial assistance); *CRT Investments, Ltd v. BDO Seidman, LLP*, 85 A.D.3d 470, 472 (1st Dep't 2011) (holding that substantial assistance "means more than just performing routine business services for the alleged fraudster").[17]

Because they cannot allege facts demonstrating substantial assistance, Plaintiffs are forced to resort to chicanery and sleight of hand. *First*, in an unsuccessful effort to implicate DLA in everything ICP and Priore did, Plaintiffs repeatedly attempt to obfuscate the distinction between two distinct sets of alleged conduct: (1) ICP's and Priore's alleged theft from the Funds, in which DLA is not alleged to have played any role and of which DLA is not alleged to have had any knowledge; and (2) the separate, subsequent use of that supposedly stolen money to satisfy Barclays's margin calls, for which DLA provided routine legal services without any factual allegations of knowledge that the money had been obtained improperly. Plaintiffs repeatedly conflate these analytically distinct points, attempting to characterize it all as some kind of unified "plan" or "scheme." (*See, e.g.*, Compl.

---

[17] *See also, e.g.*, *Reynolds v. Schrock*, 341 Ore. 338, 350 (2006) ("[A] lawyer acting on behalf of a client and within the scope of the lawyer-client relationship . . . is not liable for assisting the client in conduct that breaches the client's fiduciary duty to a third party."); *Chem-Age Indus. v. Glover*, 652 N.W.2d 756, 775 (S.D. 2002) (citing *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999) for proposition that "substantial assistance means more than providing routine professional services"); *Goodman v. Kennedy*, 18 Cal.3d 335, 344 (1976) (holding that if attorneys were liable for aiding and abetting liability based on provision of mere routine legal services it "would inject undesirable self-protective reservations into the attorney's counseling role," "prevent [the lawyer] from devoting his entire energies to his client's interests," and constitute "an undue burden on the profession and a diminution in the quality of the legal services received by the client") (internal quotation and citation omitted).

¶¶ 7-8, 13, 45, 47-48, 55.) Plaintiffs then combine these mischaracterizations with conclusory rhetoric about DLA's purported involvement, such as that White somehow "act[ed] as the point person in implementing [ICP's and Priore's] scheme" and "took the lead on implementing the scheme to siphon money from SCIF." (*See, e.g., id.* ¶¶ 6, 16, 39, 45, 55.) None of these allegations is supported by any facts; nor do they withstand even the most cursory scrutiny.

*Second*, Plaintiffs attempt to contort completely innocuous, ordinary events in the course of the CDO Transaction into purported nefarious instances of substantial assistance. For example, Plaintiffs blatantly misstate certain discussions between ICP employee Woroniecki and DLA regarding the margin loans. (*Id.* ¶¶ 11, 74-88.) Plaintiffs baselessly attempt to paint Woroniecki as some kind of "whistleblower" who ICP, Priore and DLA all conspired to "silence." (*Id.*) But the actual facts pled in the Complaint, as demonstrated below, completely contradict this insinuation: Woroniecki, in his capacity as ICP's Director of Fund Operations, examined SCIF Master's margin payments and, significantly, even he independently concluded that the payments could be recorded as loans on SCIF Master's books—hardly consistent with rhetoric about Woroniecki being a "whistleblower" who was "silenced."

- April 23, 2009: Woroniecki asked White for backup that would enable the Funds to book the margin payments as loans. (Compl. ¶ 74.) White responded by describing the events that occurred in October 2008. (*Id.* ¶ 75.)

- April 28, 2009: Woroniecki told ICP's management that he needed more backup before the margin payments could be booked as loans and—far from threatening to be a "whistleblower"—Woroniecki requested exactly the kind of backup he wanted: "[i]f we want this booked as a loan we should have something drafted which spells out the terms of the loans." (*Id.* ¶ 76) Consistent with Woroniecki's instruction, White circulated a draft letter. (*Id.* ¶ 79.) Woroniecki responded that, in his opinion, White's letter by itself did not provide the necessary backup. (*Id.* ¶ 80.) Woroniecki then provided further detail on the specific kind of backup he wanted: "The reason I asked 'Can ICP . . . require the Trustee to pay SCIF in priority over Note holders?' is because if so you can argue that ICP . . . under its authority can assure the repayment of Triaxx to SCIF." (*Id.* ¶¶ 80, 82; April 29, 2009 email (cited in Compl. ¶ 80; Appendix, Ex. I).)

