GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
Kevin S. Rosen (pro hac vice to be filed)
Craig H. Millet (pro hac vice to be filed)
Matthew S. Kahn (MK-5426)
MKahn@gibsondunn.com

*Attorneys for Defendant DLA Piper LLP (US)*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ICP STRATEGIC CREDIT INCOME FUND LTD., *et al.*,<br><br>        Debtors in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 13-12116 (REG)<br><br>(Jointly Administered) |
| ICP STRATEGIC CREDIT INCOME MASTER FUND LTD., ICP STRATEGIC CREDIT INCOME FUND LTD., and HUGH DICKSON and STEPHEN AKERS, solely in their capacity as the Foreign Representatives and Joint Official Liquidators of ICP Strategic Credit Income Fund Ltd. and ICP Strategic Credit Income Master Fund Ltd.,<br><br>        Plaintiffs,<br>  -against-<br><br>DLA PIPER LLP (US),<br><br>        Defendant. | Adv. Pro. No. 14-01835 (REG)<br><br>(Procedurally Consolidated Under This Matter) |

**DEFENDANT DLA PIPER LLP (US)'S APPENDIX OF DOCUMENTS CITED IN THE COMPLAINT AND FOREIGN AUTHORITIES SUBMITTED WITH <u>MOTION TO DISMISS THE COMPLAINT</u>**

New York, New York
January 24, 2014

**Exhibit A**: Excerpt from the deposition transcript of Lucien White ("**White**"), dated May 6, 2010

**Exhibit B**: Email sent from White to Aamer Abdullah ("**Abdullah**"), copying Brent Layman and David Parseghian ("**Parseghian**"), dated October 28, 2008

**Exhibit C**: Email sent from White to Parseghian, copying Abdullah, dated November 5, 2008

**Exhibit D**: Email sent from White to Abdullah, dated May 21, 2009

**Exhibit E**: Excerpt from the Confidential Memorandum of ICP Strategic Credit Income Fund Ltd., dated February 2009

**Exhibit F**: Letter from ICP Asset Management LLC to ICP Strategic Credit Income Master Fund Ltd., dated April 29, 2009, which is attached to an email from White to Shail Patel ("**Patel**"), copying Parseghian, Abdullah and Peter Woroniecki ("**Woroniecki**"), dated April 29, 2009

**Exhibit G**: Email sent from Woroniecki to Thomas Priore and Peter Gaudet, dated May 22, 2009

**Exhibit H**: Letter sent from J. Kevin Walker of Barclays Bank PLC to Triaxx Funding High Grade I, Ltd., dated October 30, 2008

**Exhibit I**: Email sent from Woroniecki to White and Patel, copying Parseghian and Abdullah, dated April 29, 2009

**Exhibit J**: Cayman Islands Companies Law § 147

**Exhibit K**: Cayman Islands Companies Law § 2(1)

**Exhibit L**: English Insolvency Act of 1986 § 213

**Exhibit M**: English Companies Act of 1948 § 332

**Exhibit N**: *In re Maidstone Buildings Provisions Ltd.*, 1 W.L.R. 1085 (Ch. D. 1971)

**Exhibit O**: *In re Augustus Barnett & Sons Ltd.*, 2 B.C.C. 98904 (Ch. D. 1985)

**Exhibit P**: *Morphitis v. Bernasconi*, [2003] EWCA Civ 289 (Ct. of App., Ch. D. 2003)

**Exhibit Q**: *Picard v. Primeo Fund*, Cause No. FSD 275 of 2010-AJJ (Grand Cayman Islands Jan. 14, 2013)

**DECLARATION OF MATTHEW S. KAHN IN SUPPORT OF
DEFENDANT DLA PIPER LLP (US)'S APPENDIX OF DOCUMENTS CITED IN THE
COMPLAINT AND FOREIGN AUTHORITIES SUBMITTED WITH
MOTION TO DISMISS THE COMPLAINT**

I, MATTHEW S. KAHN, hereby declare under penalty of perjury pursuant to 28 U.S.C.

§ 1746 as follows:

1.      I am an attorney licensed to practice in the State of New York and admitted to

practice before this Court.  I am a partner with the law firm of Gibson, Dunn & Crutcher LLP,

counsel of record for Defendant DLA Piper LLP (US) ("**DLA**") in the above-captioned matter.  I

have personal knowledge of the matters set forth in this Declaration and, if called upon to do so,

I could and would testify as follows:

2.      Attached hereto as Exhibit "A" is a true and correct copy of an excerpt from the

deposition transcript of Lucien White ("**White**"), dated May 6, 2010.  This document is

referenced in paragraphs 102-05 of the Complaint.  At my direction, a copy of this document was

downloaded from the Southern District of New York's ECF system and a copy was attached to

this Declaration.

3.      Attached hereto as Exhibit "B" is a true and correct copy of an email sent from

White to Aamer Abdullah ("**Abdullah**"), copying Brent Layman and David Parseghian

("**Parseghian**"), dated October 28, 2008.  This document is referenced in paragraph 44 of the

Complaint.  At my direction, a copy of this document was obtained from DLA's files and a copy

was attached to this Declaration.

4.      Attached hereto as Exhibit "C" is a true and correct copy of an email sent from

White to Parseghian, copying Abdullah, dated November 5, 2008.  This document is referenced

in paragraph 57 of the Complaint.  At my direction, a copy of this document was obtained from

DLA's files and a copy was attached to this Declaration.

5.      Attached hereto as Exhibit "D" is a true and correct copy of an email sent from White to Abdullah, dated May 21, 2009.  This document is referenced in paragraph 85 of the Complaint.  At my direction, a copy of this document was obtained from DLA's files and a copy was attached to this Declaration.

6.      Attached hereto as Exhibit "E" is a true and correct copy of an excerpt from the Confidential Memorandum of ICP Strategic Credit Income Fund Ltd., dated February 2009, and previously filed with the Court as Exhibit D to the Declaration of Hugh Dickson (ECF No. 4, Ex. D) submitted in support of the Joint Official Liquidators' Verified Petition seeking Chapter 15 recognition of the Cayman Islands Proceedings (ECF No. 3).  This document is referenced in paragraph 25 of the Complaint.  At my direction, a copy of this document was downloaded from this Court's ECF system and a copy was attached to this Declaration.

7.      Attached hereto as Exhibit "F" is a true and correct copy of a letter from ICP Asset Management LLC to ICP Strategic Credit Income Master Fund Ltd., dated April 29, 2009, which is attached to an email from White to Shail Patel ("**Patel**"), copying Parseghian, Abdullah and Peter Woroniecki ("**Woroniecki**"), dated April 29, 2009.  This document is referenced in paragraph 79 of the Complaint.  At my direction, a copy of this document was obtained from DLA's files and a copy was attached to this Declaration.

8.      Attached hereto as Exhibit "G" is a true and correct copy of an email sent from Woroniecki to Thomas Priore and Peter Gaudet, dated May 22, 2009.  This document is referenced in paragraph 87 of the Complaint.  At my direction, a copy of this document was obtained from DLA's files and a copy was attached to this Declaration.

9.      Attached hereto as Exhibit "H" is a true and correct copy of a letter sent from J. Kevin Walker of Barclays Bank PLC to Triaxx Funding High Grade I, Ltd., dated October 30,

2008. This document is referenced in paragraph 52 of the Complaint. At my direction, a copy of this document was obtained from DLA's files and a copy was attached to this Declaration.

10. Attached hereto as Exhibit "I" is a true and correct copy of an email sent from Woroniecki to White and Patel, copying Parseghian and Abdullah, dated April 29, 2009. This document is referenced in paragraph 80 of the Complaint. At my direction, a copy of this document was obtained from DLA's files and a copy was attached to this Declaration.

11. Attached hereto as Exhibit "J" is a true and correct copy of the Cayman Islands Companies Law § 147, the full version of which is publicly available at http://www.gazettes.gov.ky/sites/default/files/gazette-supplements/Gs532012_web.pdf ("**Gazettes Website**") (last visited Jan. 22, 2014). At my direction, a copy of this document was obtained by download from the Gazettes Website and a copy was attached to this Declaration.

12. Attached hereto as Exhibit "K" is a true and correct copy of the Cayman Islands Companies Law § 2(1), the full version of which is publicly available at the Gazettes Website. At my direction, a copy of this document was obtained by download from the Gazettes Website and a copy was attached to this Declaration.

13. Attached hereto as Exhibit "L" is a true and correct copy of the English Insolvency Act of 1986 § 213, the full version of which is available at www.westlaw.co.uk. At my direction, a copy of this document was obtained by download from www.westlaw.co.uk and a copy was attached to this Declaration.

14. Attached hereto as Exhibit "M" is a true and correct copy of the English Companies Act of 1948 § 332, the full version of which is publicly available at http://www.legislation.gov.uk/ukpga/1948/38/contents/enacted ("**UK Government Website**")

(last visited Jan. 22, 2014).  At my direction, a copy of this document was obtained by download from the UK Government Website and a copy was attached to this Declaration.

15.     Attached hereto as Exhibit "N" is a true and correct copy of *In re Maidstone Buildings Provisions Ltd.*, 1 W.L.R. 1085 (Ch. D. 1971).  At my direction, a copy of this document was obtained by download from www.westlaw.co.uk and a copy was attached to this Declaration.

16.     Attached hereto as Exhibit "O" is a true and correct copy of *In re Augustus Barnett & Sons Ltd.*, 2 B.C.C. 98904 (Ch. D. 1985).  At my direction, a copy of this document was obtained by download from www.westlaw.co.uk and a copy was attached to this Declaration.

17.     Attached hereto as Exhibit "P" is a true and correct copy of *Morphitis v. Bernasconi*, [2003] EWCA Civ 289 (Ct. of App., Ch. D. 2003).  At my direction, a copy of this document was obtained by download from www.lexisnexis.com and a copy was attached to this Declaration.

18.     Attached hereto as Exhibit "Q" is a true and correct copy of *Picard v. Primeo Fund*, Cause No. FSD 275 of 2010-AJJ (Grand Cayman Islands Jan. 14, 2013).  At my direction, a copy of this document was obtained by download from www.judicial.ky/, the Cayman Islands Judicial and Legal Information Website, and a copy was attached to this Declaration.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24th day of January 2014 in San Francisco, California.

/s/ Matthew S. Kahn
MATTHEW S. KAHN

# EXHIBIT A

14164 white.lucien 050610

0099
1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:                    )
4  ICP Asset Management                 )  File No. NY-8150
5
6  WITNESS:   Lucien White
7
8  PAGES:     99 through 231
9
10 PLACE:     Securities and Exchange Commission
11            3 World Financial Center
12            New York, New York  10281
13
14 DATE:      Thursday, May 6, 2010
15
16            The above-entitled matter came on for hearing,
17 pursuant to notice, at 2:18 p.m.
18
19
20
21
22
23
24
25

0100
1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4        SUSANNAH DUNN, ESQ., STAFF ATTORNEY
5        CELESTE CHASE, ESQ., ASSISTANT REGIONAL DIRECTOR
6        JOSHUA PATER, ESQ., STAFF ATTORNEY
7        KEN GOTTLIEB, STAFF ACCOUNTANT
8        JOSEPH BORYSHANSKY, SENIOR TRIAL COUNSEL
9        Division of Enforcement
10       Securities and Exchange Commission
11       3 World Financial Center
12       New York, New York 10281-1022
13
14 On behalf of the Witness:
15       ANDREW SPITAL, ESQ.
16       MICHAEL S. SCHACHTER, ESQ.
17       Wilkie, Farr & Gallagher, LLP.
18       787 Seventh Avenue
19       New York, New York 10019-6099
20
21
22
23
24
25

0101
1                        C O N T E N T S
2  WITNESS:                                      EXAMINATION
3  LUCIEN WHITE                                      101
4
5  EXHIBITS:     DESCRIPTION                      IDENTIFIED
6    263         E-mail chain                        114
7    264         E-mail                              121
8    265         E-mail chain                        143
9    266         E-mail chain                        152
10   267         E-mail chain                        152

Page 1

SEC-ICP 00010624

14164 white.lucien 050610

3      A    Yes.
4      Q    We also discussed a direction letter from ICP to
5    the trustee of Triaxx Funding, is that right?
6      A    Yes.
7      Q    Finally, we discussed something called a side
8    letter between SCIF and Barclay's, do you recall that?
9      A    Yes.
10     Q    Did you believe that all three of those documents
11   were necessary in order to properly paver the first
12   transaction?
13     A    Well, I believe that the waiver was absolutely
14   necessary.  The direction letter was something that the
15   trustee insisted on, and the side letter was something that
16   Barclay's and SCIF, according to what was told to me had
17   agreed on.
18     Q    Who told you that?
19     A    That would have been again Aamer and or Dave.
20     Q    So Aamer and or Dave communicated to you that SCIF
21   and Barclay's had agreed to sign the side letter?
22     A    Right.
23     Q    As we discussed on April 16th, you drafted a side
24   letter which you believe memorialized the terms of that
25   agreement, is that correct?
0112
1      A    Yes.
2          MS. CHASE:   You said that you came to a conclusion
3    that the loan would work under the indenture.  What do you
4    mean, that the loan wouldn't violate any provision of that
5    indenture?  Can you just explain that a little bit more?
6          THE WITNESS:   That the loan, the making of a loan
7    from a third party to Barclays would not violate any
8    provision of the indenture so that it could occur and that
9    Barclay's could therefore waive the margin requirement.
10         MS. CHASE:   Were there any particular parts of the
11   indenture though that specifically allowed for the lending of
12   money by third party to meet a margin obligation?
13         THE WITNESS:   Not that I'm aware of.
14         MS. CHASE:   Or any type of loan from a third
15   party.
16         THE WITNESS:   That's correct, but nor would it be
17   required to be in there for it to work.
18     Q    So Aamer and or Dave indicated to you that SCIF and
19   Barclay's had agreed to enter into a loan transaction and
20   they designated it or called it a loan, is that your
21   recollection?
22     A    I don't remember what they called it.
23     Q    Do you recall discussing with them how  - this is
24   before the transaction was finalized.  Do you recall
25   discussing with either of them whether or how SCIF could be
0113
1    repaid?
2      A    Yes.
3      Q    What do you recall discussing?
4      A    According to Aamer and or Dave, the agreement
5    between Barclay's and SCIF was that SCIF would advance monies
6    to Barclay's, Barclay's would agree to use the proceeds of
7    that advance to satisfy to issuers margin call obligations
8    and that if and when there were subsequent increases of
9    market value of the securities being held by Barclay's that
10   would otherwise be treated as margin excess under the
11   indenture, that those amounts would be used to repay the
12   advances made by SCIF to Barclay's.
13         MS. CHASE:   Is advance synonymous with a loan?
                              Page 6

SEC-ICP 00010629

14164 white.lucien 050610

14          THE WITNESS:   You know, six of one, half a dozen
15  of another, call it an advance, call it a loan.
16          MS. CHASE:   So it's the same thing in your mind?
17          THE WITNESS:   Yes, right.
18          MS. CHASE:   Did you look at the indenture to
19  determine whether or not a loan from SCIF to Triaxx Funding
20  could be done under the indenture?  Is that something that
21  you looked at as well?
22          THE WITNESS:   Oh yes.
23          MS. CHASE:   What did you determine?
24          THE WITNESS:   That that could not be done.
25  There's a negative covenant that prohibits the issuer from
0114
1   issuing debt other than debt that is specifically laid out in
2   the indenture.  The debt that was laid out in the indenture
3   at the closing was the several classes of notes, B1 to D.
4           MS. CHASE:   Is there any reason that you looked at
5   the indenture for that particular point because you testified
6   that you understood the loan was from SCIF to Barclay's?
7           THE WITNESS:   Well, I look generally at the
8   indenture to see if there's anything that might shed light on
9   this particular transaction.
10          Q     So it was clear to you prior to the first advance
11  from SCIF that Triaxx Funding would not have been permitted
12  to take a loan from SCIF?
13          A     Directly, right.  That's the same analysis that was
14  made when the CEN's were issued.  The issuer can't incur the
15  date without amending the indenture if we go to the mechanics
16  of amending the indenture to permit it.
17          Q     I'd like to ask the reporter to mark a document as
18  Exhibit 263.  Mr. White, I'm showing you what's just been
19  marked Exhibit 263.  Take a minute to look at that.  For the
20  record it's Bate stamped DLAPIPER 000719 through 723.  Have
21  you had a chance to review Exhibit 263?
22                        (Commission Exhibit No. 263 was
23                         marked for identification.)
24          A     Yes.
25          Q     Can you identify it?
0115
1           A     It's an e-mail from me  - well, it's an e-mail
2   chain among me, Aamer and Brent Layman.
3           Q     Aamer and Mr. Layman are ICP employees, is that
4   correct?
5           A     Yes.  There's also  - in the chain there's some
6   Barclay's folks in here as well, as well as Cadwalader.
7           Q     Is it fair to say generally this e-mail chain
8   relates to the topic of the first advance from SCIF?
9           A     Yes.
10          Q     Can I direct your attention to the first page which
11  ends in bate stamp 721.  You see it appears to be an e-mail
12  from you to Aaron Benjamin at Cadwalader copying a number of
13  other individuals, and you indicated you had left a voice
14  mail for Mr. Benjamin, do you see that?
15          A     Yes.
16          Q     And you go on to write in summary that we'd like to
17  have an ICP affiliate post the cash directly in lieu of
18  Triaxx Funding posting it for the margin call, is that a fair
19  characterization?
20          A     Yes.
21          Q     Did you understand  - let me back up.  You
22  mentioned as you understood it, ICP and SCIF had agreed to a
23  loan or transaction with Barclay's, is that right?
24          A     Yes.

Page 7

SEC-ICP 00010630

14164 white.lucien 050610

```
2              MS. CHASE:    Even though Barclay's - well, Mr.
3   Benjamin told you that Barclay's wasn't going to directly pay
4   SCIF, is that right?
5              THE WITNESS:    Right.
6         Q    Didn't that mean that Barclay's was reneging on the
7   agreement that had been reached?
8         A    Well, number one, I didn't know what agreement had
9   been reached.  I was merely drafting what I had been told was
10  the agreement.
11        Q    So what it meant was Barclay's was reneging on your
12  understanding of the agreement?
13        A    Right.
14        Q    Do you recall on April 16, you testified that the
15  terms in this draft side letter constituted your
16  understanding of the agreement and your understanding of the
17  agreement never changed?
18        A    Oh no, it changed, in subsequent conversations with
19  Aamer and or Dave, we discussed the suggestion by Aaron that
20  a transfer of these funds from Barclay's to the issuer could
21  be then subsequently transferred pursuant to an instruction
22  from the collateral manager to SCIF.  In my view then as it
23  is now is that since that's not an asset of the issuer, the
24  collateral manager can instruct and the trustee should accept
25  that instruction.
0129
1         Q    I want to read a portion of your testimony from
2   April 16 and see  - I could see if I'm misunderstanding it.
3              MR. SCHACHTER:    What page are you on?
4              MR. PATER:    Page 67.
5              MR. SCHACHTER:    Can you hold on one second?
6              MR. PATER:    Yes.
7              MR. SCHACHTER:    What line?
8         Q    If you look at page 65 you'll see that we were
9   discussing this same exhibit, Exhibit 245, but going forward
10  to page 67, beginning I guess on line 3.  I asked "After Mr.
11  Benjamin informed you that Barclay's will not sign what was
12  your understanding if any of whether SCIF had a right to
13  repayment of its loan?"  You responded, "It was my
14  understanding that the terms that were written in this
15  document were the terms that had been agreed by those two
16  parties."  I asked, "And you continue to have that
17  understanding?"  You responded, "Yes."  I asked, "Did you at
18  any point reach a different understanding?"  And you
19  responded "No."  I had understood you to be saying that the
20  terms of the attachment to Exhibit 245 accurately reflected
21  your understanding at all times of the agreement between
22  Barclay's and SCIF, but from what you're saying today it
23  sounds like that's not the case.
24        A    I'm not saying anything different today from what I
25  was saying then.  The fact of an agreement to repay a loan
0130
1   was always there.  The mechanics of the repayment are what
2   became different.
3         Q    You see in Exhibit 245, page ending bates 466.  Sub
4   point 1 near the bottom generally provides as we discussed on
5   April 16 that Barclays agreed that if any margin excess
6   amount were required to be paid by Barclay's, Barclay would
7   first pay such amount to SCIF until SCIF had been repaid.
8         A    Um-hum.
9         Q    That's a paraphrase, but is it a fair paraphrase?
10        A    Yeah.
11        Q    I had understood you to be saying that the terms as
12  spelled out in this letter always accurately reflected your
```

Page 13

SEC-ICP 00010636

```
                            14164 white.lucien 050610
13  understanding of the agreement, am I incorrect?
14       A    We have to distinguish between the obligation to
15  repay a loan and the mechanism by which the loan is repaid.
16  The mechanism by which the loan is repaid under this document
17  as it was explained to me was a direct payment.  Barclay
18  subsequently said we're not signing that document and a
19  different method of repayment was discussed.
20       Q    The different method of repayment was in fact not a
21  method of repayment to SCIF, but it was a method of transfer
22  of funds to Triaxx Funding?
23       A    Well, it's a method of repayment that anticipates
24  that Barclay's is going to transfer funds to the issuer which
25  are not funds that the issuer owns.
0131
1        Q    Did - I'm sorry, I cut you off.  Go ahead.
2        A    And that therefore the collateral manager can
3   instruct pursuant to the management agreement the trustee to
4   transfer those funds to SCIF.
5        Q    Did the trustee ever agree that it would accept
6   such a direction?
7        A    I was not party to the conversations between ICP
8   and the trustee.
9        Q    Were there such conversations?
10       A    I don't know.
11       Q    So sitting here today you don't know whether anyone
12  from LaSalle ever agreed that upon direction from ICP Asset
13  Management, it would take monies received from Barclay's and
14  send them to SCIF outside the priority of payments as
15  discussed in the Triaxx Funding indenture?
16       A    I'm going to just disagree with one factual
17  assumption in your question, which is the assumption that
18  these are  - that transfer would be a transfer outside the
19  priority of payments.  There's nothing in those assets that
20  would even permit them to be distributed pursuant to the
21  priority of payments, because it's simply not an asset of the
22  issuer, so it's not that it's a transfer outside the priority
23  of payments, it's a transfer of money that the issuer simply
24  doesn't have rights to.
25       Q    But did the trustee ever agree to that to your
0132
1   knowledge?
2        A    I'm just not aware.  I wasn't party to the
3   conversations between those three.
4        Q    But you're saying the conversations.  Do you
5   believe there were conversations with the trustee on the
6   topic of whether such a transfer would be a transfer of
7   assets or of margin excess?
8        A    I just don't know.
9        Q    So it's possible that the trustee never agreed to
10  that?
11       A    It's possible that they never agreed, or that they
12  did agree.  I don't know which.
13       MS. CHASE:    If the assets didn't belong to the
14  issuer that we're talking about, why would they be
15  transferred to the trustee?
16       THE WITNESS:   You would have to ask Barclay's.
17       Q    Did you ask Barclay's?
18       A    Well, I never had any direct conversation with
19  Barclay's.  I only spoke with their counsel.
20       Q    Have you ever heard of a loan in which the obligor
21  makes good on the loan by paying someone other than the
22  oblige?
23       A    There are plenty of instances where obliges get
                              Page 14
```

SEC-ICP 00010637

# EXHIBIT B

| From: | White, Lucien |
| Sent: | Tuesday, October 28, 2008 2:44 PM |
| To: | 'AAbdullah@icpcapital.com' |
| Cc: | 'blayman@icpcapital.com'; 'DParseghian@icpcapital.com' |
| Subject: | Re: 7.25mm CEN or escrow |

Yes. Do a side letter between the provider of the cash escrow and Barclays (it should provide for the return of the cash upon satisfaction of the requirements in the MRA); then make sure Barclays waives in writing (in favor of TFUND) the margin posting requirement in the MRA -- we need the waiver so there is no technical EoD under the MRA.  As long as you're not taking cash out of the structure to fund this new escrow, it should work.

We should also get them to extend the maturity date with our normal extension amendment.


FYI, I'm not in town -- computer access limited. If I need to draft something, let me know asap.

----- Original Message -----
From: Aamer Abdullah <AAbdullah@icpcapital.com>
To: White, Lucien
Cc: Brent Layman <BLayman@icpcapital.com>; David Parseghian <DParseghian@icpcapital.com>
Sent: Tue Oct 28 14:15:08 2008
Subject: 7.25mm CEN or escrow

Lucien,


We need to post about 7.5mm to Barclays for TFUND.  Originally we were thinking of doing it as a CEN.  However, is it possible to just post it to them in escrow for their benefit if the deal unwinds but otherwise not part of the deal structure?


---

Aamer Abdullah

Managing Director


360 Madison Avenue, 10th Floor | New York, NY 10017 ( 212-821-1914 | 917-216-8856 2 212-821-1959
* aabdullah@icpcapital.com

---

1

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.

# EXHIBIT C

| From: | White, Lucien [Lucien.White@dlapiper.com] |
|---|---|
| Sent: | Wednesday, November 05, 2008 5:04 PM |
| To: | David Parseghian |
| Cc: | Aamer Abdullah |
| Subject: | RE: Triaxx/MRA extension |

Morning meeting out of the office.  Probably unavailable till somewhere around 1:30.

Also, I just got off the phone w/Barcalys -- now they don't want to sign the side letter at all.  If we were to insist on it, they'd want the Issuer to countersign it, which creates all kinds of problems under the Indenture.  I said we need the priority and they said we should be able to get that by having the collateral manager give a direction letter to the Trustee to take the first dollars if there's a margin excess and ship them to us.  I've got to think about that a bit, but I think we should be able to get there with a formulation like that. I'll come back to you on that.

---

> From: David Parseghian [mailto:DParseghian@icpcapital.com]
> Sent: Wednesday, November 05, 2008 4:54 PM
> To: White, Lucien
> Cc: Aamer Abdullah
> Subject: FW: Triaxx/MRA extension
>
>
> Are you around for this?
>
>
> From: Tracy-Ann Lamont [mailto:Tracy-Ann.Lamont@maplesfinance.com]
> Sent: Wednesday, November 05, 2008 4:54 PM
> To: David Parseghian
> Cc: White, Lucien; Carrie Bunton
> Subject: RE: Triaxx/MRA extension
>
>
> Thanks David.  would it be possible for us to have a quick call Thursday AM to discuss the amendments?
>
> Kind regards,
>
> Tracy

---

> From: David Parseghian [mailto:DParseghian@icpcapital.com]
> Sent: Tuesday, November 04, 2008 4:26 PM

To: Tracy-Ann Lamont
Cc: White, Lucien
Subject: RE: Triaxx/MRA extension

confirmed


From: Tracy-Ann Lamont [mailto:Tracy-Ann.Lamont@maplesfinance.com]
Sent: Thursday, October 30, 2008 1:00 PM
To: Korot, Emily; Andy.Georgalas@barclayscapital.com; David Parseghian
Cc: Brent Layman; Nick Evans; Carrie Bunton; Alan.Kaplan@barclayscapital.com;
Tim.Keenan@barclayscapital.com; Kevin.walker@barclayscapital.com; Aamer Abdullah; Lisa
Spinelli; White, Lucien; Guy Major
Subject: RE: Triaxx/MRA extension


Could both the Trustee and the Manager confirm that there have been no events of
default for Triaxx Funding High Grade I, Ltd. so that the Issuer can in turn make the said
representations as contained in the attached Amendment.

Kind regards,

Tracy-Ann Lamont on behalf of Carrie Bunton
Maples Finance Limited
Cayman Islands

tracy-ann.lamont@maplesfinance.com

Direct: +1 345 814 5737
Fax:     +1 345 945 7100

www.maplesfinance.com
www.maplesandcalder.com

---

From: Korot, Emily [mailto:Emily.Korot@dlapiper.com]
Sent: Wednesday, October 29, 2008 12:34 PM
To: Andy.Georgalas@barclayscapital.com
Cc: DParseghian@icpcapital.com; BLayman@icpcapital.com; Nick Evans; Carrie Bunton;
Alan.Kaplan@barclayscapital.com; Tim.Keenan@barclayscapital.com;
Kevin.walker@barclayscapital.com; aabdullah@icpcapital.com; lspinelli@icpcapital.com; White,
Lucien
Subject: Triaxx/MRA extension

Attached is a further amendment to the Barclays MRA extending the termination date to
November (clean and marked against the prior amendment). If acceptable, please execute and
email signature pages to me and Lucien White.

Thanks very much,
Emily

      <<DV_Comparison_#41234199v4_EAST_ - MRA Amendment (Triaxx_Barclays-#41234199v5_EAST_ - MRA Amendment (Triaxx_Barclays.pdf>> <<#41234199v5_EAST_ - MRA Amendment (Triaxx_Barclays.DOC>>

      This is Global Environment Month at DLA Piper. For information, please visit www.dlapiper.com/global/aboutus/sustainability/ <http://www.dlapiper.com/global/aboutus/sustainability/> . Please consider the environment before printing this email.
_____

      The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.
_____


_____

      This e-mail (including any attachments) is confidential. No confidentiality is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. For further information about Maples Finance please visit "http://www.maplesfinance.com". For further information about Maples and Calder (including a list of our partners) please visit "http://www.maplesandcalder.com".


_____


_____
This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email
_____


_____

      This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.


_____

      This e-mail (including any attachments) is confidential. No confidentiality is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. For further information about Maples Finance please visit

"http://www.maplesfinance.com". For further information about Maples and Calder (including a list of our partners) please visit "http://www.maplesandcalder.com".

———————————————————————

———————————————————————————————————————
This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email
———————————————————————————————————————

———————————————————————

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.


Please consider the environment before printing this email.
————————————————————
The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

———————————————————————

———————————————————————————————————————
This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email
———————————————————————————————————————

# EXHIBIT D

Aamer,

As discussed, ICP Strategic Credit Income Master Fund Ltd. has made certain cash advances to Barclays to satisfy certain margin call obligations of T-Funding to Barclays under its MRA.

You have asked for our views, based on a review of the T-Funding indenture and the management agreement between T-Funding and ICP AM, as to the ability of ICP AM, as collateral manager for T-Funding, to direct the Trustee to repay these advances to ICP SCIMF from funds transferred by Barclays to T-Funding in respect of those advances.

The management agreement between ICP AM and T-Funding requires ICP AM to provide a number of services to T-Funding, including the obligations to:

- ". . . supervise and direct the investment, sale and reinvestment of the Assets and Portfolio Collateral Debt Securities . . ."

- " . . . supervise the transactions under each Master Repurchase Agreement . . .";

- " . . . ensure that any maturing liabilities under the Master Repurchase Agreements . . . are satisfied . . .";

- ". . . effect any required withdrawals from the Collateral Escrow Account, including without limitation to pay any Margin Deficit Amounts under the Master Repurchase Agreements . . ."; and

- ". . . take action, with respect to [T-Funding's] exercise of rights or remedies in connection with the Master Repurchase Agreements . . ., including without limitation requesting funds from the Repurchase Counterparties . . . with respect to any Margin Excess . . ."

ICP AM is required to ". . . manage the Assets . . . and manage the Master Repurchase Agreement . . . for the benefit of, and in the best interests of, inter alia, the Senior Counterparties and the Holders in accordance with the terms of the securities, the Indenture and the Master Repurchase Agreements . . ."

ICP AM is required to perform its obligations under the Management Agreement " . . . in good faith, with reasonable skill and care . . ."

It is our understanding that, as part of each advance by ICP SCIMF referred to above, Barclays has agreed in writing that each such advance satisfied T-Funding's then-existing margin call payment obligations under its MRA. In addition, ICP AM has certified to the Trustee in each case that "the interests of the Noteholders will not be materially and adversely affected by the consummation of the transactions referred to herein."