- May 21, 2009: Consistent with Woroniecki's further instruction, White provided a detailed explanation of the loan and the Repayment Mechanism. In direct response to Woroniecki's

33

April 29 question, White explained that ICP "***could*** direct the Trustee . . . to transfer those advances back to [SCIF Master]." (May 21, 2009 email (cited in Compl. ¶ 85; Appendix, Ex. D) (emphasis added)).)

- May 22, 2009:  After reading White's May 21 email, "Woroniecki contacted White and had a long discussion with him about SCIF Master's payments" (Compl. ¶ 87), after which Woroniecki wrote to Priore:  "[White's] perception is that there is a 'Undocumented Verbal Loan' in place between SCIF and Barclays." (May 22, 2009 email (cited in Compl. ¶ 87; Appendix, Ex. G).)  Woroniecki continued that "[White] was under the assumption that you [Priore] had that conversation with Barclays, ***I'd like to confirm that then I can set this up as a loan***." (*Id.* (emphasis added).)  Priore confirmed as Woroniecki requested:  "***we have discussed with Barclays***." (*Id.* (emphasis added).)  Having confirmed with Priore that there was a loan in place, Woroniecki then agreed that there was sufficient backup for the Funds to book the margin payments as a loan.  (Compl. ¶ 87.)

There is no basis to plausibly claim this episode in any way constituted "substantial assistance" by DLA in ICP's and Priore's alleged misconduct.  *See Twombly*, 550 U.S. at 570 (complaint must plead "enough facts to state a claim to relief that is plausible on its face"); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (dismissing complaint for failure to plead facts sufficient to state plausible claim).  The foregoing demonstrates that DLA's White simply repeated for Woroniecki the information that Barclays and ICP had told him regarding the margin loans (*see supra* pp. 33-34), as well as his understanding of how the Repayment Mechanism operated.  Further, Woroniecki ultimately concluded that a loan existed because of what ***Priore*** told him—*i.e.*, that ICP had "discussed with Barclays" the fact of a loan—***not*** what DLA said.  (May 22, 2009 email (cited in Compl. ¶ 87; Appendix, Ex. G).)

The Complaint's other mischaracterizations of mundane transactional events, stripped of unsupported insinuations and innuendo, also fail to plead substantial assistance:

- Plaintiffs mischaracterize discussions between DLA's White and the Funds' administrator regarding the margin loans.  (*See* Compl. ¶¶ 12, 89-91.)  All White did was to provide the Funds' administrator with DLA's "understanding of the terms of the Loans" as they had been described to White by ICP and Barclays.  (*Id.* ¶ 90.)  The Complaint alleges no facts supporting the bald assertion that DLA relayed this information with an intent "[t]o conceal Priore's and ICP's wrongful activity." (*Id.*)

- Plaintiffs claim White agreed to "add a certification in the direction letter" that the Triaxx Noteholders would not be "materially and adversely affected by" the margin loans even

though White purportedly knew that SCIF Master (a Noteholder) would be adversely affected. (*Id.* ¶ 61.)  But Plaintiffs ignore that (1) White believed SCIF Master's payments were loans and thus SCIF Master was ***not*** adversely affected; and (2) far from believing the Noteholders would be adversely affected by the margin loans, White believed those payments ***benefitted*** the Noteholders, including SCIF Master, by avoiding an Event of Default.  *See supra* pp. 25-27.

- Plaintiffs attempt to put a nefarious spin on the legal fees DLA billed to Triaxx for work related to SCIF Master's margin payments made on Triaxx's behalf.  (Compl. ¶ 71.)  But it is undisputed that the margin loans benefitted Triaxx by avoiding an Event of Default that Triaxx's own non-payment would have caused.

- Plaintiffs seek to cast a negative light on DLA's working to advance the interests of its clients, ICP and Triaxx.  (*See id.* ¶¶ 16, 50.)  DLA's ethical duties required that DLA protect and advance its clients' interests.