You have also indicated to us that, absent these advances, there was a substantial likelihood that Barclays would have declared an Event of Default under its MRA, triggering liquidation of the collateral by Barclays, possibly leaving the Noteholders, particularly the junior noteholders, with a principal shortfall. Because of these facts, you have indicated that it was ICP AM's good faith judgment that ICP SCIMF's making of these advances was in the best interests of the Senior Counterparties and the Noteholders.

Finally, we note that you have indicated that Barclays and ICP SCIMF view these transactions not as transfers or payments by T-Funding to Barclays, but as advances by ICP SCIMF to Barclays; as an accommodation to ICP AM, Barclays is willing to waive T-Funding's margin call obligations because of its receipt of these advances. However, Barclays will not be repaying the advances directly to ICP SCIMF, but instead will transfer all amounts, including any Margin Excess resulting from ICP SCIMF advances, to the Trustee.

1

Based on the foregoing, and subject to the qualifications below, we believe it would not be unreasonable to take the positions that:

1. The cash advances made by ICP SCIMF to Barclays are not Assets of T-Funding, but were provided as part of a transaction that is designed as an accommodation to protect the interests of the Senior Counterparties and the Noteholders; T-Funding is not a party to these transactions.

2. To the extent those advances are subsequently transferred by Barclays to the Trustee, the amounts transferred would not constitute "Principal Proceeds", "Interest Proceeds", "Class A Note Principal Proceeds", "Class A Note Interest Proceeds", "Senior Counterparty Principal Proceeds" or "Senior Counterparty Interest Proceeds" and, therefore, would not be distributable pursuant to the Priority of Payments. Accordingly, ICP AM, in its capacity as collateral manager, could direct the Trustee (i) not to hold such amounts in the Collateral Escrow Account established under the indenture and (ii) to transfer those advances back to ICP SCIMF outside of the Priority of Payments under the Indenture. We would expect that ICP AM would certify that, in connection with such direction, (i) the amounts transferred are not Assets of T-Funding and do not constitute "Principal Proceeds", "Interest Proceeds", "Class A Note Principal Proceeds", "Class A Note Interest Proceeds", "Senior Counterparty Principal Proceeds" or "Senior Counterparty Interest Proceeds" and (ii) such actions would not materially and adversely affect the Noteholders.

3. ICP SCIMF could be compensated for the time-value of money advanced to Barclays provided that the amounts that would be payable by T-Funding pursuant to the Priority of Payments would not be less than the amounts that would have been payable had these advances not occurred. We would expect that ICP AM would certify the accuracy of this statement when directing the Trustee to transfer funds to ICP SCIMF.

Please note that these views do not include any bankruptcy analysis. In particular, we cannot say that it would be unreasonable for the Trustee, any Noteholder or other interested party to take the position, either in or out of bankruptcy, that the cash advances are Assets of T-Funding and/or are subject to the Priority of Payments and therefore take a position contrary to those set forth above.

Please also note that the foregoing are our informal views only and may not be taken as, nor shall they be deemed to constitute, a legal opinion.



**Lucien D White**
Of Counsel
**DLA Piper LLP (US)**

212.335.4764 T
212.884.8664 F
917.331.0321 M
lucien.white@dlapiper.com
www.dlapiper.com

# EXHIBIT E

Copy No. _____

Furnished to: _____

---

### CONFIDENTIAL MEMORANDUM

*Relating to Shares of Par Value U.S.$0.01 per Share*

*of*

# ICP STRATEGIC CREDIT INCOME FUND LTD

*a Cayman Islands Exempted Company*

**February 2009**

**Investment Manager:**
ICP Asset Management LLC
360 Madison Avenue, 10th Floor
New York, New York 10017

**Administrator:**
GlobeOp Financial Services (Cayman) Limited
45 Market Street, Suite 3205, 2nd Floor
Gardenia Court, Camana Bay
Grand Cayman, Cayman Islands
KY1-9003

---

SRZ-10726917.24

JPMorgan is compensated for providing securities prime brokerage services based upon a fee schedule negotiated with the Investing Funds at normal commercial rates pursuant to arm's length negotiations.

The Investing Funds reserve the right to change the prime brokers described above and/or, in their discretion, to appoint additional or alternative prime broker(s) without prior notice to shareholders. Shareholders will be notified in due course of any appointment of additional or alternative prime broker(s) and custodian(s).

## BOARDS OF DIRECTORS

The Board of Directors generally meets at least once a year to review and assess the investment policy and performance of the Fund and generally to supervise the conduct of its affairs. The Board of Directors has overall responsibility to manage the Fund, but has delegated investment discretion over the Fund's assets to the Investment Manager pursuant to the terms of the Fund Investment Management Agreement and certain administrative functions to the Administrator pursuant to the Administration Agreement (defined below). The Board of Directors is not responsible for the day-to-day conduct of the Fund's trading activities.

The Fund's directors (each, a "Director") and their business experience are as follows:

**Thomas Priore.** See Mr. Priore's biography under "Management."

**Roger H. Hanson.** Roger H. Hanson is a Director of dms Management Ltd, a company management firm licensed and regulated under the laws of the Cayman Islands. Previously, he was the Regional Manager, North American & Caribbean, for Fortis Prime Fund Solutions with responsibility for operations, compliance and sales for the entire region. Prior to that, Mr. Hanson was the Managing Director of Fortis Bank (Cayman) Limited and Fortis Prime Fund Solutions (Cayman) Limited, where he was responsible for fund administration and banking operations. Mr. Hanson's previous experience includes public accounting in the audit department of Ernst & Young in the Cayman Islands, having qualified as a Chartered Accountant with Deloitte Haskins and Sells in England.

**Ronan Guilfoyle.** Ronan Guilfoyle is a Manager of dms Management Ltd. He currently serves as a director of several investment companies. Previously, he was a Group Manager at Admiral Administration Ltd., an independent mutual fund administration firm in the Cayman Islands. Prior to that, Mr. Guilfoyle worked with the audit department of Ernst & Young in Ireland. He holds a BSc degree in Accounting from University College Cork, Ireland and qualified as a Chartered Accountant in Ireland.

The Directors will also serve as the initial directors of the Master Fund. The Master Fund Board of Directors will generally meet at least once a year to review and assess the investment policy and performance of the Master Fund and generally to supervise the conduct of its affairs. The Master Fund Board of Directors has overall responsibility to manage the Master Fund, but has delegated investment discretion over the Master Fund's assets to the Investment Manager pursuant to the terms of the Master Fund Investment Management Agreement and certain administrative functions to the Administrator pursuant to the Administration Agreement.

# EXHIBIT F

| From: | White, Lucien |
|---|---|
| Sent: | Wednesday, April 29, 2009 3:54 PM |
| To: | 'Shail Patel' |
| Cc: | 'David Parseghian'; 'Aamer Abdullah'; 'Peter Woroniecki' |
| Subject: | RE: Triaxx Loan Amounts |
| Attachments: | image001.png; image002.jpg; ICP AM ltr to SCIMF 042909.pdf |

Here's the letter.

---

**From:** Shail Patel [mailto:ShailPatel@icpcapital.com]
**Sent:** Wednesday, April 29, 2009 3:47 PM
**To:** White, Lucien
**Cc:** David Parseghian; Aamer Abdullah; Peter Woroniecki
**Subject:** RE: Triaxx Loan Amounts

Lucien,

The accrued interest amount is **$14,487.54.**

Thanks,
Shail

---

**From:** White, Lucien [mailto:Lucien.White@dlapiper.com]
**Sent:** Wednesday, April 29, 2009 3:18 PM
**To:** Shail Patel
**Cc:** David Parseghian; Peter Woroniecki; Aamer Abdullah
**Subject:** RE: Triaxx Loan Amounts

I'm ready to send the final draft as soon as you get me the interest amount.

---

**From:** Shail Patel [mailto:ShailPatel@icpcapital.com]
**Sent:** Wednesday, April 29, 2009 2:32 PM
**To:** White, Lucien
**Cc:** David Parseghian; Peter Woroniecki; Aamer Abdullah
**Subject:** RE: Triaxx Loan Amounts

Lucien,
Please see legal address below (documentation attached). We are still looking over the rest of the document, however, the accrued interest amount is incorrect and we are working on the correct calculation. We'll follow up with more shortly.

ICP Structured Credit Income Master Fund Ltd.
Walker House, c/o Walkers
87 Mary Street
Georgetown, Grand Cayman KY1-9001
Cayman Islands

**From:** Aamer Abdullah
**Sent:** Wednesday, April 29, 2009 1:54 PM
**To:** White, Lucien; Peter Woroniecki
**Cc:** David Parseghian; Shail Patel
**Subject:** RE: Triaxx Loan Amounts

Peter,

Can you please review and respond the Lucien in terms of his question below. Thanks.

---

Aamer Abdullah

Managing Director

 **ICP** | Structured Investments

360 Madison Avenue, 10th Floor | New York, NY 10017

☎ 212-821-1914 | 917-216-8856 📠 212-821-1959

✉ aabdullah@icpcapital.com

---

**From:** White, Lucien [mailto:Lucien.White@dlapiper.com]
**Sent:** Wednesday, April 29, 2009 1:52 PM
**To:** Aamer Abdullah; Shail Patel
**Cc:** David Parseghian; Lisa Spinelli
**Subject:** RE: Triaxx Loan Amounts

Take a look. Someone get me the legal address for ICP SCIMF, please.

> **From:** Aamer Abdullah [mailto:AAbdullah@icpcapital.com]
> **Sent:** Wednesday, April 29, 2009 1:15 PM
> **To:** Shail Patel; White, Lucien
> **Cc:** David Parseghian; Lisa Spinelli
> **Subject:** RE: Triaxx Loan Amounts
>
> All loans are at Fed Funds rate.
>
> ---
>
> Aamer Abdullah
>
> Managing Director
>
> **ICP** Structured Investments

2

---

**From:** Shail Patel
**Sent:** Wednesday, April 29, 2009 1:07 PM
**To:** White, Lucien
**Cc:** Aamer Abdullah; David Parseghian; Lisa Spinelli
**Subject:** Triaxx Loan Amounts

Lucien,

Please see below for a comprehensive list of margin payments made.

| Date | Amount |
|------|--------|
| 10/30/2008 | 7,175,455.52 |
| 1/28/2009 | 6,986,230.11 |
| 2/4/2009 | 456,728.66 |
| 2/27/2009 | 10,008,576.32 |
| 2/27/2009 | 731,423.68 |
| 3/27/2009 | 2,434,511.83 |
| 4/14/2009 | 2,179,560.28 |
| 4/29/2009 | 4,298,355.01 |
| Excess Interest | 442,648.40 |

Thanks,
Shail

Shail P. Patel
Institutional Credit Partners LLC

**◊ ICP**

360 Madison Avenue, 10th Floor
New York, NY 10017
☎ (212) 821-1979 | 📠 (212) 821-1959
spatel@icpcapital.com

---

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for

3

**ICP Asset Management LLC**
360 Madison Avenue, 10th Floor
New York, NY 10017

April 29, 2009

ICP Strategic Credit Income Master Fund Ltd.
Walker House, c/o Walkers
87 Mary Street
Georgetown, Grand Cayman KY1-9001
Cayman Islands

Re:  Triaxx Funding High Grade I, Ltd. (*"Triaxx Funding High Grade"*)

Dear Sir/Madam:

Pursuant to that certain Indenture, dated as of May 16, 2007 (as amended through the date hereof, the *"Indenture"*), between Triaxx Funding High Grade, as issuer, Triaxx Funding High Grade I, LLC, as co-issuer, and Bank of America, National Association, as successor by merger to LaSalle Bank National Association, as trustee (the *"Trustee"*), ICP Asset Management LLC (*"ICP Asset Management"*) acts as Collateral Acquirer (as defined in the Indenture) for Triaxx Funding High Grade.

Triaxx Funding High Grade has entered into that certain master repurchase agreement, dated as of May 16, 2007 (as amended through the date hereof, the *"Repurchase Agreement"*), with Barclays Bank PLC (the *"Repurchase Counterparty"*).

ICP Strategic Credit Income Master Fund Ltd. (the *"Fund"*) has made the following advances to the Repurchase Counterparty in order to satisfy obligations of Triaxx Funding High Grade to the Repurchase Counterparty under the Repurchase Agreement:

| Date | Amount (U.S. dollars) |
| --- | --- |
| October 30, 2008 | 7,175,455.52 |
| January 28, 2009 | 6,986,230.11 |
| February 4, 2009 | 456,728.66 |
| February 27, 2009 | 10,008,576.32 |
| February 27, 2009 | 731,423.68 |
| March 27, 2009 | 2,434,511.83 |
| April 14, 2009 | 2,179,560.28 |
| April 29, 2009 | 4,298,355.01 |

Interest accrued on these advances (at the Fed Funds Rate) to date is $14,487.54.

ICP Asset Management hereby confirms that, pursuant to its authority and obligations under the Indenture and the Management Agreement (as defined in the Indenture), but in any event subject to the terms of the Indenture and the Management Agreement, it will direct the Trustee to repay advances to the Fund (together with accrued interest at the Fed Funds rate) from funds transferable by the Repurchase Counterparty to Triaxx Funding High Grade in respect of the advances made by the Fund.

Very truly yours,

**ICP ASSET MANAGEMENT LLC**

By: _____
    Name:
    Title:

EXHIBIT G

# Peter Woroniecki

**From:** Peter Woroniecki
**Sent:** Friday, May 22, 2009 8:47 AM
**To:** 'Thomas Priore'; Peter Gaudet
**Subject:** RE: ICP SCIMF
**Attachments:** image001.png

Ok so I will have Globe Ops book this as a Loan to Barclays at FF flat.

**From:** Thomas Priore
**Sent:** Thursday, May 21, 2009 4:58 PM
**To:** Peter Woroniecki
**Subject:** RE: ICP SCIMF

That"s new on his end, but we have discussed with Barclays.

---

Thomas C. Priore
President/CEO

 **ICP** Structured Investments

360 Madison Avenue, 10th Floor | New York, NY 10017

☎ 212-821-1924 | 914-548-2041 ⊪ 212-821-1959

✉ tpriore@icpcapital.com

---

**From:** Peter Woroniecki
**Sent:** Thursday, May 21, 2009 4:44 PM
**To:** Thomas Priore
**Cc:** Peter Gaudet
**Subject:** FW: ICP SCIMF

After a long discussion with Lucien following up on his mail, his perception is that there is a "Undocumented Verbal Loan" in place between SCIF and Barclays, by law which is enforceable where Barclays will repay the loan plus fed funds to the trustee when there is Excess Margin Capacity in the repo facility. Tom, Lucien was under the assumption that you had that conversation with Barclays, I'd like to confirm that then I can set this up as a loan at GlobeOps.

**From:** White, Lucien [mailto:Lucien.White@dlapiper.com]
**Sent:** Thursday, May 21, 2009 11:55 AM
**To:** Aamer Abdullah
**Subject:** ICP SCIMF

Aamer,

As discussed, ICP Strategic Credit Income Master Fund Ltd. has made certain cash advances to Barclays to satisfy certain margin call obligations of T-Funding to Barclays under its MRA.

1

You have asked for our views, based on a review of the T-Funding indenture and the management agreement between T-Funding and ICP AM, as to the ability of ICP AM, as collateral manager for T-Funding, to direct the Trustee to repay these advances to ICP SCIMF from funds transferred by Barclays to T-Funding in respect of those advances.

The management agreement between ICP AM and T-Funding requires ICP AM to provide a number of services to T-Funding, including the obligations to:

- ". . . supervise and direct the investment, sale and reinvestment of the Assets and Portfolio Collateral Debt Securities . . ."

- " . . . supervise the transactions under each Master Repurchase Agreement . . .";

- " . . . ensure that any maturing liabilities under the Master Repurchase Agreements . . . are satisfied . . .";

- ". . . effect any required withdrawals from the Collateral Escrow Account, including without limitation to pay any Margin Deficit Amounts under the Master Repurchase Agreements . . ."; and

- ". . . take action, with respect to [T-Funding's] exercise of rights or remedies in connection with the Master Repurchase Agreements . . ., including without limitation requesting funds from the Repurchase Counterparties . . . with respect to any Margin Excess . . ."

ICP AM is required to ". . . manage the Assets . . . and manage the Master Repurchase Agreement . . . for the benefit of, and in the best interests of, inter alia, the Senior Counterparties and the Holders in accordance with the terms of the securities, the Indenture and the Master Repurchase Agreements . . ."

ICP AM is required to perform its obligations under the Management Agreement " . . . in good faith, with reasonable skill and care . . ."

It is our understanding that, as part of each advance by ICP SCIMF referred to above, Barclays has agreed in writing that each such advance satisfied T-Funding's then-existing margin call payment obligations under its MRA. In addition, ICP AM has certified to the Trustee in each case that "the interests of the Noteholders will not be materially and adversely affected by the consummation of the transactions referred to herein."

You have also indicated to us that, absent these advances, there was a substantial likelihood that Barclays would have declared an Event of Default under its MRA, triggering liquidation of the collateral by Barclays, possibly leaving the Noteholders, particularly the junior noteholders, with a principal shortfall. Because of these facts, you have indicated that it was ICP AM's good faith judgment that ICP SCIMF's making of these advances was in the best interests of the Senior Counterparties and the Noteholders.

Finally, we note that you have indicated that Barclays and ICP SCIMF view these transactions not as transfers or payments by T-Funding to Barclays, but as advances by ICP SCIMF to Barclays; as an accommodation to ICP AM, Barclays is willing to waive T-Funding's margin call obligations because of its receipt of these advances. However, Barclays will not be repaying the advances directly to ICP SCIMF, but instead will transfer all amounts, including any Margin Excess resulting from ICP SCIMF advances, to the Trustee.

Based on the foregoing, and subject to the qualifications below, we believe it would not be unreasonable to take the positions that:

1. The cash advances made by ICP SCIMF to Barclays are not Assets of T-Funding, but were provided as part of a transaction that is designed as an accommodation to protect the interests of the Senior Counterparties and the Noteholders; T-Funding is not a party to these transactions.

2. To the extent those advances are subsequently transferred by Barclays to the Trustee, the amounts transferred would not constitute "Principal Proceeds", "Interest Proceeds", "Class A Note Principal Proceeds", "Class A Note Interest Proceeds", "Senior Counterparty Principal Proceeds" or "Senior Counterparty Interest Proceeds" and, therefore, would not be distributable pursuant to the Priority of Payments. Accordingly, ICP AM, in its capacity as collateral manager, could direct the Trustee (i) not to hold such amounts in the Collateral Escrow Account established under the indenture and (ii) to

2

transfer those advances back to ICP SCIMF outside of the Priority of Payments under the Indenture. We would expect that ICP AM would certify that, in connection with such direction, (i) the amounts transferred are not Assets of T-Funding and do not constitute "Principal Proceeds", "Interest Proceeds", "Class A Note Principal Proceeds", "Class A Note Interest Proceeds", "Senior Counterparty Principal Proceeds" or "Senior Counterparty Interest Proceeds" and (ii) such actions would not materially and adversely affect the Noteholders.

3. ICP SCIMF could be compensated for the time-value of money advanced to Barclays provided that the amounts that would be payable by T-Funding pursuant to the Priority of Payments would not be less than the amounts that would have been payable had these advances not occurred. We would expect that ICP AM would certify the accuracy of this statement when directing the Trustee to transfer funds to ICP SCIMF.

Please note that these views do not include any bankruptcy analysis. In particular, we cannot say that it would be unreasonable for the Trustee, any Noteholder or other interested party to take the position, either in or out of bankruptcy, that the cash advances are Assets of T-Funding and/or are subject to the Priority of Payments and therefore take a position contrary to those set forth above.

Please also note that the foregoing are our informal views only and may not be taken as, nor shall they be deemed to constitute, a legal opinion.



**Lucien D White**
Of Counsel

**DLA Piper LLP (US)**

212.335.4764 T
212.884.8664 F
917.331.0321 M
lucien.white@dlapiper.com

www.dlapiper.com

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an

official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.

---

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.

---

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.

# EXHIBIT H



October 30, 2008

Triaxx Funding High Grade I, Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT, Queensgate House
George Town, Grand Cayman
Cayman Islands

Re:    Master Repurchase Agreement

Dear Sir/Madam:

Reference is made to that certain master repurchase agreement, dated as of May 16, 2007 (as amended through the date hereof, the "Repurchase Agreement"), between Triaxx Funding High Grade I, Ltd. (the "Issuer") and Barclays Bank PLC ("Barclays"). This notice is to acknowledge that Barclays has received, on October 29, 2008, $7,175,455.52 in immediately available funds (the "Margin Payment") from ICP Strategic Credit Income Master Fund Ltd. (the "Funds Provider"), which amount has been applied by Barclays to meet the margin payment obligations of the Issuer as of October 29, 2008 under Section 5(b)(i) of Amended and Restated Annex I to the Repurchase Agreement (the "Funding Obligation").

Accordingly, subject to the next paragraph, Barclays hereby waives the Funding Obligation of the Issuer as it was satisfied by the Funds Provider.

Barclays reserves all rights it has under the Repurchase Agreement other than to declare a default based on this Funding Obligation so long as none of the Funds Provider or any other person or entity requests or makes any claim or demand for repayment, reimbursement or claw-back of the Margin Payment (other than any payments that would have been payable to the Issuer under the Repurchase Agreement had the Issuer initially made the Margin Payment to Barclays in accordance with the Repurchase Agreement).

Very truly yours,

BARCLAYS BANK PLC

By: _____
    Name:  J. Kevin Walker
    Title:  Director

EAST\42221482.2

# EXHIBIT I

| From: | Peter Woroniecki [pworoniecki@icpcapital.com] |
|---|---|
| Sent: | Wednesday, April 29, 2009 3:30 PM |
| To: | White, Lucien; Shail Patel |
| Cc: | David Parseghian; Aamer Abdullah |
| Subject: | RE: Triaxx Loan Amounts |
| Attachments: | image001.png; image002.jpg |

Ok, but I am not comfortable that this document constitutes a loan. A loan is when there is an agreement between two parties in which one entity provides cash to another in return the counter party agrees to repay the advance. That's the basics, there is more that is needed but without those basics elements, we don't have a loan agreement. No agreement no obligation to repay. No obligation to repay SCIF has an unsecured cash payment and I have no documentation to book a loan on SCIF's books.

The reason I asked " Can ICP Asset Management require the Trustee to pay SCIF in priority over Note holders?" is because if so you can argue that ICP Asset Management under its authority can assure the repayment of Triaxx to SCIF and by signing it, they are required, however if they don't not sure of the recourse. Now I read the waterfall in the indenture I don't see ICP having any control. Trustee all the way with priority to the A's.

Beside the basics there should be an understanding of what collateralizes the loan, the terms rate, maturity, payment date of interest.

This is not a loan agreement but merely a confirmation of what happened.

**From:** White, Lucien [mailto:Lucien.White@dlapiper.com]
**Sent:** Wednesday, April 29, 2009 3:18 PM
**To:** Shail Patel
**Cc:** David Parseghian; Peter Woroniecki; Aamer Abdullah
**Subject:** RE: Triaxx Loan Amounts

I'm ready to send the final draft as soon as you get me the interest amount.

**From:** Shail Patel [mailto:ShailPatel@icpcapital.com]
**Sent:** Wednesday, April 29, 2009 2:32 PM
**To:** White, Lucien
**Cc:** David Parseghian; Peter Woroniecki; Aamer Abdullah
**Subject:** RE: Triaxx Loan Amounts

Lucien,
Please see legal address below (documentation attached). We are still looking over the rest of the document, however, the accrued interest amount is incorrect and we are working on the correct calculation. We'll follow up with more shortly.

ICP Structured Credit Income Master Fund Ltd.
Walker House, c/o Walkers
87 Mary Street
Georgetown, Grand Cayman KY1-9001
Cayman Islands

**From:** Aamer Abdullah
**Sent:** Wednesday, April 29, 2009 1:54 PM
**To:** White, Lucien; Peter Woroniecki
**Cc:** David Parseghian; Shail Patel
**Subject:** RE: Triaxx Loan Amounts

Peter,

Can you please review and respond the Lucien in terms of his question below. Thanks.

---

Aamer Abdullah

Managing Director

**ICP** | Structured Investments

360 Madison Avenue, 10th Floor | New York, NY 10017

☎ 212-821-1914 | 917-216-8856 📠 212-821-1959

✉ aabdullah@icpcapital.com

---

**From:** White, Lucien [mailto:Lucien.White@dlapiper.com]
**Sent:** Wednesday, April 29, 2009 1:52 PM
**To:** Aamer Abdullah; Shail Patel
**Cc:** David Parseghian; Lisa Spinelli
**Subject:** RE: Triaxx Loan Amounts

Take a look.  Someone get me the legal address for ICP SCIMF, please.

> **From:** Aamer Abdullah [mailto:AAbdullah@icpcapital.com]
> **Sent:** Wednesday, April 29, 2009 1:15 PM
> **To:** Shail Patel; White, Lucien
> **Cc:** David Parseghian; Lisa Spinelli
> **Subject:** RE: Triaxx Loan Amounts
>
> All loans are at Fed Funds rate.

---

Aamer Abdullah

Managing Director



2

---

**From:** Shail Patel
**Sent:** Wednesday, April 29, 2009 1:07 PM
**To:** White, Lucien
**Cc:** Aamer Abdullah; David Parseghian; Lisa Spinelli
**Subject:** Triaxx Loan Amounts

Lucien,

Please see below for a comprehensive list of margin payments made.

| Date | Amount |
|------|--------|
| 10/30/2008 | 7,175,455.52 |
| 1/28/2009 | 6,986,230.11 |
| 2/4/2009 | 456,728.66 |
| 2/27/2009 | 10,008,576.32 |
| 2/27/2009 | 731,423.68 |
| 3/27/2009 | 2,434,511.83 |
| 4/14/2009 | 2,179,560.28 |
| 4/29/2009 | 4,298,355.01 |
| Excess Interest | 442,648.40 |

Thanks,
Shail

**Shail P. Patel**
Institutional Credit Partners LLC

 **ICP**

360 Madison Avenue, 10th Floor
New York, NY 10017
☎ (212) 821-1979 | 📠 (212) 821-1959
spatel@icpcapital.com

---

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.

3

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.

**EnergySMART - April 27 to May 1, 2009**
Our lawyers and staff worldwide are coming together this week to take positive action to reduce energy consumption now and in the future. Click here to learn more about our efforts.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading

or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.

**EnergySMART - April 27 to May 1, 2009**
Our lawyers and staff worldwide are coming together this week to take positive action to reduce energy consumption now and in the future. Click here to learn more about our efforts.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email is for informational purposes only and comes from a person employed by Institutional Credit Partners LLC (ICP) or its affiliates. It is not an offer or solicitation for any transaction or an official confirmation of any transaction. The information presented, including pricing and market data, is not warranted as to completeness or accuracy and is subject to change without notice. Any comments or statements do not constitute investment advice or a recommendation and may differ from or be inconsistent with the views and opinions of ICP or its affiliates, none of which shall have any liability or responsibility for any incorrect, misleading or altered information. This email is for business purposes only. Messages are not confidential and are subject to review, archiving and disclosure to regulatory agencies or others.

# EXHIBIT J

(4)   No action or proceedings shall be commenced by an official liquidator under this section more than six years after the date of the relevant disposition.

(5)   In the event that any disposition is set aside under this section, then if the Court is satisfied that the transferee has not acted in bad faith-

   (a)   the transferee shall have a first and paramount charge over the property, the subject of the disposition, of an amount equal to the entire costs properly incurred by the transferee in the defence of the action or proceedings; and

   (b)   the relevant disposition shall be set aside subject to the proper fees, costs, pre-existing rights, claims and interests of the transferee (and of any predecessor transferee who has not acted in bad faith).

147. (1)   If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section. <span style="float:right">Fraudulent trading</span>

(2)   The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

148. (1)   If a request is made by or with the concurrence of the liquidator (including a provisional liquidator) for the giving, after the effective date, of any of the supplies mentioned in the subsection (2), the supplier- <span style="float:right">Supply of utilities</span>

   (a)   may make it a condition of the giving of the supply that the liquidator personally guarantees the payment of any charges in respect of the supply; but

   (b)   shall not make it a condition of the giving of the supply, or do anything which has the effect of making it a condition of the giving of the supply, that any outstanding charges in respect of a supply given to the company before the effective date are paid.

(2)   The supplies referred to in subsection (1) are-

   (a)   a supply of electricity;
   (b)   a supply of water; and
   (c)   a supply of telecommunication services.

(3)   In this section-

"effective date" means-

   (a)   the date on which the provisional liquidator was appointed; or

# EXHIBIT K

## COMPANIES LAW

## (2012 Revision)

## PART I - Introductory

1.    This Law may be cited as the Companies Law (2012 Revision).

Short title

2.    (1)    In this Law-

Definitions and interpretation

"Authority" means the Cayman Islands Monetary Authority established under section 3(1) of the Monetary Authority Law (2011 Revision), and includes a person acting under the Authority's authorisation;

2012 Revision

"bearer share" means a share in the capital of any company incorporated in the Islands which-

    (a)    is represented by a certificate that does not record the owner's name; and

    (b)    is transferable by delivery of the certificate;

"certified translator" means a person whose interpretation or translation competence has been tested and approved by a professional association or governmental body or any other person determined by the Registrar;

"Court" means the Grand Court of the Cayman Islands;

"company" except where the context excludes exempted companies, means a company formed and registered under this Law or an existing company;

"currency" includes the ECU and any unit of account used at any time by the European Monetary Fund;

"custodian" means-

    (a)    "an authorised custodian" who is a person licensed under the Companies Management Law (2003 Revision) to act as a custodian of bearer shares or a bank or trust company licensed under the Banks and Trust Companies Law (2009 Revision); or

2003 Revision

2009 Revision

    (b)    "a recognised custodian" which is an investment exchange or clearing organisation operating a securities clearance or settlement system and carrying on business in a country specified in the Third Schedule of the Money Laundering Regulations (2010 Revision) and which has been approved by the Authority for the purposes of this Law to act as a custodian of bearer shares;

2010 Revision

"dual foreign name" means an additional name in any language not utilising the Roman alphabet, utilising any letters, characters, script, accents and other

diacritical marks, and which does not have to be a translation or transliteration of the name in the Roman alphabet;

"ECU" or "European Currency Unit" means the currency basket that is, from time to time, used as the unit of account of the European Community as defined in European Council Regulation No. 3320/94;

"euro" means the common currency of participating member states of the European Union that adopt a single currency in accordance with the Treaty;

"exempted company" means a company registered as an exempted company under section 164;

"exempted limited duration company" means an exempted company registered as an exempted limited duration company under section 179;

"existing company" means a company which, prior to the 1st December, 1961, has been incorporated and its memorandum of association recorded in the Islands pursuant to the laws relating to companies then in force in the Islands;

"Insolvency Rules Committee" means the committee established in accordance with section 154;

"Judge" means a Judge of the Grand Court;

"name", when relating to the name of a company, means a name in the Roman alphabet or Arabic numerals;

2007 Revision "non-resident company" bears the meaning ascribed to that term in section 2(1) of the Local Companies (Control) Law (2007 Revision);

"officer" in relation to a company, includes a manager or secretary;

"overseas company" means a company, body corporate or corporate entity existing under the laws of a jurisdiction outside the Islands;

"public notice" means a public notice affixed by the Registrar on the public notice board in George Town, Grand Cayman or such other place as may be fixed, from time to time, by the Governor in Cabinet;

"Registrar" means the Registrar of Companies appointed under section 3 and includes, where appropriate, the Deputy Registrar of Companies;

"regulated business" means a business which is required to be licensed under one or other of the regulatory laws;

"regulatory laws" means any one or more of the following-

2009 Revision
2010 Revision
2003 Revision
2001 Revision
Law 32 of 2010

    (a)   Banks and Trust Company Law (2009 Revision);
    (b)   Building Societies Law (2010 Revision);
    (c)   Companies Management Law (2003 Revision);
    (d)   Cooperative Societies Law (2001 Revision);
    (e)   Insurance Law, 2010;

 (f) Money Services Law (2010 Revision); <span style="float:right">2010 Revision</span>
 (g) Mutual Funds Law (2012 Revision); and <span style="float:right">2012 Revision</span>
 (h) Securities Investment Business Law (2011 Revision), <span style="float:right">2011 Revision</span>

and any other laws that may be prescribed by the Governor by regulations made under section 46 of the Monetary Authority Law (2011 Revision); <span style="float:right">2011 Revision</span>

"special resolution" means a special resolution as defined in section 60;

"special economic zone business" means any type of business authorised to be carried on in a special economic zone pursuant to any Law in force in the Islands;

"special economic zone company" means an exempted company that is registered as such under section 182A; and

 "translated name" means a translation or transliteration of an exempted company's dual foreign name into the English language provided by either a person licensed to provide such company's registered office in the Cayman Islands or a certified translator (together with a statement in the prescribed form as to the foreign language in which such dual foreign name is written); and

"Treaty" means the Treaty on European Union signed in Maastricht on 7th February, 1992.