- Plaintiffs attempt to distort Triaxx's routine expense disbursements as being somehow improper.  (*Id.* ¶¶ 9-10, 65, 70, 93-99.)  As an initial matter, what ***Triaxx*** did is simply irrelevant; the alleged misconduct at issue here is the purported theft of funds from SCIF Master and their transfer to Barclays, not anything Triaxx did subsequent to those transfers. As to Triaxx's purported payment of DLA's legal fees with SCIF Master's funds, Plaintiffs' allegations are based exclusively on their willful misreading of a ***joke*** White made in an email.  (*Id.* ¶ 98 ("I'm kidding").)  Plaintiffs do not plead any facts supporting the conclusory assertion that "Priore, ICP, and White agreed to use $200,000 from SCIF Master to pay DLA's outstanding legal bills."  (*Id.* ¶ 97.)

Reduced to the actual facts pled, the Complaint's "substantial assistance" allegations amount to nothing more than a recitation of innocuous events over the course of the CDO Transaction—events in which DLA played a standard transactional counsel role.  This is insufficient to plead substantial assistance, particularly considering that DLA's limited legal work did not assist ICP and Priore in the ***central event*** of their alleged misconduct:  stealing $36.5 million from the Funds.  *See Broad-Bussel*, 472 F. Supp. 2d at 533-34 (granting motion to dismiss aiding and abetting claim where "the complaint does not identify a single affirmative act by [defendants] that assisted, let alone substantially assisted, Bayou's primary violations").  It is undisputed that DLA:  (1) did ***not*** propose that ICP and Priore use the Funds' money in particular for the margin loans—ICP and Priore made that decision alone (Compl. ¶ 46); (2) ***never*** interacted with anyone from the Funds regarding the margin loans, including, as Plaintiffs concede, "never communicated with any counsel" for the Funds

(*id.* ¶ 29); and (3) was ***not*** involved in any fashion with the actual taking of money from the Funds. (*Id.* ¶¶ 8, 47, 62-63.)  Plaintiffs have failed to plead the essential element of substantial assistance; their aiding and abetting claims therefore should be dismissed for this independent reason.

### E.      Plaintiffs Do Not Allege Facts Reasonably Suggesting That DLA Proximately Caused The Funds' Harm

Finally, the Complaint fails to adequately plead proximate causation.  Plaintiffs must plead facts showing that "the ***aiding and abetting defendant*** [*i.e.*, DLA, ***not*** just ICP or Priore] proximately caused the harm on which the primary liability is predicated" because the Funds' alleged "injury [was] a direct or reasonably foreseeable result of [DLA's] conduct." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 201-02 (S.D.N.Y. 2006) (emphasis added); *see also Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 63 (2d Cir. 1985) (affirming lower court's holding that "that aider and abettor liability would not attach where the injury was not a direct or reasonably foreseeable result of the conduct").  That is, Plaintiffs must plead facts demonstrating that DLA's purported "substantial assistance in the primary violation proximately caused the [Funds'] harm." *Fraternity Fund*, 479 F. Supp. 2d at 370-71.

The ***only*** proximate cause of the Funds' harm alleged in the Complaint was ICP's and Priore's ***unilateral*** conduct in causing the Funds to transfer $36.5 million to Barclays.  Indeed, the Complaint repeatedly admits that ***only*** "***Priore and ICP caused*** the SCIF Funds to make [the] transfers to Barclays" (Compl. ¶ 8 (emphasis added); *see also id.* ¶¶ 47, 62-63), ***not*** DLA's purported substantial assistance, which allegedly occurred ***after*** the fact in any event.  Plaintiffs, therefore, have not met their pleading burden on this element either.  *See Bloor*, 754 F.2d at 61-62 (holding law firm did not proximately cause losses of entities whose principal was engaged in "massive and continuing" fraud because law firm only prepared SEC filings relating to the transactions whose proceeds were wrongfully diverted).

# IV.   PLAINTIFFS' CAYMAN LAW CLAIM IS INCURABLY DEFICIENT

Plaintiffs assert a claim under Section 147 of the Cayman Islands Companies Law

("**Companies Law**"), the elements of which are largely duplicative of Plaintiffs' aiding and abetting

claims.[18]  Not surprisingly, the Cayman law claim fails for many of the same reasons as the aiding

and abetting claims, in addition to other independent deficiencies.