 (2) Where, in this Law, it is provided that a company and every officer of the company who is in default shall be liable to a default fine, the company and every such officer shall, for every day during which the default, refusal or contravention continues, be liable to a fine of ten dollars.

 (3) In this Law, where it provides that an officer of a company who is in default shall be liable to a default fine, the expression "officer who is in default" means any officer of the company who knowingly and wilfully authorises or permits the default, refusal or contravention mentioned in the enactment.

 (4) For the purposes of this Law "paid up" or "fully paid" means, in the case of shares with a nominal or par value, paid up or fully paid as to nominal or par value only and, in the case of shares without nominal or par value, means paid up or fully paid up as to the issue price.

3. (1) The Governor shall, by instrument under the Public Seal, appoint a Registrar and a Deputy Registrar of Companies for the purposes of this Law, and the Deputy Registrar may, in the absence of the Registrar, act as Registrar for all purposes of this Law. <span style="float:right">Registrar</span>

 (2) Without divesting the Registrar of any of his powers or duties the Financial Secretary may authorise by name any officer in the Registrar's department to exercise and perform any of such powers and duties under the

# EXHIBIT L

UK Parliament Acts/I/IH-IN/Insolvency Act 1986 (1986 c 45)/Part IV Winding Up of Companies Registered under the Companies Acts (ss [73-219)/213 Fraudulent trading

### 213 Fraudulent trading

(1)    If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.

(2)    The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper.

### NOTES

#### Derivation

This section derived from the Companies Act 1985, s 630(1), (2), and the Insolvency Act 1985, Sch 6, para 6(1).

#### Initial Commencement

*To be appointed*

To be appointed: this Act shall come into force on the day on which the Insolvency Act 1985, Pt III comes into force: see s 443.

#### Appointment

Appointment: 29 December 1986 (being the day on which the Insolvency Act 1985, Pt III came into force): see SI 1986/1924, art 3.

#### Modification

Modified by the Building Societies Act 1986, s 90, Sch 15, and the Friendly Societies Act 1992, s 23, Sch 10.
The Limited Liability Partnerships Act 2000 provides for the creation of Limited Liability Partnerships (LLPs). The Limited Liability Partnerships (Scotland) Regulations 2001, SSI 2001/128 regulate LLPs by applying to them, with modifications, the appropriate provisions of this Act: see SSI 2001/128, regs 4, 6, Sch 2.

#### See Further

See further, in relation to the application of this section, with modifications, in respect of bank insolvency and administration: the Banking Act 2009, ss 103(3), (4), Table, 145(3), (4), Table 2.
See further, in relation to the application of this section, with modifications, for the purposes of an authorised bank: the Scottish and Northern Ireland Banknote Regulations 2009, SI 2009/3056, reg 29, Sch 1, Pt 1, para 2(a).
See further, in relation to the application of this section, with modifications, in relation to special administration as in relation to other insolvency proceedings: the Investment Bank Special Administration Regulations 2011, SI 2011/245, regs 9, 15(4)(b), (6), Table 2, Sch 2, para 6(2), (3), Table, (4).
See further, in relation to the application, with modifications, of this Act to a body which holds a licence issued by the Law Society which is in force under the Legal Services Act 2007, Part 5: the Legal Services Act 2007 (Designation as a Licensing Authority) (No 2) Order 2011, SI 2011/2866, art 8(1), (2), Sch 2.
See further, in relation to the application of this section, with modifications, for the purposes of the

Charitable Incorporated Organisations (Insolvency and Dissolution) Regulations 2012: the Charitable Incorporated Organisations (Insolvency and Dissolution) Regulations 2012, SI 2012/3013, reg 3, Schedule, para 1(1)(a), (f), (2), (3).

See further, in relation to the application of this section, with modifications, for the purposes of the Collective Investment in Transferable Securities (Contractual Scheme) Regulations 2013: the Collective Investment in Transferable Securities (Contractual Scheme) Regulations 2013, SI 2013/1388, reg 17, Sch 2, Pts 1-3.

```
Document information
```

Insolvency Act 1986
**Date made**
25/07/1986

EXHIBIT M

company, including books containing entries from day to day
in sufficient detail of all cash received and cash paid, and,
where the trade or business has involved dealings in goods,
statements of the annual stocktakings and (except in the case
of goods sold by way of ordinary retail trade) of all goods
sold and purchased, showing the goods and the buyers and
sellers thereof in sufficient detail to enable those goods and
those buyers and sellers to be identified.

**332.**—(1) If in the course of the winding up of a company Responsibility
it appears that any business of the company has been carried for fraudulent
on with intent to defraud creditors of the company or creditors trading of
of any other person or for any fraudulent purpose, the court, persons
on the application of the official receiver, or the liquidator or concerned.
any creditor or contributory of the company, may, if it thinks
proper so to do, declare that any persons who were knowingly
parties to the carrying on of the business in manner afore-
said shall be personally responsible, without any limitation of
liability, for all or any of the debts or other liabilities of the
company as the court may direct.

On the hearing of an application under this subsection the
official receiver or the liquidator, as the case may be, may
himself give evidence or call witnesses.

(2) Where the court makes any such declaration, it may
give such further directions as it thinks proper for the purpose
of giving effect to that declaration, and in particular may
make provision for making the liability of any such person
under the declaration a charge on any debt or obligation due
from the company to him, or on any mortgage or charge or
any interest in any mortgage or charge on any assets
of the company held by or vested in him, or any
company or person on his behalf, or any person claiming as
assignee from or through the person liable or any company
or person acting on his behalf, and may from time to time
make such further order as may be necessary for the purpose
of enforcing any charge imposed under this subsection.

For the purpose of this subsection, the expression
" assignee " includes any person to whom or in whose
favour, by the directions of the person liable, the debt, obliga-
tion, mortgage or charge was created, issued or transferred
or the interest created, but does not include an assignee for
valuable consideration (not including consideration by way
of marriage) given in good faith and without notice of any
of the matters on the ground of which the declaration is
made.

(3) Where any business of a company is carried on with
such intent or for such purpose as is mentioned in subsection

PART V.
—*cont.*

(1) of this section, every person who was knowingly a party to the carrying on of the business in manner aforesaid, shall be liable on conviction on indictment to imprisonment for a term not exceeding two years or to a fine not exceeding five hundred pounds or to both.

(4) The provisions of this section shall have effect notwithstanding that the person concerned may be criminally liable in respect of the matters on the ground of which the declaration is to be made, and where the declaration under subsection (1) of this section is made in the case of a winding up in England, the declaration shall be deemed to be a final judgment within the meaning of paragraph (*g*) of subsection (1) of section one of the Bankruptcy Act, 1914.

4 & 5 Geo. 5. c. 59.

Power of court to assess damages against delinquent directors, &c.

**333.**—(1) If in the course of winding up a company it appears that any person who has taken part in the formation or promotion of the company, or any past or present director, manager or liquidator, or any officer of the company, has misapplied or retained or become liable or accountable for any money or property of the company, or been guilty of any misfeasance or breach of trust in relation to the company, the court may, on the application of the official receiver, or of the liquidator, or of any creditor or contributory, examine into the conduct of the promoter, director, manager, liquidator or officer, and compel him to repay or restore the money or property or any part thereof respectively with interest at such rate as the court thinks just, or to contribute such sum to the assets of the company by way of compensation in respect of the misapplication, retainer, misfeasance or breach of trust as the court thinks just.

(2) The provisions of this section shall have effect notwithstanding that the offence is one for which the offender may be criminally liable.

(3) Where in the case of a winding up in England an order for payment of money is made under this section, the order shall be deemed to be a final judgment within the meaning of paragraph (*g*) of subsection (1) of section one of the Bankruptcy Act, 1914.

Prosecution of delinquent officers and members of company.

**334.**—(1) If it appears to the court in the course of a winding up by, or subject to the supervision of, the court that any past or present officer, or any member, of the company has been guilty of any offence in relation to the company for which he is criminally liable, the court may, either on the application of any person interested in the winding up or of its own motion, direct the liquidator to refer the matter, in the case of a winding up in England, to the Director of Public Prosecutions, and, in the case of a winding up in Scotland, to the Lord Advocate.

# EXHIBIT N

A  authorising him to bring an appeal would be entitled to a dispensation because he would say: " I have got my certificate. That shows I have a prima facie case. Also, the legal aid committee have assessed my contribution. That is the end of it. I cannot be made to pay anything more."

That argument would in my judgment be putting the case too high. The question however is where one draws the line, and *In re Cohen, A*
B  *Bankrupt* [1961] Ch. 246 does not help, because there is nothing in the report of that case to show on what basis the Court of Appeal proceeded, save only that it shows there may be cases in which there ought not to be a dispensation.

In the present case, the evidence in support of the application is very brief. The bankrupt says that payment of such a sum would occasion
C  him " serious hardship." He does not say " Unless I have a dispensation, my case cannot go on at all." Having regard to the authorities that mere inability to pay is not enough, real hardship must be shown.

Mr. Lightman also spoke of the merits of an appeal, but that seems to me to be not a very helpful line of country from his point of view, since as I understand it, there is an authority directly in point against him. There are, I am told, dicta of the Court of Appeal which throw
D  doubt upon it, but they may not be binding on this court. Certainly the position might be different elsewhere, but if one is going to appeal on the merits—apart from a legal aid committee having said that it is a proper case to bring on—that line of approach is not very helpful in these circumstances.

For these reasons, it seems to me that the bankrupt has failed to show
E  that his is a special case within rule 129 of the Bankruptcy Rules 1952, and for my part, I would not dispense with the security for costs of the appeal.

FOSTER J. I agree.

*Order accordingly.*

F  Solicitors: *Sharpe, Pritchard & Co. for William Bains, Brigg; Solicitor, Department of Trade and Industry.*

K. N. B.

---

[CHANCERY DIVISION]

G       * *In re* MAIDSTONE BUILDINGS PROVISIONS LTD.

1971  April 29, 30                              Pennycuick V.-C.

*Company—Winding up—Fraud—Secretary of company—Liqui-
    dator's claim for declaration of liability—" Parties to the
    carrying on of the business "—Whether applicable to com-*
H  *pany secretary—Companies Act 1948 (11 & 12 Geo. 6, c. 38),
    s. 332 (1)*

A chartered accountant, who was a partner in the firm which acted as auditors of an incorporated company, was appointed secretary of that company in March 1960. He ceased to be secretary in November 1962 but was re-appointed in December 1962. At a meeting of the board of

---

[Reported by MRS. F. ALLEN MCLEAN, Barrister-at-Law]

directors in March 1961 the draft figures which he presented A showed a considerable loss. The secretary, or his staff, continued until November 1962 to prepare monthly and quarterly written statements of the company's finances, and advised the board of directors as to the position indicated by those figures. Except for one directors' meeting held in September 1962, the secretary was present or in attendance at all meetings held from March 1961 until he resigned in April 1965. The company's finances were discussed at B directors' meetings subsequent to that of March 1961 and resolutions were passed to effect certain economies. However the company continued to trade at a heavy loss, incurring debts without any reasonable prospect of being able to pay them. In June 1965 a resolution was passed at an extraordinary general meeting that the company be wound up voluntarily. The liquidator sought an order against the directors and also against the secretary making them personally C liable for the liabilities of the company pursuant to section 332 of the Companies Act 1948.[1]

On an application by the secretary for the proceedings to be dismissed on the grounds that they disclosed no reasonable cause of action:—

*Held,* that the expression " party to " in section 332 of the Companies Act 1948 indicated no more than " participates in," " takes part in " or " concurs in " and involved some D positive steps (post, p. 1092F). Mere omission by the secretary to give certain advice to the directors was not being a party to carrying on the business in a fraudulent manner and, accordingly, the proceedings against him would be dismissed.

The following case is referred to in the judgment:

*Leitch (William C.) Bros. Ltd., In re* [1932] 2 Ch. 71.          E

The following additional cases were cited in argument:

*Barnett* v. *South London Tramways Co.* (1887) 18 Q.B.D. 815, C.A.
*Bradford Third Equitable Benefit Building Society* v. *Borders* [1941] 2 All E.R. 205, H.L.(E.).
*Cross* v. *Earl Howe* (1892) 62 L.J.Ch. 342.
*Cullen* v. *Thomson* (1862) 6 L.T. 870, H.L.(Sc.).          F
*Joint Stock Discount Co.* v. *Brown* (1869) L.R. 8 Eq. 376.
*Registrar of Restrictive Trading Agreements* v. *W. H. Smith & Son Ltd.* (1969) L.R. 7 R.P. 122; [1969] 1 W.L.R. 1460; [1969] 3 All E.R. 1065, C.A.

SUMMONS

In December 1959 a company was incorporated with the name Merfeels G Ltd. for the purpose of carrying on the business of general and manufacturers' agents, producers, manufacturers, importers, exporters and dealers in canned goods of all kinds. It had a share capital of £100. The company's name was later changed to Stock, Dehn and Spear Ltd. and finally to Maidstone Buildings Provisions Ltd. In 1960 the authorised share capital was increased to £10,000, the paid up, or credited paid up, capital being £8,000. The registered holders of the shares were Stuart H John Stock, Kurt Otto Dehn and Wilfred John Spear who became directors when trading began in March 1960. Ronald Frederick Penney, a partner in the firm of F. G. Jenkins Wood & Co., the company's auditors, became a director and was appointed secretary. He resigned as director in July 1960 but continued as secretary. A Mr. C. A. Smith

---

[1] Companies Act 1948, s. 332 (1): see post, p. 1088c–E.

A  was appointed secretary in November but died shortly afterwards and
Mr. Penney consented in December to act as interim secretary until his
successor was appointed. The expenses of promoting the company had
been heavy and the company traded at very narrow margins. In March
1961 the figures Mr. Penney put before the board of directors showed that
the company had been trading at a considerable loss. The board resolved
to effect certain economies and to reduce the directors' salaries by £500
B  each per annum. In November 1962, in view of the serious situation of
the company's finances, further economies were agreed on. The company
continued to trade at a loss until 1965, obtaining goods on credit, incurring
debts for wages, salaries, commissions, rent, heating, advertising, travel and
entertainment and otherwise. In June 1965 when it was resolved
to go into voluntary liquidation, the company's debts stood at approxi-
C  mately £99,000. The liquidator sought an order against the three
directors Messrs. Stock, Dehn and Spear and also against Mr. Penney,
making them personally responsible for the liabilities of the company
pursuant to section 332 of the Companies Act 1948. It was common
ground that the issue raised against Mr. Penney was quite different from
that raised against the directors. The contention of the liquidator was that
Mr. Penney, in his capacity of secretary and as a chartered accountant, who
D  was a member of the firm acting as the company's auditors, and who acted
as a sort of financial adviser, was knowingly a party to the carrying on
of the business of the company. He owed a duty to the company to give
advice and he should have taken positive steps to ensure that the company
ceased fraudulent trading. Whilst section 275 of the Companies Act 1929
applied only to directors, section 332 of the Companies Act 1948 applied
E  to any persons. Mr. Penney contended that, as company secretary, he was
a servant and could not be held liable under section 332 unless a clear case
of complicity in fraudulent trading was pleaded. He applied for dismissal
of the proceedings against him in that the points of claim made by the
liquidator disclosed no reasonable cause of action.

F
   *D. M. Burton* for the former company secretary.
   *M. K. I. Kennedy* for the liquidator.

   PENNYCUICK V.-C. I have before me an application by Mr. Ronald
Frederick Penney in a matter entitled In re Maidstone Buildings Provisions
Ltd. and In re the Companies Act 1948. That matter is a summons
brought pursuant to section 332 of the Companies Act 1948 by the
G  liquidator of the company whereby he seeks an order against certain
directors of the company and also against the present applicant, Mr.
Penney, making them personally responsible for the liabilities of the
company pursuant to the section. Mr. Penney was not at any relevant time
a director of the company but was for some time its secretary.
   The liquidator has come to terms with one of the director respondents.
As regards another, the summons has been stood over with a view to a
H  compromise. I am not sure what the position is as regards the third; it
does not matter.
   It is not in dispute that the issue raised against Mr. Penney is quite
different from that raised against the directors so that there is no reason
why the summons should not be dealt with as between the liquidator and
Mr. Penney separately from the directors.
   The application before me today is one by Mr. Penney that the pro-
ceedings issued against him be dismissed on the ground that the points

1088

of claim disclose no reasonable cause of action. I should mention at this  A
stage that the present application has been made at a very late date. The
summons has actually been set down for hearing. Moreover, the issues
raised by the summons are certainly such as to admit of serious argument.
In those circumstances it may well be that there would be insuperable
difficulty in making an order upon the present summons to dismiss on the
ground that the summons discloses no reasonable cause of action.

Counsel for the liquidator has, however, very properly accepted that I  B
should deal with this summons on its merits. That is clearly desirable
because if my decision goes in favour of Mr. Penney, that puts an end to
the whole matter. If I were to refuse to hear the present application or
dismiss it because it was too late or because there was an arguable point,
the only result would be that there would be further delay and expense,
and then the identical point would come before another judge.  I say  C
" the identical point " because the point which I have to deal with depends
on the construction of section 332 and its application as construed to a
certain state of facts as alleged by the liquidator, or as admitted by the
respondent. I am not concerned to adjudicate upon any issues of fact.

It will be convenient first to read section 332 (1):

> " If in the course of the winding up of a company it appears that any  D
> business of the company has been carried on with intent to defraud
> creditors of the company or creditors of any other person or for
> any fraudulent purpose, the court, on the application of the official
> receiver, or the liquidator or any creditor or contributory of the
> company, may, if it thinks proper so to do, declare that any persons
> who were knowingly parties to the carrying on of the business in
> manner aforesaid shall be personally responsible, without any limita-  E
> tion of liability, for all or any of the debts or other liabilities of the
> company as the court may direct. . . ."

It is worth pointing out that section 332 reproduces section 275 in the
Act of 1929 which is in identical terms except that there the persons who
could be made liable were confined to directors whether past or present
whereas the present section applies to any person.                       F

Subsection (3) of the section imposes, apart from the civil liability, a
punishment, including imprisonment or fine. There is, therefore, no
question but that section 332 is a penal section.

I propose now to read the relevant passages in the pleadings and
particulars, making certain comments on them as I go on. The liquidator
delivered points of claim to the following effect:                       G

> " (1) The . . . company . . . was incorporated . . . for the purpose
> of carrying on the business of general and manufacturers' agents,
> producers manufacturers importers, exporters and dealers in canned
> goods of all kinds. . . ."

(2) deals with changes in the company's name; (3) states that the com-
pany's authorised share capital was increased in 1960 to £10,000 and the  H
issued capital at £8,000. Then the three named individuals, Dehn, Stock
and Spear, are the registered holders of those shares. (4) sets out that at
an extraordinary general meeting of the company the company went into
voluntary liquidation and that the present liquidator, Mr. Norman
Barrington Cork, was appointed the liquidator.

> " (5) The company is hopelessly insolvent and the deficit on the said
> winding up is likely to exceed £99,000. (6) The company commenced

The Weekly Law Reports, July 2, 1971

1089

1 W.L.R.          In re Maidstone Buildings Ltd. (Ch.D.)          Pennycuick V.-C.

A    to trade in or about March 1960. On March 25, 1960, the respondent Ronald Frederick Penney became secretary of the company and on July 1, 1960, the respondents Stock, Dehn and Spear became directors of the company. [Then it deals with their salaries.] (7) At the meeting of the board of directors held on March 8, 1961, it was resolved that, as the draft figures showed a considerable loss for the period from the commencement of trading to January 31, 1961, con-

B    siderable economies be effected. It was further resolved that the respondents drawings as directors be reduced immediately by £500 each per annum. (8) At the meeting of the board of directors held on November 21, 1962, the respondents recognised the seriousness of the company's financial position and agreed to prune overheads wherever possible. [Then there are particulars of the reduction of

C    the directors' remuneration.] The financial position of the company was further discussed at subsequent meetings of the board of directors. (9) At all times after the said meeting held on March 8, 1961, the respondents knew or ought to have known that the company was trading at a heavy loss and was insolvent. But the respondents regularly caused the company to purchase goods on credit and to incur other debts without any reasonable prospect of being able to pay

D    for the said goods or to satisfy its other debtors."

Those words are an echo of the judgment of Maugham J. in *In re William C. Leitch Bros. Ltd.* [1932] 2 Ch. 71 a decision under the corresponding section of the earlier Act.

E    "(10) In the premises the respondents were knowingly parties to the carrying on of the business of the company with intent to defraud creditors of the company and for other fraudulent purposes."

So that is an almost entirely unparticularised allegation, so far as Mr. Penney is concerned, of fraudulent trading within the terms of section 332. I need not read the rest of the points of claim.

In the points of defence Mr. Penney makes a number of admissions

F    and denials which I need not read. He states in paragraph 3 that he "was appointed secretary of the company on March 25, 1960, and ceased to be secretary of the company on November 21, 1962; he was reappointed secretary on December 13, 1962." Then paragraph 4

"As to paragraphs 7–10 inclusive of the points of claim (a) this respondent was not concerned with the management of the company or the direction of its policy which was wholly under the control

G    of the respondents Stock, Dehn and Spear. This respondent advised the said respondents in 1961 and 1962 of the company's actual financial position: but he was not a party to carrying on the business of the company. In particular, this respondent at no time caused the company to purchase goods or incur credit. (b) This respondent admits the proceedings of the meetings of directors on March 8,

H    and November 21, 1962. On November 21, 1962, the directors resolved that this respondent should be replaced as secretary of the company by one C. A. Smith. The said C. A. Smith died on December 1, 1962, and this respondent was requested by the directors to become secretary of the company on an interim basis until they found a permanent successor to the said C. A. Smith, which he agreed to do and was appointed secretary on December 13, 1962. (c) The function of this respondent was at all times solely to advise

the board of directors of the company and to carry out such duties   A
as the board deputed to him. He says he was not knowingly a party
to the carrying on of the business of the company with intent to
defraud creditors of the company or for other fraudulent purposes
and is not liable as alleged or at all."

The liquidator made a request for particulars under paragraph 4 (a)
of the advice alleged to have been given by the respondent, Mr. Penney,   B
to the respondents Stock, Dehn and Spear stating the nature of such advice
and the date or dates on which such advice is alleged to have been given;
whether such advice is alleged to have been given to each of the said
respondents individually or to them collectively and if advice was given
in writing identifying the document or documents.

The answers to the particulars given pursuant to that request were   C
as follows:

" This respondent or his staff from March 25, 1960, to November
1962 prepared monthly and quarterly written statements of the finan-
cial position of the company which were submitted to board meetings
of the company: and this respondent or Endicott, a member of his
staff, at such meetings orally advised the directors present as to the
position appearing from such statements. From March 1961 onwards   D
to November 1962 the nature of the advice given was that the com-
pany's overheads ought to be reduced and/or that sales should be
expanded. After December 1962 this respondent's duties did not
include the giving of general financial advice, but he was as auditor
of the company consulted on specific occasions to advise: . . ."

In fact, Mr. Penney was not the auditor of the company. He was   E
a partner in a firm of accountants who were the auditors of the company.
Then he deals with certain particular matters on which he was consulted.
Mr. Penney in turn sought further particulars of the points of claim,
the particulars sought under paragraph 9 being as follows:

" Particularly each and every occasion on which it is alleged that
this respondent caused the company to purchase goods on credit   F
and stating the manner in which it is alleged this respondent caused
the company to purchase goods on credit and the goods so purchased:
Particularly each and every occasion on which it is alleged this
respondent caused the company to incur other debts and stating the
manner in which it is alleged this respondent caused the company
to incur the debts relied on and stating the amount of each such   G
debt and the creditor concerned." And under paragraph 10: " Parti-
cularly every fact relied on in support of the allegations of fraud
made in this paragraph."

In response to that request he received particulars in these terms:

" Under paragraph 9 and 10: Such goods were bought on credit after   H
March 8, 1961 (being the date of the meeting of the board of directors
referred to in paragraph 7 of the points of claim). Such debts were
incurred after the said March 8, 1961, in respect of wages, salaries,
commissions, rent, light and heating, advertising, travelling and enter-
tainment expenses, indebtedness to Westminster Bank and C. H.
Donner. The only other particulars known to the applicant suffi-
ciently appear from the books of account of the company all of

The Weekly Law Reports, July 2, 1971

1091

1 W.L.R.      In re Maidstone Buildings Ltd. (Ch.D.)      Pennycuick V.-C.

A   which have been made available to this respondent upon discovery and upon which the applicant will rely at the trial.

"Save as above the best particulars which the applicant can give of the manner in which this respondent caused the company to purchase such goods on credit and to incur such other debts are that the respondent Penney was at all material times an officer of the company and knowingly a party to the carrying on of the business

B   of the company under the circumstances set out in paragraph 9 of the points of claim and thereby rendering himself liable under the provisions of section 332 of the Companies Act 1948."

Mr. Penney was perhaps not unnaturally not content with those particulars. He sought an order for further particulars and on October 13,

C   1970, Mr. Registrar Berkeley made an order that the liquidator deliver to the applicant the following further and better particulars under paragraph 9 of the points of claim, namely:

"Whether it is alleged that the respondent Ronald Frederick Penney caused the said company to purchase the goods and incur the debts referred to in the particulars dated July 7, 1970, only by reason of his being the secretary of the company and as such having knowledge

D   of the business of the company or whether it is alleged that he was in any other and if so what way knowingly a party to the purchase of such goods and incurring of such debts and in the latter event giving full particulars of the facts relied on."

Pursuant to that order the liquidator delivered further particulars. It is clear from the form of the particulars which he delivered that he was

E   then quite properly setting out afresh the full particulars upon which he relied in support of his allegation in the points of claim. The particulars run as follows:

"The applicant will rely upon the following facts and matters in support of the allegation that this respondent was knowingly a party to the carrying-on of the business of the company: (a) At all times

F   after March 8, 1961 the respondent knew that the company was trading at a heavy loss and was insolvent."

I break off to observe that counsel for the liquidator states that the words " the respondent knew that the company was insolvent " are intended in the context to mean not only that he knew the company was insolvent, but that he knew there was no reasonable prospect of the company ever

G   being able to pay its debts, and I will proceed on the basis that that is so. To continue:

"(i) This respondent was appointed a director and the secretary of the company on March 25, 1960. On July 1, 1960, he resigned as director." I interpose that it is accepted there was no fraudulent trading up to that date. "On November 21, 1962, he resigned as secretary but

H   was reappointed as secretary on December 13, 1962, and continued in office until his resignation on April 20, 1965.

"(ii) At the first meeting of the directors of the company held on March 25, 1960, Messrs. Jenkins, Wood & Co. were appointed auditors and accountants to the company. This respondent was at all material times a partner in the said firm and assisted in the preparation of the company's accounts for the 18 months ending on December 31, 1961, and for the year ending on December 31, 1962, and draft

A

accounts for the six months ending on June 30, 1963. The applicant will rely upon the fact that the following letters concerning the company's accounts . . ." I need not refer to the particulars of those letters.

B

" (iii) This respondent was present or in attendance at all meetings of the board of directors (save for the meeting held on September 27, 1962) which were held between March 25, 1960, and his said resignation on April 20, 1965. Such meetings included the meetings of the board of directors held on March 8, 1961, and November 21, 1962, and referred to in paragraphs 7 and 8 of the points of claim, and a meeting of the board of directors held on March 5, 1964, at which the financial position of the company was discussed.

C

" (b) Despite such knowledge as aforesaid of the company's insolvency, this respondent took no steps, or alternatively took no effective steps, to prevent the company from purchasing the goods on credit and incurring the other debts, described in paragraph 9 of the points of claim and the particulars thereof. The steps that this respondent should have taken, but did not take, were to advise the respondents Stock, Dehn and Spear at or after the said meeting of the board of directors held on March 8, 1961, that the company was insolvent and should cease to trade."

D

So the effect of those particulars is that it is alleged that Mr. Penney, in addition to being the secretary of the company, acted in some sense as its financial adviser; in that dual capacity, although he knew that the company was insolvent, he omitted to take the steps which he should have taken to prevent the company continuing to trade, the steps being to give certain advice to the directors; and that, it is said, brings him within section 332.

E

Counsel for Mr. Penney contends that upon the points of claim particularised in that way there is no cause of action against him. He contends that, assuming all the facts alleged are made out, upon those facts he was not a party to the carrying on of the company's business in manner aforesaid, that is with intent to defraud creditors of the company or for any other fraudulent purpose.

F

The expression " parties to the carrying on of the business " is not, I think, a very familiar one, but so far as I can see, the expression " party to " must on its natural meaning indicate no more than " participates in," " takes part in " or " concurs in." And that, it seems to me, involves some positive steps of some nature. I do not think it can be said that someone is party to carrying on a business if he takes no positive steps at all. So in order to bring a person within the section you must show that he is taking some positive steps in the carrying on of the company's business in a fraudulent manner.

G

So far as the position of a secretary as such is concerned, it is established beyond all question that a secretary, while merely performing the duties appropriate to the office of secretary, is not concerned in the management in the company. Equally I think he is not concerned in carrying on the business of the company. On the other hand, it is equally well established, indeed it is obvious, that a person who holds the office of secretary may in some other capacity be concerned in the management of the company's business.

H

I was referred to certain authorities on these points, but I do not think it would be useful to cite them. There is quite a neat statement of

The Weekly Law Reports, July 9, 1971

1093

1 W.L.R.          In re Maidstone Buildings Ltd. (Ch.D.)          Pennycuick V.-C.

A   the position in *Palmer's Company Law*, 21st ed. (1968), p. 603, where he says:

"The position of secretary in a company has altered out of recognition during the past 75 years. From being a humble clerk he has become, in most large companies, an officer of the company having important duties and responsibilities and often with considerable influence. He
B   remains, however, in the eyes of the law what he was originally intended to be, namely, an officer in a ministerial and administrative capacity: he has no managerial functions, and it would, normally, be unwise for an outsider to assume that he has any managerial powers, which are, prima facie, vested in the directors and any managing directors. In practice the functions of the secretary often exceed those contemplated by the Acts and he is sometimes given considerable
C   managerial responsibility."

So, says counsel for Mr. Penney, the mere fact that Mr. Penney was the secretary clearly does not bring him within the terms of this section. As secretary he was not a party to the carrying on of the business of the company. Then, he says, although it is alleged that he occupied one other position in relation to the company, in effect, that of financial
D   adviser, when one looks at the particulars, no positive action of any kind on his part is alleged. All that is alleged is his omission to take steps to prevent the company trading fraudulently. The steps he omitted to take were to give certain advice to the directors.

It seems to me impossible to say that that mere inertia on the part of Mr. Penney, and that is all that is alleged against him, could represent
E   being a party to the carrying on of the business of the company, and if that is right, it is the end of the matter.

Counsel for the liquidator does not, I think, contend that the expression "party to" covers everyone who has notice that the business of the company is being carried on fraudulently. That contention, if it were right, would lead to impossible results. But what he does say—I think this is the substance of his argument—is that Mr. Penney in his position as
F   secretary and financial adviser of the company and also member of the firm of the company's auditors owed a duty to the company to give them certain advice and that his omission to give that advice rendered him a party to carrying on the business of the company.