## A.   Principles Of Comity Warrant Dismissal Of The Cayman Law Claim

This claim belongs in a Cayman court, not a U.S. court, for at least two reasons.  *First*,

Section 147 only authorizes relief to be granted by a Cayman court, ***not*** a U.S. court.  The Companies

Law defines "Court" to "mean[] the Grand Court of the Cayman Islands" only.  Companies Law

§ 2(1) (Appendix, Ex. K).  And Section 147 only authorizes parties to "apply ***to the Court*** for a

declaration under this section;" it further provides that "***[t]he Court*** may declare" certain relief "as

***the Court*** thinks proper."  *Id.* § 147 (Appendix, Ex. J.) (emphasis added).  Thus, by its very terms, no

claim under Section 147 can be asserted other than in the Grand Court of the Cayman Islands.

*Second*, Section 147 has been in effect only since March 1, 2009 and has not yet been the

subject of significant Cayman judicial interpretation.  In fact, research was unable to locate any

reported Cayman decision substantively applying Section 147.  A Cayman court is best positioned to

interpret, and has a greater interest in interpreting, this statute's applicability to the factual allegations

in this case.  *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 76 (2d Cir. 2003)

(affirming district court's holding that need to apply English law to plaintiffs' claim "strongly tipped

---

[18]   Section 147 provides:

> (1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

> (2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

Companies Law § 147(1)-(2) (Appendix, Ex. J).

in favor of litigation in England"), *cert. denied*, 540 U.S. 1149 (2004); *VictoriaTea.com v. Cott Beverages, Canada*, 239 F. Supp. 2d 377, 387 (S.D.N.Y. 2003) ("An action should be tried in a forum familiar with the law governing the case.") (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947)).

These factors support dismissal of the Section 147 claim on comity grounds. *See Maxwell Commc'ns Corp. v. Société Générale (In re Maxwell Commc'ns Corp.)*, 93 F.3d 1036, 1048-52 (2d Cir. 1996) (dismissing foreign preference claim out of deference to foreign court, because foreign court had closer connection to case and stronger interest in outcome of dispute, and dismissal would facilitate orderly and equitable distribution of debtor's assets); *Official Comm. of Unsecured Creditors v. Transpac. Cor. Ltd. (In re Commodore Int'l Ltd.)*, 242 B.R. 243, 260 (Bankr. S.D.N.Y. 1999) (dismissing preference action against Bahamian creditor on principles of comity because "notwithstanding the fact that CEL is a debtor in the U.S., any interest that we may have in resolving this dispute is outweighed by the significant interest of the Bahamas"), *aff'd*, 2000 WL 977681 (S.D.N.Y. Jul. 17, 2000).[19]

**B.      The Cayman Law Claim Also Fails As A Matter of Law**

Even if this Court were to consider Plaintiffs' Section 147 claim, it nevertheless fails as a matter of law. To state a claim under Section 147, Plaintiffs must plead particularized facts demonstrating, among other things, that DLA (1) was "knowingly part[y] to" (2) "the carrying on of the [Funds'] business" (3) in a fraudulent manner. *See* Companies Law § 147 (Appendix, Ex. J.). Absent reported Cayman decisions substantively applying Section 147, cases decided under analogous English statutes[20] are instructive and demonstrate why Plaintiffs' Section 147 claim fails to

---

[19]    In making this argument, DLA is not intending to waive, and hereby reserves, any defenses it may have should this claim be asserted in a Cayman court, including defenses to jurisdiction.

[20]    Nearly identical to Section 147 of the Companies Law, Section 213 of the English Insolvency Act provides:

If in the course of winding up of a company it appears that any business of the company has been carried on with

*(Cont'd on next page)*

plead any of these elements.  *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source."); *Winn v. Schafer*, 499 F. Supp. 2d 390, 393 (S.D.N.Y. 2007) ("[W]here Cayman Islands law is silent, Cayman Islands courts look primarily to English common law for guidance.").

*First*, DLA was not "knowingly part[y]" to any alleged fraudulent carrying on of the Funds' business.  As demonstrated at length, *supra* pp.21  21-31 Plaintiffs utterly fail to plead DLA knew of ICP's and Priore's purported fraud (or even that there was such a fraud).  Those same failings completely devastate the Section 147 claim just as they sound the death knell for the aiding and abetting claims.