I find it impossible to accept that contention. Whatever duty Mr. Penney may have owed to the company, I do not think mere omission
G   to give advice could be regarded as amounting to being a party to carrying on the business of the company.

I would add to avoid misunderstanding that if any given individual does owe a duty to another party to give advice, his omission to give that advice may well represent negligence for which he could be made account-able at the instance of the person to whom he owes the duty. Again
H   there are, I think, circumstances in which a party remaining silent where he ought to speak may be held to be implicated in a fraud, but that is not what this section requires. This section requires that the person concerned should be a party to the carrying on of the business in a fraudulent manner. I find it impossible to say, whatever duty to give advice Mr. Penney may have owed to the company, that mere silence and omission to give advice could make him a party to the carrying on of the company's business.

It is worth while to mention again in this connection that this is a penal    A
section. The principle on which the courts now act as regards penal
enactments is stated in *Halsbury's Laws of England*, 3rd ed., vol. 36 (1961),
p. 415, para. 631:

> " It is a general rule that penal enactments are to be construed strictly,
> and not extended beyond their clear meaning. At the present day, this
> general rule means no more than that if, after the ordinary rules of
> construction have first been applied, as they must be, there remains    B
> any doubt or ambiguity, the person against whom the penalty is
> sought to be enforced is entitled to the benefit of the doubt."

I myself do not feel any doubt or ambiguity of the construction of
section 332 in the present context. If there were any doubt, it would have
to be resolved in favour of the respondent.

For the reasons which I have given it seems to me that the allegation    C
of fraudulent participation against Mr. Penney as alleged in the points
of claim and expanded in the particulars has not been made out even on
the footing that every matter of fact raised in the pleadings is decided in
favour of the liquidator.

That being the position, the result is that the proceedings issued by
the liquidator disclose no reasonable cause of action against Mr. Penney    D
and that I should make the order sought upon Mr. Penney's application.

*Order accordingly.*

Solicitors: *Chamberlain & Co.; Simmons & Simmons.*

E

---

[QUEEN'S BENCH DIVISION]

\* SECRETARY OF STATE FOR EMPLOYMENT AND
PRODUCTIVITY *v.* CLARKE CHAPMAN & CO. LTD.    F

1971  March 24                    Lord Parker C.J., Widgery L.J.
                                  and Bean J.

*Revenue—Selective employment tax—Premium—Manufacturers of
electrical units—Installation at site separate from main estab-
lishment over four- or five-year period—Temporary buildings
erected at site—Head office retaining control—Whether    G
separate site " establishment "—Whether employment on site
" in, or carried out from " main establishment—Selective
Employment Payments Act 1966 (c. 32), s. 1 (2) (a)*

The employers were electrical engineers engaged in the
manufacture and installation of large electrical units. At site
F four 500-megawatt generating units were being installed
over a period of four or five years. Buildings were erected    H
as general accommodation for the men working on the site,
but they were built with the knowledge that they would be
there for a period of only five years and were of a kind which
could be removed and used elsewhere. The employers' head
office was at G, from where the whole administration of the
company was carried out.

---

[Reported by Mrs. Celia Fox, Barrister-at-Law]

# EXHIBIT O

Status: 🄲 Positive or Neutral Judicial Treatment

## *98904* Re Augustus Barnett & Son Limited

Chancery Division Companies Court

27 November 1985

### (1986) 2 B.C.C. 98904

Before: Hoffmann J.

Judgment delivered 27 November 1985

*Liquidation—Parent and subsidiary companies—Subsidiary company in liquidation—Liquidators sought to make parent company responsible for subsidiary's debts—Whether parent company party to carrying on subsidiary's business with intent to defraud—Whether liquidators' claim disclosed a reasonable cause of action—Whether allegation of fraud adequately particularised— Companies Act 1948, sec. 332 .*

This was an application to strike out part of the relief claimed in a summons, and the supporting parts of the points of claim, on the ground that they disclosed no reasonable cause of action.

The summons was issued by the joint liquidators of Augustus Barnett & Son Ltd. ("the company") for relief including a declaration pursuant to sec. 332 of the Companies Act 1948 , that Rumasa S.A. ("Rumasa") was knowingly party to the carrying on of the business of the company with intent to defraud creditors, and should be responsible for the company's debts.

The company became a subsidiary of Rumasa in 1977. Then and throughout the period of Rumasa's control of the company, there was a substantial deficiency of current assets, and from 1977 to the end of 1981 Rumasa paid the company nearly £4m by way of subsidy. In addition, until April 1983 Rumasa made statements both to the board of the company and in public that it would continue to support the company financially. In June 1983 Rumasa refused further support, and in September 1983 the company went into creditors' voluntary liquidation with an estimated deficiency of £4.5m for unsecured creditors.

*98905*

The liquidators' points of claim alleged that Rumasa, by indicating an intention to support the company financially, to enable it to trade as a viable concern, had induced the company's board to carry on business, and had induced suppliers and creditors to do business with it. The liquidators relied on this as showing that Rumasa had been party to the carrying on of the company's business. It was further alleged that Rumasa's ultimate failure to support the company showed that its previously expressed intention to provide funds to pay the company's debts, if it had existed at all, had not been settled but contingent. The liquidators said that such a qualified intention could give rise to an inference that there had been an intention to defraud.

Rumasa said that the liquidators' case on the pleadings was an inadequate basis for a claim for relief under sec. 332 . Firstly, the requirements of the section could not be satisfied since there was no allegation that Rumasa had in any way itself carried on the company's business, nor any allegation that the company's board, in carrying on the business, had had any intent to defraud. Secondly, the alleged facts, if proved, could not in any event sustain the inference of an intention to defraud on Rumasa's part.

*Held* , striking out the claim for a declaration under sec. 332 and the supporting paragraphs of the points of claim:

1 To make an order under sec. 332 the court had first to find that someone had done an act which could be described as carrying on the business of the company, and that the person had done that act with intent to defraud. Once the court had made such a finding, it might impose liability on any persons knowingly party to that carrying on of the business.

2 The words "persons … party to" might be wide enough to cover those who did not carry on the business but had nevertheless participated in the fraudulent acts. Since no fraudulent intent was alleged against the board who actually carried on the business, there was no business carried on

with intent to defraud, to which Rumasa could have been party.

3 In any event the facts pleaded, if proved, would be entirely inadequate to sustain an allegation of an intention to defraud on the part of Rumasa.

**The following cases were referred to in the judgment:**

*Cooper (Gerald) Chemicals Ltd., In re [1978] Ch. 262* .

*D.P.P. v. Ray [1974] A.C. 370* .

*R. v. Grantham (1984) 1 BCC 99,075; [1984] Q.B. 675* .

SUMMONS

By a summons issued on 23 May 1985, Rumasa S.A. applied under O.18, r.19 to strike out the claim for a declaration under sec. 332 of the Companies Act 1948 and the relevant points of claim made by the joint liquidators of Augustus Barnett & Son Limited as disclosing no reasonable cause of action. The liquidators' summons dated 14 December 1983 sought a declaration that Rumasa was knowingly party to the carrying on of the business of the company with intent to defraud creditors. Rumasa also sought an order that the liquidators' summons be dismissed with costs and an order that the applicants' time for serving points of defence be extended until 28 days after the determination of the application. The facts are set out in the judgment.

**Representation**

Mr. Peter J. Millett Q.C. and Mr. Alan G. Steinfeld (instructed by Messrs. Herbert Smith & Co. ) for the applicant.

Mr. John E.F. Lindsay Q.C. and Mr. Nigel A.L. Davis (instructed by Messrs. D.J. Freeman & Co. ) for the respondents. *\*98906*

**JUDGMENT**

Hoffmann J.:

There is before the court a summons by the joint liquidators of Augustus Barnett & Son Limited (which I shall call "the company") for relief which includes a declaration pursuant to sec. 332 of the Companies Act 1948 (now sec. 630 of the Companies Act 1985 ) that Rumasa S.A. (which I shall call "Rumasa") was knowingly party to the carrying on of the business of the company with intent to defraud creditors. The liquidators have served points of claim. Rumasa has applied pursuant to O. 18 r. 19 to strike out the claim to a declaration under sec. 332 and the relevant parts of the points of claim on the ground that they disclose no reasonable cause of action. I heard the application in chambers but since it raises a point on which I am told there is no authority, I am with the consent of the parties giving my judgment in open court.

I shall summarise the facts alleged in the points of claim, which for the purposes of the application to strike out I must assume to be true. The company was the owner of a well-known chain of shops selling wines and spirits. In 1977 it became a subsidiary of Rumasa, a Spanish company with substantial interests in the production and marketing of wines and sherry. Thereafter the company was the principal UK retail outlet for Rumasa's wine and sherry exports.

Throughout the period of Rumasa's control of the company there was a substantial deficiency of

current assets. The auditors would not certify accounts prepared on a going concern basis without a letter from Rumasa confirming that it would continue to support the company. Such letters, often known as "letters of comfort", were provided by Rumasa on various occasions between 1978 and 1982. They were noted in the published accounts for the years ended 31 December 1979, 1980 and 1981. The last comfort letter dated 1 June 1982 stated that

> "Rumasa … undertakes to provide such additional working capital as is necessary to enable [the company] to trade at its current level of activity for a period of not less than 12 months from this date and also to provide such long term finance as is necessary".

During the period from 1977 until the end of 1981, Rumasa actually paid the company nearly £4m by way of subsidy.

On 23 February 1983 Rumasa was nationalised by Spanish Royal decree. The company at that date was in serious financial difficulties. There was a £4.5m deficiency in working capital. In March 1983 the company was advised by its auditors and lawyers that the members of its board were at risk of personal liability for fraudulent trading and that unless it could obtain additional funds to pay its current debts it should cease trading and invite its bankers, National Westminister Bank PLC, to appoint a receiver. The board notified Rumasa that unless assurances of financial support were received by 21 March it would ask the bank to appoint a receiver.

On 21 March the company obtained an offer of a substantial borrowing facility from Banco de Jerez S.A., another subsidiary of Rumasa, secured by a debenture which was executed on 5 April. On the strength of this facility, which was regarded by the board as a temporary measure pending what is described without particularity as a "long term solution" to the company's financial problems to be provided by Rumasa, the company continued to trade. Important suppliers were reluctant to extend credit but were reassured by statements on behalf of Rumasa that it would continue to support the company. These included an assurance of support to the chairman of the company and statements made at a press conference held on 29 April 1983 in London by the senior administrator of Rumasa appointed by the Spanish government, which were given wide publicity.

The company's financial position continued to deteriorate and on 6 June Ernst & Whinney reported to the board that the company had no prospect of trading out of its financial difficulties as an independent company. The board asked Banco de Jerez and Rumasa for additional financial support. This was not forthcoming and on 11 July 1983 the National Westminster Bank PLC, at the invitation of the board, appointed receivers. On 31 August Rumasa appointed the same persons as receivers under the debenture granted to *\*98907* Banco de Jerez in April, which had been assigned to Rumasa. On 2 September the company entered into creditors' voluntary liquidation. There is estimated to be a deficiency of £4.5 million for unsecured creditors.

These are in summary the facts alleged in the points of claim. I must also draw attention to certain matters which are not alleged. First, it is not alleged that anyone other than the board actually carried on the business of the company. In particular, it is not alleged that Rumasa carried on any business of the company. The way in which the matter is summed up by the liquidators in para. 48 of the points of claim is that by (i) giving the auditors letters of comfort and allowing those letters to be noted in the accounts (ii) providing subsidies (iii) making statements of intention to continue support after nationalisation, both to the board and in public, Rumasa

> "indicated an intention financially to support the company and to enable the company to trade as a viable concern; and by doing so induced, and intended to induce, the board of the company to cause the company to carry on trading and to incur debts (which the board would not otherwise have done) and induced, and intended to induce, suppliers and the creditors of the company to continue to supply or grant credit to the company".

The allegation is therefore that Rumasa induced the board to continue actively to carry on the company's business and induced suppliers and creditors to do business with the company but not that Rumasa itself in any way carried on the company's business.

Secondly, it is not alleged that in carrying on the company's business the board had any intent to

defraud creditors or anyone else. On the contrary, as may be inferred from the passage which I have quoted from the points of claim, it is accepted that the board honestly believed that Rumasa would continue to support the company and it is alleged that without such belief the board would not have caused the company to continue to trade.

Section 332 of the Companies Act 1948 reads as follows:

> "If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the court, on the application of the official receiver, or the liquidator or any creditor or contributory of the company, may, if it thinks proper to do so, declare that any persons who were knowingly parties to the carrying on of the business in manner aforesaid shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the court may direct."

It is a necessary condition of the court's power to make an order under this section that it appears that "any business of the company has been carried on with intent to defraud". Transferring the passive to the active voice, this in my judgment involves a finding that someone has done an act which can be described as carrying on some business of the company and that in doing so he had an intent to defraud. Equally, the words "any business of the company has been carried on … for any fraudulent purpose" must mean that someone carrying on the business had a fraudulent purpose in doing so. Once this condition has been satisfied, the court may impose personal liability on any persons who were knowingly "party to" the carrying on of the business "in manner aforesaid". The words "persons … party to" may be wide enough to cover outsiders who could not be said to have carried on or even assisted the carrying on of the company's business but who nevertheless in some way participated in the fraudulent acts. For an example, see *In re Gerald Cooper Chemicals Ltd. [1978] Ch. 262* . But I cannot see how the requirements of the section can be satisfied if no fraudulent intent is alleged against any person who actually carried on the business. In such a case, there are no fraudulent acts to which the outsider can have been a party and his own state of mind seems to me for present purposes irrelevant. It may give rise to liability in deceit or some other cause of action but not under sec. 332 of the Companies Act 1948 .

Mr. Lindsay for the liquidators said that I should not adopt this construction of sec. 332 *\*98908* unless driven to do so. The effect, he said, would be to make comfort letters legally worthless. The circumstances in which parent companies should be liable for the debts of their subsidiaries is a matter of considerable public importance and debate. It may be that the law on this subject is inadequate. To form a view would require a much wider investigation of the issues of public policy than is open to a judge hearing an interlocutory application to strike out a pleading. The only point with which I am concerned is whether sec. 332 can form the basis for imposing liability on a parent company otherwise than as accessory to fraudulent trading by the persons who actually carried on the business of the subsidiary. In my judgment it cannot. The language of the section is clear and unambiguous.

For these short reasons the application to strike out succeeds. Assuming, however, that I am wrong and that it is sufficient to show that Rumasa, with intent to defraud, was party to the carrying on of the business of the company, there is the further question of whether the allegations in the points of claim are sufficient to support such a case. I shall divide the necessary allegations into two. First, did Rumasa do acts which constituted being party to the carrying on of the company's business? Secondly, were those acts done with intent to defraud?

I have already quoted the summary in para. 48 of the statement of claim of the acts relied upon as making Rumasa party to the carrying on of the company's business. Mr. Millett for the applicants says that they may show Rumasa to have been "privy" to the carrying on of the business but are not sufficient to show that it was "party". Rumasa, he says, was no more a party to the carrying on of the company's business than the National Westminster Bank was by maintaining overdraft facilities or any large supplier who does not press for payment in the hope that his customer will be able to trade out of insolvency. This may well be the conclusion to emerge from all the evidence but I do not think that the contrary is so clearly unarguable as to justify striking out. For present purposes the pleadings may be regarded as sufficient. The

liquidators' serious difficulty lies in the allegation that the acts were done with intent to defraud. Rumasa's state of mind is pleaded in para. 48 as follows:

"In so proferring such assurances of support as aforementioned and then by choice failing to give such support (as Rumasa did so fail) Rumasa either never intended to honour its assurances or regarded its assurances as capable of being revoked at its will and irrespective of the loss, damage and harm to the creditors of the company thereby caused."

Paragraph 49 goes on to say that

"Accordingly, in the premises, Rumasa was knowingly party to and concurred in the carrying on of the business of the company with intent to defraud creditors of the company and/or for a fraudulent purpose (namely the deliberate procuring of the carrying on of the business of the company while insolvent, to the deteriment and harm of the creditors of the company, in order to secure or prolong a benefit to Rumasa and/or Rumasa's Spanish wine production companies by providing an outlet for its wines, sherries and Montilla and other products) within the meaning of s. 332 of the Companies Act 1948 . The conduct of Rumasa was in the premises dishonest and/or such as involved, according to current notions of fair trading among commercial men, real moral blame."

Fraud must be pleaded clearly and with particularity. The allegation of dishonesty in para. 49 is clear enough but conclusory, being alleged to be an inference from facts already pleaded. The allegations about Rumasa's alternative states of mind in para. 48 are also said to be inferences from the pleaded facts. The question is therefore whether the facts alleged in para. 1–47 constitute adequate particulars of fraud. What those paragraphs amount to is that Rumasa on several occasions declared an intention to support the company but in the end did not provide enough to pay the company's debts.

Mr. Lindsay for the liquidators says that Rumasa's change of mind shows that its previous intention to provide funds to pay the company's debts, if it existed at all, was not *98909 settled but subject to an element of contingency. An intention thus qualified is not an adequate basis for a belief that there is good reason for thinking that funds will become available to pay the company's debts as they fall due and can therefore give rise to an inference that there was an intent to defraud – see *R. v. Grantham (1984) 1 BCC 99,075; [1984] Q.B. 675* . I do not accept this form of reasoning, which involves translating the actual facts pleaded into generalities and then drawing inferences from those generalities rather than the facts themselves.

In my judgment, these facts, if proved, would be entirely inadequate to sustain an allegation of intention to defraud. They are quite consistent with a genuine and honest intention on the part of Rumasa, at the time of each of the statements relied upon, to support the company until it was able to stand upon its own feet. There is no allegation that Rumasa refused any support requested by the board before the Ernst & Whinney report on 6 June. The 1982 comfort letter, so far as it promised support for current trading, expired on 1 June 1983. The promise to provide "such long term finance as is necessary" had become meaningless in the light of the knowledge that the company could not survive. The statements to the chairman and at the press conference after nationalisation are, as pleaded, plainly no more than statements of current intent and descriptions of what the new controllers of Rumasa had just done, which was to inject a further £2m into the company. Rumasa is entitled to say that even if it admitted every fact alleged by the liquidators, the conclusions alleged in para. 48 and 49 could not be drawn. The pleaded facts show only that Rumasa decided to stop pouring money into the company after it learned that the company's condition was hopeless.

Mr. Lindsay also submitted that an intent to defraud could be inferred from the fact that Rumasa had made continuing representations that it was supporting the company and then decided no longer to do so without informing the company or its suppliers. In those circumstances, the continuing representation would become fraudulent – see *D.P.P. v. Ray [1974] A.C. 370* . I do not doubt a case of fraud along these lines is conceptually possible. But there is no trace of such a case in the existing points of claim. Mr. Lindsay said that it could be introduced by amendment and the points of claim were therefore not so incurably bad as to merit striking out under O. 18, r.

19. Over an adjournment he produced a draft amendment which alleged that upon a date which could not yet be particularised between 1 June 1982 (when the last comfort letter was given) and 8 July 1983 (when the receivers were appointed) Rumasa ceased to have the intention to support the company but deliberately and fraudulently failed to communicate this to the company or its creditors.

Mr. Millett opposed the application for leave to amend on the ground that there was no material upon which such an allegation could be based. He referred me without objection to certain additional documents which showed that in March 1983 it was a condition of the borrowing facilities provided by the Banco de Jerez that the board of the company should minute its belief that those and its other borrowing facilities would enable the company to meet its debts as they fell due for the foreseeable future. There was nothing to show any retraction of that statement until the Ernst & Whinney report on 6 June. Mr. Millett also referred me to a letter from the company to the Banco de Jerez on 9 June, which recognised that the Ernst & Whinney report had transformed the company's expectations and, while appealing for further support from Rumasa, accepted that one option would be to allow the company to fail. There is no suggestion in the letter that Rumasa's comfort letters or other declarations had given rise to a moral obligation to provide continued support in the new circumstances. Therefore, says Mr. Millett, there is no material upon which it can be alleged either that Rumasa had abandoned its intention to support the company before the Ernst & Whinney report or misled the company afterwards. I agree. It seems to me that the allegations in the proposed amendment are wholly speculative and that I should not allow an amendment to plead fraud on such a basis.

I also think that the introduction of an allegation of fraud of this kind would be *\*98910* something quite different from the case presently pleaded. It is one thing not to strike out a pleading which contains an arguable case merely because it has been inadequately or inartistically pleaded. It is quite another, particularly where the allegation is fraud, to refrain from striking out an unarguable case merely because it is claimed that a different arguable case could be formulated instead.

For these reasons I order the prayer for a declaration under sec. 332 and the supporting paragraphs of the points of claim to be struck out.

*(Application dismissed)*
*\*98911*

© 2013 Sweet & Maxwell



# EXHIBIT P



Morphitis v Bernasconi and others

COURT OF APPEAL, CIVIL DIVISION

*[2003] 2 BCLC 53; [2002] EWCA Civ 289*

**HEARING-DATES:** 12, 13 DECEMBER 2002,

5 MARCH 2003

**CATCHWORDS:**

Insolvency - Fraudulent trading - Single creditor defrauded in single transaction - Only intent of directors being to mislead by promise of payment which they knew would not be made - Whether business of company carried on with intent to defraud creditors - Insolvency Act 1986, s 213.

**CASES-REF-TO:**

*Bird, Re, ex p The debtor v IRC* [1962] 2 All ER 406, [1962] 1 WLR 686, CA.
*Cooper (Gerald) Chemicals Ltd, Re* [1978] 2 All ER 49, [1978] Ch 262, [1978] 2 WLR 866.
*Cyona Distributors Ltd, Re* [1967] 1 All ER 281, [1967] Ch 889, [1967] 2 WLR 369, CA.
*Murray-Watson Ltd v Lincomb Hall (Hartlebury) Ltd* (6 April 1977, unreported), Ch D.
*Park Air Services plc, Re, Christopher Moran Holdings Ltd v Bairstow* [1999] 1 BCLC 155, [1999] 1 All ER 673, [2000] 2 AC 172, [1999] 2 WLR 396, HL.
*Sarflax Ltd, Re* [1979] 1 All ER 529, [1979] Ch 592, [1979] 2 WLR 202.
*Theophile v Solicitor General* [1950] 1 All ER 405, [1950] AC 186, HL.

**INTRODUCTION:**

**Appeal**The liquidator of TMC Transport (UK) Ltd (the company), Geoffrey Christopher Antony Morphitis, appealed with leave granted by Jonathan Parker J on 11 February 2002 from the order of Anthony Elleray QC, sitting as a deputy judge of the High Court in the Chancery Division in the Companies Court, dated 18 June 2001 and entered on 5 February 2000 (see [2001] 2 BCLC 1), whereby he held that the liability of two former directors of the company, the first and second defendants Leonardo Bernasconi and Pasqualino Monti, to make contribution of [#163]35,000 to the assets of the company had been satisfied by the liquidator's acceptance of a payment into court of [#163]75,000 by the third defendant, Nicholas Bennett & Co, a firm of solicitors formerly instructed by the company. The first and second defendants cross-appealed with leave granted by Jonathan Parker LJ on 1 May 2002 against the judge's finding that fraudulent trading had been made out against them. The facts are set out in the judgment of Chadwick LJ.

**COUNSEL:**

*David Chivers QC* for the liquidator. *Clare Hoffmann* for the first and second defendants.

**JUDGMENT-READ:**

*Cur adv vult* 5 March 2003. The following judgments were delivered.

**PANEL:** ALDOUS, CHADWICK LJJ AND MUNBY J

**JUDGMENT-1:**

CHADWICK LJ

(giving the first judgment at the invitation of Aldous LJ).

**[1]** TMC Transport (UK) Ltd, a company incorporated under the Companies Acts 1948 and 1981, was ordered to be wound up on 20 December 1994. By these proceedings, commenced by application issued on 1 August 1997, the liquidator sought a declaration, under s 213 of the Insolvency Act 1986, that two former directors of the company and a firm of solicitors formerly instructed by the company were knowingly party to the carrying on of the business of the company with intent to defraud creditors and for other fraudulent purposes and that they were liable to make such contributions to the assets of the company as the court thought proper. On 13 September 2000 the liquidator accepted a payment into court, in the sum of [#163]75,000, made by the solicitors. The claim proceeded to trial only against the two former directors, Mr Leonardo Bernasconi and Mr Pasqualino Monti.

**[2]** The matter came on for trial before Mr Anthony Elleray QC, sitting as a deputy judge of the High Court, in November 2000. In February 2001 the judge handed down a lengthy written judgment, in which he held that fraudulent trading had been made out against the directors; and declared that they should contribute an amount of [#163]35,000 to the assets of the company (see [2001] 2 BCLC 1). That sum included an element ([#163]17,500) which the judge described as punitive. The judge went on to hold that liability of the directors to make contribution had been satisfied - or, as he put it, extinguished - by the liquidator's acceptance of the payment into court made by the solicitors. He adjourned the matter for further argument in relation to costs.

**[3]** The matter was restored in June 2001, no order having been drawn up following the judgment in February. The judge was asked to reconsider his decision that the whole of the amount of the contribution which the directors would otherwise have been liable to make should be treated as extinguished by the solicitors' payment. It was said that, notwithstanding that payment, the directors should remain liable to contribute an amount equal to the punitive element fixed by the judge. The judge rejected that contention. He went on to consider by whom the costs of the proceedings should be paid. He held (i) that the liquidator should pay 75% of the directors' costs incurred after the date (13 September 2000) on which he accepted the payment into court and (ii) that the directors should pay the liquidator's costs up to that date, but that those costs should include only 50% of the costs of adducing expert evidence. The judge refused permission to appeal.

**[4]** The judge's order is dated 18 June 2001; although it was not agreed by counsel, approved by the judge and entered until February 2002. In the meantime the liquidator had filed an appellant's notice. He sought an order: (i) that the directors be liable to make such contribution to the company's assets (in excess of [#163]35,000) as this court might think fit; in the alternative, (ii) that the directors be ordered to pay the punitive element of [#163]17,500 by way of contribution in addition to the [#163]75,000 paid by the solicitors; and (iii) that the directors pay the whole of the costs of the proceedings. Permission to appeal, limited to grounds 2, 3, and 4 in the appellant's notice, was granted by this

court (Jonathan Parker LJ) on 11 February 2002. On 1 March 2002 the directors filed a respondents' notice raising issues by way of cross-appeal. Permission to cross-appeal, limited to grounds 3, 4 and 5 in the respondents' notice was granted by Jonathan Parker LJ on 1 May 2002.

**[5]** Accordingly, there were before this court: (i) the liquidator's application for permission to appeal on ground 1 in the appellant's notice (which, although refused by Jonathan Parker LJ on paper, he was given liberty to renew at the hearing of the appeal); (ii) the directors' application for permission to appeal on ground 1 in the respondents' notice (adjourned for hearing at the appeal) and on ground 2 (refused on paper, with liberty to renew); (iii) the liquidator's appeal; and (iv) the directors' cross-appeal. We indicated that we would hear argument on all issues; treating the applications for permission as if they were additional grounds of appeal or cross-appeal.

**The issues raised on these appeals**

**[6]** The issues raised by the appeal and cross-appeal may be summarised as follows. (1) Whether the judge was correct, on the findings of fact which he made, to hold that the directors had been knowingly party to the carrying on of the business of the company with intent to defraud creditors or for other fraudulent purposes within the meaning of s 213 of the Insolvency Act 1986 - ground 3 in the respondents' notice. (2) If so, whether the judge was correct in holding that the directors were not parties to fraudulent trading prior to 12 November 1993 (and, in particular, were not parties to fraudulent trading from, at the latest, 20 May 1993) - ground 1 in the appellant's notice. (3) Whether any relevant loss was suffered by reason of the directors' participation in fraudulent trading, as found by the judge - grounds 4 and 5 in the respondents' notice. (4) If so, whether the judge was correct in assessing the contribution to be made by the directors (exclusive of the punitive element) at [#163]17,500 - ground 2 in the appellant's notice. (5) Whether the judge was entitled (alternatively, whether it was a proper exercise of his discretion) to include a punitive element in the contribution for which he held the directors liable - grounds 1 and 2 in the respondents' notice. (6) Whether the judge was correct to hold that the contribution for which he had held the directors liable (alternatively, the punitive element of that contribution) was satisfied by the payment made by the solicitors - ground 3 in the appellant's notice. (7) Whether the judge ought to have ordered the directors to pay the costs of the proceedings from 13 September 2000 (as well as the costs before that date) - ground 4 in the appellant's notice.

**The underlying facts**

**[7]** The underlying facts are not now in dispute. I take them from the judgment below. The company was established at the end of 1983 by Mr Monti, who was (and remains) a successful haulier operating throughout continental Europe through a number of locally incorporated companies bearing the initials 'TMC' (derived from 'Transmetal Chimica') as part of their name. Until early in 1991 the day-to-day business of the company was managed by Mr Daniel Murat, who had a 25% share interest. Mr Monti and Mr Murat were the directors. In 1991 Mr Murat was replaced as a director by Mr Bernasconi, an accountant in practice in Switzerland. Mr Monti and Mr Bernasconi ceased, formally, to be directors of the company at the end of 1992 - before the events said to constitute fraudulent trading in the present case - but it was not in dispute that Mr Monti continued to control the company to an extent which required him to be treated as a de facto director.

**[8]** By the end of the 1980s the company was tenant of warehouse and depot premises on the Sandwich Industrial Estate, in Kent, under four leases; each of which would continue, in accordance with its contractual terms, until 1998 or for some years thereafter. On 28 July 1989 the reversion to those leases was acquired by Ramac Holdings Ltd. The leases were guaranteed by Mr Murat alone.

**[9]** The company had traded profitably until the beginning of 1991 - as appeared from its accounts to 31 December 1990. But, by early 1991 Mr Monti had become concerned at reports of unpaid suppliers and, with the assistance of Mr Bernasconi, had investigated the cause of that concern. That investigation led to the departure of Mr Murat; and to Mr Bernasconi's appointment as a director. To assist the company Mr Monti arranged for loan capital to be provided by

Accoulis Tours Establishment, a company which (nominally at least) was owned and controlled by Mr Bernasconi but which was amenable to Mr Monti's wishes. The amount invested in 1991 was [#163]135,000. A further [#163]235,000 was lent by Accoulis in 1992; but part of that further loan may have represented unpaid interest due under the earlier loan. Nothing turns on the precise amount of 'new money' introduced by Accoulis.

[10] The company remained unprofitable during 1992. By June 1992 management accounts showed an excess of liabilities over assets in the sum of [#163]27,275. The company was suffering from a general downturn in the haulage industry; but Mr Monti and Mr Bernasconi identified the company's principal commercial problem as the onerous rental obligations under the leases. The problem was exacerbated by a pending upwards-only rent review. The solution was seen to be a relocation to other premises near Ramsgate. The difficulty in the way of relocation was the inability to find a purchaser for the leases or to agree terms with Ramac upon which they could be surrendered.

[11] In July 1992 Mr Monti and Mr Bernasconi instructed solicitors to seek advice from counsel. The matter on which counsel was asked to advise appears from para 3 of the opinion which he gave on 14 July 1992:

'TMC wishes to preserve its assets (apart from the leases) and its trade [connection], but to free itself from the liability to pay rent under the leases. Those premises no longer suit its need, and, I infer, there is

no market for them at present. What is envisaged is that the non-lease assets will be transferred in some way to another company in the hope that they can be put out of the reach of the landlord. It is an essential ingredient of any such scheme that TMC's trade creditors should be paid.'