*Second*, Plaintiffs cannot allege (nor do they) that DLA was party to the carrying on of the Funds' business in the first place.  DLA did not do anything at all to carry on the Funds' business—as demonstrated *supra* pp. 31-36.  DLA was counsel to Triaxx and ICP only; DLA represented these entities solely in the context of the CDO Transaction and in no other context; and all actions that DLA is alleged to have taken were performed on behalf of those entities alone.  (Compl. ¶¶ 5-9, 14, 16, 29, 43-55, 59-63, 65-70.)  While Plaintiffs may claim (falsely) that DLA sat silently by while ICP and Priore allegedly looted the Funds, even that is ***not*** enough to satisfy Plaintiffs' pleading burden for this element.  *See In re Maidstone Buildings Provisions Ltd.*, 1 W.L.R. 1085 (Ch. D. 1971) (holding under § 332 of English Companies Act that "mere silence and omission" was insufficient to "make [defendant] a party to the carrying on of the company's business") (Appendix, Ex. N).

---

*(Cont'd from previous page)*

intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.  The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are liable to make such contributions (if any) to the company's assets as the court thinks proper.

Insolvency Act 1986 § 213 (Appendix, Ex. L).  Section 332 of the English Companies Act of 1948 (Appendix, Ex. M) is the predecessor to Section 213 and contains substantially similar language.

*Third*, Plaintiffs do not plead, as they must, that "any business of the [Funds] has been carried on with an intent to defraud creditors of the company" or "for any fraudulent purpose." Companies Law § 147(1) (Appendix, Ex. J.). As demonstrated *supra* pp. 21-36, Plaintiffs do not adequately plead the existence of any fraud at all. Indeed, the Complaint makes clear that the (non-fraudulent) purpose of SCIF Master's payments was to keep the CDO Transaction afloat for the ***benefit*** of creditors (including Plaintiffs) by avoiding an Event of Default, not to defraud them. (*See* Compl.¶¶ 7, 13, 39, 48, 78.) Having failed to allege fraud and fraudulent intent against those "who actually carried on the business" (*i.e.*, ICP and Priore), "there are no fraudulent acts to which the outsider [DLA] can have been a party." *In re Augustus Barnett & Sons Ltd.*, 2 B.C.C. 98904 (Ch. D. 1985) (applying § 332 of English Companies Act) (Appendix, Ex. O); *see also Morphitis v. Bernasconi*, [2003] EWCA Civ 289, ¶ 47 (Ct. of App., Ch. D. 2003) (holding that § 213 of English Insolvency Act "is engaged only where the business of the company has been carried on with intent to defraud") (Appendix, Ex. P).[21]

## CONCLUSION

For the foregoing reasons, DLA respectfully requests that the Court dismiss Plaintiffs' Complaint with prejudice.

Dated: New York, New York
      January 24, 2014

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By:   /s/ Matthew S. Kahn
        Kevin S. Rosen (pro hac vice to be filed)
        Craig H. Millet (pro hac vice to be filed)
        Matthew S. Kahn (MK-5426)

*Attorneys for Defendant DLA Piper LLP (US)*

---

[21] In addition, Section 147 would not apply to any events occurring prior to March 1, 2009, the effective date of the statute. *See Picard v. Primeo Fund*, Cause No. FSD 275 of 2010-AJJ, ¶ 8 (Grand Court Cayman Islands Jan. 14, 2013) (Appendix, Ex. Q). The Complaint alleges that five of the ten transfers to Barclays took place prior to March 1, 2009; Plaintiffs cannot recover for those transfers under Section 147.

## CERTIFICATE OF SERVICE

I, GRACE WAGNER, hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746,

that on this 24th day of January, 2014, I served MEMORANDUM OF LAW IN SUPPORT OF

DEFENDANT DLA PIPER LLP (US)'S MOTION TO DISMISS THE COMPLAINT, by United

States Mail and E-mail, upon the following counsel of record:

> Joshua J. Bruckerhoff, Esq.
> Reid Collins & Tsai LLP
> 1301 S. Capital of Texas Hwy
> Building C, Suite 300
> Austin, TX 78746

_Grace Wagner_
Grace Wagner