Counsel pointed out, correctly, that any transfer of non-lease assets to another company, if not made for full value, would be open to attack by a liquidator if the company were to go into insolvent liquidation within two years thereafter: see ss 238 and 240(1)(a) of the Insolvency Act 1986. Even if the transfer were made for full value, the use of the proceeds to pay trade creditors (to the exclusion of the landlord) would be vulnerable to attack as a preference if liquidation occurred within six months: see ss 239 and 240(1)(b) of the Act. Counsel drew attention, also, to the provisions of ss 207 ('Transactions in fraud of creditors') and 216 ('Restriction on re-use of company names'). He concluded with the following advice:

'My opinion is that the only lawful way of divesting TMC of its leases and of enabling its business to continue is as follows. TMC should go into voluntary liquidation. Since I infer that no declaration of solvency under s 89 could be made, the liquidation will be a creditors' voluntary liquidation. Upon liquidation, the liquidator could, if he so wished, disclaim the leases, thereby ending TMC's liability under them. Mr Murat's liability would continue, and he could be required by the landlord to take new leases for their unexpired terms, or he could apply for vesting orders under s 181; but that is of no concern to those instructing me. The liquidator would then explore the possibility of the sale of the business of TMC and its tangible assets as a going concern. Some or all of the present directors would be entitled to negotiate with the liquidator for such a purchase, but, of course, they would not necessarily be successful. Section 216 would restrict their choice of a new trading name.'

[12] It is convenient, here, to set out the material provisions of s 216 of the Insolvency Act 1986:

'(1) This section applies to a person where a company ("the liquidating company") has gone into insolvent liquidation on or after the appointed day and he was a director or shadow director of the company at any time within the period of 12 months ending with the day before it went into liquidation.

(2) For the purposes of this section, a name is a prohibited name in relation to such a person if-(a) it is a name by which the liquidating company was known at any time in that period of 12 months, or (b) it is a name which is so similar to a name falling within paragraph (a) as to suggest an association with that company.

(3) Except with the leave of the court or in such circumstances as may be prescribed, a person to whom this section applies shall not at any time in the period of 5 years beginning with the day on which the liquidating company went into liquidation-(a) be a director of any other company that is known by a prohibited name, or (b) in any way, whether directly or indirectly, be concerned or take part in the promotion, formation or management of any such company, or (c) in

any way, whether directly or indirectly, be concerned or take part in the carrying on of a business carried on

(otherwise than by a company) under a prohibited name.
   (4) If a person acts in contravention of this section, he is liable to imprisonment or a fine, or both ...'

**[13]** Those provisions made the scheme suggested in the final paragraph of counsel's opinion of 14 July 1992 unattractive. Following liquidation, the business could not be sold by the liquidator to a new company in which Mr Monti was involved (as he would be) and carried on under the TMC initials, unless Mr Monti had ceased to be a director or shadow director of the old company on a date which was at least 12 months before the liquidation of the old company. If the business were to be carried on by the old company until liquidation and sale (as it would have to be, if it were to be sold by the liquidator as a going concern) it was impossible to envisage circumstances, in practice, in which Mr Monti would cease to be a shadow director prior to liquidation, even if he resigned his formal appointment. The point was recognised by counsel in a second opinion, dated 28 September 1992. He wrote:

   '[The] solution [suggested in the opinion of 14 July 1992] is unattractive to the directors for two reasons. First, there would inevitably be an interruption in trading while the liquidator gathered in TMC's assets and considered what to do with them. And, secondly, the goodwill attaching to the name "TMC" would be lost, because of the restriction imposed by s 216 of the 1986 Act on the former directors of a company which has gone into insolvent liquidation trading, either through a company or otherwise, in the same name as the liquidated company.'

**[14]** In his opinion of 28 September 2002, written to confirm advice given in conference a few days earlier, counsel put forward a revised scheme which (as he said) would avoid both of the problems which he had identified. The revised scheme is set out in para 4 of that opinion:

   '(1) TMC's holding company (H1 Ltd) sells [its] shares in TMC at a proper valuation to another, independent company, H2 Ltd. First of all, however, the shares in TMC's subsidiary, TMC (Northern) Limited, which is a warehousing company and which H1 Ltd would wish to retain, are transferred to it by TMC. In other words H2 Ltd will acquire TMC without its subsidiary. As would be usual on a sale of a company to an independent party, the present directors of TMC would resign and H2 Ltd would appoint its own nominated directors. (2) The (now) former directors of TMC incorporate a new company with a suitable name which would enable it to be known as TMC (new TMC). That could be done through H1 Ltd or through another holding company. (3) New TMC seeks new premises and prepares to operate as a road haulier. In the meantime TMC carries on its business as usual. (4) When new TMC is ready to trade TMC ceases to trade as a road haulier and becomes, instead, a lessor of trailers, which it leases for 12 months to new TMC. At the same time new TMC buys TMC's goodwill (namely its list of customers) at a fair value. (5) Not less than 12 months later, new TMC cancels its leases (which I am instructed it will then no longer
   require) and makes fresh arrangements for providing the necessary vehicles for its business. TMC is left with its trailers and can either continue to trade or go into liquidation as it thinks fit. If it were to go into insolvent liquidation at that stage, the original directors of TMC would have committed no offence under s 207, because there would have been no transfer of TMC's property by them. The shares in TMC themselves would have been transferred, by H1 Ltd. Nor could there be an objection to new TMC trading as "TMC" under s 216, because the original directors of TMC, who will by then be the directors of new TMC, will not have been directors of TMC within 12 months of its liquidation.'

**[15]** Mr Monti and Mr Bernasconi decided to adopt the scheme put forward by counsel in his second opinion. On 24 November 1992, the company's shares in TMC Northern were transferred to its holding company, Alca Enterprises AG, at a price which the liquidator has not challenged. On 22 December 1992, the company's own shares were transferred by Alca to PPM Trading Ltd (PPM), a Liechtenstein company incorporated by Mr Bernasconi. Mr Monti and Mr Bernasconi resigned office as directors of the company. The sole director appointed in their place was Mr Augustoni Domenico, Mr Bernasconi's father-in-law. Those steps were (I assume) intended to carry into effect step (1) of counsel's scheme; but it is difficult to think that counsel would have been satisfied that PPM Trading was an 'independent' company in the role of H2 Ltd or that he would have envisaged the appointment of Mr Bernasconi's father-in-law as the nominated director of the old company.

**[16]** Steps (2), (3) and (4) of counsel's scheme were carried into effect by the incorporation of a new company, Trans Montana Carriers Ltd, which could use the initials 'TMC'; the transfer of goodwill from the old company to the new

company at a price of [#163]1,000; the execution of a leasing contract for the lease by the old company to the new of the 34 trailers which the old company then owned at a rent of [#163]125,000 per annum; and the acquisition by the new company of leasehold premises in Ramsgate from which it could trade. The old company ceased trading as hauliers on 31 December 1992; and the haulage business was thereafter (with effect from 1 January 1993) carried on by the new company. For convenience I shall refer to the old company as 'the company' and to the new company as 'Newco'.

[17] The financial statements in respect of the company, for the year to 31 December 1992, show fixed and current assets of [#163]843,409 and liabilities of [#163]903,704. The fixed assets were shown at a book value of [#163]206,251; and current assets, principally trade debtors, at a book value of [#163]637,158. Liabilities comprised trade creditors ([#163]428,849), a loan creditor (Accoulis, [#163]370,000), accrued expenses of [#163]100,000 or thereabouts, and Crown debts of about [#163]7,000. The trade creditors included the landlord of the Sandwich premises, Ramac.

[18] During 1993 the company collected its trade debts and received from Newco the rents payable under the trailer lease. By the year end the company had sold its remaining trailers to an associated Belgian company, ICTS, for about [#163]195,000. That sale has not been challenged by the liquidator. The company paid off nearly all its trade creditors, much of the current rent under the leases of the Sandwich premises, and part of the Accoulis loan. The financial position of the company as at 31 December

1993, as it appeared from a reconstruction by the joint expert which was not challenged, showed current liabilities of [#163]292,000. Those liabilities included the balance of the Accoulis loan ([#163]240,000) and trade creditors of [#163]43,000, of which [#163]37,000 represented rent due to Ramac. Assets had reduced to [#163]63,000. Net liabilities were [#163]222,000, suggesting a loss during 1993 of some [#163]160,000. The loss was attributable to losses on the sale of fixed assets below book value, depreciation on fixed assets, interest charges on the Accoulis loan and the rent accruing on the Sandwich premises. But, in broad terms, the objective of realising the company's assets and paying its trade creditors (other than its landlord) had been achieved.

[19] The sale of the company's trailers to ICTS followed a third opinion from counsel, dated 14 October 1993. Counsel had been asked to advise whether 'on the insolvent liquidation of TMC in due course, there would be any contravention of the provisions of the Insolvency Act 1986 if TMC were now to sell its trailers to a third party'. He wrote:

'The purpose of introducing 12 month [trailer] leases into the scheme mentioned in para 4 of my Further Opinion of 28 September 1992 was to enable TMC to continue trading and to generate an income flow which would enable it to pay its debts (including the rent due under the leases of its properties in Sandwich) for at least that period. In other words it is essential that no creditor (including the landlord) should present a petition to wind up TMC before the expiration of the period of 12 months beginning with its having ceased to trade as a haulier. That is to protect the original directors of TMC (now the directors of the new TMC) from contravention of s 216 of the 1986 Act.'

It seems unlikely that counsel appreciated that Mr Monti and Mr Bernasconi were continuing to act as directors of the company de facto, notwithstanding that they had formally resigned office. If counsel had appreciated that, he would have realised that the objective for which the scheme had been devised - the avoidance of liability under s 216 of the 1986 Act in their role as directors of Newco - could not be achieved in any event.

[20] Counsel advised that, provided that the cancellation of the trailer leases and the sale of the trailers did not result in the financial position of TMC deteriorating so that it was unable to pay its debts as they fell due, no creditor would be in a position to petition for winding up before the end of the 12-month period; so that there was no reason, on that ground, why the trailers should not be sold. Nevertheless, counsel went on to advise against that course on other grounds. First, that there was a risk of challenge to the transaction under s 238 of the Act unless the sale (and the surrender of the trailer leases) were each effected at full value; and, second, that there was a risk that the present directors of TMC would be held liable for wrongful trading under s 214 of the Act. As he explained:

'The basis of such liability would be that, once TMC had sold virtually all its assets and virtually all its leases had

been cancelled, its directors ought to have concluded that there was no reasonable prospect of its avoiding going into insolvent liquidation. In other words it seems very difficult for the present directors of TMC to adopt the proposed middle course: either TMC ought to continue trading to an extent which generates sufficient income for it to pay its debts as they

fall due so that it can plausibly appear to be a going concern, or it ought to cease trading altogether (in which case a winding-up petition is likely to be presented soon afterwards). To wind its activities down in the manner suggested is such a clear preparation for a subsequent liquidation that the directors could well be criticised for not having ceased those activities altogether.'

[21] It appears from an attendance note made by the solicitors shortly after that opinion had been received that counsel's advice was accepted. The note, dated 28 October 1993, records:

'It was, therefore, agreed that Mr [Monti] would go ahead and sell the four trailers which he appeared already to have done a deal and to retain the 22 trailers until on or after 1 January 1994 when they would be sold off. The Company would then subsequently be placed into liquidation probably by Ramac Holdings Limited issuing winding up proceedings.'

The judge found that nearly all of the remaining 22 trailers were sold by the company 'as the year ended', rather than 'on or after the 1st January 1994', but nothing turns on that.

[22] If counsel's scheme was to secure the objective for which it had been devised, it was necessary to avoid circumstances in which the landlord of the Sandwich premises, Ramac, presented a petition for the winding up of the company during 1993. This was recognised, expressly, in the opinion of 14 October 1993 to which I have just referred; but it was implicit in counsel's earlier advice. The need was identified in a letter dated 13 May 1993 from Mr David Saunders, the solicitor dealing with the matter on behalf of the company, to the company secretary, Mr Eddie Borgers. After informing Mr Borgers of a letter from Ramac's solicitors threatening the issue of a writ in respect of unpaid rent, service charges and insurance, Mr Saunders wrote:

'I am concerned because in the scheme devised to remove from the premises at Unit 6 and set up the new TMC it is an essential element that rent and other expenses made payable to the Landlord are kept up to date for a period of at least 12 months in order that former Directors and Company Secretary of the old TMC are (a) not criminally liable and (b) to prevent Ramac, as creditors, from seeking to set aside a transaction or pursue new TMC or its Directors and Company Secretary for the outstanding monies. If these outstanding debts remain outstanding, then I am fearful that the scheme will fail and considerable problems will ensue.'

[23] It will be necessary to examine, in some detail, the steps which were taken, following that letter, to forestall the issue of a writ, or the presentation of a winding-up petition, in respect of the company's debt to Ramac. It is sufficient to note, at this point, that those steps did not extend beyond the end of 1993. On 13 January 1994 Mr Saunders was able to report to Mr Bernasconi that 'we have successfully utilised the one year period for the purpose of off-loading the premises at Sandwich Industrial Estate'. It was not until 18 September 1994 that Ramac served a statutory demand for the amount of the rent then due ([#163]112,478). That was followed

by the presentation of a winding-up petition on 10 November 1994. As I have said, the company was wound up by the court on 20 December 1994. The liquidator was appointed on 3 March 1995.

[24] The liquidator disclaimed the leases of the Sandwich premises, as he was entitled to do under s 178(2) of the Insolvency Act 1986. The effect of the disclaimer was to determine the continuing liabilities of the company in respect of those premises: see s 178(4)(a) of the Act; but Ramac was entitled to prove as a creditor in the liquidation for the loss which it had suffered: see s 178(6) of the Act and the analysis in *Re Park Air Services plc* , *Christopher Moran Holdings Ltd v Bairstow* [1999] 1 BCLC 155 at 161-162, [2000] 2 AC 172 at 183-184. The judge was told that a proof by Ramac in the sum of [#163]621,980.41, representing the discounted value of the loss of the right to future rent after giving credit for receipts to be obtained on re-letting, had been admitted by the liquidator.

**The liquidator's pleaded case**

**[25]** Section 213 of the Insolvency Act 1986 is in these terms:

'(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, the following has effect.

(2) The court, on the application of the liquidator may declare that any persons who were knowingly parties to the carrying on of the business in the manner above-mentioned are to be liable to make such contributions (if any) to the company's assets as the court thinks proper.'

**[26]** The liquidator's case in relation to the allegation of fraudulent trading under s 213 of the Act is pleaded at paras 18 to 24 of the points of claim dated 11 November 1997. Paragraph 18 contains the allegation that, from 16 February 1993, the company was in default of its obligations for rent, service charges and interest charges under the leases. Paragraph 19 alleges that, from 13 May 1993, Ramac (through its solicitors) was demanding payment of the moneys due; and (on particular dates specified) was threatening proceedings to recover those moneys. Paragraphs 20 and 21 are in these terms, so far as material:

'20. In all instances Nicholas Bennett [the company's solicitors] wrote to Ramac's solicitors, adopted the tactics of either seeking time to pay, or to reschedule payments, or making some small payment on account ... The purpose of such tactics was to ensure that Ramac did not commence proceedings or present a winding up petition until 12 months from the date when new TMC commenced trading as a haulier, being 23 December 1993.

21. By seeking time to make payments due, and/or making the Company liable for interest on the outstanding sums, throughout 1993 the Respondents caused the Company to incur credit at a time when they knew or ought to have known that the Company was unable to pay the sums due and/or had no intention of paying the same.'

Paragraph 22 of the points of claim pleads the disposal of the trailers in late 1993. Paragraphs 23 and 24 are in these terms:

'23. The course of trading by the Company through the Respondents ... was intended to deceive Ramac into believing that it would be paid the sums due under the leases in due time or within an agreed rescheduling time when at all times the said Respondents knew or intended that no monies would be paid after 23 December 1993. No monies were paid after 8 December 1993. As at 23 December 1993 over [#163]35,000 plus interest was owing to Ramac.

24. In the premises, the Respondents ... have been knowingly parties to the carrying on of the business of the Company to defraud creditors of the Company and for other fraudulent purposes.'

**[27]** On 28 July 2000 Arden J directed that a list of issues be served with the skeleton arguments. The list served on behalf of the liquidator included, as issue 6(b), the following:

'In any case, did the defendants conduct the business of the Company ... (b) with the purpose of ensuring that the transfer of assets pursuant to the Scheme could not be challenged and to avoid personal or criminal liability?'

At the trial, counsel for the former directors (Miss Hoffmann) took the point that it had not been alleged by the liquidator in his pleading that conduct of the business for the purpose identified in issue 6(b) amounted to fraudulent trading for the purposes of s 213 of the 1986 Act. The judge upheld that objection. It is, I think, important to note what he said ([2001] 2 BCLC 1 at [111]-[114]):

'[111] Mr Chivers [counsel for the liquidator] summarised the liquidator's claim in opening as a claim that Mr Monti and Mr Bernasconi dishonestly persuaded Ramac to hold off the commencing of legal proceedings until the 12 month period required by the scheme had elapsed and that their intention was to pay the minimum required to keep Ramac at bay, notwithstanding that nothing further should be paid after December 1993.

[112] Mr Chivers acknowledged on behalf of the liquidator that the present claim would not have arisen if the company had during the 12 month period simply paid the current rent. The liquidator alleges that the trading became fraudulent by reason of lies to Ramac as to intention to pay rent and comply with obligations. Though the particulars of

claim at para 20 referred to the tactic of seeking time to pay or reschedule payments as a tactic designed to ensure that Ramac would not commence proceedings or the presentation of a winding-up petition during the 12 month period, the deception alleged at para 23 was that the company intended to deceive Ramac into believing that it would be paid sums due under the leases or as rescheduled when it was known or intended that no monies would be paid after 23 December 1993. It is not understood that the liquidator seeks to allege that the tactic of avoiding proceedings or a petition of itself is fraudulent trading.

[113] The particulars of fraudulent trading do not allege that the transfer of the company's assets or the preference of other creditors at the expense of Ramac's right to future rents etc during the 12 month period were wrongful or a misfeasance, so as to amount to fraudulent

trading. I have cited part of para 22 of the particulars, which refers to the sale of vehicles and trailers. Those full particulars had gone on to say that the sums received from the disposal of vehicles and trailers were paid to PPM in discharge of its loan to the company, a particular preference claim. That latter claim was however abandoned. The evidence is that the sales were at or above market value. Though Mr Chivers asked me to note in connection with the particulars the fact of the disposals, he did not allege that they amounted to fraudulent trading.

[114] I summarised at para 62 above expectations of the scheme on the face of counsel's second opinion and the attendance note of 24 September 1992. In determining or purporting to follow the scheme it is obviously correct that Mr Monti and Mr Bernasconi intended the transfer of assets out of the company during the 12 month period. Their expectation should have been, to the extent that the scheme was followed, that such transfers would not be challenged and they would avoid personal liabilities, as those had been identified by counsel. It does appear to me that, as Miss Hoffmann submitted, to allege that causing the company to carry on business for those scheme reasons was fraudulent trading would be to raise a new case. Further, that case would be substantially inconsistent with Mr Chivers' disavowal of any challenge to the implementation of the scheme, insofar as it was followed. Mr Chivers did not seek to make any amendment to the claim. In consequence, I do not understand that bare issue 6(b) purposes would demonstrate fraudulent trading for the purposes of this claim.'

The judge repeated that 'it is not the fraudulent trading case of the liquidator that it was dishonest to prefer creditors at the expense of the landlord' (see [2001] 2 BCLC 1 at [140]). He concluded:

'Given the absence of a relevant plea and the *Sarflax* point [a reference to the decision of Oliver J in *Re Sarflax Ltd* [1979] 1 All ER 529, [1979] Ch 592], I do not consider it would be right to find dishonesty arising from the pursuit of the scheme, in the absence of independent directors.'

The judge's reference, there, to 'the absence of independent directors' indicated that he had recognised that counsel's scheme had not contemplated the appointment of Mr Bernasconi's father-in-law as sole director of the company following the resignation of Mr Monti and Mr Bernasconi. Nevertheless, and notwithstanding that departure from the scheme which counsel had advised could safely be pursued, the judge did not allow the liquidator to advance a case based on the submission that conduct of the business for the purpose identified in issue 6(b) amounted to fraudulent trading.

[28] The position, therefore, was that the only conduct upon which the liquidator relied at the trial in support of his claim that the former directors were parties to fraudulent trading was the deception of Ramac-

'into believing that it would be paid the sums due under the leases in due time or within an agreed rescheduling time when at all times the said Respondents knew or intended that no monies would be paid after 23rd December 1993.'

It is necessary, therefore, to consider what was said to Ramac during 1993.

**The representations made to Ramac during 1993**

[29] As I have said, Ramac (through its solicitors) had demanded payment of outstanding rent and other sums due by letter dated 13 May 1993. Mr Saunders had been concerned that such demand put the implementation of counsel's scheme at risk; and had written to Mr Borgers. Mr Saunders sought instructions from Mr Bernasconi at a meeting on 19

May 1993. His attendance note records:

'... I discussed at some length with Mr Bernasconi the threat made by Ramac Holdings Limited through their Solicitors to issue a Writ for unpaid monies of [#163]33,000. Mr Bernasconi agreed that the only matter in dispute was damage to a wall at Unit 6. Apart from this, they had no alternative but to agree the figures outstanding and, after some discussion, it was agreed that the following would be proposed.'

[30] Following those instructions, Mr Saunders wrote to Ramac's solicitors on 20 May 1993. His letter included these paragraphs:

'This [notice of a planning application made by Ramac] is of considerable concern to my clients as they instruct us that they still intend to use the buildings at Sandwich for international freight forwarding, storage and additional warehousing space to include the representation of foreign haulage companies using Port Ramsgate. Negotiations are continuing in this respect and, in the circumstances, they strongly object to any proposed development particularly if it should affect their business ... So far as the outstanding monies are concerned, our clients reply as follows:-(1) The sum of [#163]2,986.50 said to be in respect of "repairs to wall" as it relates to Building 6 has always been in dispute and, indeed, is the subject of correspondence entered into between ourselves and your clients in the past. These matters are continuing. (2) The majority of the amount outstanding represents payment of rent and insurance in the future months. Due to our clients' concern with regard to the above, they are quite prepared to pay the balance by instalments, and quickly, provided that they are made fully aware of what is to happen in the future. As a gesture of good faith and their willingness to pay the outstanding amount, we enclose our clients' cheque for [#163]7,466.00 in part settlement of the outstanding amount. Please acknowledge receipt.'

[31] Ramac's solicitors were not content with the proposal that the moneys outstanding would be paid by instalments. They pointed out that, under the terms of the leases, rent, service charges and insurance were payable in advance; and described the letter of 20 May 1993 as 'a smoke screen for payment on a monthly basis'. They continued to threaten the issue of a writ.

[32] On 25 May 1993, Mr Saunders wrote to Mr Bernasconi, noting his

instructions 'to delay matters for as long as possible'. On 28 May 1993 he was able to put a proposal to Ramac's solicitors for payments of [#163]10,000 in June and July, with a final payment of [#163]2,951 in August to clear the outstanding balance. By early June 1993 that proposal had been accepted. The instalments were paid in accordance with the proposal.

[33] The next quarterly rents ([#163]18,800) fell due on 24 June 1993; but were not paid. Ramac's solicitors sought payment by letters dated 2 and 26 July 1993. On 12 August 1993 Mr Saunders explained that he was awaiting his clients' instructions. He wrote: 'They would hope to be able to put forward some proposals shortly in connection with an instalment option.' No proposals were forthcoming. On 2 September 1993 Mr Saunders wrote to Mr Bernasconi:

'I have managed to stall Ramac's Solicitors for some time now but, unfortunately, they are becoming more aggressive. It would be helpful if you could please give me TMC's instructions for payment by instalments to include the June and September payments of rent. I am sorry to mention this to you but it is urgent.'

There was no response to that request. On 14 September 1993 Ramac's solicitors threatened proceedings. That threat, when relayed to Mr Bernasconi, prompted payment of [#163]5,000 'on account'. A further [#163]5,000 was sent on 12 October 1993 'in part satisfaction of the outstanding debt'. By that date, of course, the quarterly rents due at Michelmas were in arrears. A statement sent by Ramac's solicitors on 15 October 1993 showed the amount outstanding to be [#163]36,749.24.

[34] Mr Saunders wrote again to Mr Bernasconi. He pointed out that Ramac was threatening to issue proceedings within the next seven days; and explained what might follow:

'The effect of issuing proceedings will be that you will then have 14 days in which to defend the proceedings and/or

Judgment will be entered against you in the sum outstanding less the sum of [#163]2,986.50 with regard to the repairs to the wall of Building 6 which is, of course, disputed. Ramac will then proceed to try and enforce the Order either by the issue of a Winding Up Petition and, clearly, we do not wish this to be heard before 1 January 1994 in view of the scheme devised by Counsel. I recommend that we make a relatively substantial further payment and, at the same time, arrange a definite date for a meeting in order that these matters can be dealt with and to prevent Ramac taking the matter through to the next stage. However the alternative would be to leave matters as they are and allow legal proceedings to take their course with the eventual enforcement proceedings resulting from a Judgment obtained by Ramac against your Company. This may take some time but I cannot guarantee that I can delay matters until after the New Year.'

[35] By 22 October 1993 Mr Saunders was in a position to promise Ramac's solicitors that a further [#163]5,000 would be paid by the end of the month. That sum was paid on 1 November 1993. An attendance note of a meeting on 28 October 1993, at which Mr Monti and Mr Bernasconi were present, records that it was agreed that 'we would try and stall as long as possible'. On 29 October 1993 Mr Saunders was able to write to

Mr Bernasconi expressing pleasure that 'we have been able to stall Ramac Holdings sufficiently in order that they do not, as yet, appear to be in a position to wind up TMC Transport (UK) Limited'. As he put it: 'In that regard, we have been extremely successful.'

[36] Two more weeks went by. On 12 November 1993 Ramac's solicitors threatened the issue of a writ by close of business that day unless proposals were forthcoming. The response was a letter from Mr Saunders of the same date. He wrote:
'We have made a considerable amount of effort to obtain instructions from our client and have, at long last, been able to contact them abroad. Our instructions are as follows:-
(1) Our clients will make payment of the sum of [#163]5,000.00 by next Wednesday, that is 17 November, 1993.
(2) There will be a further payment by way of a second tranche of [#163]5,000.00 on Wednesday 8 December, 1993.
(3) Our clients will make a further payment of [#163]10,000.00 on Wednesday 29 December, 1993.
(4) They are prepared to meet with your clients at a venue to be appointed on Wednesday 12 January 1994 when it is anticipated that they will either pay the balance owed to your client company or, alternatively, to make proposals to pay the balance.
We trust that this is acceptable to your clients and await hearing from you that you are not issuing a Writ in respect of these matters. Our clients have instructed us that if a Writ is so issued then they will take a different attitude towards the question of repayment. The structured settlement proposals that they have suggested are arranged in such a way that they hope that they can meet their financial obligations towards your clients.'

On 16 November 1993 Mr Saunders was able to report to Mr Bernasconi that (subject to a request that the payments be made by post dated cheques) 'all appears to be agreed and, once again, we have been able to avoid the issue of a writ'. He asked for instructions whether post-dated cheques could be offered; pointing out that 'Clearly, the object of the exercise is to make as small a payment as possible prior to the end of the year'.

[37] The first instalment of [#163]5,000 promised by the letter of 12 November 1993 was paid on 19 November 1993. It was agreed that the date for payment of the third instalment should be brought forward to 23 December 1993. Mr Saunders explained to Mr Bernasconi that that made no difference to the position. On 25 November 1993 he wrote:
'The mere fact of bringing forward the schedule payment date from the 29th to 23 December is not is any practical use (sic) in that, even if proceedings are issued on that date, Judgment could not be obtained until at least 14 days has elapsed from the date of service of the proceedings which would, in effect, take us to 7 January 1994. I am sure that you are pleased by developments ...'

[38] The second instalment of [#163]5,000 promised by the letter of 12 November 1993 was paid on 8 December 1993. The third instalment, [#163]10,000 on 23 December 1993, was never paid. As I have already noted, on 13 January 1994 Mr Saunders was able to report to Mr Bernasconi that 'we

have successfully utilised the one-year period for the purpose of off-loading the premises at Sandwich Industrial Estate'.

**The judge's conclusions as to fraudulent trading**

[**39**] I have explained that the liquidator's case at trial was that Ramac was deceived into a belief that it would be paid the sums due under the leases in due time or within an agreed rescheduling time 'when at all times the said Respondents knew or intended that no monies would be paid after 23rd December 1993'; and that it was that deception on the part of Mr Bernasconi and Mr Monti (through Mr Saunders) - and that alone - which constituted fraudulent trading. As the judge put it in his judgment ([2001] 2 BCLC 1 at [69]):

'... the essence of the particulars of fraudulent trading alleged against Mr Monti and Mr Bernasconi (and the solicitors) has been the very stalling which Mr Saunders was reporting in correspondence ... in 1993 ... coupled with the unwarranted incurring of credit and deception as to the intention to pay instalments after 23 December 1993. The liquidator does not seek to complain that Mr Monti and Mr Bernasconi sought to implement the scheme.'

[**40**] The judge accepted that 'a purpose of the company's business in 1993 was to carry on for a 12 month period without being wound up'. He identified, as the reason underlying that purpose, 'Counsel's advice by his second opinion that the survival for 12 months would enable Mr Monti and Mr Bernasconi to avoid restrictions on the use of the TMC name under s 216 of the 1986 Act'. He accepted that 'the company, through Mr Saunders at the direction of Mr Bernasconi and Mr Monti, did from May 1993 onwards, represent that Ramac would [be paid] outstanding rent subject to demand by instalments'. But he was satisfied that 'representations as to the payment of outstanding rentals were true, save in regard to the final instalment offered on 12 November 1993'. In particular, he declined to hold that the representations which were made during 1993 were representations as to the payment of rents falling due in the future. His conclusions are summarised in his judgment ([2001] 2 BCLC 1 at [130] and [131]):

'[130] The liquidator's pleaded case may be read as suggesting that misrepresentations were made as to an intention to pay rents after 23 December 1993. The company was contractually bound to make such payments. Nonetheless, I do not consider that the 1993 representations carried with them at least before the letter of 12 November 1993 and the suggestion of a meeting on 12 January 1994, any representation as to intentions beyond the time of the instalments that were offered.

[131] In the result I have come to the conclusion, in regard to false representations insofar as they were given for intention and purpose relevant to s 213, that the liquidator has simply made out relevant intent in regard to the promise of an instalment of [#163]10,000 on 23 December 1993. Mr Monti and Mr Bernasconi did, in my judgment, intend to defraud Ramac in the sense of misleading it as to the company's intention to pay the 23 December 1993 instalment. The misrepresentation was made on 12 November 1993.'

[**41**] The question for the judge, in the light of his finding that Mr Monti and Mr Bernasconi intended to mislead Ramac on 12 November 1993 (and thereafter) by promising a payment of [#163]10,000 on 23 December 1993 which they knew would not be made, was whether, from 12 November 1993, 'any business of the company was carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose': see s 213(1) of the 1986 Act. The judge had directed himself, earlier in his judgment ([2001] 2 BCLC 1 at [86]), that:

'... the defrauding of a single creditor by a single transaction can properly be described as the carrying on of a business to defraud creditors. Further, the carrying on of a business can include the collection and distribution of assets in payment of debts ...'

The second of those propositions is not, I think, in doubt: see *Re Sarflax Ltd* [1979] 1 All ER 529 at 534-535, [1979] Ch 592 at 599, applying *Theophile v Solicitor General* [1950] 1 All ER 405, [1950] AC 186 and *Re Bird, ex p The debtor v IRC* [1962] 2 All ER 406, [1962] 1 WLR 686. The judge found support for the first of those propositions in *Re Gerald Cooper Chemicals Ltd* [1978] 2 All ER 49, [1978] Ch 262, to which I shall need to return. His conclusion that the business of the company had been carried on with intent to defraud is expressed in his judgment ([2001] 2 BCLC 1 at [134]):

'It follows in my judgment that the liquidator has made out relevant intent or purpose for the purpose of s 213 in regard to the period from 12 November 1993 when Mr Monti and Mr Bernasconi had no intention that the company should pay the final instalment then being suggested to Ramac nor any intention to attend a meeting with it the following January. I am not satisfied that a relevant intent or purpose is made out prior to that date. The relevant trading continued until the year's end or just into 1994, as last vehicles were sold off and the company ceased trading.'

**The first issue: was the business of the company carried on with intent to defraud?**

**[42]** The first issue for decision on this appeal is whether the judge was correct to hold that the business of the company was carried on, from 12 November 1993, with intent to defraud creditors or for other fraudulent purposes within the meaning of s 213 of the Insolvency Act 1986. On the findings of fact which the judge made, the only creditor in relation to whom Mr Monti and Mr Bernasconi could be said to have had an intent to defraud was Ramac; and the only relevant intention in relation to Ramac was to mislead it by the promise, on 12 November 1993, of a payment which they knew would not be made. It is necessary to keep in mind that, but for the deception which flowed from the promise of payment, the judge would not have held that the business was carried on after 12 November 1993 for any fraudulent purpose. In particular, he did not hold that the carrying on of the business in the knowledge that Ramac would not be paid moneys which were due to it was, of itself, a fraudulent purpose. It is clear that the liquidator had taken the view that, in the light of the decision in *Re Sarflax Ltd*, the case could not be advanced on that basis.

**[43]** Miss Hoffmann, who appeared for Mr Monti and Mr Bernasconi on this appeal as she did in the court below, pointed out, correctly, that not every fraud or fraudulent misrepresentation perpetrated by a company amounts to fraudulent trading under s 213 of the 1986 Act. That was made clear by the observations of Oliver J in *Murray-Watson Ltd v Lincomb Hall (Hartlebury) Ltd* (6 April 1977, unreported) which are cited and explained by Templeman J in *Re Gerald Cooper Chemicals Ltd* [1978] 2 All ER 49 at 53, [1978] Ch 262 at 267. In the former case Oliver J had said this, of what was then s 332 of the Companies Act 1948 (the statutory predecessor of s 213 of the 1986 Act):

'[Section 332] is aimed at the carrying on of a business ... and not at the execution of individual transactions in the course of carrying on that business. I do not think that the words "carried on" can be treated as synonymous with "carried out", nor can I read the words "any business" as synonymous with "any transaction or dealing". The director of a company dealing in second-hand motor cars who wilfully misrepresents the age and capabilities of a vehicle is, no doubt, a fraudulent rascal, but I do not think he can be said to be carrying on the company's business for a fraudulent purpose, although no doubt he carries out a particular business transaction in a fraudulent manner.'

In *Re Gerald Cooper Chemicals Ltd*, Templeman J accepted that analysis. He said ([1978] 2 All ER 49 at 53, [1978] Ch 262 at 267):

'In the example given by Oliver J [in *Murray-Watson Ltd v Lincomb Hall (Hartlebury) Ltd*] the dealer was carrying on the business of selling motor cars. He did not carry on that business with intent to defraud creditors if he told lies every time he sold a motor car to a customer or only told one lie when he sold one motor car to one single customer. When the dealer told a lie, he perpetrated a fraud on the customer, but he did not intend to defraud a creditor. It is true that the defrauded customer had a right to sue the dealer for damages, and to the extent of the damages was a contingent creditor, but the dealer did nothing to make it impossible for the customer, once he had become a creditor, to recover the sum due to him as a creditor.'

**[44]** Nevertheless, the judge relied on the *Cooper Chemicals* case as authority for the proposition that the defrauding of a single creditor by a single transaction can properly be described as the carrying on of a business with intent to defraud creditors: see the passage of his judgment to which I have already referred ([2001] 2 BCLC 1 at [86]). It is necessary, therefore, to have the facts of that case in mind. The company, through a subsidiary, was engaged in the production of indigo. It had obtained finance by way of loan, the principal amount of which was repayable on 30 June 1976. The company was in no position to make that repayment save from forward sales of indigo against pro-forma invoices. It was alleged that the loan creditor and its directors knew that, if moneys paid in advance in respect of forward sales were applied in repayment of the loan rather than for the purpose of the production of indigo, no indigo would be available to

satisfy the customer's order. On 19 August 1976, the company obtained an order from Harrisons (London) Ltd for the delivery of 5,000 kg of indigo; and, on the following day, received prepayment from Harrisons in respect of that

order of an amount in excess of [#163]125,000. Part of those moneys ([#163]110,000) were immediately paid by the company to the loan creditor (Jimlou Ltd). The company failed to deliver the indigo for which it had been paid; and subsequently went into liquidation. Harrisons brought proceedings under s 332 of the 1948 Act against the loan creditor and its directors for a declaration that they were knowingly party to the carrying on of the company's business with intent to defraud. The respondents sought to strike out those proceedings on the ground that there was no sufficient allegation of fraudulent trading. Templeman J dismissed that application.

**[45]** In the course of his judgment in the *Cooper Chemicals* case Templeman J said ([1978] 2 All ER 49 at 53, [1978] Ch 262 at 267-268):

'In my judgment, when Mr Cooper on behalf of the Cooper company sought from Harrisons an order for indigo on advance payment terms, Mr Cooper was carrying on the business of the Cooper company. When the Cooper company accepted payment of [#163]125,698-odd, Mr Cooper knowing that there was no prospect, or no reasonable prospect or intention of supplying indigo, and no intention of returning the money to Harrisons, the business of the Cooper company was carried on fraudulently. The subsequent payment to Jimlou of [#163]110,000 made the fraudulent carrying on of the business irremediable and constituted a fraud on the then creditor, Harrisons. The whole transaction between the Cooper company and Harrisons constituted the carrying on of the business of the Cooper company with intent to defraud a creditor of the company. Save that only one creditor was involved, the situation appears to meet the requirements of s 332 set forth by Oliver J in *Re Murray-Watson Ltd* [*Murray-Watson Ltd v Lincomb Hall* (*Hartlebury*) *Ltd* (6 April 1977, unreported) to which I have already referred, namely that the section is contemplating a state of facts in which the intent of the person carrying on the business is that the consequence of carrying it on (whether because of the way it is carried on or for any other reason) will be that creditors will be defrauded; "intent", of course, being used in the sense that a man must be taken to intend the natural or foreseen consequences of his act ... In the present case, the Cooper company was carrying on the business of selling indigo. In my judgment, they carried on that business with intent to defraud creditors if they accepted deposits knowing that they could not supply the indigo and were insolvent. They were carrying on business with intent to defraud creditors as soon as they accepted one deposit knowing that they could not supply the indigo and could not repay the deposit. It does not matter for the purposes of s 332 that only one creditor was defrauded, and by only one transaction, provided that the transaction can properly be described as a fraud on a creditor perpetrated in the course of carrying on business. If the Cooper company had fraudulently supplied sub-standard indigo to Harrisons, the Cooper company would have committed a fraud on a customer, but by accepting a deposit knowing that they could or would not supply indigo, and by using the deposit in a way which made it impossible for them to repay Harrisons, the Cooper company, in my judgment, committed a fraud on a creditor.'

**[46]** For my part, I would accept that a business may be found to have

been carried on with intent to defraud creditors notwithstanding that only one creditor is shown to have been defrauded, and by a single transaction. The *Cooper Chemicals* case is an example of such a case. But, if (which I doubt) Templeman J intended to suggest that, whenever a fraud on a creditor is perpetrated in the course of carrying on business, it must necessarily follow that the business is being carried on with intent to defraud creditors, I think he went too far. It is important to keep in mind that the pre-condition for the exercise of the court's powers under s 332(1) of the 1948 Act - as under s 213 of the 1986 Act - was that it should appear to the court 'that any business of the company has been carried on with intent to defraud creditors of the company'. Parliament did not provide that the powers under those sections might be exercisable whenever it appeared to the court 'that any creditor of the company has been defrauded in the course of carrying on the business of the company'. And, to my mind, there are good reasons why it did not enact the sections in those terms.

**[47]** Until the decision of this court in *Re Cyona Distributors Ltd* [1967] 1 All ER 281, [1967] Ch 889, it was generally thought that the powers which s 332 of the 1948 Act conferred on the court were exercisable for the benefit of creditors

as a class and not for the benefit of individual creditors: see the judgment of Russell LJ ([1967] 1 All ER 281 at 286-287, [1967] Ch 889 at 906-908). In the *Cyona* case the majority in this court (Lord Denning MR and Danckwerts LJ) took a different view - at least in a case where the application under s 332 was made (as it could be under that section) by an individual creditor. But the view of the majority in the *Cyona* case cannot have survived the enactment of s 213 of the 1986 Act. An application under that section cannot be made by an individual creditor; it can only be made by the liquidator. And the order which the court can now make under s 213 is for contribution to the company's assets; cf the observations of Russell LJ in the *Cyona* case ([1967] 1 All ER 281 at 287, [1967] Ch 889 at 907). There is no longer power to declare that persons party to the carrying on of the company's business with intent to defraud shall be personally liable for particular debts, or (as was held in the *Cyona* case) to particular creditors. An individual creditor who is defrauded in the course of the carrying on of the business of the company has his individual remedy under the general law. Section 213 of the 1986 Act is not engaged in every case where an individual creditor has been defrauded. The section is engaged only where the business of the company has been carried on with intent to defraud.

[48] In my view it is impossible to reach the conclusion, on the facts found by the judge in the present case, that the business of the company was carried on after 12 November 1993 (but not before) with intent to defraud creditors - or, in particular, with intent to defraud a single creditor, Ramac. The business of the company was carried on throughout 1993 (as well before as after 12 November) with intent to protect Mr Monti and Mr Bernasconi (as former directors) from the penalties to which they would otherwise be exposed under s 216 of the 1986 Act as directors of Newco. It was inherent in counsel's scheme that, when the company did go into insolvent liquidation (as it was intended that it would at the end of the 12-month period), Ramac would be an unpaid creditor. The liquidator does not suggest that the carrying on of the business of the company with the

intent to protect the former directors from penalties under s 216 of the Act - and with the knowledge that, on liquidation, Ramac would be an unpaid creditor - is, of itself, sufficient to engage s 213 of the Act. The only matter relied on is the promise, in the letter of 12 November 1993, that Ramac would be paid an instalment of outstanding rent at the end of December. The promise was intended to mislead; in the sense that it was intended to persuade Ramac that its interests were best served by not taking proceedings (including the presentation of a winding-up petition) to enforce the debt which it was then owed. But it has not been shown that, by carrying on of the business of the company during the period that Ramac was so misled, Mr Monti or Mr Bernasconi intended to defraud Ramac; or, indeed, that the carrying on of the business of the company did defraud Ramac, in the sense that Ramac's claim as a creditor in the liquidation was prejudiced by the carrying on of the business between 12 November 1993 (when, but for the misleading promise, Ramac might have presented a petition) and 23 December 1993 (when the promised payment was not forthcoming).

[49] For those reasons, I would hold that fraudulent trading within s 213 of the 1986 Act has not been made out in the present case; and would

**JUDGMENT-2:**
allow the cross-appeal on that ground.

**The remaining issues**

[50] It follows that I am of the view that it is unnecessary to decide the remaining issues raised by the appeal and cross-appeal. But, in the circumstances that they were fully argued before us, I think it appropriate to address them. I can do so shortly.

[51] The judge declined to hold Mr Monti and Mr Bernasconi party to fraudulent trading prior to 12 November 1993 on the ground that 'representations as to the payment of outstanding rentals' made before the letter of 12 November 1993 'were true'. As he put it ([2001] 2 BCLC 1 at [121]):

  'The instructions given to Mr Saunders on 19 May 1993 were that the outstanding rentals should be paid by such instalments as he could negotiate ... The company, acting at the relevant direction, was seeking to delay payments of the

1993 current rents but was not seeking to avoid those rents, at least at that stage.'

As I have said, the judge was not asked to find that it was inherent in the implementation of counsel's scheme that Ramac be deceived as to the business that the company was actually carrying on during 1993; nor as to the company's intentions as to the future. Nevertheless, it is, I think, clear that he did take the view that, in practice, the scheme could not have been implemented without deception: see the observations ([2001] 2 BCLC 1 at [64]). I agree with that view. But, given that the judge found that Mr Monti and Mr Bernasconi thought that, in implementing the scheme, they were following the advice of counsel and solicitors, he was plainly correct (in the absence of a finding of dishonesty in relation to the representations made before 12 November 1993) to hold that a case of fraudulent trading prior to that date had not been made out. The liquidator could not have succeeded in this court on the issue raised by ground 1 in his appellant's notice.

**[52]** In the light of his finding that they had been parties to fraudulent trading after 12 November 1993, the judge assessed the contribution to be made by Mr Monti and Mr Bernasconi at [#163]17,500 (exclusive of the punitive element, also [#163]17,500). He did so on the basis that that was the amount which the company would have had to pay to Ramac 'to buy off a writ issued on or shortly after 12 November 1993' (see ([2001] 2 BCLC 1 at [145] and [160]). That might or might not have been the correct measure of damage in an action brought by Ramac in the tort of deceit, given the judge's view that, but for the deceptive promise made in the letter of 12 November 1993, Ramac would have issued proceedings for outstanding rent, which the company would have then paid, but it is not, in my view, the proper basis on which to assess the amount of contribution to be made under s 213 of the 1986 Act.

**[53]** The power under s 213(2) is to order that persons knowingly party to the carrying on of the company's business with intent to defraud make 'such contributions (if any) to the company's assets' as the court thinks proper. There must, as it seems to me, be some nexus between (i) the loss which has been caused to the company's creditors generally by the carrying on of the business in the manner which gives rise to the exercise of the power and (ii) the contribution which those knowingly party to the carrying on of the business in that manner should be ordered to make to the assets in which the company's creditors will share in the liquidation. An obvious case for contribution would be where the carrying on of the business with fraudulent intent had led to the misapplication, or misappropriation, of the company's assets. In such a case the appropriate order might be that those knowingly party to such misapplication or misappropriation contribute an amount equal to the value of assets misapplied or misappropriated. Another obvious case would be where the carrying on of the business with fraudulent intent had led to claims against the company by those defrauded. In such a case the appropriate order might be that those knowingly party to the conduct which had given rise to those claims in the liquidation contribute an amount equal to the amount by which the existence of those claims would otherwise diminish the assets available for distribution to creditors generally; that is to say an amount equal to the amount which has to be applied out of the assets available for distribution to satisfy those claims. In the present case there is nothing to suggest either (i) that the deception which the judge found to have been practised on Ramac led to the misapplication or misappropriation of the company's assets, or (ii) that the letter of 12 November 1993 led Ramac to make a claim in the liquidation that it would not otherwise have had. In my view there was no material on which the judge could have reached the conclusion that it was correct to order contribution of [#163]17,500, or any other sum.

**[54]** The judge added a punitive element to the amount which he would otherwise have regarded as sufficient 'simply to reflect the loss I find attributable to Ramac'. He did so for the reasons which he expressed ([2001] 2 BCLC 1 at [161]):

'I could not punish Mr Monti and Mr Bernasconi for matters which are not alleged or not found by me to have amounted to fraudulent trading. Nonetheless, the scheme which they purported to follow foreshadowed the due payment of rent during the 12 month period

 supposedly to preserve the TMC name in Mr Monti's hands. Mr Monti and Mr Bernasconi did not conduct the affairs of the company in that 12 month period to ensure that it had cash in hand promptly to pay rent for the full 12 month period. They could have done so. They preferred to pursue the instalment route and then dishonestly to represent that a further [#163]10,000 would be paid off arrears on 23 December 1993. To compound the intention to cause the company's assets to escape Ramac's claim to future rent by such dishonesty would merit punishment and I consider Mr

Monti and Mr Bernasconi should be liable to make an additional [#163]17,500 contribution ...'

[55] The judge had found that Mr Monti and Mr Bernasconi had been advised that they were entitled 'to cause the company's assets to escape Ramac's claim to future rent' by applying those assets in payment of other creditors; they were entitled to think that preferring some creditors to others was not dishonest. The dishonesty lay in promising (in the letter of 12 November 1993) a payment of [#163]10,000 which they did not intend to make. I accept that the dishonesty which the judge found deserved criticism; but, for my part, I cannot see that it compounded (or was compounded by) dishonesty which the judge did not find to have been made out. Be that as it may, I am not persuaded that there is power to include a punitive element in the amount of any contribution which, in the exercise of the power conferred by s 213(2) of the 1986 Act, a person should be declared liable to make to the assets of the company. As I have said, I think that the principle on which that power would be exercised is that the contribution to the assets in which the company's creditors will share in the liquidation should reflect (and compensate for) the loss which has been caused to those creditors by the carrying on of the business in the manner which gives rise to the exercise of the power. Punishment of those who have been party to the carrying on of the business in a manner of which the court disapproves, beyond what is inherent in requiring them to make contribution to the assets of a company with limited liability which they could not otherwise be required to make, seems to me foreign to that principle. Further, the power to punish a person knowingly party to fraudulent trading, formerly contained in s 332(3) of the 1948 Act, has been re-enacted (and preserved) in s 458 of the Companies Act 1985. It could not have been Parliament's intention that the court would use the power to order contribution under s 213 of the 1986 Act in order to punish the wrongdoer. In my view, had the judge been right to find fraudulent trading in the present case, he would, nevertheless, have been wrong to include a punitive element in the amount of contribution which he ordered.

[56] If the punitive element were excluded - as I think it should have been - I can see no basis upon which Mr Monti and Mr Bernasconi could have been required to make a contribution which went beyond that needed to compensate the creditors of the company (including Ramac) for the loss attributable to the fraudulent trading to which the judge had held that they were knowingly party. On the basis that (on the judge's view) the creditors had already been over-compensated by the payment of [#163]75,000 made by the solicitors, there was no reason to require further payment to be made by the directors. The judge was right to treat their liability as satisfied by the solicitors' payment.

[57] In my view the judge was right, also, to make no order against

Mr Monti and Mr Bernasconi in respect of the costs incurred by the liquidator after the date (13 September 2000) on which the liquidator accepted that payment. It is said that the liquidator was entitled to pursue them for contribution for so long as there was a possibility that Accoulis might claim in the liquidation in competition with Ramac. But there was nothing to suggest that that was ever a real possibility - Accoulis had lodged no proof of debt - and, if that was of concern to the liquidator, he could have raised the point.

**Conclusion**

[58] I would allow the applications for permission to appeal. I would dismiss the liquidator's appeal. I would allow the directors' cross-appeal on ground 3 in their respondent's notice. In those circumstances it is unnecessary to make any order in relation to grounds 1, 2, 4 and 5 of the respondent's notice.

**JUDGMENT-3:**

MUNBY J.

[59] I agree with Chadwick LJ and have nothing to add.

**JUDGMENT-4:**

ALDOUS LJ.

**[60]** I also agree.

**DISPOSITION:**
Appellant granted permission to appeal on ground 1 of appellant's notice; respondent granted permission to appeal on grounds 1 and 2 of respondent's notice. Appeal dismissed; respondent's cross-appeal on ground 3 of respondent's notice allowed and no order on grounds 1, 2, 4 and 5 of the respondent's notice. Order of Mr Anthony Elleray QC set aside and action against respondents dismissed.

**SOLICITORS:**

*Stephenson Harwood*; *Steptoe & Johnson Rakisons*

**LOAD-DATE:** April 17, 2012

# EXHIBIT Q

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 275 OF 2010-AJJ

The Hon. Mr. Justice Andrew Jones
In Open Court, 15th – 17th October 2012 and
14th January 2013

BETWEEN:

(1) IRVING H PICARD
(AS TRUSTEE FOR THE LIQUIDATION OF THE
BUSINESS OF BERNARD L. MADOFF
INVESTMENT SECURITIES LLC) (IN SECURITIES
INVESTOR PROTECTOR ACT LIQUIDATION)

(2) BERNARD L. MADOFF INVESTMENT
SECURITIES LLC (IN SECURITIES INVESTOR
PROTECTION ACT LIQUIDATION)

**Plaintiffs**

and

PRIMEO FUND (IN OFFICIAL LIQUIDATION)

**Defendant**

Appearances: Mr. Robin Dicker QC and Mr. Stephen Robins instructed by Mr. John Harris
of Higgs & Johnson for the Plaintiffs

Mr. Michael Crystal QC instructed by Mr. Peter Hayden and Mr. Nicholas Fox
of Mourant Ozannes for the Defendant

## RULING ON PRELIMINARY ISSUES

**Introduction and Factual Background**

1.  This is the trial of certain preliminary issues of law based upon stated assumptions of
    fact. However, in order to understand the factual assumptions and put the legal
    argument into context, one does need to have a general understanding of the relevant
    factual background. My summary is drawn from the pleadings and counsels' written
    submissions. It is intended to reflect what is common ground between the parties and
    should not be read as constituting any findings of fact made by the Court.

2.  Bernard L. Madoff Investment Securities LLC ("BLMIS") is a company incorporated under the laws of New York, whose principal place of business was in New York City. It was owned and controlled by Bernard L. Madoff ("Madoff"). Throughout the whole of the period relevant to this proceeding, BLMIS' investment advisory business was being carried on fraudulently. Madoff was arrested on 11 December 2008. The Securities and Exchange Commission filed a complaint on the same day, and the United States District Court for the Southern District of New York appointed a receiver. On 15 December 2008, the Securities Investor Protection Corporation filed an application in the District Court for the commencement of liquidation proceedings in respect of BLMIS and Judge Stanton made an order which (i) appointed Mr. Irving H. Picard as trustee ("the Trustee"), (ii) transferred the case to the United States Bankruptcy Court for the Southern District of New York (which I shall refer to as "the New York Court"), and (iii) removed the receiver from office. As a matter of United States law, the statutory avoidance claims which the Trustee seeks to assert against Primeo Fund (In Official Liquidation) ("Primeo") in these proceedings arose at that moment in time. Madoff admitted that he had operated a massive *Ponzi* scheme through BLMIS. On 12 March 2009 he pleaded guilty to 11 counts of fraud and was subsequently sentenced to 150 years in prison.

3.  On 5 February 2010, I made a declaration under section 241(1)(a) of the Companies Law by which it is recognized that the Trustee is the only person entitled to act on behalf of BLMIS in this jurisdiction ("the Recognition Order"). This declaration is binding on all persons and for all purposes in the Cayman Islands, whether or not such persons had actual notice of the Trustee's petition. My reasons for making the Recognition Order are reported at 2010 (1) CILR 231. BLMIS' only connection with the Cayman Islands is that Primeo (and at least two other Cayman domiciled investment funds) placed funds with it for investment. BLMIS was never licensed under the Securities Investment Business Law (2003 Revision) to carry on its business in this country and had no property located here. *Prima facie,* this Court therefore has no jurisdiction to make a winding up order in respect of BLMIS under section 91(d) of the Companies Law.

| | | |
|---|---|---|
| 1 | 4. | Primeo was incorporated under the Companies Law on 18 November 1993 and on 1 |
| 2 | | January 1994 commenced business as an open-ended investment fund subject to the |
| 3 | | regulatory requirements of the Mutual Funds Law (Law 13 of 1993). Its offering |
| 4 | | document, which was required to be filed with the Cayman Islands Monetary |
| 5 | | Authority, described it as "an open-ended investment fund designed for non-U.S. |
| 6 | | investors desiring to invest a portion of their assets in a fund emphasizing preservation |
| 7 | | of capital through diversification of investments". Its participating shares were listed |
| 8 | | on the Luxembourg Stock Exchange. From the inception of its business, Primeo |
| 9 | | placed funds for investment with BLIMIS pursuant to three written agreements |
| 10 | | executed on or about 29 February 1996. These accounts were closed sometime in June |
| 11 | | 2007. Thereafter, Primeo's investment strategy was changed in that its assets were |
| 12 | | invested in the participating shares of two investment funds, namely Herald Fund SPC |
| 13 | | which is a segregated portfolio company incorporated under the Companies Law |
| 14 | | ("Herald") and Alpha Prime Equity Hedged Fund Limited, a company incorporated in |
| 15 | | Bermuda ("Alpha Prime"). Herald and Alpha Prime placed funds for investment with |
| 16 | | BLIMIS. This new investment strategy is said by Primeo to have been disclosed to its |
| 17 | | investors in a revised offering document issued on 25 April 2007. Funds withdrawn |
| 18 | | from Primeo's account with BLMIS prior to June 2007 were paid directly to Primeo |
| 19 | | and are referred to in the pleadings as the "Direct Transfers". Primeo was not the only |
| 20 | | investor in Herald and Alpha Prime, but at some point it did become the largest single |
| 21 | | investor in Herald. When Primeo redeemed shares in Herald or Alpha Prime, the |
| 22 | | assumption is that they in turn withdrew funds from their accounts with BLMIS. To |
| 23 | | the extent that redemption proceeds received by Primeo from Herald and/or Alpha |
| 24 | | Prime were funded by withdrawing funds from their BLMIS accounts, it is said by the |
| 25 | | Trustee that BLMIS indirectly paid money to Primeo. The expression Indirect |
| 26 | | Transfers is used in the Statement of Claim to describe transactions of this sort. |
| 27 | | |
| 28 | 5. | It follows that, even after changing its investment strategy in 2007, Primeo remained |
| 29 | | highly dependent upon BLMIS' integrity and investment performance. On 12 |
| 30 | | December 2008, the day after Madoff's arrest, Primeo's directors passed a resolution, |
| 31 | | *inter alia,* to suspend the calculation of its NAV and suspend subscriptions and |

1      redemptions of its participating shares. On 23 January 2009, the sole voting
2      shareholder of Primeo passed a special resolution for the company to be wound up
3      voluntarily and two qualified insolvency practitioners, Messrs James Cleaver and
4      Richard Fogerty, were appointed as joint voluntary liquidators. On 8 April 2009, an
5      order was made for Primeo's winding up to continue under the supervision of this
6      Court, whereupon Messrs Cleaver and Fogerty were appointed as the joint official
7      liquidators.

8
9 6.     In these proceedings the Trustee asserts three different types of avoidance claim
10      against Primeo in respect of both Direct and Indirect Transfers. First, in Section VI of
11      the Statement of Claim he asserts claims under section 241 of the Companies Law
12      and/or at common law based upon the application of the substantive United States law,
13      including: (a) immediate transferee claims under section 548 of the US Bankruptcy
14      Code (two-year fraudulent transfers); (b) immediate transferee claims under the New
15      York Debtor and Creditor Law (six-year fraudulent transfers); (c) subsequent
16      transferee claims to recover payments avoided under section 547 of the U.S.
17      Bankruptcy Code (90-day preference payments); and (d) subsequent transferee claims
18      to recover payments avoided under section 548 of the U.S. Bankruptcy Code (two-
19      year fraudulent transfers). The US law in this respect is materially different from the
20      provisions contained in Part V of the Companies Law (2011 Revision), in particular
21      section 145, although it may be said that the underlying policy objective of ensuring
22      the fair and equal treatment of creditors is the same.

23
24 7.     Secondly, in Section X of the Statement of Claim, the Trustee asserts claims under
25      section 241 of the Companies Law and/or at common law in accordance with section
26      145 of the Companies Law (voidable preferences), as if the liquidation of BLMIS
27      were occurring in the Cayman Islands rather than in the United States, for the purpose
28      of recovering Indirect Transfers in the total sum of approximately US$588 million
29      which were paid to Primeo within the period of six months immediately preceding the
30      commencement of the foreign liquidation on 18 December 2008. These transfers are
31      referred to as the "Six Month Payments". Whether the applicable voidable preference

provision is section 168 of the Companies Law (2007 Revision) which was in force at the time when the Six Month Payments were made or section 145 of the 2010 Revision which did not come into force until 1 March 2009 (being after commencement of the liquidation) is an issue which does not fall to be decided at this stage of the proceedings.

8.  Thirdly, in Section XII of the Statement of Claim, the Trustee asserts claims under section 147 of the Companies Law (fraudulent trading), so as to require Primeo to make a contribution to the estate of BLMIS. However, it is now conceded by counsel for the Trustee that this claim must fail by reason of the fact that section 147 did not come into force until 1 March 2009. It follows that I am now only concerned with two broad issues – whether the Trustee is entitled, either pursuant to section 241 or at common law, to assert US law avoidance claims (as pleaded in Section VI of his Statement of Claim) and/or Cayman Island law preference claims (as pleaded in Section X of the Statement of Claim).

9.  By the Order which I made on 19 January 2011, the Court will now determine the following preliminary issues of law :

    (1) Whether, on the assumption that the Plaintiffs have avoidance claims against the Defendant under U.S. insolvency law on the basis pleaded in the Plaintiffs' Statement of Claim, the Grand Court is able to apply U.S. insolvency law under section 241 and/or section 242 of the Companies Law and/or at common law (Section VI of the Statement of Claim) ("Preliminary Issue 1").

    (2) Whether the Court is entitled to apply section 145 of the Companies Law or equivalent rules as a matter of common law or under sections 241 or 242 of the Companies Law so as to avoid the Six Month Payments (as defined in the Statement of Claim) and/or to entitle the Plaintiffs to judgment for the Credit Balance (as defined in the Statement of Claim) and/or for any shortfall, as if (contrary to reality) BLMIS had gone into liquidation in the Cayman Islands on 15 December 2008 (Section X of the Statement of Claim). This formulation

does not take into account the possibility that the Court might be entitled to apply section 168 of the Companies Law (2007 Revision) rather than section 145 of the current law.[1] Counsel agreed that this preliminary issue should be re-formulated as follows – Whether the Court is able to apply avoidance provisions of Cayman Islands insolvency law in aid of a foreign insolvency proceeding as a matter of common law or under sections 241 and 242 of the Companies Law. ("Preliminary Issue 2").

(3)     Whether the Court is entitled to apply section 147 of the Companies Law or equivalent rules as a matter of common law under sections 241 or 242 of the Companies Law to require the Defendant to make a contribution to the estate of BLMIS (Section XII of the Statement of Claim) ("Preliminary Issue 3"). This issue no longer falls to be decided.

(4)     Whether Sections VI, X and/or XII of the Statement of Claim should therefore be struck out as disclosing no reasonable cause of action ("Preliminary Issue 4"). It is now accepted that Section XII should be struck out.

(5)     Whether, in the event that the Plaintiffs or either of them have valid non-proprietary claims against the Defendant as pleaded in the Statement of Claim any sums due from the Defendant to the Plaintiffs or either of them in respect of such claims would be off-set pursuant to section 140 of the Companies Law against sums due from the Plaintiffs or either of them in respect of any claims sounding in debt, damages, equitable compensation or restitution which the Defendant may have against the Plaintiffs or either of them in respect of investments made with the Second Plaintiff by or on behalf of the Defendant ("Preliminary Issue 5").

(6)     Whether, in the event that there is no off-set between any sums due in respect of the Plaintiffs' Claims and any sums due in respect of the Defendants' Claims, the rule in *Cherry v Boultbee* (1839) 4 My & Cr 442 applies so that the

---

[1] Section 168 formed part of the Companies Law, Cap.22 as originally enacted in 1961.

liquidators of the Defendant would have a right of quasi-retainer exercisable against the Plaintiffs so as to entitle the Defendant to retain dividends otherwise payable by the Defendant to the Plaintiffs or either of them in respect of the Plaintiffs' Claims ("Preliminary Issue 6").

(7) Whether, if the Liquidators of the Defendant would have a right of quasi-retainer, the entitlement to retain is up to an amount equal to the full amount of the liability of the Plaintiffs or either of them to the Defendant in respect of the Defendants' Claims or some lesser amount and, if so, what amount ("Preliminary Issue 7")

These preliminary issues give rise to important questions about the nature and extent of this Court's statutory jurisdiction to make orders ancillary to a foreign insolvency proceeding and its common law jurisdiction to provide assistance in connection with foreign bankruptcy proceedings.

## Cross border insolvency co-operation: Part XVII of the Companies Law

10. Until recently the corporate insolvency law of the Cayman Islands was based almost entirely upon Part IV of the English Companies Act, 1862. This surprising state of affairs came about because the draftsman of the Companies Law, Cap.22 originally enacted by the Cayman Islands Legislature in 1961 chose to adopt parts of the existing Jamaican Companies Law, Cap.69 and parts of the English Companies Act 1948. The provisions relating to the liquidation of solvent and insolvent companies contained in Part V of the Cayman Islands Law were reproduced (with certain omissions) from Part II of the Jamaican Law which was itself reproduced from Part IV of the English 1862 Act. This statutory provision remained in force, largely without amendment, until the Companies (Amendment) Law 2007 was brought into force on 1 March 2009. Prior to this date matters relating to cross-border insolvencies were not addressed in the legislation at all. The main focus of the 2007 Law is the amendment of the law applicable to domestic liquidation proceedings and the introduction of a comprehensive set of winding up rules which had not previously existed. It addresses the international aspects of corporate insolvency proceedings in two respects only.

11. One of the unfortunate and probably unforeseen consequences of the legislative draftsman's decision in 1961 to adopt Part IV (but not Part VIII) of the 1862 Act is that it was generally accepted, at least until 2005,[2] that this Court had no jurisdiction to make winding up orders in respect of insolvent foreign companies even if they were carrying on business and had assets in this country. The jurisdiction was limited to companies "formed and registered" under the Cayman Islands Law. The 2007 Law cures this problem by conferring jurisdiction upon this Court, under what is now section 91(d) of the Companies Law (2011 Revision), to make winding up orders in respect of an insolvent foreign company which (i) has property in the Cayman Islands; or (ii) is carrying on business in the Cayman Islands; or (iii) is the general partner of a limited partnership registered under Cayman Islands law; or (iv) is registered under Part IX of the Companies Law as a foreign company whether or not it has actually carried on business here. This Court has not yet had an opportunity to consider the criteria which must be applied in deciding how to exercise this discretionary jurisdiction.

12. The 2007 Law also introduced Part XVII of what is now the Companies Law (2012 Revision). It sets out a mechanism by which this Court can provide assistance to the representative of a foreign company which is the subject of a bankruptcy proceeding in its country of incorporation. The material text of Part XVII is as follows:

> "240. "In this Part –
>
> 'debtor' means a foreign corporation or other foreign legal entity subject to a foreign bankruptcy proceeding in the country in which it is incorporated or established;
>
> 'foreign bankruptcy proceeding' includes proceedings for the purpose of reorganising or rehabilitating an insolvent debtor; and
>
> 'foreign representative' means a trustee, liquidator or other official appointed in respect of a debtor for the purposes of a foreign bankruptcy proceeding".

---

[2] In *Dyoll Insurance Company Limited* 2004-5 CILR 412 Levers J. did in fact make a winding up order in respect of a foreign company based upon a novel and highly artificial interpretation of what is meant by "forming and registering" a company under Cayman Islands law.

241.(1) "Upon the application of a foreign representative the Court may make orders ancillary to a foreign bankruptcy proceeding for the purposes of –

    (a) recognising the right of a foreign representative to act in the Islands on behalf of or in the name of a debtor;

    (b) enjoining the commencement or staying the continuation of legal proceedings against a debtor;

    (c) staying the enforcement of any judgment against a debtor;

    (d) requiring a person in possession of information relating to the business or affairs of a debtor to be examined by and produce documents to its foreign representative; and

    (e) ordering the turnover to a foreign representative of any property belonging to a debtor".

(2) An ancillary order may only be made under subsection (1)(d) against -

    (a) ..........

    (b) a person who was or is a relevant person as defined in section 103(1).

242 (1) In determining whether to make an ancillary order under section 241, the Court shall be guided by matters which will best assure an economic and expeditious administration of the debtor's estate, consistent with –

    (a) the just treatment of all holders of claims against or interests in a debtor's estate wherever they may be domiciled;

    (b) the protection of claim holders in the Islands against prejudice and inconvenience in the processing of claims in the foreign bankruptcy proceeding;

    (c) the prevention of preferential or fraudulent dispositions of property comprised in the debtor's estate;

    (d) the distribution of the debtor's estate amongst creditors substantially in accordance with the order prescribed by Part V;

    (e) the recognition and enforcement of security interests created by the debtor;

    (f) the non-enforcement of foreign taxes, fines and penalties; and

    (g) comity;

(2) In the case of a debtor which is registered under Part IX, the Court shall not make an ancillary order under section 241 without also considering whether it should make a winding up order under Part V in respect of its local branch."

13. I make some general observations about this provision. First, Part XVII supplements and partially codifies the common law. It does not abolish the common law rules which continue to exist alongside the new statutory provision. Second, the statutory



provision reflects the traditional English common law rule that this Court will recognize only the authority of a liquidator or trustee appointed under the law of the country of incorporation. (*Dicey, Morris & Collins, The Conflict of Laws*, 14th Ed. Para.30R-097). This contrasts with the approach reflected in the UNCITRAL Model Law which recognizes the courts of the country in which an insolvent company has its "centre of main interest" as being competent to exercise bankruptcy jurisdiction, which is not necessarily the country in which the company is incorporated. The Cayman Islands legislature chose not to adopt this model. This Court has no jurisdiction to provide judicial assistance under section 241 upon the application of a foreign representative of an insolvent company appointed by a court in any country other than the country of its incorporation. Third, the Recognition Order which I made under section 241(1)(a) has two related consequences. It constitutes recognition that the Trustee is the only person entitled to act as agent on behalf of BLMIS for the purpose of enforcing in this jurisdiction any cause of action belonging to the company. It also determined that the New York court is competent to exercise bankruptcy jurisdiction in respect of BLMIS and that the Trustee, as its appointed officeholder, is therefore entitled to seek the assistance of this Court pursuant to section 241 and/or at common law. What I have to decide in this case is whether the scope of the assistance available to the Trustee, whether under section 241 or at common law, enables him to pursue transaction avoidance claims against Primeo and, if so, whether this Court should apply the substantive foreign law applicable in the New York bankruptcy proceeding or the domestic law which would be applicable if a winding up order had been made against BLMIS in this jurisdiction.

14.    Mr. Crystal's argument is that the power to apply transaction avoidance provisions (whether domestic or foreign) in support of a foreign bankruptcy proceeding is not included in section 241(a) to (e) as one of the forms of relief which may be granted by this Court. I accept that the list is exhaustive. It does not use language such as "including" or "for example". There is no catch all provision for "making any other appropriate relief". The contrary argument is that paragraphs (a) to (e) list "purposes", not "powers". Mr. Dicker's point is that section 241(1) confers only one general

power upon the Court, which is the power to make orders ancillary to a foreign bankruptcy proceeding. He says that paragraphs (a) to (e) merely describe various purposes for which this single generalized power may be exercised. If these paragraphs are not a list of powers, it may be said that the application of transaction avoidance provisions (whether domestic or foreign) is merely incidental to the exercise of the Court's general power. I do not accept this argument. It seems to me that paragraphs (a) to (e) describe *both* powers and the purposes for which they may be exercised. For example, the effect of paragraph (c) is that the Court may make an order staying the enforcement of any judgment against a debtor. It seems to me that the draftsman is identifying a power (in this case the power to make an order or injunction which is negative in effect) and describing the particular purpose for which it may be exercised (that is, to prevent enforcement of a judgment against an insolvent debtor). Paragraph (d) identifies a power to make an order or injunction which is mandatory in effect. It also describes the purpose for which it may be exercised, in this case requiring persons to give evidence and/or produce documents. On its true construction, I think that section 241(1) is intended to be an exhaustive list of the Court's statutory powers to grant ancillary relief in aid of a foreign bankruptcy proceeding.

15. Having reached this conclusion, the next point is whether, on its true construction, paragraph (e) constitutes a power to make orders for the purpose of setting aside antecedent transactions and ordering the repayment of money to the debtor. It states that the Court may order "the turnover to a foreign representative of any property belonging to a debtor". Mr. Dicker makes the obvious point that the power to set aside antecedent transactions is an essential feature of any personal bankruptcy or corporate insolvency regime. This explains why "the prevention of preferential or fraudulent dispositions of property comprised in the debtor's estate" is one of the matters required by section 242(1) to be taken into account by the Court in deciding whether to exercise its discretionary powers. I would go further and say that the absence of this feature under the applicable foreign law might point to the conclusion that the foreign proceeding should not be characterized as a "bankruptcy proceeding" at all for the purposes of Part XVII. For these reasons it would not have been surprising if the

Legislature had included within section 241(1) a power to make orders for the purpose of setting aside preferential payments or the fraudulent dispositions of property comprised in a debtor's estate. On the other hand, if this had been the Legislature's intention, I think it is surprising that it is not stated expressly.

16.  Mr. Dicker submits that I should have regard to the legislative history as an aid to the construction of Part XVII. It is open to the Court to have regard to what was said in the Law Reform Commission's report entitled *Review of the Corporate Insolvency Law and Recommendations for the Amendment of Part V of the Companies Law* dated 12th April 2006 for the purpose of identifying the statutory objective and the mischief at which the provisions of Part XVII are aimed. (Bennion's *Statutory Interpretation*, 4th Edition, Section 216). The report's executive summary states —

> " • There is currently a considerable degree of cross-border co-operation in respect of insolvency matters, but the basis upon which this co-operation is afforded depends largely upon judicial practice.
>
> • The Commission therefore recommends that the law relating to international co-operation in respect of insolvency matters be codified and included in a new Part [XVII] of the Companies Law."

The Commission was clearly recommending "codification" rather than reform. The mischief appears to have been the absence of "black letter law". The report itself is a very high level summary which does not contain any real analysis of the issues which must have been considered by the Commission. Section 17.3 merely recommends that this Court be given a statutory power to make ancillary orders and states that "The powers are set out in a proposed Part [XVII] of the Companies Law and are based upon the corresponding provisions of the United States Bankruptcy Code with which local practitioners are very familiar." It does not even identify the "corresponding provisions." It is also open to the Court to have regard to what was said by the Attorney-General when introducing the Companies (Amendment) Bill to the Legislative Assembly for the purpose of identifying its legislative objective when the criteria described by the rule in

| | | |
|---|---|---|
| 1 | | *Pepper —v- Hart*[3] are met. Even if I did think that Part XVII of the Law, or any part of it, |
| 2 | | is ambiguous or obscure (which I do not), what the Attorney-General actually said in the |
| 3 | | Legislative Assembly would be of no real assistance. He merely said, "The powers set |
| 4 | | out in Part [XVII] are based upon the corresponding provisions of the United States |
| 5 | | Bankruptcy Code with which local practitioners are familiar."[4] He said nothing more. He |
| 6 | | was merely repeating the statement in the Commission's report without any explanation |
| 7 | | whatsoever. |
| 8 | | |
| 9 | 17. | However, it is reasonably apparent from the language of sections 241 and 242 of the |
| 10 | | 2007 Law that the legislative draftsman must have paid some regard to section 304 of |
| 11 | | the US Bankruptcy Code, notwithstanding that it had been repealed long before the |
| 12 | | bill was published. It seems to me that he looked to section 304 only because he was |
| 13 | | not intending to enact provisions based upon the UNCITRAL Model Law as was done |
| 14 | | by the United States in October 2005 (Chapter 15 of the Bankruptcy Code) and by the |
| 15 | | United Kingdom in April 2006 (the Cross-Border Insolvency Regulations). The |
| 16 | | obvious alternative model to which the Legislature might have looked for guidance is |
| 17 | | that reflected in section 426 of the UK Insolvency Act 1986. A key feature of this |
| 18 | | model is that the court is empowered to give assistance only in connection with |
| 19 | | insolvency proceedings pending in "designated countries". The designated countries |
| 20 | | are limited to the British Overseas Territories and certain Commonwealth countries |
| 21 | | whose corporate insolvency laws are similar to or based directly upon the English law. |
| 22 | | The United States is not one of them. Rather than adopt this model, which would have |
| 23 | | depended upon the Governor in Cabinet to designate the countries whose courts could |
| 24 | | be assisted, the Legislature decided to give the Court a discretionary power to provide |
| 25 | | assistance provided that (a) the foreign bankruptcy proceeding is capable of |
| 26 | | recognition in accordance with the traditional common law rules and (b) the |
| 27 | | substantive law of the foreign proceeding is consistent with Cayman Islands policy |

---

[3]  The decision of the House of Lords in *Pepper (Inspector of Taxes) —v- Hart* [1993] AC 593 has been followed and applied in this jurisdiction. It explains the circumstances in which it is permissible for this Court to have regard to statements made by ministers to the Legislative Assembly, as reported in the Official Hansard Report, in arriving at the legal meaning of an enactment

[4]  See *Official Hansard Report*, 2007/8 Session, Monday 17 September 2007, page 456.

objectives relating to the matters set out in section 242(1), including just treatment of all creditors, preferential or fraudulent dispositions and the recognition of security interests. Even if the foreign proceeding is recognized, as it has been in this case, this Court could still decline to provide assistance if the order sought by the Trustee would likely produce or contribute to an economic result which is inconsistent with the policy objectives of the Cayman Islands corporate insolvency law.

18. In my view, this is the extent to which it can be said that the Cayman Islands Legislature had regard to model reflected in section 304, which had of course been repealed and replaced with Chapter 15 by the time that the 2007 Law was enacted. However, Mr Dicker goes further and suggests that, to the extent that the language of sections 241 and 242 is actually the same or similar to that used in section 304, I should construe and apply the Cayman Islands law in the same way as the US courts had construed and applied the US law. He referred to the decision of Buschman J. in *Re Metzeler*, 78 B.R. 674 (Bankr. SDNY 1987) as an authoritative statement of the way in which the US courts had interpreted and applied section 304. This case concerned an ancillary petition filed in the New York Court by Mr. Friedrich Metzeler, who had been appointed by a German court as trustee of an insolvent German company. He sought an order for the recovery of $508,952 as a preferential and fraudulent transfer. One of several issues was whether the trustee could rely upon the US law or was limited to reliance upon the German Bankruptcy Act. It was held that the US court would apply the foreign law. In the course of his judgment Buschman J referred to a decision of the US Supreme Court in *United States –v- Whiting Pools Inc,* 462 U.S. 198 FN10 and said –

> "To be sure, this analysis depends in large part on the *Whiting Pools* analysis that estate property includes property recoverable under § 547 and § 548, and we have held above that the voidability powers of a foreign representative and the nature of the foreign estate must be tested by foreign law. In this, there is no inconsistency. The term "property of the estate" employed in § 109(a) is to be construed according to the definition adopted in *Whiting Pools*. Although, *Whiting Pools* refers to transfer avoidable under §§ 547 and 548, our task is to construe § 304. That Congress provided for turnover actions in § 1410(b) is sufficient indication of its expectation that the concept applies to similar avoidance actions based on foreign law in light of the policies sought to be achieved. It thus seems clear that Congress intended that foreign preference and fraudulent transfer

1           actions seeking to recover property located here are a sufficient basis on which to ground
2           a § 304 petition and we so hold."

3     It is clear that the expression "property of the estate" includes property recoverable under
4 the avoidable transfer provisions and that the expression "turnover of the property of such
5 estate" (as used in section 304) includes actions (referred to as "turnover actions") to set
6 aside antecedent preferential payments and fraudulent dispositions. Mr Dicker focuses on
7 the use of the word "turnover" in section 241 and invites me give it an American
8 meaning. In my view, this is not an approach which I am entitled to adopt for two
9 reasons. First, for the reasons which I have explained, there is no sufficient basis upon
10 which I can properly infer that the Legislature intended that words and expressions used
11 in Part XVII should be given the technical meanings which would likely be ascribed to
12 them if those words had been used by the United States Congress in a statute relating to
13 the same general subject-matter. I think that the Legislature merely looked to (the then
14 repealed) section 304 of the US Bankruptcy Code as a general model which was thought
15 to be more appropriate than the model reflected in section 426 of the UK Insolvency Act.
16 Second, I should avoid falling into the error of focusing unduly on the single word
17 "turnover" and failing to pay proper regard to the provision as a whole. Section 241(1)(e)
18 empowers the Court to order "the turnover to a foreign representative of any property of
19 the debtor". Property of the debtor means property of the company, which is not the
20 same thing as "property of the estate".

21 19.    The conceptual difference between the "property of the debtor" and the "property of
22 the estate" is perfectly clear and well understood by insolvency practitioners. (See the
23 decision of the English Court of Appeal in *Re Oasis Merchandising Ltd* [1998] Ch.
24 170). The expression "property of the debtor" means the assets which are the property
25 of a company at the time of the commencement of the liquidation and the property
26 representing it, including rights of action which might have been pursued by the
27 company itself prior to the liquidation. This contrasts with "property of the estate"
28 which means the assets available for distribution to the creditors in a company's
29 liquidation, including the rights of action which are available only to the official
30 liquidator as a result of a winding up order having been made. An official liquidator's
31 right to pursue preference claims and the recoveries made are part of the "property of

the estate" available for distribution to creditors but not part of the "property of the debtor" within the meaning of section 241(1)(e). I think what the draftsman had in mind was situations of the kind which arose in *Re Reserve International Liquidity Fund Ltd (In Liquidation)* (Unreported, 1 April 2010). This case concerned a company incorporated in the British Virgin Islands which carried on business as a money market daily liquidity fund. It got into financial difficulty as a result of the credit crunch in September 2008. Its directors believed that these difficulties could be overcome and resisted any form of liquidation or reorganization proceeding, but an unpaid creditor succeeded in persuading the High Court in the British Virgin Islands to make an order for its compulsory liquidation and the appointment of official liquidators. The company had $10 million on deposit with each of the Cayman Islands branches of two well known banks. The official liquidators gave instructions for these funds to be transferred to an account in Tortola under their control. The company's directors refused to recognize the liquidators' authority and instructed the banks to transfer the funds to an account in New York which would be under their own control. This Court made an order under section 241(1)(a) recognizing the BVI official liquidators as the persons entitled to give instructions to the banks on behalf of the company. I think that this factual scenario illustrates what is meant by "ordering the turnover to a foreign representative of property belong to the debtor". It relates to property belonging to a company prior to the commencement of its insolvent liquidation and does not include property which is recoverable only by an officeholder pursuant to the transaction avoidance provisions of the applicable bankruptcy law. I think this interpretation is also consistent with the fact that Part XVII provides foreign representatives with a simple procedural mechanism for obtaining various different kinds of ancillary relief in a single proceeding. Transaction avoidance and preference claims may give rise to complex legal and factual disputes which are best resolved in an action commenced by writ. It follows that the Trustee has no statutory right under section 241 to pursue an action against Primeo for recovery of the Six Month Payments.

20. I shall nevertheless go on to consider whether the foreign or domestic law would be the substantive law applicable in the event that it is subsequently held that the Trustee is entitled to pursue his claim under section 241. Mr. Dicker argues that there are a

series of reasons why I should conclude that if section 241 applied, it would enable the Trustee to assert transaction avoidance claims based upon the United States law. Firstly, he says that the concept of making "orders ancillary to a foreign bankruptcy proceeding" implies that the focus is on the foreign proceeding and the foreign law. The word "ancillary" means "subservient, subordinate and ministering to something else". However, section 241 should be interpreted in the light of the amendments made to Part V and enacted at the same time. As I have already observed, section 91(1)(d) expressly empowers this Court to make winding up orders in respect of foreign companies and section 242(2) mandates that it must consider doing so before deciding to make any ancillary order if the company in question is registered under Part IX of the Companies Law.[5] In these circumstances the Cayman Islands liquidation would be regarded as "ancillary" to the foreign liquidation, but it is perfectly clear that a local liquidation proceeding can only be conducted in accordance with Part V of the Companies Law. I think that Mr. Dicker is attempting to read too much into the use of the word "ancillary".

21. Secondly, it is said that as a matter of principle the application of the foreign substantive law to transaction avoidance and preference claims is the logical choice because this is the law applicable to the distributional regime. It is said to be illogical to "mix and match" by applying the domestic law to avoidance issues when the distribution regime is governed by a foreign law. I follow the logic, but this is the result at common law and it seems to me that if the Legislature intended to change the common law it would have said so expressly. Thirdly, Mr. Dicker argues that the application of foreign law is consistent with the reference in section 242(1)(c) to the "prevention of preferential or fraudulent dispositions of property comprised in a debtor's estate". He says that this sub-section refers to dispositions taking place before the commencement of the foreign bankruptcy proceeding. This must be right. It means that Part V of the Companies Law would be applied as if a local liquidation proceeding had commenced in respect of BMLIS on 15 December 2008, with the

---

[5] Part IX of the Companies Law (2011 Revision) provides that any foreign incorporated company which establishes a place of business or carries on business in the Cayman Islands must make a filing with the Registrar of Companies and become registered as a "foreign company".

1       result that the "suspect period" is calculated back from this date. However, this
2       requirement does not point to the conclusion that sections 241 and 242 require the
3       application of the foreign substantive law.

4

5 22.    Fourthly, it is argued that the application of foreign law would be consistent with the
6       reference to in section 242(1)(c) to property comprised in the "debtor's estate" which,
7       as I have already explained, means the property available for distribution to creditors
8       including the proceeds of preference claims. The exercise of this Court's jurisdiction
9       to make orders ancillary to a foreign bankruptcy proceeding does not result in the
10      establishment of a separate parallel liquidation proceeding in this jurisdiction. Nor
11      does it result in the creation of a separate local estate on a territorial basis. It follows
12      that the "debtor's estate" referred to in sub-section (1)(c) must mean the estate as
13      defined and constituted under the foreign law. However, the purpose of an ancillary
14      order is not to ensure the constitution of an estate in accordance with the foreign law in
15      question. Its purpose is the more general one of assisting the foreign court to achieve
16      an economic and expeditious administration of the estate in a manner consistent with
17      Cayman Islands policy objectives in respect of the matters reflected in section 242(1).
18      However, laws relating to the avoidance of antecedent transactions vary significantly
19      from country to country and it could be said that mandating the application of a myriad
20      of foreign laws would actually be *inconsistent* with this general objective.

21
22 23.    Mr. Dicker's fifth point is that the reference to "comity" in Section 242(1) demands
23       the application of foreign law. In *HSH Cayman II GP Ltd –v- ABN Amro Bank NV*
24       2010 (1) CILR 375 the Court of Appeal defined the concept of comity in terms used
25       by the US Supreme Court over a hundred years ago in *Hilton –v- Guyot* (1895) 159
26       US 113-

27
28         "Comity is the recognition which one nation allows within its territory to the legislative,
29         executive and/or judicial acts of another nation, having due regard to international duty
30         and convenience, and to the rights of its own citizens or of other persons under the
31         protection of its laws".

32



What this means in the present context is that the courts of two countries can be expected to seek and grant assistance in corporate insolvency proceedings for the purpose of achieving commonly held policy objectives, notwithstanding that the application of their own laws to any given set of factual circumstances would not necessarily produce exactly the same or even a similar economic result. Both the US Bankruptcy Code and Part V of the Cayman Islands Companies Law recognize the need to set aside antecedent transactions in certain circumstances in order to achieve the policy objective of treating an insolvent company's creditors equally, but the actual rules of law are materially different. In principle, comity enables this Court to lend its assistance to the New York proceeding notwithstanding that the application of the foreign versus the domestic law could produce materially different economic results. Adherence to the concept of comity does not necessarily mean that the New York court should be expected to apply Cayman Islands law or that the Cayman Islands court should be expected to apply United States law in any given set of circumstances. For these reasons I do not think that the requirement to have regard to comity implies that the Legislature intended applications for ancillary relief under section 241 to be governed by foreign law. The application of Cayman Islands law is entirely consistent with an adherence to comity.

24.     Mr. Dicker's sixth point is that the legislative history of Part XVII, to which I have already referred, points to the conclusion that the Legislature must have intended this Court to apply the foreign substantive law when deciding whether to make ancillary orders under section 241, with the exception of orders for evidence under section 241(1)(d) which can only be made against a "relevant person" as defined by Cayman Islands law. He relies on *Re Metzeler* (supra) in which Buschman J. held that "a foreign representative may assert under section 304, only those avoiding powers vested in him by the law applicable to the foreign estate". For the reasons which I have

1    already given, the fact that the US courts interpreted section 304 in this way does not

2    lead me to infer that the Legislature intended this Court to interpret section 241 in the

3    same way. If the Legislature had intended to abolish the common law rule (which

4    applies the domestic law), it would have said so expressly.

5    25.   Mr. Dicker also points to sub-section (2)(b) as implying that, upon its true

6          construction, the whole of section 241 requires the application of the substantive

7          foreign law. Sub-section (2)(b) says that an order for evidence can only be made

8          against someone who is a "relevant person" within the meaning of section 103(1) of

9          the Companies Law.[6] This amounts to an express requirement to apply the substantive

10         domestic law for this purpose, thereby implying, according to Mr. Dicker, that foreign

11         law must be applicable in all other respects otherwise sub-section (2)(b) would have

12         been unnecessary. The difficulty with this argument is that it suggests an intention to

13         "mix and match" the application of both domestic and foreign law, which the

14         Legislature is inherently unlikely to have intended. For example, this approach might

15         lead to the conclusion that this Court must apply section 103(1) of the Companies Law

16         for the purpose of identifying the target of an order for production of documents and at

17         the same time apply the foreign law, rather than section 103(3)(b), for the purpose of

18         defining the subject matter of the order.[7] This is inherently unlikely. I think that the

19         purpose of section 241(2)(b) is merely to emphasize that orders for evidence and

20         production of documents will only be made against those whom the law regards as

21         "insiders".

22    26.   This Court's common law jurisdiction to provide assistance in respect of foreign

23         corporate insolvency proceedings (whatever its scope) depends upon the application of

24         the domestic law. If the Legislature had intended this rule to be abolished by the

25         enactment of Part XVII, it would have said so expressly. If, and to the extent that, the

26         Trustee is entitled to proceed under section 241 at all, on its true construction I think

27         that section 241 requires the application of Cayman Islands law

---

[6]   Put simply, a "relevant person" is an insider. It is defined narrowly to mean those involved in the promotion or
management of a company.
[7]   Section 103(3)(b) provides that the subject-matter of a production order will be limited to "documents belonging to
the company".



**Cross-border insolvency co-operation: the position at common law**

27.  I now turn to consider the scope of the Trustee's common law right to seek the assistance of this Court. The starting point for this analysis is the decision of the Privy Council in *Cambridge Gas Transportation Corporation v Official Committee of Unsecured Creditors of Navigator Holdings plc* [2007] 1 AC 508. This case concerned an insolvent group of companies engaged in the shipping industry. The group structure was complex. For the purposes of understanding the Privy Council's decision, it can be stated in the following simplified way. The top holding company was a Bahamian company called Vela Energy Holdings Ltd ("Vela"), which owned an intermediate holding company incorporated in the Cayman Islands called Cambridge Gas Transportation Corporation ("Cambridge Gas"). Cambridge Gas owned 70% of the shares of Navigator Holdings Plc, ("Navigator") which was incorporated in the Isle of Man. Navigator owned the shares of the ship owning companies. Navigator filed a petition in the New York Court for relief under Chapter 11 of the US Bankruptcy Code. Its principal creditors were the holders of a $300 million bond issue. The group's investors, acting through Vela, proposed a reorganization plan which the New York Court rejected in favour of a plan proposed by Navigator's creditors. The approved reorganization plan provided that, upon entry of the court's confirmation order, title to all the shares in Navigator would vest in the creditors' committee, thereby extinguishing the interest of its shareholders, including Cambridge Gas which owned 70% of the shares. The overall intended economic result was that the creditors would acquire ownership and control of the underlying ship owning companies. Since Navigator was incorporated in the Isle of Man, the applicable conflict of laws rules establish that its shares are treated as property located in the Isle of Man. The New York Court therefore issued a letter of request to the Manx court and the creditors' committee petitioned the Manx court for an order vesting the shares in their representatives.

28.  In the Manx court Cambridge Gas contested the creditors' right to have the New York Court's confirmation order recognized and enforced. It was argued that the confirmation order must be either a judgment *in rem* or a judgment *in personam* and

1  that, in either case, it was not capable of being recognised and enforced in the Isle of
2  Man in accordance with the well established common law rules relating to the
3  enforcement of foreign judgments.[8]  If the New York Court's order was properly
4  characterized as a judgment *in rem*, it could not be recognized as affecting title to the
5  Navigator shares because they are treated as property located in the Isle of Man, not
6  New York. Alternatively, if it was characterized as a judgment *in personam*, it could
7  not be enforced because Cambridge Gas itself had not submitted to the jurisdiction of
8  the New York Court. The Manx court accepted this argument, as did the Court of
9  Appeal, although its conclusion that Cambridge Gas had not submitted to the
10  jurisdiction of the New York court was regarded as highly technical bearing in mind
11  that the Chapter 11 petition had been filed by Navigator (its indirect subsidiary) and
12  Vela (its indirect parent company) had participated in the proceeding by proposing is
13  own reorganization plan. Nevertheless, the case proceeded before the Privy Council on
14  the basis that Cambridge Gas had not submitted to the jurisdiction of the New York
15  Court.

16  29.  The Privy Council held that orders made in bankruptcy proceedings, including
17  corporate insolvency proceedings, do not fall into the category of either judgments *in*
18  *rem* or judgments *in personam*.  Lord Hoffmann said (at paragraphs 13 and 14) that –

19  "Judgments *in rem* and *in personam* are judicial determinations of the existence of rights:
20  in one case rights over property and in the other, rights against a person. When a
21  judgment *in rem* or *in personam* is recognized by a foreign court, it is accepted as
22  establishing the right which it purports to have determined, without further enquiry into
23  the grounds upon which it did so. The judgment itself is treated as the source of the right.

24  The purpose of bankruptcy proceedings, on the other hand, is not to determine or
25  establish the existence of rights, but to provide a mechanism of collective execution
26  against the property of the debtor by creditors whose rights are admitted or established."

27
28  The Privy Council treated the New York Court's confirmation order as a judgment in,
29  and for the purposes of, the collective enforcement regime of the bankruptcy proceedings,
30  which are governed by the sui generis private international law rules relating to

---

[8] See Dicey, Morris & Collins *The Conflict of Laws*, 14th Edition, Rule 36



insolvency. On this basis the New York Court's confirmation order was recognized and enforced in the Isle of Man.

30. The rationale for this approach is derived from the principle of universality in bankruptcy proceedings. Lord Hoffmann said (at paragraph 16) –

> "The English common law has traditionally taken the view that fairness between creditors requires that, ideally, bankruptcy proceedings should have universal application. There should be a single bankruptcy in which all creditors are entitled and required to prove. No one should have an advantage because he happens to live in a jurisdiction where more of the assets or fewer of the creditors are situated."

In the case of corporate insolvency proceedings this principle of universality is given effect by recognizing the person who is empowered by the foreign law to act on behalf of the insolvent company as entitled to do so in the Cayman Islands. Two key questions then arise. Firstly, what are the criteria under Cayman Islands law by which this Court must decide whether or not to recognize the foreign representative? In the United Kingdom this question has been answered by the Cross-Border Insolvency Regulations 2006. In the United States it has been answered by Chapter 15 of the Bankruptcy Code. Both these legislative provisions are based upon the UNCITRAL Model Law which introduces the concept that recognition should depend upon identifying a company's "centre of main interest". The Cayman Islands legislature had the opportunity to enact this model but chose not to do so. Section 241 of the Companies Law answers this question by codifying the traditional conflict of laws rule that the authority of a trustee or liquidator appointed in the place of incorporation will be recognized in the Cayman Islands. The second question is what is the effect of recognition, once granted? Lord Hoffmann answered this question by deciding that "recognition carries with it the active assistance of the court". In *Cambridge Gas* itself the only form of assistance sought by the creditors was the recognition and enforcement of the New York Court's confirmation order. However, Lord Hoffmann also answered the broader question about the nature and scope of the assistance available at common law in the following way (at paragraph 22) –

> "What are the limits of the assistance which the court can give? … At common law, their Lordships think it is doubtful whether assistance could take the form of applying

provisions of the foreign insolvency law which form no part of the domestic system. But the domestic court must at least be able to provide assistance by doing whatever it could have done in the case of a domestic insolvency ... The purpose of recognition is to enable the foreign office holder or the creditors to avoid having to start parallel proceedings and to give them the remedies to which they would have been entitled if the equivalent proceedings had taken place in the domestic forum".

31. Lord Hoffmann returned to this subject again in *Re HIH Casualty and General Insurance Ltd* [2008] 1 WLR 852. The case concerned four Australian insurance companies which were being wound up in Australia and in respect of which provisional liquidators had been appointed in England. The question was whether the English court had power to direct remission of assets collected in England to Australia, notwithstanding that there were material differences between the English and Australian statutory regimes for distribution which meant that some creditors would benefit from remission whilst others would be worse off. The House of Lords unanimously decided that remission should take place, but their lordships' reasoning differed. The decision of the majority (Lord Scott, Lord Neuberger and Lord Phillips) was based entirely upon the English statutory power to assist foreign insolvency proceedings. Lord Hoffmann (with whom Lord Walker agreed) also considered that such a power existed at common law. Lord Hoffmann characterized the principle of universality as a principle of English private international law that, where possible, there should be a unitary insolvency proceeding in the courts of the insolvent's domicile which receives worldwide recognition and which should apply universally to all the bankrupt's assets (at paragraph 6):

"Despite the absence of statutory provision, some degree of international co-operation in corporate insolvency had been achieved by judicial practice. This was based upon what English judges have for many years regarded as a general principle of private international law, namely that bankruptcy (whether personal or corporate) should be unitary and universal. There should be a unitary bankruptcy proceeding in the court of the bankrupt's domicile which receives world-wide recognition and it should apply universally to all the bankrupt's assets."

The purpose of the principle is to ensure that the debtor's assets are distributed under one scheme of distribution (paragraph 30):

1     "The primary rule of private international law which seems to be applicable to this case is
2     the principle of (modified) universalism, which has been the golden thread running
3     through English cross-border insolvency law since the 18th century. That principle
4     requires that English courts should, so far as is consistent with justice and UK public
5     policy, co-operate with the courts in the country of the principal liquidation to ensure that
6     all the company's assets are distributed to its creditors under a single system of
7     distribution."

32. In *Schmitt –v- Deichmann* [2012] 2 All E.R. 1217 the English High Court considered whether an administrator appointed in respect of a foreign bankruptcy proceeding has a right at common law to pursue transaction avoidance claims in the English court. The case concerned a German incorporated company, Phoenix Kapitaldienst GmbH ("Phoenix"), which had carried on an investment management business in Germany and elsewhere. Its German appointed administrator alleged that its business had been carried on fraudulently in much the same way as the fraud committed against BLMIS' investors. The administrator sought to commence proceedings to set aside transactions allegedly done at an undervalue with the intention of defrauding creditors. However, it was common ground that the statutory scheme did not apply and so the question was whether the English court had power at common law to assist the foreign administrator and, if so, whether the assistance extended to doing whatever the English court could have done in the case of a domestic liquidation proceeding, including the exercise of its statutory powers to set aside antecedent transactions. The court ordered that Phoenix' administrator could assert avoidance claims based upon the substantive UK law. Proudman J. said (at paragraph 62) –

    "…Reading together the *Cambridge Gas Transport* case, *RE HIH Casualty and General Insurance Ltd, Re New Cap Reinsurance Corp Ltd and Rubin's* case, I derive the following propositions: (i) there is power to use the common law to recognise and assist an administrator appointed overseas, (ii) assistance includes doing whatever the English court could have done in the case of a domestic insolvency, (iii) bankruptcy proceedings are collective proceedings for the enforcement (not establishment) of rights for the benefit of all creditors, even when those proceedings include proceedings to set aside antecedent transactions, (iv) proceedings to set aside antecedent transactions are central to the purpose of the insolvency."



The question which I have to ask myself is whether this statement of the common law has survived the recent decision of the UK Supreme Court in *Rubin –v- Eurofinance SA* [2012] UKSC 46.

33. In *Rubin* the UK Supreme Court held by a majority (Lord Clarke dissenting) that *Cambridge Gas* had been wrongly decided. A default judgment had been entered against Eurofinance SA in a bankruptcy proceeding pending before the New York Court for about $10 million based upon, *inter alia*, various transaction avoidance provisions of the US Bankruptcy Code. It was common ground that it was an *in personam* judgment and that the judgment debtor was not present in the United States and had not submitted to the jurisdiction of the New York Court within the meaning of the common law rule stated as "Rule 43" in *Dicey, Morris & Collins*, 15th Edition, para.14R-054. The Court of Appeal had followed Lord Hoffmann's reasoning in *Cambridge Gas* and held that *Dicey's* Rule 43 does not apply to foreign judgments made in transaction avoidance proceedings because they are essential to the collective enforcement regime in insolvency and are governed by special rules. In the Supreme Court, the majority rejected this proposition and held that *Cambridge Gas* had been wrongly decided. However, they did not reject the underlying proposition that recognition at common law "carries with it the active assistance of the court". They only rejected the proposition that "active assistance" extended to the enforcement of *in personam* judgments made in bankruptcy proceedings which would not otherwise be enforceable in accordance with the established conflict of laws rules articulated in *Dicey's* Rule 43. Lord Collins said (at paragraphs 29 and 31) –

> "29. ...at common law the court has power to recognize and grant assistance to foreign insolvency proceedings. The common law principle is that assistance may be given to foreign officeholders in insolvencies with an international element. The underlying principle has been stated in different ways: 'recognition..... carries with it the active assistance of the court': *In re African Farms Ltd* [1906] TS 373, 377; 'This court... will do its utmost to co-operate with the United States Bankruptcy Court and avoid any action which disturbs the orderly administration of [the company] in Texas under Ch. 11': *Banque Indosuez SA v Ferromet Resources Inc* [1993] BCLC 112, 117."

> "31. The common law assistance cases have been concerned with such matters as the vesting of English assets in a foreign officeholder, or the staying of local proceedings, or

1 orders for examination in support of the foreign proceedings, or orders for the remittal of
2 assets to a foreign liquidation, and have involved cases in which the foreign court was a
3 court of competent jurisdiction in the sense that the bankrupt was domiciled in the foreign
4 country or, if a company, was incorporated there..."

5 34. Lord Collins did not express a view on the question which I have to decide, which is
6 whether the assistance available to the Trustee at common law extends to providing
7 him with what he later described as a "direct remedy", meaning an original cause of
8 action which can be pursued against a person in this jurisdiction. However, it seems to
9 me that he was leaving open the possibility that the office holder in *Rubin* would be
10 entitled at common law to pursue transaction avoidance claims under English law (as
11 well as pre-existing causes of action not dependent upon the existence of bankruptcy
12 proceedings). He said (at paragraph 131) -

13 "131. .....It would not be appropriate to express a view on whether the officeholders in
14 the present cases would have, or would have had, a direct remedy in England, because
15 there might be, or might have been, issues as to the governing law, or issues as to time-
16 limits or as to good faith. Subject to those reservations, several of the ways in which the
17 claims were put (especially those parts of the judgment which were not the subject of
18 these proceedings) in the United States proceedings in *Rubin* could have founded
19 proceedings by trustees in England for the benefit of the creditors (as beneficiaries of the
20 express trust). In addition there are several other avenues available to officeholders ...
21 [under the various statutory provisions applicable in the UK]."

22 It remains open to this Court to accept Lord Hoffmann's answer to the question which I
23 have to decide. I conclude, as Proudman J. did in *Schmitt –v- Deichmann*, that the scope
24 of the assistance available at common law includes the power to entertain a preference
25 claim under section 145 (or its predecessor section).

26 35. Having prepared a draft judgment, I invited further written submissions from counsel
27 on the question whether the common law jurisdiction to provide assistance in this way
28 (which Mr. Crystal describes as "non-traditional assistance") is possible if the only
29 connection with this jurisdiction is the fact that the counterparty to the relevant
30 transactions (in this case Primeo as recipient of the Six Month Payments) happens to
31 be incorporated in this jurisdiction and therefore subject to the territorial jurisdiction of
32 this Court. My initial view was that the common law jurisdiction to provide active
33 assistance by enabling the foreign representative to invoke the Court's statutory

1    jurisdiction to set aside preferential payments as if BLMIS was in liquidation in this
2    jurisdiction ought to depend upon the existence of a sufficient connection between the
3    foreign company and this jurisdiction, determined by reference to the criteria set out in
4    section 91(d). In Mr Dicker's submission, this approach would be inconsistent with the
5    case law and wrong in principle.

36.    In *Cambridge Gas* the Privy Council relied upon a decision of the Transvaal Supreme
Court in *Re African Farms Ltd* [1906] TS 373. It concerned a company incorporated in
England, having its head office in London, but carrying on business and owning assets
in the Transvaal (which subsequently became part of the Union of South Africa). In
February 1906 the company was put into voluntary liquidation. Two months later an
unpaid creditor, with notice of the liquidation, obtained judgment against the company
in the Transvaal court, whereupon the English liquidator presented a petition by which
he sought either a winding up order or an order recognizing and authorizing him to
take possession of the local assets and distribute them amongst the creditors in
accordance with the English statutory scheme. It was held that the Transvaal court had
no jurisdiction to make a winding up order, but it nevertheless made a declaration that
the English liquidator was entitled to the sole administration of all the company's
assets in the Transvaal subject to certain conditions. A stay of execution against the
local judgment creditor was implicit in the court's order. Innes C.J. said (at page 378) -

> "...the grant of assistance to the English liquidator, in a case where the Court could not
> wind up itself, may possibly be open to the objection that we are doing by indirect means
> what the law has given us no power to do directly."

He went on to answer this point (at page 381-2) in the following way –

> "The true test appears to me to be not whether we have the power to order a similar
> liquidation here, but whether our recognizing the foreign liquidation is actually prohibited
> by any local rules; whether it is against the policy of our laws, or whether its
> consequences would be unfair to local creditors, or on other grounds undesirable. And
> that test is, in the present case fully satisfied."

37.    The decision in *Re African Farms Ltd* was cited with approval by Lord Hoffmann in
*Cambridge Gas* in support of the proposition that recognition carries with it the active
assistance of the Court. The question whether the scope of the available assistance was

1    in any way dependent upon the Manx court having jurisdiction to make a winding up
2    order in respect of Navigator did not arise because Navigator was incorporated in the
3    Isle of Man. However, this point was subsequently addressed by the Supreme Court of
4    Bermuda in *Re Founding Partners Global Fund Ltd* [2011] Bda L.R. 22. *Founding*
5    was a company incorporated in the Cayman Islands in respect of which this Court had
6    made a provisional winding up order. Upon the application of the provisional
7    liquidators, this Court issued a letter of request to the Bermudian court by which it was
8    asked to direct that they should have all the powers of a liquidator as if they had been
9    appointed by the Bermudian court. Upon their *ex parte* application the court made an
10    order, in reliance upon the Transvaal court's decision in *African Farms* and the Privy
11    Council's decision in *Cambridge Gas*, that the appropriate assistance which could be
12    afforded to the Cayman liquidators was to empower them to exercise all the powers
13    conferred on liquidators under the Bermudian Companies Act 1981, notwithstanding
14    that the Bermudian court did not have jurisdiction to make a winding up order in
15    respect of the company. Based upon the analysis of Lord Hoffman in *Cambridge Gas*
16    and Ward L.J. in *Rubin*, Kawaley J. said that "it is wholly irrelevant for the purposes
17    of recognition at common law whether or not this Court could (if needed) wind up the
18    company". I think what he meant by this statement is that the scope of the assistance
19    available at common law is not dependent in any way upon the existence of
20    jurisdiction to make a winding up order. The matter in issue before the court was
21    simply the right to collect the monies deposited in the company's account with a local
22    bank, but the scope of the order for directions seems to have encompassed the
23    possibility that the Bermudian court would have jurisdiction under the Companies Act
24    to make an order setting aside a payment as a fraudulent preference, even though it had
25    no jurisdiction to make a winding up order. However, it seems to me that Kawaley J's
26    analysis has to be reconsidered in light of the fact that the UK Supreme Court
27    overruled the Court of Appeal's decision in *Rubin* and held that *Cambridge Gas* was
28    wrongly decided.

29   38.    In *Rubin* the UK Supreme Court confirmed the common law power to recognize and
30       grant assistance to foreign proceedings and Lord Collins expressly approved the
31       statement made by Innes C.J in *African Farms* that recognition carries with it the

active assistance of the court, but he did not address the question whether recognition carries with it the right to pursue causes of action which would not otherwise exist in the absence of a winding up order. Lord Collins said –

> "29. Fourth, at common law the court has power to recognize and grant assistance to foreign insolvency proceedings. The common law principle is that assistance may be given to foreign officeholders in insolvencies with an international element. The underlying principle has been stated in different ways: "recognition …. carries with it the active assistance of the court": *In re African Farms Ltd [1906] TS 373, 377;* "This court … will do its utmost to co-operate with the United States Bankruptcy Court and avoid any action which might disturb the orderly administration of [the company] in Texas under ch.11": *Banque Indosuez SA v Ferromet Resources In [1993] BCLC 112, 117"*

He went on to give examples of the way in which courts have provided assistance at common law.

> "31. The common law assistance cases have been concerned with such matters as the vesting of English assets in a foreign officeholder, or the staying of local proceedings, or orders for examination in support of foreign proceedings, or orders for the remittal of assets to a foreign liquidation, and have involved cases in which the foreign court was a court of competent jurisdiction in the sense that the bankrupt was domiciled in the foreign country or, if a company, was incorporated there."

Mr. Crystal characterizes these examples as "traditional assistance", the availability of which is dependent upon recognition alone. He contrasts this with "non-traditional assistance" of a kind which involves conferring upon the foreign representative a cause of action under the local insolvency law (in this case the fraudulent preference provisions of section 145 of the Companies Law or its predecessor section 168), which would not otherwise be available in the absence of a winding up order. He argues that the justification for this type of assistance is, as a matter of comity, to avoid putting the foreign representative (and so creditors of the foreign estate) to the expense of having to commence a parallel winding up proceeding in this jurisdiction merely to access relief available to an official liquidator under Part V of the Companies Law.

39.    It may be said that orders vesting local assets in a foreign representative or declaring his right to deal with such assets are not dependent upon the exercise of a statutory power available only to official liquidators appointed by this Court. Similarly, the



1     grant of a stay of proceedings or a stay of execution upon the application of a foreign

2     representative merely involves the exercise of a general power in a manner which

3     recognizes the existence of the foreign insolvency proceeding. Traditional assistance

4     of this sort does not depend upon conferring a cause of action upon the foreign

5     representative or giving him access to a remedy under the domestic insolvency law

6     which would not otherwise exist, absent a winding up order. The argument is that

7     traditional assistance is dependent upon recognition alone. Non-traditional assistance

8     is dependent upon the application of an additional "sufficient connection test" to

9     determine whether or not there is jurisdiction to make a winding up order, without

10     which the local court cannot properly treat the foreign representative as having any of

11     the rights and remedies available only to a locally appointed official liquidator. Mr.

12     Crystal's argument has a compelling logic, but it is not actually consistent with the

13     approach which appears to have been approved by Lord Collins in *Rubin* He stated (at

14     paragraph 33) that "Cases of judicial assistance in the traditional sense include *In re*

15     *Impex Services Worldwide Ltd* [2004] BPIR 564, where a Manx order for examination

16     and production of documents was made in aid of the provisional liquidation in

17     England of an English company." In this case a foreign liquidator made an application

18     to the Manx court for an order for the examination of an individual in aid of the

19     foreign liquidation proceeding. The application was made under section 206 of the

20     Companies Act (Isle of Man) 1931 which is the equivalent of section 103 of the

21     Companies Law. It was held that the statutory jurisdiction was not available because

22     Impex was not a "company" within the meaning of the Act. Nevertheless, the Manx

23     court held that it had power at common law to make an order for examination in

24     exactly the same terms as the statutory power even though the statutory power did not

25     apply. This decision, which is described by Lord Collins as an example of traditional

26     common law assistance, is inconsistent with Mr Crystal's analysis and suggests that

27     recognition is sufficient for granting assistance, even when it involves treating the

28     foreign representative as having rights and remedies otherwise available *only* to

29     official liquidators appointed by this Court.

30   40.     It might be said that this approach conflicts with the general principle that this Court

31       has no inherent jurisdiction to exercise a statutory power in circumstances not falling

within the provisions of the Law in question. This point was addressed in the decision of the Privy Council in *Al Sabah –v- Grupo Torras SA* [2005] 2 AC 333. The case concerned an individual who was subject to a personal bankruptcy proceeding in the Bahamas. The trustee in bankruptcy obtained a letter of request from the Bahamas court seeking the aid of this Court in setting aside two trusts settled by the debtor under Cayman Islands law pursuant to section 107 of the Bankruptcy Law (1997 Revision). It was held that this Court had a statutory jurisdiction under section 156 of the Cayman Islands Law and/or under section 122 of the UK Bankruptcy Act 1914.[9] However, in giving judgment Lord Walker made the following observation (at paragraph 35) –

> "The respondents relied in the alternative, on the second issue, on the inherent jurisdiction of the Grand Court. This point was not much developed in argument and their Lordships can deal with it quite shortly. If the Grand Court had no statutory jurisdiction to act in aid of a foreign bankruptcy it might have had some limited inherent power to do so. But it cannot have had inherent jurisdiction to exercise the extraordinary powers conferred by section 107 of its Bankruptcy Law in circumstances not falling within the terms of that section. The non-statutory principles on which British courts have recognized foreign bankruptcy jurisdiction are more limited in their scope ..... and the inherent jurisdiction of the Grand Court cannot be wider."

What this means is that the common law cannot bring into play a statutory provision to achieve a purpose which is different from the object of the statute. The object of section 107 of the Bankruptcy Law (1997 Revision) is to confer jurisdiction on the court to set aside voluntary settlements only in connection with personal bankruptcy proceedings. The Law has no application to corporate insolvency proceedings. Lord Walker's point is that the common law cannot be invoked to apply provisions of the Bankruptcy Law to achieve an objective outside the scope of the statute. To put the point another way, as Lord Neuberger did in *HIH* (supra) (at paragraph 76), the common law cannot be used to thwart a statutory purpose. However, bringing the preference claim provisions of section 145 into play in respect of BLMIS in the circumstances of this case does not, in my view, depart from or thwart the statutory

---

[9]  These statutes relate only to personal bankruptcy and have no application to corporate insolvency proceedings.

1   objective of the Companies Law in the way contemplated by Lord Walker and Lord
2   Neuberger.

3

4   41.   Treating BLMIS as being the subject of a liquidation proceeding under Cayman
5         Islands law as at the date of the foreign bankruptcy proceeding (15 December 2008),
6         even though there was no jurisdiction to make a winding up order, is consistent with
7         the general principle of modified universalism and does not, in my view, involve
8         applying the statute for an unintended purpose or tend to thwart its intended purpose.[10]
9         Indeed, the very concept of recognizing a foreign bankruptcy proceeding, involves
10        recognizing that certain legal consequences have occurred from a specific date. The
11        effect of the Recognition Order in this case is, *inter alia,* that the Trustee is recognized
12        as having authority to act for BLMIS with effect from the date upon which the New
13        York Court made its order, namely 15 December 2008. This Court has recognized that
14        BLMIS has been in bankruptcy since that date. Applying the provisions of section 145
15        in this way is an incidence of recognition and it is consistent with the statutory
16        objective. For these reasons I have come to the conclusion, not without some
17        hesitation, that this Court does have jurisdiction at common law to apply the avoidance
18        provisions of Cayman Islands insolvency law in aid of the BLMIS liquidation whether
19        it would have had jurisdiction to make a winding up order.

20   **Insolvency set-off and the rule in Cherry –v- Boultbee**

21   42.   I now turn to Preliminary Issues 5 and 6 which concern the applicability of insolvency
22        set-off under section 140 of the Companies Law and the rule in *Cherry –v- Boultbee.*
23        The preliminary issues proceed on the hypothesis that the Plaintiffs have valid non-
24        proprietary claims (whether arising under foreign or domestic law) as pleaded in their
25        Statement of Claim and that Primeo has claims sounding in debt, damages, equitable
26        compensation or restitution against the Plaintiffs, or either of them, which it will be
27        entitled to plead by way of counterclaim. Primeo is in liquidation under the

---

[10] Section 91(d) of the Companies Law was not in force on 18 December 2008. Even if it had been in force, the factual circumstances relating to BLMIS are such that the Court would have had no power to make a winding up order.

1 supervision of this Court with the result that its assets will be distributed subject to the
2 insolvency set-off provisions contained in section 140 of the Companies Law which
3 provides as follows:–

4    "(1)    Subject to sub-section (2), the property of the company shall be applied in
5    satisfaction of its liabilities *pari passu* and subject thereto shall be distributed amongst
6    the members according to their rights and interests in the company.

7    (2)    The collection in and application of the property of the company referred to in
8    subsection (1) is without prejudice to and after taking into account and giving effect to
9    the rights of the preferred and secured creditors and to any agreement between the
10   company and any creditors that the claims of such creditors shall be subordinated or
11   otherwise deferred to the claims of any other creditors and to any contractual rights of set
12   –off or netting of claims between the company and any person or persons (including
13   without limitation any bilateral or any multi-lateral set-off or netting arrangement
14   between the company and any person or persons) and subject to any agreement between
15   the company and any person or persons to waive or limit the same.

16   (3)    In the absence of any contractual right of set-off or non set-off, an account shall
17   be taken of what is due from each party to the other in respect of their mutual dealings,
18   and the sums due from one party shall be set-off against the sums due from the other.

20   (4)    Sums due from the company to another party shall not be included in the account
21   taken under subsection (3) if that other party had notice at the time they became due that
22   a petition for the winding up of the company was pending.

24   (5)    Only the balance, if any, of the account taken under subsection (3) shall be
25   provable in the liquidation or, as the case may be, payable to the liquidator as part of the
26   assets."

27 43.   This provision was introduced by the 2007 Law and codifies the pre-existing law
28      which was that contractual rights of set-off or non set-off concluded in the ordinary
29      course of business prior to the commencement of the liquidation were enforceable by
30      and against the liquidator and, in the absence of any contractual right, rule 4.90 of the
31      English Insolvency Rules 1986 would be applied.  To this extent it can be said that
32      section 140 is based upon rule 4.90 with the result that this Court will regard the
33      decisions of the English courts on the meaning and effect of rule 4.90 and its
34      predecessors as persuasive authorities relating to the interpretation of the Cayman
35      Islands statute. It is common ground that there is no relevant contractual right as
36      between Primeo and BLMIS and that for present purposes I am only concerned with



1   the residual insolvency set-off rule. It is also common ground that its application is

2   automatic and self-executing.

3   44.   It is well established as a matter of English law, and I think also as a matter of Cayman

4         Islands law, that there are certain situations in which insolvency set-off will not apply

5         so as to enable a creditor of a company in liquidation to rely on his claim against the

6         company to extinguish or reduce the company's claim against him. Insolvency set-off

7         cannot be relied upon as a defence to a liquidator's claim against a contributory for

8         calls on unpaid or part-paid shares: *Re Overend, Gurney & Co, Grissell's case* (1866)

9         LR 1 Ch. App 528. Nor can insolvency set-off be relied upon as a defence to a

10        misfeasance claim against directors and others: *re Anglo Co-operative Society, ex*

11        *parte Pelly* (1882) 21 Ch. D 492. Nor is it a defence to a claim by a liquidator to

12        recover voidable preferences: *Lister –v- Hooson* [1908] 1 KB 174. The rationale for

13        the non-application of the insolvency set-off in these special situations is obvious. The

14        legislative intention that contributories make good a company's capital, that delinquent

15        directors pay compensation and that recipients of preferential payments be put back in

16        the position they would have been in had the payment not been received, would be

17        defeated by the application of set-off. It follows that if BLMIS was in compulsory

18        liquidation under Cayman Islands law, Primeo's liquidator would not be entitled to

19        set-off its ordinary non-proprietary claim for a debt etc against a preference claim

20        asserted by BLMIS' liquidator under section 145 (or the predecessor section 168) of

21        the Companies Law.

22   45.   I am wholly un-persuaded that Primeo can avoid this result in the event that the

23        Trustee is entitled to assert a preference claim at common law as if it were in

24        liquidation in this jurisdiction. For present purposes I have to assume two things. First,

25        I must assume that the Trustee and/or BLMIS is entitled to claim recovery of the Six

26        Month Payments as a preferential payment under Cayman Islands law as pleaded in

27        Part X of the Statement of Claim. For the reasons which I have explained, the

28        substantive law applicable to this claim is Cayman Islands law, which includes section

29        140 of the Companies Law as interpreted and applied in the manner which I have

30        described. Second, I must assume that Primeo has a non-proprietary claim against

BLMIS for a debt etc, being a cause of action which existed prior to the commencement of its liquidation, which for these purposes is treated as being 15 December 2008. On the basis of these assumptions, the Trustee is entitled to pursue a preference claim against Primeo under Cayman Islands law and Primeo is entitled to prove in BLMIS' notional liquidation as an ordinary unsecured creditor. In these circumstances, mandatory insolvency set-off under section 140 does not apply. This result turns upon the characterization of BLMIS' claim and Primeo's cross-claim. The result would be different if the Trustee was pursuing on behalf of BLMIS an ordinary contractual or tortious cause of action which had arisen prior to the liquidation. In such a case the Trustee would prove in the liquidation as an ordinary unsecured creditor and set-off would apply. The result is different if the Trustee's claim is properly characterized as the kind of claim which is not subject to set-off under section 140, which depends upon the Court determining that the Trustee is entitled at common law to pursue a preference claim under Cayman Islands law. The right to pursue a preference claim under the domestic law necessarily carries with it the domestic set-off rules as interpreted and applied in accordance with the authorities to which I have referred.

46. In my view it is impossible to arrive at a different result by calling in aid the rule in *Cherry –v- Boultbee*. This is a principle of equity which means that where a person entitled to participate in a fund is also bound to make a contribution in aid of that fund, he cannot be allowed so to participate unless and until he has fulfilled his duty to contribute. It can apply to a variety of different situations, including the case of an insolvent company in liquidation. Primeo's argument is that its liquidators will be entitled to withhold payment of any dividend to BLMIS in respect of a judgment on its pleaded claim for recovery of the Six Month Payments unless and until it pays in full the amount owing to Primeo on a judgment in respect of its (as yet un-pleaded) counterclaim. So long as BLMIS can properly be treated as if it is in liquidation in this jurisdiction and its pleaded claim against Primeo is properly characterized as one to which mandatory set-off under section 140 does not apply, it is not open to Primeo to rely upon the rule in *Cherry –v- Boultbee* as a means of circumventing this result. The reason for this conclusion is explained in the UK Supreme Court's decision in *Re*



*Kaupthing Singer & Friedlander Ltd (No 2)* [2012] 1 AC, per Lord Walker at paragraphs 52 and 53.

> "52 The situation in this line of authority is that a shareholder is a creditor of an insolvent company, but his shares are not fully paid up, so that he is liable as a contributory. Suppose he has 10,000 £1 shares, 10p paid, and is owed £15,000, but the dividend prospectively payable is only 30p in the pound. If the liquidator calls on him for £9,000 to make his shares fully paid up, he has no right of set-off, and to that extent he is disadvantaged (that is *In re Auriferous Properties Ltd* [1898] 1 Ch 691). If he seeks to prove in the liquidation, the liquidator can rely on the equitable rule as it applies in a case of this sort—that is, that he can receive *nothing* until he has paid *everything* that he owes as a contributory. That is *In re Auriferous Properties Ltd (No 2)* [1898] 2 Ch 428. The rule is also very clearly stated by Buckley J in *In re West Coast Gold Fields Ltd* [1905] 1 Ch 597, 602 (affirmed [1906] 1 Ch 1, and cited in para 20 above). Payment of the call is a condition precedent to the shareholder's participation in any distribution, and again the shareholder is to that extent disadvantaged."

> "53 So the equitable rule may be said to fill the gap left by disapplication of set-off, but it does not work in opposition to set-off. It produces a similar netting-off effect except where some cogent principle of law requires one claim to be given strict priority to another. The principle that a company's contributories must stand in the queue behind its creditors is one such principle....."

Another such principle is that the recipients of preference payments must repay without the benefit of set-off. Assuming that the Trustee's pleaded claim is properly characterized as a preference claim which is not subject to mandatory set-off, Primeo cannot rely on the rule in *Cherry –v- Boultbee.*

47.  However, I should perhaps mention one other aspect of the matter which does not form part of the preliminary issues which I have to decide but was touched upon in the course of the argument. When a creditor has repaid the amount adjudicated to have been a preference payment under section 145 (or its predecessor section 168), he then becomes entitled to prove in the liquidation for that amount. The policy of the law is that the recipient of a preferential payment should be put back in the same economic position that he would have been in, had he not received the payment (which is of course why insolvency set-off does not apply). However, it has been said that if Primeo were to repay the Six Month Payments as constituting preferential payments under Cayman Islands law, it would still not be entitled (as a matter of US law) to

1   prove in the liquidation of BLMIS for this amount or have this amount taken into
2   account for the purpose of making a claim based upon a "cash in/cash out" calculation.
3   This Court's common law jurisdiction to assist in connection with a foreign
4   bankruptcy proceeding is discretionary. In determining whether it can properly provide
5   such assistance, it seems to me that the Court must take into account the same policy
6   considerations which would be applicable under section 242(1). The mere fact that the
7   application of the foreign law produces an economic result which is different from that
8   which would be produced by the application of Cayman Islands law is not of course a
9   reason for refusing this Court's assistance. However, if it were to be established that
10  the assistance sought by a foreign representative is intended to produce an economic
11  result which is plainly contrary to a fundamental policy of the Cayman Islands law, the
12  claim would be dismissed.

13  **Conclusions**

14  48.   This Court has no power to entertain preference or transaction avoidance claims under
15        section 241(1)(e) of the Companies Law (2011 Revision) and, even if such power
16        existed, the Court would have no power to apply foreign law. It follows that Section
17        VI of the Statement of Claim must be struck out as disclosing no reasonable cause of
18        action.

19  49.   Having determined that the Trustee is entitled to recognition under section 241, it
20        follows that the Court does have a discretionary power at common law to entertain the
21        Plaintiffs' preference claim based upon the application of the domestic corporate
22        insolvency law as if BLMIS was the subject of a winding up order. The Court's power
23        is not dependent upon establishing that there is jurisdiction under section 91(d) to
24        make a winding up order in respect of BLMIS. It follows that Section X of the
25        Statement of Claim does disclose a reasonable cause of action should not be struck
26        out.

27  50.   In the event that the Plaintiffs establish their claim, as pleaded in Section X of the
28        Statement of Claim, any sums due from Primeo to the Plaintiffs (or either of them)
29        will not be set-off pursuant to section 140 of the Companies Law against any sums due

from the Plaintiffs (or either of them) in respect of any claims sounding in debt, damages, equitable compensation or restitution which Primeo may have against the Plaintiffs (or either of them) in respect of investments placed with BLMIS. Nor will the rule in Cherry –v- Boultbee apply, so the official liquidators of Primeo will have no right of quasi-retainer exercisable against the Plaintiffs.

51.  Having reached these conclusions, I did not consider it necessary to deal with Preliminary Issue 7.

DATED this day of January 2013



_____

**The Honourable Mr. Justice Andrew J. Jones QC**
**JUDGE OF THE GRAND COURT**

## CERTIFICATE OF SERVICE

I, Grace Wagner, hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this 24th day of January, 2014, I served DEFENDANT DLA PIPER LLP (US)'S APPENDIX OF DOCUMENTS CITED IN THE COMPLAINT AND FOREIGN AUTHORITIES SUBMITTED WITH MOTION TO DISMISS THE COMPLAINT, by United States Mail and E-mail, upon the following counsel of record:

Joshua J. Bruckerhoff, Esq.
Reid Collins & Tsai LLP
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, TX 78746

_Grace Wagner_
Grace Wagner