GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
Kevin S. Rosen (pro hac vice to be filed)
Craig H. Millet (pro hac vice to be filed)
Matthew S. Kahn (MK-5426)
MKahn@gibsondunn.com

*Attorneys for Defendant DLA Piper LLP (US)*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ICP STRATEGIC CREDIT INCOME FUND LTD., *et al.*,<br><br>        Debtors in Foreign Proceedings. | Chapter 15 Case<br><br>Case No. 13-12116 (REG)<br><br>(Jointly Administered) |
| ICP STRATEGIC CREDIT INCOME MASTER FUND LTD., ICP STRATEGIC CREDIT INCOME FUND LTD., and HUGH DICKSON and STEPHEN AKERS, solely in their capacity as the Foreign Representatives and Joint Official Liquidators of ICP Strategic Credit Income Fund Ltd. and ICP Strategic Credit Income Master Fund Ltd.,<br><br>        Plaintiffs,<br>  -against-<br><br>DLA PIPER LLP (US),<br><br>        Defendant. | Adv. Pro. No. 14-01835 (REG)<br><br>(Procedurally Consolidated Under This Matter) |

## <u>REQUEST FOR JUDICIAL NOTICE</u>

New York, New York
January 24, 2014

Pursuant to Federal Rule of Evidence 201, made applicable here by Federal Rule of Bankruptcy Procedure 9017, Defendant DLA Piper LLP (US) ("**DLA**") respectfully requests that the Court take judicial notice of true and correct copies of the following documents that are attached to and authenticated in the attached Declaration of Matthew S. Kahn ("**Kahn RJN Decl.**"):

1.      Amended Complaint and Jury Demand, *SEC v. ICP Asset Management, LLC et al.*, No. 10-cv-4791 (LAK) (JCF) (S.D.N.Y. June 30, 2011) (Exhibit A to Kahn RJN Decl.).

2.      Final Judgment as to Defendants Thomas C. Priore, ICP Asset Management LLC, ICP Securities, LLC, and Institutional Credit Partners, LLC, *SEC v. ICP Asset Management, LLC et al.*, No. 10-cv-4791 (LAK) (JCF) (S.D.N.Y. Feb. 6, 2012) (Exhibit B to Kahn RJN Decl.).

3.      Complaint, *ICP Strategic Credit Income Master Fund Ltd. et al. v. ICP Asset Management LLC et al.*, Index No. 650385-2012 (Sup. Ct. N.Y. Cty. Feb. 8, 2012) (Exhibit C to Kahn RJN Decl.).

## I.      DISCUSSION

Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute [and] . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The Rule further states that "[a] court shall take judicial notice if requested by a party and supplied with the necessary information."  *Id*. at (d).

All of the documents attached to the Kahn RJN Decl. are proper subjects of judicial notice under Rule 201 because (1) these documents already are on file with this Court (*see* ECF

No. 4, Exs. E-F)[1] *and* (2) they also are pleadings on file in other courts, namely, the United States District Court for the Southern District of New York (Exhibits A & B to the Kahn RJN Decl.) and the Supreme Court for the State of New York, New York County (Exhibit C to the Kahn RJN Decl). *See, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts . . . ."); *In re Enron Corp.*, 379 B.R. 425, 430 n.18 (Bankr. S.D.N.Y. 2007) (taking judicial notice of documents filed with the court and other courts because "[j]udicial notice of public records such as court filings, is clearly appropriate") (citation omitted), *motion to certify appeal denied*, 2007 WL 2780394 (S.D.N.Y. Sept. 24, 2007).

## II.     CONCLUSION

Based on the foregoing, this Court can and should take judicial notice of Exhibits A through C to the Kahn RJN Decl.


Dated:  January 24, 2014

                                        GIBSON, DUNN & CRUTCHER LLP

                                        By: /s/ Matthew S. Kahn
                                             Kevin S. Rosen (pro hac vice pending)
                                             Craig H. Millet (pro hac vice pending)
                                             Matthew S. Kahn (MK-5426)


                                        *Attorneys for Defendant DLA Piper LLP (US)*

---

[1] All references to "ECF" are to the ECF in the proceedings initiated by Plaintiffs in this Court pursuant to Chapter 15 of the United States Bankruptcy Code captioned *In re ICP Strategic Credit Income Fund Ltd., et al.*, Case No. 13-12116-reg.

**DECLARATION OF MATTHEW S. KAHN**
**IN SUPPORT OF DLA PIPER LLP (US)'S REQUEST FOR JUDICIAL NOTICE**

I, MATTHEW S. KAHN, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I am an attorney licensed to practice in the State of New York and admitted to practice before this Court.  I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Defendant DLA Piper LLP (US) in the above-captioned matter.  I have personal knowledge of the matters set forth in this Declaration and, if called upon to do so, I could and would testify as follows:

2.      Attached hereto as Exhibit "A" is a true and correct copy of the Amended Complaint and Jury Demand filed in *SEC v. ICP Asset Management, LLC et al.*, No. 10-cv-4791 (LAK) (JCF) (S.D.N.Y. June 30, 2011).  At my direction, a copy of this document was downloaded from this Court's ECF system and a copy was attached to this Declaration.

3.      Attached hereto as Exhibit "B" is a true and correct copy of the Final Judgment as to Defendants Thomas C. Priore, ICP Asset Management LLC, ICP Securities, LLC, and Institutional Credit Partners, LLC, entered in, *SEC v. ICP Asset Management, LLC et al.*, No. 10-cv-4791 (LAK) (JCF) (S.D.N.Y. Feb. 6, 2012).  At my direction, a copy of this document was downloaded from this Court's ECF system and a copy was attached to this Declaration.

4.      Attached hereto as Exhibit "C" is a true and correct copy of the Complaint filed in *ICP Strategic Credit Income Master Fund Ltd. et al. v. ICP Asset Management LLC et al.*, Index No. 650385-2012 (Sup. Ct. N.Y. Cty. Feb. 8, 2012).  At my direction, a copy of this document was downloaded from this Court's ECF system and a copy was attached to this Declaration.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of January 2014 in San Francisco, California.

/s/ Matthew S. Kahn

MATTHEW S. KAHN

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

                          **Plaintiff,**

        - against -

ICP ASSET MANAGEMENT, LLC, ICP
SECURITIES, LLC, INSTITUTIONAL CREDIT
PARTNERS, LLC, and THOMAS C. PRIORE,

                     **Defendants,**

        - and -

THOMAS C. PRIORE, LORI A. PRIORE, and
BERTRAND H. SMYERS,

               **Defendants and**
               **Relief Defendants.**

No. 10 Civ. 4791 (LAK) (JCF)

**AMENDED COMPLAINT**
**AND JURY DEMAND**

       Plaintiff Securities and Exchange Commission ("Commission"), for its Amended Complaint against defendants ICP Asset Management, LLC ("ICP"), ICP Securities, LLC ("ICPS"), Institutional Credit Partners, LLC a/k/a or d/b/a ICP, LLC or ICP Capital, LLC ("ICP Holdco"), and Thomas C. Priore ("Priore") (collectively, "Defendants"), and against Priore, Lori A. Priore ("L. Priore"), and Bertrand H. Smyers ("Smyers") (collectively, "Transfer Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

       1.     The Commission brings this action against the investment advisory firm ICP, its founder, owner and president, Thomas Priore, its affiliated broker-dealer, ICPS, and its holding company, ICP Holdco, for repeated violations of the federal securities laws. Since 2006, ICP has managed several investment vehicles, including four multi-billion-dollar collateralized debt

obligations, known as the Triaxx CDOs, whose assets primarily consisted of mortgage-backed bonds. Starting in 2007, as the mortgage markets increasingly deteriorated, ICP and the other Defendants engaged in a range of improper transactions that defrauded the Triaxx CDOs of tens of millions of dollars and placed them at risk of substantial additional losses in the future.

2. As the markets declined, ICP and the other Defendants repeatedly caused the Triaxx CDOs, their advisory clients, to overpay for bonds — often in order to protect another ICP client from realizing losses or to make money for ICP. To take just one example of many dozens, ICP caused a CDO to purchase approximately $22 million of mortgage bonds from another client account at a price of $75 per bond, even though ICP had purchased the same bonds into that client account, earlier in the day, at only $63.50 per bond. (When first issued, each bond is priced at "par" or $100 but its market price may decline over time.) This trade defrauded the CDO of approximately $2.5 million. In another example, ICP caused two Triaxx CDOs to purchase from another ICP client approximately $9 million of bonds at a price of $99.22 per bond, just days after ICP had purchased the same bonds in the open market at only $78.63 per bond. ICP also caused several Triaxx CDOs to purchase bonds from another CDO at artificially-inflated prices to help the latter meet the margin calls of one of its creditors. In total, ICP and Priore directed more than a billion dollars of trades by the Triaxx CDOs at what they knew were inflated prices.

3. ICP also defrauded the Triaxx CDOs by structuring trades in ways that disadvantaged the CDOs and allowed ICP and its affiliates to reap massive, risk-free, and undisclosed profits at the CDOs' expense. For example, in the summer of 2007, after the CDOs had purchased a large portfolio of mortgage bonds, ICP fraudulently altered the trade to pocket a $14 million profit for itself. ICP did so by directing the brokers from whom the CDOs had

purchased the bonds — weeks after the trade had taken place — to cancel the transaction and rebook it, only this time replacing affiliates of ICP for the CDOs as the purchasers. ICP enriched itself and its affiliates with undisclosed markups in various other transactions it made on behalf of the CDOs.

4.    The Defendants' abuses of their fiduciary responsibilities to clients included numerous other improper practices, such as entering into prohibited investments, failing to obtain required approvals for trades, misrepresenting the value of holdings, and deceiving clients, investors, and other parties about the CDOs' investments. By early 2010, the bulk of the bonds held by the Triaxx CDOs, which had once been AAA-rated, had been downgraded to "junk bond" status, leaving investors with heavily-impaired collateral and exposing them to potentially massive losses as the CDOs mature.

5.    By directing the transactions described in this Amended Complaint, ICP and the other Defendants put their interests ahead of their advisory clients and improperly obtained tens of millions of dollars in fees and undisclosed profits at the expense of clients and investors.

6.    In addition to the securities laws violations described herein, in March 2010, after Priore learned that the Commission's staff intended to bring fraud claims against him and his ICP entities, Priore transferred ownership of his homes in Westchester County, New York, and Martha's Vineyard, Massachusetts, into trusts that he had created during the time when the Commission's Enforcement Division was investigating him. With these transfers, Priore has hindered the Commission's ability to collect a judgment against him for disgorgement, penalties, and prejudgment interest. As alleged below, the Commission seeks to rescind these transfers, and any other fraudulent transfers Priore made, in order to preserve its ability to satisfy any monetary judgment against Priore.

3

## SECURITIES LAWS VIOLATIONS

7. By virtue of the foregoing conduct and as alleged further herein, the Defendants, directly or indirectly, singly or in concert, have engaged in acts, practices, schemes, and courses of business that violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.l0b-5]. Defendant ICPS also violated Section 15(c)(1)(a) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.l0b-3]. In addition, Defendants ICP and Priore violated Sections 206(1), 206(2), 206(3), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1)-(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8], and ICP violated Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rules 204-2 and 206(4)-7 [17 C.F.R. 275.204-2 and 275.206(4)-7].

8. In addition, each of the Defendants aided and abetted the other Defendants' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.l0b-5], and Defendants ICP and Priore aided and abetted ICPS's violations of Section 15(c)(1)(a) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.l0b-3]. Defendants ICPS, ICP Holdco, and Priore also aided and abetted ICP's violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8], and Priore aided and abetted ICP's violations of Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

9. Finally, at all times relevant to the charges contained in this Amended Complaint, Defendant Priore was a controlling person of Defendants ICP and ICPS pursuant to Section 20(a)

of the Exchange Act [15 U.S.C. § 78t(a)], and is therefore liable as a control person for ICP's and ICPS's violations of the Exchange Act.

10. .  Unless each of the Defendants is permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Amended Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## JURISDICTION AND VENUE

11.  The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)] seeking, among other things, to restrain and enjoin permanently the Defendants from engaging in the acts, practices, transactions, and courses of business alleged herein.  In addition to injunctive relief, the Commission seeks:  (a) final judgments ordering the Defendants to disgorge their ill-gotten gains, with prejudgment interest; (b) final judgments ordering the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and (c) such equitable and other relief as the Court deems just, appropriate or necessary for the benefit of investors [15 U.S.C. § 78u(d)(5)].

12.  This Court has jurisdiction over this action, and venue lies in this District, pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14, 28 U.S.C. § 1345, and the Court's ancillary jurisdiction.  The Defendants, directly or indirectly, have used the mails and the means and instrumentalities of interstate commerce in

connection with the acts, practices, transactions, and courses of business alleged herein, many of which occurred in this District. In addition, the Defendants transacted business and maintained offices in this District throughout the relevant period. In addition, this Court has jurisdiction over the Transfer Defendants because Priore and L. Priore reside in this District, the fraudulent transfers alleged herein were made into trusts established within this District, the transfers of the properties occurred in this District, and one of the transferred properties is located in this District.

## DEFENDANTS

13. **ICP Asset Management, LLC (ICP)** is a Delaware corporation headquartered in New York. ICP is engaged in providing investment and trading advice relating to various structured fixed income instruments, including mortgage-backed bonds and other asset-backed securities. ICP has been registered with the Commission as an investment adviser since 2006 and is a wholly-owned subsidiary of ICP Holdco.

14. **ICP Securities, LLC (ICPS)** is a Delaware corporation headquartered in New York. ICPS is a registered broker-dealer and a member firm of the Financial Industry Regulatory Authority ("FINRA"). ICPS engages in the structuring, origination, trading, and distribution of leveraged credit instruments and primarily conducts riskless principal transactions. ICPS is a wholly-owned subsidiary of ICP Holdco.

15. **Institutional Credit Partners, LLC (ICP Holdco)**, a/k/a or d/b/a ICP LLC or ICP Capital LLC, is a Delaware corporation headquartered in New York. ICP Holdco is majority-owned by Defendant Priore (through an entity he wholly owns, Founders, LLC) and is the owner of ICP and ICPS. In addition, ICP Holdco is the sole owner of several other ICP affiliates: (a) ICP Strategic Credit Income GP, LLC; (b) ICP (Capital) London LLP, a broker-

dealer registered with the United Kingdom's Financial Services Authority; and (c) ICP Consulting, LLC, a firm that provides portfolio analytic services.

16. **Thomas C. Priore**, age 43, resides in Chappaqua, New York. Priore is the founder, president, and chief investment officer of ICP and a 76% owner of ICP Holdco (through Founders, LLC). Priore serves as ICPS's president and is registered with FINRA as ICPS's general securities principal and general securities representative. Priore is a trustee of the "Lori A. Priore Revocable Trust," the "Thomas C. Priore Thirty-Five Year Qualified Personal Residence Trust," and the "Lori A. Priore Thirty-Two Year Qualified Personal Residence Trust."

17. **Lori A. Priore**, age 43, resides in Chappaqua, New York, and is married to Thomas Priore. L. Priore is a trustee of the "Lori A. Priore Revocable Trust," the "Thomas C. Priore Thirty-Five Year Qualified Personal Residence Trust," and the "Lori A. Priore Thirty-Two Year Qualified Personal Residence Trust."

18. **Bertrand H. Smyers**, age 42, resides in Shaker Heights, Ohio. Smyers is a trustee of the "Thomas C. Priore Thirty-Five Year Qualified Personal Residence Trust" and the "Lori A. Priore Thirty-Two Year Qualified Personal Residence Trust."

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

19. **The Portfolio Manager** resides in New York, New York. Until 2010, Portfolio Manager was a senior officer of ICP who reported directly to Priore.

20. **The Managed Account** is an investment account for which ICP served as investment adviser since 2007 and over which it exercised discretionary trading authority. The Managed Account was beneficially owned by an important client of ICP and Priore ("Client A").

## FACTUAL BACKGROUND

21.     ICP served as the collateral manager to four collateralized debt obligations known

as the Triaxx CDOs:  Triaxx Prime CDO 2006-1, Ltd. ("Triaxx 1"); Triaxx Prime CDO 2006-2,

Ltd. ("Triaxx 2"); Triaxx Prime CDO 2007-1, Ltd. ("Triaxx 3"); and Triaxx Funding High Grade

I, Ltd. ("Triaxx Funding").  The Triaxx CDOs, which were launched in 2006 and 2007, were

pooled investment vehicles that issued notes and other debt obligations to investors to raise funds

to invest in residential mortgage-backed bonds.  Each of the CDOs was an entirely separate

entity with distinct investors.  Triaxx 1, 2, and 3 were what are typically referred to in the

structured finance industry as "cash-flow" CDOs, while Triaxx Funding was a "market-value"

CDO.[1]   Collectively, the Triaxx CDOs issued more than $11 billion of notes and other

obligations.

22.     Like other CDOs, the Triaxx CDOs were structured so that investors who owned

notes with a higher credit rating and a higher priority of repayment received a lower interest rate.

The CDOs' debt notes were issued in several classes (or "tranches"), with each tranche having a

different seniority in the priority of repayment and a different rate of interest payment.  The

CDOs' residual or equity interests, which were last in the priority of repayment, did not receive a

fixed rate of return but instead were entitled to receive any assets or interest that may remain

after the CDOs' obligations were satisfied and their notes were repaid.

---

[1]     The most relevant distinction between cash-flow and market-value CDOs is in the effect of
changes in the market value of the portfolio of bonds or other assets held by the CDO.  In cash-flow
CDOs, a change in the market value of this investment portfolio usually does not require any of the assets
to be sold.  Under the financing arrangements typically employed by market-value CDOs, however, the
CDOs are subject to margin calls whenever the market value of their assets declines.  To meet such
margin calls, a market-value CDO is required to sell assets and, if it cannot do so at sufficiently high
prices, liquidate its investment portfolio to satisfy obligations to senior lenders or investors.

8

23.     Unlike many other CDOs, the Triaxx CDOs did not sell equity interests to third-party investors. Instead, ICP structured each of the three cash-flow CDOs — Triaxx 1, 2, and 3 — so that, in addition to a collateral management fee, ICP would earn an "incentive fee" equal to 100 percent of the cash flow that remained after the CDOs' other obligations were paid. In effect, therefore, ICP held the residual or equity interest in each of the Triaxx cash-flow CDOs, without having contributed any cash or assets. Similarly, the equity interest in Triaxx Funding was held by a hedge fund managed by ICP, in which Defendants ICP Holdco and Priore held ownership interests. As the effective equity holders in the Triaxx CDOs, ICP, Priore, and ICP Holdco had the incentive to enhance the CDOs' risk in the hope of reaping the potential returns (since losses would be borne by the other investors while any profits in excess of what was owed to those investors would be retained by the Defendants).

24.     In addition to managing billions of dollars in the Triaxx CDOs, ICP and Priore served as investment advisers to several hedge funds, the largest of which was known as the ICP Strategic Credit Income Fund ("SCIF"). ICP touted SCIF as a multi-strategy, fixed income, absolute-return fund. In addition, ICP served as investment adviser with discretionary trading authority for the Managed Account, with Priore serving as its portfolio manager. Under an investment management agreement, ICP had the authority to manage the Managed Account's assets without the need to obtain Client A's prior consent, and was entitled to receive certain of the net profits generated by the Managed Account.

25.     To govern its conduct in managing the Triaxx CDOs, ICP entered into investment advisory agreements known as "collateral management agreements," which Priore signed on behalf of ICP. These agreements placed various restrictions on ICP's authority to act on behalf of the CDOs. For example, the agreements obligated ICP at all times to "exercise reasonable

care, using a degree of skill and attention no less than that which [ICP] exercises with respect to comparable assets that it manages for itself, and in a commercially reasonable manner consistent with practices and procedures followed by institutional managers of national standing . . . ." In addition, ICP was required strictly to follow all of the terms set forth in the CDOs' indentures, which were the documents governing the CDOs' obligations to their investors.

26. To further protect the Triaxx CDOs and their investors from improper transactions, ICP was required under the terms of the collateral management agreements to conduct all trades on behalf of the CDOs on an "arm's length" basis — i.e., on terms at which unaffiliated parties would freely agree to trade. In setting prices for trades, ICP also was required to seek "best execution," which meant that ICP had to use reasonable diligence to ascertain the best market and to purchase or sell securities at prices that were as favorable as possible to the CDOs. Finally, if ICP sought to sell a security held by a Triaxx CDO, it was prohibited from bidding on that security for the account of any other client of ICP (including another CDO) unless ICP first obtained "*bona fide* bids" on that security "from at least two other nationally recognized independent dealers." These various restrictions were designed to prevent ICP from directing trades on terms that were unfavorable to the CDOs.

27. ICP was also required to follow certain investment guidelines for the Triaxx CDOs. Among other things, the guidelines prohibited ICP from causing either Triaxx 1, 2, or 3 from "hold[ing] itself out as being willing to enter into . . . or to offer to enter into . . . [or] assume" any "forward contract" (i.e., an agreement to buy or sell an asset, at a pre-determined price, on a specified date in the future). Because forward contracts could substantially increase the investment risk faced by the CDOs, thereby exposing investors to potentially serious losses in a down market, ICP was expressly forbidden by the collateral management agreements from

10

entering into them. The indentures for Triaxx 1, 2, and 3 contained limited exceptions to this, including an exception for short-term forward purchases (up to 30 days for ordinary bonds, or 45 days for new issue bonds), but they did not permit forward purchases of more than 45 days following the end of the CDOs' initial "ramp-up" period under any circumstances.

28.     The CDOs' indentures placed other restrictions on ICP's authority. The CDOs received monthly payments (known as "amortization") as the mortgages backing the bonds held by the CDOs were refinanced, redeemed, or paid down. Although the CDOs were permitted in certain circumstances to reinvest such amortization in additional securities, they could do so only if ICP first obtained independent approval for each reinvestment. Specifically, the indentures provided that neither Triaxx 1, 2, nor 3 could purchase securities "without the prior written approval of such investment" by the parties that provided insurance on the CDOs' senior debt notes. For Triaxx 1 and 2, this party was AIG Financial Products Corporation ("AIG"), and for Triaxx 3, it was Financial Guaranty Insurance Company ("FGIC"). In addition, ICP was not permitted to reinvest in additional securities unless the proposed trade satisfied detailed investment criteria designed to ensure diversification of the CDOs' overall portfolio and to preclude investment in risky or poor quality assets.

29.     Finally, to ensure that all trading activity on behalf of the CDOs conformed to these and other criteria, ICP was required to make certifications to a third-party trustee that acted on behalf of the Triaxx CDOs and their investors. Before the trustee would accept trades for the CDOs, ICP had to certify by its signature on each trade ticket that a given trade complied with all of the investment criteria set forth in the CDOs' indentures, including the obligations to trade on an arms' length basis, consistent with ICP's best execution obligation, and with the consent of

AIG or FGIC. When the CDOs were created, ICP "directed [the trustee] to rely" on its future representations that each trade was in compliance with such requirements.

30. As collateral and investment managers, ICP and Priore were fiduciaries to the Triaxx CDOs, SCIF, and the Managed Account, and owed to each a duty to act in its best interests. Notwithstanding their obligations, however, ICP and the other Defendants engaged in a multitude of transactions that defrauded ICP's clients out of many millions of dollars. Many of these transactions were done to favor one set of ICP clients — Triaxx Funding or the Managed Account — over ICP's other clients, the three Triaxx cash-flow CDOs. Other transactions were made in order to line the pockets of ICP and its affiliates. As described more fully below, the Defendants' misconduct included the following:

a. Committing the Triaxx CDOs, without obtaining required approvals from AIG or FGIC and in violation of the CDOs' indentures, to forward-purchase a $1.3 billion portfolio of mortgage-backed bonds, and concealing this investment from the CDOs' trustee;

b. Fraudulently rearranging the purchase of the $1.3 billion portfolio to misappropriate an undisclosed $14 million profit for ICP and its affiliates at the Triaxx CDOs' expense;

c. Committing the Triaxx CDOs to forward-purchase from the Managed Account numerous bonds at back-dated prices instead of the lower prevailing market prices;

d. Selling bonds from Triaxx Funding to the other Triaxx CDOs at artificially-inflated prices so that Triaxx Funding could satisfy its margin obligations to one of its creditors at the expense of the other Triaxx CDOs;

e. Using SCIF's assets to make undisclosed cash transfers to meet Triaxx Funding's margin obligations, repeatedly misrepresenting the transfers as collateralized loans, and causing their value to be misreported on SCIF's books;

f. Directing fraudulent and manipulative "rebalancing" cross-trades of bonds between the CDOs, at above-market prices, in order to: (i) facilitate the CDOs' improper purchases of bonds from Triaxx Funding and the Managed Account; and (ii) manipulate the CDOs' overcollateralization and other tests to generate millions of dollars in fees for ICP;

g. Purchasing bonds in the open market and then selling those bonds, often on the same day, to the Triaxx CDOs at higher prices, thereby generating undisclosed riskless profits at the CDOs' expense;

h. Improperly "swapping" bonds that were forward-purchased by the Triaxx CDOs with cheaper securities and selling those cheaper securities to the CDOs at the forward-purchase price of the original bonds, while retaining the undisclosed price spread for the benefit of ICP and another client;

i. Purchasing numerous bonds for the Triaxx CDOs without obtaining the prior written consent of AIG or FGIC;

j. Misrepresenting to the CDOs' trustee that trades that ICP executed for the CDOs conformed in all respects to the CDOs' investment eligibility criteria, when in fact such trades violated multiple criteria; and

k. Misrepresenting and concealing information concerning their improper trading activity in communications with investors in the Triaxx CDOs.

## THE DEFENDANTS' ILLEGAL CONDUCT

**A.** **The First Prohibited Forward-Purchase Arrangement**

31. In early June 2007, as a result of the collapse of certain hedge funds under its management, the Wall Street firm of Bear Stearns put up for auction a large quantity of mortgage-backed bonds that previously had been held by its hedge funds. Priore participated in the auction and placed a winning bid for approximately $1.3 billion of bonds. Since no ICP

entity or client account had sufficient cash available to immediately acquire all of the bonds, ICP arranged for two other major brokerage firms and SCIF, the hedge fund ICP managed, to accept immediate delivery of the bonds. The brokerage firms agreed to hold a total of approximately $1 billion in bonds and SCIF was allocated approximately $300 million.

32.     Under a temporary financing arrangement, the two brokerage firms agreed to purchase the bonds and simultaneously forward-sell them to the Triaxx CDOs. On or around June 14, 2007, ICP committed Triaxx 1, 2, and 3 to forward purchase the Bear Stearns bonds from the brokerage firms. These trades were memorialized in writing. The settlement dates — i.e., the dates when the CDOs would deliver payment and receive the bonds — were set for August and September 2007.

33.     In entering into this forward-purchase agreement, ICP violated its duties to the CDOs in numerous ways. First, ICP and Priore violated the express prohibition against forward contracts in the CDOs' investment guidelines. Second, ICP committed the CDOs to this arrangement without consulting with, or obtaining the consent of, AIG or FGIC. Third, ICP failed to inform the CDOs' trustee, as it was required to do, of the CDOs' commitment to forward-purchase the bonds, knowing that as a result the trustee's reports to investors would materially misrepresent the CDOs' true investment risk.

**B.     Rearranging the Forward-Purchase Transaction to Misappropriate $14 Million for ICP and its Affiliates**

34.     In late June 2007, after having committed the CDOs to the forward purchase of the Bear Stearns bonds from the two brokerage firms, Priore fraudulently altered the transaction to misappropriate approximately $14 million for ICP and its affiliates. Approximately two weeks after the CDOs forward-purchased the bonds (but prior to the settlement dates), Priore arranged to sell the bonds to another ICP client, the Managed Account, at substantially higher

prices. This trade would have allowed the CDOs to realize a profit of approximately $14 million for the risk to which they were exposed on their investment in the Bear Stearns bonds.

35.     Rather than executing this trade on behalf of the CDOs, however, Priore contrived to misappropriate the entire profit for ICP and himself. Under his direction, ICP asked the two brokerage firms to cancel the trades by which they sold the Bear Stearns bonds to the CDOs and book new trades that listed ICP entities — ICP, ICPS, and/or ICP Holdco — as the purchasers of these bonds. Once this was done, the ICP entities simultaneously purchased the bonds from the brokerage firms and resold them at the higher prices to the Managed Account, thereby misappropriating for themselves a risk-free profit of approximately $14 million.

36.     By replacing the CDOs with the ICP entities as the purchasers of the bonds, ICP and Priore defrauded the CDOs of a profit that rightfully belonged to them. If the trade had been done properly, the CDOs would have sold the bonds to the Managed Account and retained the $14 million profit. Moreover, by placing the CDOs at risk of loss on the original trade (by obligating them to purchase the bonds from the brokerage firms at fixed prices even if the market prices of the bonds declined in the future) but depriving them of the opportunity for gain (by seizing for ICP and its affiliates any gains from the sale of the bonds at improved prices), ICP and Priore exploited the CDOs' creditworthiness for their own gain.

37.     Although each of the Triaxx CDOs had a board of independent directors, ICP made no disclosure of this transaction to the CDOs or their boards of directors. Nor was the $14 million markup disclosed to Client A.

C.     **The Second Improper Forward-Purchase Arrangement**

38.     When Priore sold the $1.3 billion portfolio of Bear Stearns bonds to the Managed Account in June 2007, he represented to Client A that he had CDOs with "locked up money" that could acquire the bonds from the Managed Account on a regular basis. At the time, however,

Priore viewed this as only one of several options that ICP could utilize in managing the Managed Account's portfolio, and he did not firmly commit the CDOs to forward-purchase the bonds from the Managed Account.

39.     It was not until August 2007 — when Client A voiced concerns about the decline in the mortgage markets — that Priore determined to forward sell the entire portfolio of Bear Stearns bonds to the Triaxx CDOs at defined prices. Priore did so, once again, in violation of the prohibition on forward contracts, and without obtaining the approval of AIG or FGIC or disclosing the transaction to the CDOs' trustee. Moreover, rather than using the prevailing market prices of the bonds in August 2007, Priore used the higher prices at which the Managed Account had acquired them in June 2007, before the market deteriorated. By effectively "back-dating" the forward-purchase prices, ICP and Priore improperly committed the CDOs to overpay for the bonds. In the end, as a result of this prohibited and concealed arrangement, the Triaxx CDOs overpaid for bonds purchased from the Managed Account by at least $50 million.

40.     At the same time that they violated their fiduciary duties to the Triaxx CDOs in connection with this second improper forward-purchase agreement, ICP and Priore violated important duties of disclosure owed to Client A. In communications with Client A concerning this agreement, Priore failed to disclose that ICP lacked authority to enter into forward contracts on behalf of the CDOs and that he had not obtained the required approval of AIG or FGIC. Nor did Priore tell Client A that ICP had not disclosed the forward-purchase agreement to the CDOs' trustee or that the CDOs' ability to acquire the bonds from the Managed Account depended on many unfulfilled contingencies and conditions, such as satisfaction of numerous investment eligibility requirements and the CDOs' continued ability, under their indentures, to reinvest the proceeds of amortization in new securities.

41.     When he finalized the forward-purchase arrangement in August 2007, Priore delivered a schedule to Client A that contained a list of the bonds to be sold to each of Triaxx 1, 2, and 3, the prices and quantities of each bond, and projected dates, between October 2007 and April 2008, for each CDO to purchase its allotted bonds.   Afterwards, as the market for mortgage-backed securities continued to decline in late 2007 and 2008, ICP simultaneously managed the portfolios of Client A and the Triaxx CDOs, executing transactions between these client accounts at its own discretion.  In doing so, ICP often caused further harm to the CDOs by entirely ignoring the August 2007 schedule.  For example, when one Triaxx CDO was unable to make a scheduled purchase, Priore very often caused another CDO to purchase the bond at the originally-scheduled price.  He did this repeatedly even though the market price of the bond had fallen to much less than the scheduled price, and notwithstanding the fact that the other CDO had no obligation to purchase the bond at the scheduled price and could have purchased the same bond or a similar one for a lower price in the open market.  In this way, ICP improperly treated separate investment vehicles (with distinct investors) as if they were a single portfolio, and caused one CDO to bear the loss on a trade that ICP committed another CDO to make.

42.     Priore also caused the Triaxx CDOs to purchase from the Managed Account, again using "back-dated" mid-2007 prices, bonds that were not forward purchased by the CDOs until much later.  When Priore emailed Client A in late August 2007, he noted that the forward-purchase agreement between the Managed Account and the CDOs did not extend to several bonds in the Managed Account's portfolio, including certain BAFC 2007 and RALI 2007 bonds. For these, Priore noted, "price has not been locked" and the schedule attached to Priore's email listed them as "Hold" positions (i.e., positions that were not being sold to the CDOs).  The forward-purchase of the BAFC and RALI bonds by the Triaxx CDOs was first memorialized in

December 2007. Nonetheless, Priore once again "back-dated" the pricing. In mid-2008, after Priore described these bonds as "drastically underperform[ing]," he caused Triaxx 3 to acquire approximately $31 million worth of these bonds at mid-2007 prices of $99.91 and $99.73 per bond. In purchasing the bonds at these prices, Triaxx 3 overpaid by approximately $3.5 million.

43. By late 2008, approximately half of the Managed Account's portfolio had been sold to the CDOs at June 2007 forward-purchase prices. The remainder of the portfolio was liquidated on the open market at a loss of over $200 million to Client A.

**D.     Undisclosed $2.5 Million Profit On Same-Day Sale
of Bonds to a Triaxx CDO**

44. ICP also knowingly directed a purchase by the CDOs through another client account to circumvent an express restriction in the Triaxx CDOs' indentures. In August 2008, ICP's Portfolio Manager caused a Triaxx CDO to purchase approximately $22 million of mortgage-backed bonds in the open market at a price of $63.50 per bond, and submitted a trade ticket to the CDO's trustee. The trustee rejected the trade because the CDO's indenture expressly prohibited the purchase of bonds priced below $75. This prohibition was designed, among other things, to protect the CDO and its investors by ensuring that ICP did not expose them to the risks of owning highly-distressed bonds.

45. After conferring with Priore, the Portfolio Manager instead caused the Managed Account to acquire the bonds at their prevailing market price of $63.50 per bond and immediately caused Triaxx 2 to purchase the bonds from the Managed Account at a price of $75 per bond. This grossly-mispriced transaction generated for the Managed Account an immediate, risk-free profit of approximately $2.5 million, directly at the expense of Triaxx 2, and fraudulently evaded an express prohibition in Triaxx 2's indenture. ICP and Priore made no disclosure of this to any of their clients or the investors in Triaxx 2.

E.    **Fraudulent "Swaps" of Bonds to "Make Some Dough"**

46.    Beginning in early 2008, Priore and others at ICP directed multiple "swaps" of bonds in the Managed Account to generate profits at the expense of the Triaxx CDOs and to evade the approval procedure set forth in the CDOs' indentures.  These swaps were designed to remove bonds from the Managed Account that AIG would not approve for purchase into Triaxx 1 and 2, and replace them with bonds that ICP could argue were approved (because AIG purportedly had approved purchases of such bonds in the past).

47.    The swaps consisted of three steps:  (a) selling bonds from the Managed Account to the open market, even though ICP had committed a Triaxx CDO to forward-purchase those bonds in the summer of 2007; (b) purchasing from the open market into the Managed Account new bonds that were priced below the original bonds; and (c) causing the Triaxx CDO to purchase the new, cheaper bonds from the Managed Account at the forward-purchase price assigned to the original bonds.

48.    As an example of one swap, the Managed Account held several millions of dollars worth of DBALT 2005 bonds, which a Triaxx CDO committed in August 2007 to forward-purchase for $99.22 per bond.  The improper swap was executed as follows:

a.    In June 2008, ICP and Priore caused the Managed Account to sell approximately $38 million of the DBALT 2005 bonds in the open market at $81.56 per bond (the prevailing price at the time);

b.    At the same time, ICP and Priore caused the Managed Account to purchase approximately $38 million of CMALT 2007 bonds at $78.63 per bond from ICPS, which had just purchased those bonds in the open market; and

c. Next, ICP and Priore caused a Triaxx CDO to purchase from the Managed Account several million dollars worth of CMALT 2007 bonds at the forward-purchase price of the original DBALT 2005 bonds (i.e., $99.22 per bond) just days after ICPS purchased the CMALT 2007 bonds in the open market at $78.63 per bond.

49. ICP and Priore structured some of the swaps so that ICPS could generate an additional risk-free profit at the expense of the CDOs. Indeed, in one email, Priore wrote that he was doing the swaps so that he could "make some dough" for ICP. For example, in mid-2008, ICPS acquired approximately $26 million dollars worth of CMALT 2006 bonds in the open market at a price of $81.13 per bond and immediately sold them to the Managed Account at a price of $82.63 per bond (generating a risk-free profit of approximately $400,000 for ICPS). Shortly afterwards, ICP caused the Managed Account to sell the bonds to Triaxx 1 at a forward-purchase price of $97.84 per bond — a price that had been assigned to a different bond approximately 12 months earlier.

50. By carrying out these improper swaps, ICP, ICPS, and Priore compounded the Triaxx CDOs' losses on purchases from the Managed Account by causing them to pay forward-purchase prices for less valuable bonds. In addition, the swaps caused the CDOs to acquire bonds, using inflated June 2007 prices, that the CDOs had never committed to forward purchase. If ICP and Priore wanted the CDOs to acquire the cheaper bonds, they could have made such purchases directly into the CDOs from the open market at prevailing market prices. Instead, they executed the swaps to generate profits at the CDOs' expense.

**F.** **Fraudulent Sales to Save Triaxx Funding**

51. As the mortgage markets began to sharply decline in late 2007, Triaxx Funding received numerous margin calls from the counterparty to its repurchase financing agreement ("Repo Counterparty"). Under the repurchase agreement, the Repo Counterparty regularly

marked-to-market the value of Triaxx Funding's portfolio of mortgage bonds and, as the value dropped, demanded that Triaxx Funding post additional capital (referred to as "margin") to protect against potential losses. If Triaxx Funding failed to do so, the Repo Counterparty had the right to seize the CDO's bonds and sell them to satisfy Triaxx Funding's obligations under the repurchase agreement.

52. To allow Triaxx Funding to raise cash to meet the margin calls, ICP and Priore caused Triaxx 1, 2, and 3 to purchase hundreds of millions of dollars in bonds from Triaxx Funding at what they knew were above-market prices. Triaxx 1, 2, and 3 thereby overpaid for bonds by approximately $38 million. In addition to improperly favoring Triaxx Funding over the other CDOs, these sales violated ICP's obligations to obtain best execution for all purchases by Triaxx 1, 2, and 3 and to conduct all transactions on an arms' length basis.

53. Between March and October 2008, ICP caused Triaxx Funding to sell nineteen bonds — each one to another Triaxx CDO, and not once in the open market. For example, at Priore's direction, Triaxx 3 purchased CMALT 2007-A6 1A1 bonds from Triaxx Funding on July 28, 2008 at a price of $92 per bond, even though ICP knew that the prevailing market price for these bonds was substantially lower. (ICP had purchased a very similar bond, CMALT 2007-A5 1A3, on the open market two weeks earlier at a price of $78.63 per bond.) ICP submitted to the CDOs' trustee trade tickets for each of the sales from Triaxx Funding to the other CDOs that falsely represented that such sales complied with the CDOs' investment eligibility criteria in all respects.

54. Priore knew that the prices of sales from Triaxx Funding were substantially above prevailing market levels, yet instructed ICP employees to proceed with the sales. After several sales were executed, ICP's Portfolio Manager, who felt uncomfortable following Priore's instructions, directed ICP employees to name Priore as the trader in ICP's books and records.

## G.  Misrepresented Transfers from SCIF to Triaxx Funding

55.  In late 2008, after AIG complained about unauthorized trades, ICP was compelled to stop nearly all reinvestments by the Triaxx CDOs.  Among other things, this meant that ICP no longer could cause Triaxx 1 or 2 to purchase bonds from Triaxx Funding at inflated prices so that the latter could meet its margin calls.  Nor could ICP sell bonds from Triaxx Funding in the open market to meet its margin obligations because ICP knew that market prices were so depressed that such sales would not raise enough cash.  To keep Triaxx Funding afloat — and protect ICP's reputation and future fee stream — ICP caused SCIF, the largest hedge fund it managed, to make several multi-million-dollar payments to the Repo Counterparty to meet Triaxx Funding's margin calls.  Priore did not inform SCIF's investors of these payments or seek their approval, and repeatedly misrepresented the nature of the payments to the hedge fund's administrator.

56.  In late October 2008, the Repo Counterparty issued a margin call of approximately $7.2 million to Triaxx Funding.  At Priore's direction, the Portfolio Manager caused SCIF to make a payment of $7.2 million directly to the Repo Counterparty.  ICP initially planned to execute a side letter between SCIF and the Repo Counterparty providing for repayment to SCIF, but the Repo Counterparty declined to sign such an agreement.  In the following months, ICP caused SCIF to make nine additional cash transfers to the Repo Counterparty for a total of approximately $36.5 million — even though neither the Repo Counterparty nor Triaxx Funding ever agreed to repay SCIF.

57.  ICP and Priore repeatedly misrepresented the nature of the cash transfers to SCIF's administrator, causing the administrator to materially misrepresent SCIF's holdings.  In December 2008, ICP sent a letter to the administrator that falsely described the first cash transfer as a "Collateralized Loan" with a term of "1 month (Option to Roll)" and an "End Date" of

November 28, 2008.  The letter also falsely asserted that the transfer "represents ownership in

Triaxx Funding CDO."  All of these characterizations were false, as Priore knew.  In January

2009, Priore signed another letter, again describing a SCIF cash transfer to the Repo

Counterparty as a "Collateralized Loan," this time with an "Open Term" and no "End Date."

ICP also misrepresented to the hedge fund's administrator that the "use of proceeds . . . of each

Loan is solely to meet the margin payment obligations of [Triaxx Funding]."  In truth, ICP

caused SCIF to make cash transfers even when no margin call was outstanding so that Triaxx

Funding could meet its quarterly payment obligations for administrative expenses, legal fees, and

interest payments to investors.

    58.    By referring to the payments as "collateralized loans," ICP and Priore falsely

implied that there were defined means of repayment or assets that SCIF could look to if it were

not repaid.  None of that was true.  ICP and Priore knew that no party had agreed to repay the

funds, that no interest rate was being earned on the amounts advanced, and that there was no

term or maturity date associated with the cash transfers.  Even after being advised in writing by

counsel that it was uncertain whether SCIF could ever be repaid, ICP continued to account for all

cash transfers on SCIF's books at full value as if repayment with interest were guaranteed.

When an ICP employee raised questions about the "loans" and SCIF's repayment prospects,

Priore concealed the truth from him as well.  He wrote to the employee that an explanation for

the "loans" was "imbedded in the Triaxx document itself as to how the transaction operates."  In

truth, neither Triaxx Funding's indenture nor any other document contemplated repayment to

SCIF.

    59.    Triaxx Funding collapsed in early 2010 after failing to meet a margin call.  The

Repo Counterparty auctioned the CDO's portfolio at prices ranging from $41 to $69 per bond,

which left SCIF with no prospect of repayment of the purported "collateralized loans." In addition, SCIF lost approximately $119 million on notes it held in Triaxx Funding.

## H.     Cross-Trades at Artificially-Inflated Prices

60.     Beginning in the fall of 2007, ICP began executing dozens of cross-trades among Triaxx 1, 2, and 3 at what Priore and others at ICP knew were inflated prices. Within ICP, this process was referred to as "rebalancing."

61.     One of the reasons for these "rebalancing" trades was to generate cash in a CDO so that it could purchase bonds at artificially-inflated prices from Triaxx Funding. For example, on April 28, 2008, an ICP employee wrote: "we cannot put the bonds from TF [Triaxx Funding] into T2 [Triaxx 2] because they are not eligible . . . . We need to put them into T3 [Triaxx 3] and then move . . . eligible bonds from T3 out [into Triaxx 2]." On other occasions, cross-trades were done to generate cash for the purpose of purchasing bonds from the Managed Account at above-market prices.

62.     The cross-trades between Triaxx 1, 2, and 3 violated ICP's obligations to obtain best execution on all trades and to conduct transactions on behalf of the CDOs on an arms' length basis, in a commercially reasonable manner, and, in the case of cross-trades, only after bona fide bids had been received from third parties. The prices at which the cross-trades were done often vastly exceeded the market prices of the bonds, as Priore knew. For example, on April 30, 2008, ICP caused the CDOs to cross-trade tens of millions of dollars worth of WFMBS 2007 bonds at a price of $99.20 per bond, even though ICP acquired the same bonds on the same day from an unaffiliated dealer at $85.16 per bond. On another occasion, ICP caused the CDOs to cross-trade millions of dollars worth of CMALT 2007 bonds several times at prices ranging from $78 to $99.86 per bond. In both instances, ICP employees were aware that the market price for the bonds was somewhere in the $70s or $80s per bond and not anywhere near par. In yet

another instance, after a Triaxx CDO purchased bonds from Triaxx Funding at the price of $92 per bond, ICP caused the CDO to sell the same bonds to another Triaxx CDO, on the same day, at a price of approximately $96 per bond. Each time ICP submitted a trade ticket for a cross-trade between the Triaxx CDOs, it represented to the CDOs' trustee that the trade complied with the vehicles' investment eligibility criteria. Those representations were false.

63.     Many of the cross-trades between Triaxx 1, 2, and 3 were done, with Priore's knowledge, at a price of $92 or above per bond to manipulate the CDOs' "overcollateralization" test. Like other CDOs, the Triaxx vehicles had to satisfy several tests each month before they could reinvest income and pay ICP's fees. Among those was the overcollateralization test, which measures the protection afforded investors by the overall value of collateral bonds. In computing overcollateralization, the Triaxx CDOs' indentures permitted a bond's value to be considered at par (i.e., $100) if the bond was purchased at $92 or above. The "rebalancing" cross-trades usually were done at or above that threshold, and the extra overcollateralization credit that these trades generated caused the Triaxx CDOs to continue their reinvestment period for months after it should have ceased. As a result, ICP earned tens of millions of dollars in advisory fees that it otherwise would not have received and to which it was not entitled.

I.    **Repeated Investments Without Required Approvals**
       **and Misrepresentations to Investors**

64.     As described above, ICP had to obtain prior written consent from AIG or FGIC for all investments on behalf of the Triaxx CDOs — a procedure that served as an independent check on ICP's management of the vehicles. The requirement of a trade-by-trade approval by independent parties was touted by ICP in marketing the notes issued by the CDOs. In promotional materials to investors, ICP referred to AIG as a "collateral manager" that would provide "ongoing approval on collateral." The offering circulars of Triaxx 1 and 2 similarly

25

represented to investors that the CDOs "may not purchase any Collateral Debt Securities without the prior written approval of" AIG. Notwithstanding these representations, ICP and Priore repeatedly caused the Triaxx CDOs to invest in bonds without obtaining any approvals.

65. Unapproved purchases began as early as April 2007. Short after, in the summer of 2007, ICP and Priore caused the Triaxx CDOs to forward purchase the $1.3 billion Bear Stearns portfolio of bonds, a massive investment for which ICP and Priore did not seek any approval and which they concealed from the CDOs' trustee.

66. In October 2007, an ICP employee sought after-the-fact approval for bonds that had been purchased (without approval) from the Managed Account the month before. The employee represented to AIG that the "current market allows us to buy these securities at significant discounts." ICP did not mention that the price of the bonds had in fact been fixed in the summer of 2007 and was therefore not reflective of the "current market." ICP also failed to disclose that the acquisition of the bonds was not driven by "significant discounts" but rather by a concealed and prohibited forward-purchase agreement. After AIG rejected the bonds, ICP kept them in the Triaxx CDO anyway. When AIG later learned of this and complained, the Portfolio Manager blamed an "operational oversight" and promised to remove the bonds. Instead, ICP left the unapproved bonds in the CDO for months and continued to purchase other unapproved investments.

67. In December 2007, ICP admitted to AIG that it had made additional unapproved purchases and promised to reverse such trades. For one purchase, an ICP employee again sought after-the-fact approval by referring to "significant discounts" available in the "current market," and stating that "[w]e are targeting this pool because of sound underwriting and performance." Once again, this was misleading because the bonds were priced at June 2007 levels that did not reflect "significant discounts" or "current market" levels. Nor was ICP "targeting" the bonds

because of "sound underwriting and performance" — ICP had already committed the CDO to this purchase months earlier. AIG again rejected the bonds, and in May 2008 informed Priore that it was "not able to agree to continued reinvestment" in Triaxx 1 and 2 and that "consent will no longer be given for any collateral." Nonetheless, ICP continued to make purchases for both Triaxx 1 and 2.

68.     In the fall of 2008, AIG inquired about additional unauthorized purchases at above-market prices. At Priore's direction, ICP's Portfolio Manager wrote to AIG that "[w]e bought the assets at market prices." As Priore knew, this statement was misleading because ICP made the purchases at prices that far exceeded the market prices prevailing at the time of the trades. In mid-2008, another CDO investor contacted ICP to inquire about trades at inflated prices. Priore and others acting at Priore's direction responded with similarly misleading explanations, informing the investor that such trades were part of ICP's focus on "building OC [overcollateralization] . . . by buying some discount securities, and by buying some earlier vintage securities which trade at a higher dollar price but [which] we believe offer a better credit story." It was not until subsequent communications that ICP acknowledged to the investor that trades were made pursuant to a forward-purchase arrangement. When the investor requested more information, including a copy of any agreement, Priore refused to provide it.

69.     ICP evaded the CDOs' approval procedure in other ways. For example, the CDOs' investment guidelines prohibited the purchase of derivatives. Nevertheless, ICP used ICPS to combine mortgage-backed bonds with ineligible derivatives and then sell the "repackaged" security into a CDO in violation of that restriction and without obtaining any approval. Moreover, in creating the new repackaged security, ICP caused SCIF to earn substantial undisclosed fees. SCIF acquired and temporarily held the prohibited derivatives shortly before they were sold into the new security (which, in turn, was immediately sold to the

Triaxx CDOs). Although it faced virtually no risk in doing so (because ICP had already committed to sell the derivatives from SCIF into the new repackaged security), ICP caused SCIF to retain undisclosed markups of up to 40 percent — substantially above what was appropriate for SCIF's riskless role — and thereby caused the CDOs to overpay for the repackaged security. SCIF's profits at the expense of the CDOs totaled approximately \$5 million.

## J.     Failure to Implement Compliance Procedures and to Maintain Accurate Books and Records

70.     In addition to defrauding its clients and investors, ICP failed to implement appropriate compliance policies and procedures and to maintain accurate books and records, as it was required to do under the securities laws. Among other things, ICP's written compliance manual required independent third-party approvals before ICP could execute any trades with ICPS on behalf of its advisory clients. In practice, ICP did not implement or follow this procedure. ICP's compliance manual also required ICP to hold quarterly Brokerage Committee meetings to oversee ICP's compliance with its obligations to obtain best execution for client trades. In practice, no such committee ever met for that purpose.

71.     ICP's written compliance manual also required the prior written disclosure to clients of all material terms of principal trades (i.e., trades between clients, on the one hand, and ICP or its affiliates acting as principals, on the other) and obtaining client consent to such trades. The manual further provided that in a trade in which ICP or its affiliates sold a security to a client, the purchase price paid by ICP or its affiliate for the security was a material term. Nevertheless, ICP did not disclose the original purchase prices that ICP and its affiliates paid for the \$1.3 billion Bear Stearns portfolio of bonds, which they sold to the Managed Account and which they caused the Triaxx CDOs to forward purchase from the Managed Account.

72.     Similarly, in the course of operating its investment advisory business, ICP failed to maintain accurate books and records.  Among other things, it failed to maintain proper memoranda of all orders for the purchase or sale of securities that identify the person who actually recommended each such transaction.  As a result of the fraudulent practices described above, numerous trades in ICP's trade blotter did not accurately reflect the ICP trader who had in fact directed the transaction or the accurate parties to the transaction.

**K.     Transfers of Priore's Assets During the Commission's Investigation of ICP**

73.     Until early 2010, Priore owned two homes, one in Chappaqua, New York (the "Westchester Property") and another in Edgartown, Massachusetts (the "Martha's Vineyard Property").  Priore held sole title to these properties for many years.

74.     In March 2009, staff from the Commission's Office of Compliance Inspections and Examinations began an on-site examination of ICP's and Priore's conduct in connection with, among other matters, the management of the Triaxx CDOs and other ICP-managed accounts.  As part of the examination, the staff interviewed Priore and other employees of ICP and made several requests for information concerning trading by the Triaxx CDOs.  On September 24, 2009, at the conclusion of the examination, the staff conducted an interview with Priore in which it informed him that the staff had several concerns regarding ICP's compliance with the securities laws.  On September 25, 2009, the staff sent a detailed letter to Priore setting forth these concerns.

75.     Also in or around September 2009, Priore learned that the staff of the Commission's Enforcement Division was investigating him and his ICP entities.  In September, Enforcement Division staff issued a document preservation notice and multiple subpoenas for documents to ICP and ICPS concerning transactions made on behalf of the Triaxx CDOs and

other ICP-managed accounts. On October 1, 2009, Enforcement Division staff subpoenaed documents concerning the Triaxx CDOs' overcollateralization tests and the management fees that ICP earned from the CDOs, and subpoenaed the testimony of Priore and the Portfolio Manager for later in the month. Priore was aware of these subpoenas.

76. In early October 2009, counsel for ICP and Priore acknowledged in writing to the Enforcement Division's staff that the overcollateralization tests for Triaxx 1, 2, and 3 would have failed in March 2008, many months before they actually did, if the cross-trades that ICP had conducted between the Triaxx CDOs had been carried out at the prices indicated by contemporaneous dealer marks that ICP had received for the bonds — i.e., at prices approximating the bonds' fair market prices. ICP also acknowledged that, had the overcollateralization tests for Triaxx 1, 2, and 3 failed in March 2008, ICP would not have received at least $24 million in fees from Triaxx 1, 2, and 3. ICP also acknowledged that the management fees that it received would instead have been used to pay back principal to senior investors in Triaxx 1, 2, and 3.

77. In mid-October October 2009, shortly after ICP and Priore made these admissions to the Commission's staff, Priore met with an estate-planning attorney and began the process of establishing several trusts, including the following:

a. The "Lori A. Priore Revocable Trust," dated on or about January 8, 2010, established for the benefit of Priore's family members. Under the terms of the trust, Priore and L. Priore serve as co-trustees and L. Priore retains the power to appoint or remove trustees during her lifetime and direct the disposition of the trust property.

b. The "Thomas C. Priore Thirty-Five Year Qualified Personal Residence Trust," dated on or about March 18, 2010, established as an irrevocable trust with Priore, L. Priore, and Smyers serving as trustees to manage, invest, and dispose of trust property for the

benefit of Priore.

          c.    The "Lori A. Priore Thirty-Two Year Qualified Personal Residence Trust," dated on or about March 18, 2010, established as an irrevocable trust with Priore, L. Priore, and Smyers serving as trustees to manage, invest, and dispose of trust property for the benefit of L. Priore.

78.    On February 17, 2010, staff from the Commission's Enforcement Division met with counsel for ICP and Priore and informed counsel of the staff's concerns regarding several topics, including cross-trades between the Triaxx CDOs at above-market prices, tens of millions of dollars in fees that ICP obtained from the Triaxx CDOs, and the "swaps" of bonds in the Managed Account.

79.    Late in the evening on March 8, 2010, Enforcement Division staff informed ICP's and Priore's counsel that it would soon be issuing "Wells notices" to Priore, ICP, ICPS, and ICP Holdco — i.e., notices indicating that the staff intended to recommend that the Commission charge Priore and the ICP entities with violating the securities laws. The next day, March 9, 2010, the staff sent a letter to counsel specifying the areas of concern and the securities laws that it had identified as relevant. The staff also confirmed to counsel by telephone that it expected that the Commission would charge Priore and the ICP entities with fraud within the next month or two. Priore was aware of the staff's intention. Shortly thereafter, he took the following steps:

          a.    On or about March 15, 2010, Priore transferred for $1 the Martha's Vineyard Property to himself and L. Priore so that each held, after the transfer, a 50% interest as a tenant in common. Three days later, Priore and L. Priore transferred their respective interests for $1 to Priore, L. Priore, and Smyers as trustees of the "Thomas C. Priore Thirty-Five Year Qualified Personal Resident Trust" and the "Lori A. Priore Thirty-Two Year Qualified Personal Residence Trust." These quitclaim deed transfers occurred in this District.

b.     By deed dated March 18, 2010, Priore transferred for $10 the Westchester Property to himself and to L. Priore as trustees of the "Lori A. Priore Revocable Trust," a trust that is revocable solely by L. Priore.

80.     Before these transfers occurred, Priore had been making payments on loans and mortgages secured by the Westchester Property and the Martha's Vineyard Property and on February 19, 2010 discharged a mortgage on the Martha's Vineyard Property. The funds used to make those payments consisted, in whole or in part, of ill-gotten gains that ICP and its affiliates obtained from the fraud alleged herein and that Priore's ICP entities paid him in prior months and years.

81.     Notwithstanding the transfers described above, Priore continues to use the Westchester Property as his primary residence, to pay the outstanding loans and mortgages on that property, and to enjoy the use of the Martha's Vineyard Property.

82.     The Westchester Property and Martha's Vineyard Property comprised a substantial portion of Priore's overall assets before the transfers occurred. Prior to the transfers, Priore had not engaged in estate planning or otherwise created trusts to administer his assets. With knowledge of the Commission's threatened fraud action and his potential exposure to a judgment for millions of dollars in monetary liability, Priore transferred the Westchester Property and, with the knowing assistance of L. Priore, the Martha's Vineyard Property into trusts to hinder the Commission's ability to collect disgorgement, penalties, and prejudgment interest from him.

## FIRST CLAIM

### Violations of Section 17(a) of the Securities Act

(Against all Defendants)

83.     The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

84.     As alleged herein, Defendants ICP, ICPS, ICP Holdco, and Priore, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce and of the mails, knowingly or recklessly:   (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operated or operate as a fraud or deceit upon purchasers of securities.

85.     By reason of the foregoing, Defendants ICP, ICPS, ICP Holdco, and Priore violated, and unless enjoined and restrained will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM

### Violations of and Aiding and Abetting Violations
### of Section 10(b) of the Exchange Act and Rule 10b-5

(Against all Defendants)

86.     The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

87.     As alleged herein, Defendants ICP, ICPS, ICP Holdco, and Priore, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, in connection with

the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated and operate as a fraud or deceit upon purchasers of securities and upon other persons.

88.     By reason of the foregoing, Defendants ICP, ICPS, ICP Holdco, and Priore violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

89.     As further alleged herein, Defendants ICP, ICPS, ICP Holdco, and Priore knowingly provided substantial assistance to the other Defendants' violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants ICP, ICPS, ICP Holdco, and Priore aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## THIRD CLAIM

### Violations of and Aiding and Abetting Violations of Section 15(c)(1)(A) of the Exchange Act and Rule 10b-3

(Against ICPS, ICP, and Priore)

90.     The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

91.     At all relevant times, Defendant ICPS was a registered broker dealer pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

92.     As alleged herein, Defendant ICPS, directly or indirectly, by the use of the means or instrumentality of interstate commerce, of the mails, or of any facility of any national securities exchange, used or employed, in connection with the purchase or sale, or the inducement or attempted inducement of the purchase or sale, of securities otherwise than on a national securities exchange, acts, practices, or courses of business that constitute a manipulative, deceptive, or other fraudulent device or contrivance.

93.     By reason of the foregoing, Defendant ICPS violated, and unless enjoined and restrained will continue to violate, Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

94.     As further alleged herein, Defendants ICP and Priore knowingly provided substantial assistance to ICPS's violations of Section 15(c)(1)(A) of the Exchange Act and Rule 10b-3 thereunder.  Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants ICP and Priore  aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

### FOURTH CLAIM

**Violations of and Aiding and Abetting Violations
of Sections 206(1) and 206(2) of the Advisers Act**

(Against all Defendants)

95.     The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

96.     At all relevant times, Defendants ICP and Priore operated as investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to their clients and investors.

97.     As alleged herein, Defendants ICP and Priore, while acting as investment advisers, directly or indirectly, by the use of the mails or means and instrumentalities of interstate commerce:  (a) with requisite scienter, employed devices, schemes, and artifices to defraud clients and prospective clients; and (b) engaged in transactions, practices, and courses of business which operated and operate as a fraud or deceit upon clients and prospective clients.

98.     By reason of the foregoing, Defendants ICP and Priore violated, and unless enjoined and restrained will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

99.     As further alleged herein, Defendants ICPS, ICP Holdco, and Priore knowingly provided substantial assistance to ICP's violations of Sections 206(1) and 206(2) of the Advisers Act.  By reason of the foregoing, Defendants ICPS, ICP Holdco, and Priore aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)].

### FIFTH CLAIM

**Violations of and Aiding and Abetting Violations
of Section 206(4) of the Advisers Act and Rule 206(4)-8**

(Against all Defendants)

100.    The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

101.    At all relevant times, Defendants ICP and Priore operated as investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to their clients and investors.

102.    As alleged herein, Defendants ICP and Priore, while acting as investment advisers to pooled investment vehicles, have made untrue statements of material facts or omitted to state

material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors, or otherwise engaged in acts, practices, or courses of business that are fraudulent, deceptive, or manipulative with respect to investors or prospective investor.

103. By reason of the foregoing, Defendants ICP and Priore violated, and unless enjoined and restrained will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

104. As further alleged herein, Defendants ICPS, ICP Holdco, and Priore knowingly provided substantial assistance to ICP's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder. By reason of the foregoing, Defendants ICPS, ICP Holdco, and Priore aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Sections 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## SIXTH CLAIM

### Violations of and Aiding and Abetting
### Violations of Section 206(3) of the Advisers Act

(Against ICP and Priore)

105. The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

106. At all relevant times, Defendants ICP and Priore operated as investment advisers as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to their clients and investors.

107. As alleged herein, Defendants ICP and Priore, while acting as principal for their own account, knowingly sold securities to or purchased securities from a client, or while acting

as broker for a person other than such client, knowingly effected a sale or purchase of securities for the account of such client, without first disclosing to such client in writing, before the completion of such transaction, the capacity in which they were acting and obtaining the consent of the client to each such transaction. Defendants ICP and Priore did so both directly, indirectly, and/or through or by another person [15 U.S.C. § 80b-8(d)].

108.    By reason of the foregoing, Defendants ICP and Priore violated, and unless enjoined and restrained will continue to violate, Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

109.    As further alleged herein, Defendant Priore knowingly provided substantial assistance to ICP's violations of Section 206(3) of the Advisers Act. By reason of the foregoing, Defendant Priore aided and abetted, and unless enjoined and restrained will continue to aid and abet, violations of Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

### SEVENTH CLAIM
### Violations of Section 204 of
### the Advisers Act and Rule 204-2
(Against ICP)

110.    The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

111.    At all relevant times, Defendant ICP operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to its clients and investors.

112.    Defendant ICP made use of the mails and means and instrumentalities of interstate commerce in connection with its business as an investment adviser and was required to make and keep certain prescribed records as necessary or appropriate in the public interest and

for the protection of investors. Such records were subject at any time to such reasonable periodic, special, or other examinations by representatives of the Commission as the Commission deemed necessary or appropriate.

113. As alleged herein, Defendant ICP failed to make, keep, maintain on its premises, and provide to the Commission all required records, including but not limited to: (a) accurate memoranda of each order given by ICP for the purchase or sale of any security, showing the terms and conditions of the order, instruction, modification or cancellation, identifying the person connected with ICP who recommended the transaction to the client and the person who placed such order, and showing the account for which it was entered, the date of entry, and the bank, broker or dealer by or through whom it was executed; and (b) all written agreements (or copies thereof) entered into by ICP with any client.

114. By reason of the foregoing, Defendant ICP violated, and unless enjoined and restrained will continue to violate, Section 204 of the Advisers Act [15 U.S.C. § 80b-4] and Rule 204-2 [17 C.F.R. 275.204-2].

**EIGHTH CLAIM**

**Violations of Section 206(4) of
the Advisers Act and Rule 206(4)-7**

(Against ICP)

115. The Commission repeats and realleges Paragraphs 1 through 82 of this Amended Complaint as if fully set forth herein.

116. At all relevant times, Defendant ICP operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)], and served in that capacity with respect to its clients and investors.

117.    As alleged herein, Defendant ICP failed to implement written policies and procedures reasonably designed to prevent violation by ICP and its supervised persons of the Advisers Act and the rules thereunder.  Additionally, Defendant ICP failed to designate an individual who was a supervised person as responsible for administering its policies and procedures.

118.    By reason of the foregoing, Defendant ICP violated, and unless enjoined and restrained will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R. 275.206(4)-7].

## NINTH CLAIM

### Control Person Liability Under
### Section 20(a) of the Exchange Act

(Against Priore)

119.    The Commission repeats and realleges Paragraphs 1 through 82 and 86 through 94 of this Amended Complaint as if fully set forth herein.

120.    At all relevant times, Defendant Priore possessed, directly or indirectly, the power to direct and control ICP's and ICPS's management, policies, and operations and was a control person of ICP and ICPS pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]. Defendant Priore was a culpable participant in ICP's and ICPS's violations of the Exchange Act as described above.

121.    By reason of the foregoing, Defendant Priore is jointly and severally liable as a control person of ICP and ICPS with, and to the same extent as, ICP and ICPS for ICP's and ICPS's violations of Sections 10(b) and 15(c)(1)(A) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(c)(1)(A)] and Rules 10b-3 and 10b-5 thereunder [17 C.F.R. 240.l0b-3 and 240.l0b-5], and unless enjoined and restrained, Priore will continue to cause, or will fail to prevent, ICP's and ICPS's violations of these provisions.

## TENTH CLAIM

### Fraudulent Transfer in Violation of
### N.Y. Debtor & Creditor Law § 273

(Against Priore and L. Priore as transferors, and
Priore, L. Priore, and Smyers, in their capacities as trustees, as transferees)

122.   The Commission repeats and realleges Paragraphs 6, 11-12, 16-18, and 73-82 of this Amended Complaint as if fully set forth herein.

123.   Priore made the transfer described above of the Westchester Property and Priore and L. Priore made the transfer described above of the Martha's Vineyard Property after the Commission had informed Priore of its claims against him and his potential liability for millions of dollars in disgorgement, prejudgment interest, and penalties. The Commission's causes of action against Priore accrued before the transfers of the Westchester Property and Martha's Vineyard Property took place.

124.   Priore and L. Priore effected the transfers without fair consideration and at a time when they were insolvent or, as a result of the transfers, were rendered insolvent.

125.   By reason of the foregoing, the transfers effected by Priore and L. Priore violated N.Y. Debtor & Creditor Law § 273.

## ELEVENTH CLAIM

### Fraudulent Transfer in Violation of
### N.Y. Debtor & Creditor Law § 275

(Against Priore and L. Priore as transferors, and
Priore, L. Priore, and Smyers, in their capacities as trustees, as transferees)

126.   The Commission repeats and realleges Paragraphs 6, 11-12, 16-18, and 73-82 of this Amended Complaint as if fully set forth herein.

127.   Priore made the transfer described above of the Westchester Property and Priore and L. Priore made the transfer described above of the Martha's Vineyard Property after the Commission had informed Priore of its claims against him and his potential liability for millions

of dollars in disgorgement, prejudgment interest, and penalties. The Commission's causes of action against Priore accrued before the transfers of the Westchester Property and Martha's Vineyard Property took place.

128. Priore and L. Priore effected the transfers without fair consideration and at a time when they intended or believed that they would incur debts beyond their ability to pay those debts as they became due.

129. By reason of the foregoing, the transfers effected by Priore and L. Priore violated N.Y. Debtor & Creditor Law § 275.

## TWELFTH CLAIM

### Fraudulent Transfer in Violation of
### N.Y. Debtor & Creditor Law § 276

(Against Priore and L. Priore as transferors, and
Priore, L. Priore, and Smyers, in their capacities as trustees, as transferees)

130. The Commission repeats and realleges Paragraphs 6, 11-12, 16-18, and 73-82 of this Amended Complaint as if fully set forth herein.

131. Priore made the transfer described above of the Westchester Property and Priore and L. Priore made the transfer described above of the Martha's Vineyard Property after the Commission had informed Priore of its claims against him and his potential liability for millions of dollars in disgorgement, prejudgment interest, and penalties. The Commission's causes of action against Priore accrued before the transfers of the Westchester Property and Martha's Vineyard Property took place.

132. Priore and L. Priore effected the transfers without fair consideration and with actual intent to hinder, delay, or defraud the Commission in the enforcement of a judgment on the Commission's claims against Priore for violation of the federal securities laws.

133.    By reason of the foregoing, the transfers effected by Priore and L. Priore violated N.Y. Debtor & Creditor Law § 276.

### THIRTEENTH CLAIM

#### Violation of the Federal Debt Collections Procedure Act, 28 U.S.C. § 3304(b)(1)(A)

(Against Priore and L. Priore as transferors, and
Priore, L. Priore, and Smyers, in their capacities as trustees, as transferees)

134.    The Commission repeats and realleges Paragraphs 6, 11-12, 16-18, and 73-82 of this Amended Complaint as if fully set forth herein.

135.    Priore made the transfer described above of the Westchester Property and Priore and L. Priore made the transfer described above of the Martha's Vineyard Property after the Commission had informed Priore of its claims against him and his potential liability for millions of dollars in disgorgement, prejudgment interest, and penalties. The Commission's causes of action against Priore accrued before the transfers of the Westchester Property and Martha's Vineyard Property took place.

136.    Priore and L. Priore effected the transfers without adequate or fair consideration and with actual intent to hinder, delay, or defraud the Commission in the enforcement of a judgment on the Commission's claims against Priore for violation of the federal securities laws.

137.    By reason of the foregoing, the transfers effected by Priore and L. Priore violated the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3304(b)(1)(A).

### FOURTEENTH CLAIM

#### Violation of the Federal Debt Collections Procedure Act, 28 U.S.C. § 3304(b)(1)(B)

(Against Priore and L. Priore as transferors, and
Priore, L. Priore, and Smyers, in their capacities as trustees, as transferees)

138.    The Commission repeats and realleges Paragraphs 6, 11-12, 16-18, and 73-82 of this Amended Complaint as if fully set forth herein.

139.    Priore made the transfer described above of the Westchester Property and Priore and L. Priore made the transfer described above of the Martha's Vineyard Property after the Commission had informed Priore of its claims against him and his potential liability for millions of dollars in disgorgement, prejudgment interest, and penalties. The Commission's causes of action against Priore accrued before the transfers of the Westchester Property and Martha's Vineyard Property took place.

140.    Priore and L. Priore effected the transfers without receiving a reasonably equivalent value in exchange and at a time when they intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

141.    By reason of the foregoing, the transfers effected by Priore and L. Priore violated the FDCPA, 28 U.S.C. § 3304(b)(1)(B).

### FIFTEENTH CLAIM
### Relief Claim (Unjust Enrichment)
(Against Priore, L. Priore, and Smyers
in their capacities as trustees)

142.    The Commission repeats and realleges Paragraphs 6, 11-12, 16-18, and 73-82 of this Amended Complaint as if fully set forth herein.

143.    Priore, L. Priore, and Smyers, in their capacities as trustees of the trusts described herein, were the recipients without adequate or fair consideration of proceeds of the fraudulent and illegal conduct alleged in this Amended Complaint. These relief defendants, in their capacities as trustees, profited from such receipt and from the fraudulent and illegal conduct alleged above by obtaining such proceeds under circumstances in which it is not just, equitable, or conscionable for them to retain those proceeds. Consequently, Priore, L. Priore, and Smyers

44

are liable as relief defendants for the amount of proceeds by which each has been unjustly enriched, in his or her capacity as trustee.

144. By reason of the foregoing, Priore, L. Priore, and Smyers in their capacities as trustees should disgorge their ill-gotten gains plus prejudgment interest.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

A final judgment permanently enjoining and restraining Defendants ICP, ICPS, ICP Holdco, and Priore, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### II.

A final judgment permanently enjoining and restraining Defendants ICP, ICPS, ICP Holdco, and Priore, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, or aiding and abetting violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

### III.

A final judgment permanently enjoining and restraining Defendant ICPS, its agents, servants, employees, attorneys, assigns and all persons in active concert or participation with

ICPS who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

## IV.

A final judgment permanently enjoining and restraining Defendants ICP and Priore, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 thereunder [17 C.F.R. 240.10b-3].

## V.

A final judgment permanently enjoining and restraining Defendants ICP and Priore, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, or aiding and abetting violations of, Sections 206(1), 206(2), 206(3) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## VI.

A final judgment permanently enjoining and restraining Defendants ICPS and ICP Holdco, their agents, servants, employees, attorneys, assigns and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8].

## VII.

A final judgment permanently enjoining and restraining Defendant ICP, its agents, servants, employees, attorneys, assigns and all persons in active concert or participation with ICP who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Sections 204 and 206(4) of the Advisers Act [15 U.S.C. § 80b-4 and 80b-6(4)] and Rules 204-2 and 206(4)-7 thereunder [17 C.F.R. 275.204-2 and 275.206(4)-7].

## VIII.

A final judgment permanently, enjoining and restraining Defendant Priore, his agents, servants, employees, attorneys, assigns and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from controlling any person who violates Sections 10(b) or 15(c)(1)(A) of the Exchange Act [15 U.S.C. §§ 78j(b) or 78o(c)(1)(A)] and Rules 10b-3 or 10b-5 thereunder [17 C.F.R. 240.10b-3 or 240.10b-5].

## IX.

A final judgment ordering ICP, ICPS, ICP Holdco, Priore, L. Priore, and Smyers to disgorge, with prejudgment interest thereon, all illicit profits or other ill-gotten gains received, and all amounts by which ICP, ICPS, ICP Holdco, Priore, L. Priore, and Smyers have been unjustly enriched, as a result of the misconduct and transfers alleged in this Amended Complaint, including, as to each Defendant and Transfer Defendant, his, her, or its own illicit profits, ill-gotten gain, or unjust enrichment, and such other and further amounts as the Court may find appropriate.

**X.**

A final judgment ordering ICP, ICPS, ICP Holdco, and Priore to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e)(1) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**XI.**

A final judgment voiding the transfers of the Westchester Property and the Martha's Vineyard Property, and restraining Priore, L. Priore, and Smyers from disposing of any property improperly transferred, pursuant to N.Y. Debtor & Creditor Law § 279.

**XII.**

A final judgment voiding the transfers of the Westchester Property and the Martha's Vineyard Property, and directing Priore, L. Priore, and Smyers to return all assets fraudulently conveyed to them, or the equivalent value of such assets, pursuant to N.Y. Debtor & Creditor Law § 278.

**XIII.**

A final judgment directing Priore to pay attorneys' fees pursuant to N.Y. Debtor & Creditor Law § 276-a.

**XIV.**

A final judgment voiding the transfers of the Westchester Property and the Martha's Vineyard Property, restraining Priore, L. Priore, and Smyers from disposing of any property improperly transferred, and directing Priore, L. Priore, and Smyers to return all assets fraudulently conveyed, or the equivalent value of such assets, pursuant to the FDCPA, 28 U.S.C. § 3306.

## XV.

A final judgment voiding all fraudulent transfers by ICP, ICPS, ICP Holdco, Priore, L. Priore, and Smyers, and directing the return of such assets or their equivalent value, as may be revealed in further discovery in this action.

## XVI.

Granting such other and further relief as the Court deems just and proper, including such equitable relief as may be appropriate or necessary for the benefit of investors.

## **DEMAND FOR JURY TRIAL**

Under Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury in this action of all issues so triable under the claims added in this Amended Complaint.

Dated: June 30, 2011
      New York, New York

<div style="margin-left:2em;">

SECURITIES AND EXCHANGE COMMISSION

By: _____

    Joseph O. Boryshansky
    Mark S. Germann
    Joshua R. Pater
    Susannah M. Dunn

    New York Regional Office
    3 World Financial Center
    New York, NY 10281
    Tel: (212) 336-0113
    Fax: (212) 336-1319
    BoryshanskyJ@sec.gov

</div>

# EXHIBIT B



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

               Plaintiff,

    - against -

ICP ASSET MANAGEMENT, LLC, et al.,

               Defendants and
               Relief Defendants.

No. 10 Civ. 4791 (LAK) (DCF)
ECF Case



## FINAL JUDGMENT AS TO DEFENDANTS
## THOMAS C. PRIORE, ICP ASSET MANAGEMENT LLC,
## ICP SECURITIES, LLC, AND INSTITUTIONAL CREDIT PARTNERS, LLC

The Securities and Exchange Commission ("Commission") having filed a Complaint and

Defendants Thomas C. Priore ("Priore"), ICP Asset Management, LLC ("ICP"), ICP Securities,

LLC ("ICPS"), and Institutional Credit Partners, LLC ("ICP Holdco") (collectively

"Defendants") having entered a general appearance; consented to the Court's jurisdiction over

them and the subject matter of this action; consented to entry of this Final Judgment without

admitting or denying the allegations of the Complaint (except as to jurisdiction); waived findings

of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

<p style="text-align:center">I.</p>

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that each of the

Defendants and their agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating Section 17(a) of the Securities

Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

## II.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that each of the Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, or aiding and abetting violations of, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

2

(c)    to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person.

### III.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendant ICPS and its agents, servants, employees, attorneys, and all persons in active concert

or participation with them who receive actual notice of this Final Judgment by personal service

or otherwise are permanently restrained and enjoined from violating, directly or indirectly,

Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule 10b-3 [17 C.F.R.

240.10b-3], by the use of any means or instrumentality of interstate commerce, or of the mails, or

of any facility of any national securities exchange, by using or employing, in connection with the

purchase or sale, or the inducement or attempted inducement of the purchase or sale, of securities

otherwise than on a national securities exchange, any act, practice, or course of business that

constitutes a manipulative, deceptive, or other fraudulent device or contrivance.

### IV.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendants Priore and ICP and their agents, servants, employees, attorneys, and all persons in

active concert or participation with them who receive actual notice of this Final Judgment by

personal service or otherwise are permanently restrained and enjoined from aiding and abetting

any violation of Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)] and Rule

10b-3 [17 C.F.R. 240.10b-3] by knowingly providing substantial assistance to a broker or dealer

that, through the use of any means or instrumentality of interstate commerce, or of the mails, or

of any facility of any national securities exchange, uses or employs, in connection with the

purchase or sale, or the inducement or attempted inducement of the purchase or sale, of securities

3

otherwise than on a national securities exchange, any act, practice, or course of business that

constitutes a manipulative, deceptive, or other fraudulent device or contrivance.

## V.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendants Priore and ICP and their agents, servants, employees, attorneys, and all persons in

active concert or participation with them who receive actual notice of this Final Judgment by

personal service or otherwise are permanently restrained and enjoined from violating, or aiding

and abetting violations of, directly or indirectly, Sections 206(1) or 206(2) of the Investment

Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1), (2)] by, while acting as an

investment adviser or associated person of an investment adviser, using the mails or any means

or instrumentality of interstate commerce:

      (a)     employing any device, scheme, or artifice to defraud any client or prospective

              client; or

      (b)     engaging in any transaction, practice, or course of business which operates as a

              fraud or deceit upon any client or prospective client.

## VI.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendants ICPS and ICP Holdco and their agents, servants, employees, attorneys, and all

persons in active concert or participation with them who receive actual notice of this Final

Judgment by personal service or otherwise are permanently restrained and enjoined from aiding

and abetting any violation of Sections 206(1) or 206(2) of the Advisers Act [15 U.S.C. § 80b-

6(1), (2)] by knowingly providing substantial assistance to an investment adviser or associated

person of an investment adviser that, using the mails or any means or instrumentality of interstate

4

commerce:

    (a)      employs any device, scheme, or artifice to defraud any client or prospective

            client; or

    (b)      engages in any transaction, practice, or course of business which operates as a

            fraud or deceit upon any client or prospective client.

## VII.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendants Priore and ICP and their agents, servants, employees, attorneys, and all persons in

active concert or participation with them who receive actual notice of this Final Judgment by

personal service or otherwise are permanently restrained and enjoined from violating, or aiding

and abetting violations of, directly or indirectly, Section 206(3) the Advisers Act [15 U.S.C. §

80b-6(3)] by, while acting as an investment adviser or associated person of an investment

adviser, using the mails or any means or instrumentality of interstate commerce, acting as

principal for its or his own account, knowingly selling any security to or purchasing any security

from a client, or acting as broker for a person other than such client, knowingly effecting any

sale or purchase of any security for the account of such client, without disclosing to such client in

writing before the completion of such transaction the capacity in which he is acting and

obtaining the consent of the client to such transaction.

## VIII.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendants Priore and ICP and their agents, servants, employees, attorneys, and all persons in

active concert or participation with them who receive actual notice of this Final Judgment by

personal service or otherwise are permanently restrained and enjoined from violating, or aiding

and abetting violations of, directly or indirectly, Section 206(4) the Advisers Act [15 U.S.C. §

80b-6(3)] and Rule 206(4)-8 thereunder [17 C.F.R. 275.206(4)-8] by, while acting as an

investment adviser or associated person of an investment adviser, using the mails or any means

or instrumentality of interstate commerce:

    (a)    engaging in any act, practice, or course of business which is fraudulent, deceptive,

             or manipulative; or

    (b)    while acting as an investment adviser or associated person of an investment

             adviser to a pooled investment vehicle:

        (1)    making any untrue statement of a material fact or omitting to state a

                 material fact necessary to make the statements made, in the light of the

                 circumstances under which they were made, not misleading, to any

                 investor or prospective investor in the pooled investment vehicle; or

        (2)    otherwise engaging in any act, practice, or course of business that is

                 fraudulent, deceptive, or manipulative with respect to any investor or

                 prospective investor in the pooled investment vehicle.

## IX.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendants ICPS and ICP Holdco and their agents, servants, employees, attorneys, and all

persons in active concert or participation with them who receive actual notice of this Final

Judgment by personal service or otherwise are permanently restrained and enjoined from aiding

and abetting any violation of Section 206(4) the Advisers Act [15 U.S.C. § 80b-6(3)] and Rule

206(4)-8 thereunder [17 C.F.R. 275.206(4)-8] by knowingly providing substantial assistance to

an investment adviser or associated person of an investment adviser that, using the mails or any

means or instrumentality of interstate commerce:

(a)    engages in any act, practice, or course of business which is fraudulent, deceptive,

or manipulative; or

(b)    while acting as an investment adviser or associated person of an investment

adviser to a pooled investment vehicle:

(1)    makes any untrue statement of a material fact or omitting to state a

material fact necessary to make the statements made, in the light of the

circumstances under which they were made, not misleading, to any

investor or prospective investor in the pooled investment vehicle; or

(2)    otherwise engages in any act, practice, or course of business that is

fraudulent, deceptive, or manipulative with respect to any investor or

prospective investor in the pooled investment vehicle.

## X.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendant Priore and his agents, servants, employees, attorneys, and all persons in active concert

or participation with them who receive actual notice of this Final Judgment by personal service

or otherwise are permanently restrained and enjoined from, directly or indirectly, controlling any

person who violates Sections 10(b) or 15(c)(1)(A) of the Exchange Act and Rules 10b-3 or 10b-5

thereunder, by using any means or instrumentality of interstate commerce, or of the mails, or of

any facility of any national securities exchange, in connection with the purchase or sale of any

security, or the inducement or attempted inducement of the purchase or sale:

7

(a)     to employ any device, scheme, or artifice to defraud;

(b)     to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in the light of the circumstances

under which they were made, not misleading;

(c)     to engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person; or

(d)     using or employing any act, practice, or course of business that constitutes a

manipulative, deceptive, or other fraudulent device or contrivance

unless Defendant acts in good faith and does not directly or indirectly induce the act or acts

constituting the violation.

## XI.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendant ICP and its agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section

204 of the Advisers Act of 1940 [15 U.S.C. § 80b-4] and Rule 204-2 thereunder [17 C.F.R.

275.204-2], while acting as an investment adviser or associated person of an investment adviser,

by failing to make, keep, maintain on its premises, and provide to the Securities and Exchange

Commission all required records, including but not limited to

(a)     a memorandum of each order given by the investment adviser for the purchase or

sale of any security, of any instruction received by the investment adviser

concerning the purchase, sale, receipt or delivery of a particular security, and of

any modification or cancellation of any such order or instruction, showing the

terms and conditions of the order, instruction, modification or cancellation,

identifying the person connected with the investment adviser who recommended

the transaction to the client and the person who placed such order, and showing

the account for which entered, the date of entry, and the bank, broker or dealer by

or through whom executed where appropriate; and

(b)    all written agreements (or copies thereof) entered into by the investment adviser

with any client.

### XII.

**IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendant ICP and its agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or

otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section

206(4) of the Advisers Act of 1940 [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17

C.F.R. 275.206(4)-7], while acting as an investment adviser or associated person of an

investment adviser, by failing to adopt and implement written policies and procedures reasonably

designed to prevent violation, by the adviser and its supervised persons, of the Advisers Act and

the rules that the Securities and Exchange Commission has adopted under the Advisers Act.

### XIII.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendants ICP

and ICP Holdco are liable, on a joint and several basis, for disgorgement in the amount of

$13,916,005 and prejudgment interest of $3,709,028.  Defendants ICP and ICP Holdco shall

satisfy this obligation by paying $17,625,033 to the Securities and Exchange Commission within

14 days after entry of this Final Judgment.  Defendants ICP and ICP Holdco may transmit

payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire

instructions upon request. Payment may also be made directly from a bank account via Pay.gov

through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendants ICP and ICP

Holdco may also pay by certified check, bank cashier's check, or United States postal money

order payable to the Securities and Exchange Commission, which shall be delivered or mailed to:

Enterprise Services Center, Accounts Receivable Branch, 6500 South MacArthur Boulevard,

Oklahoma City, OK 73169, and shall be accompanied by a letter identifying the case title, civil

action number, and name of this Court; ICP Asset Management, LLC and Institutional Credit

Partners, LLC as defendants in this action; and specifying that payment is made pursuant to this

Final Judgment. Defendants ICP and ICP Holdco shall simultaneously transmit photocopies of

evidence of payment and case identifying information to the Commission's counsel in this

action. By making this payment, Defendants ICP and ICP Holdco relinquish all legal and

equitable right, title, and interest in such funds and no part of the funds shall be returned to them.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest

by moving for civil contempt (and/or through other collection procedures authorized by law) at

any time after 14 days following entry of this Final Judgment. Defendants ICP and ICP Holdco

shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

## XIV.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant ICP is

liable for a civil penalty in the amount of $650,000 pursuant to Section 20(d) of the Securities

Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section

209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. Defendant ICP shall satisfy this obligation by

paying $650,000 to the Securities and Exchange Commission within 14 days after entry of this

Final Judgment. Defendant ICP may transmit payment electronically to the Commission, which

will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be

made directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm. Defendant ICP may also pay by certified check,

bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to: Enterprise Services Center,

Accounts Receivable Branch, 6500 South MacArthur Boulevard, Oklahoma City, OK 73169,

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; ICP Asset Management, LLC as a defendant in this action; and specifying that

payment is made pursuant to this Final Judgment. Defendant ICP shall simultaneously transmit

photocopies of evidence of payment and case identifying information to the Commission's

counsel in this action. By making this payment, Defendant ICP relinquishes all legal and

equitable right, title, and interest in such funds and no part of the funds shall be returned to it.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest

by moving for civil contempt (and/or through other collection procedures authorized by law) at

any time after 14 days following entry of this Final Judgment. Defendant ICP shall pay post

judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

## XV.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant ICP

Securities is liable for disgorgement in the amount of $1,637,581, prejudgment interest in the

amount of $301,893, and a civil penalty in the amount of $1,939,474 pursuant to Section 20(d) of

the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)],

and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]. Defendant ICP Securities shall

11

satisfy this obligation by paying $3,878,948 to the Securities and Exchange Commission within

14 days after entry of this Final Judgment. Defendant ICP Securities may transmit payment

electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions

upon request. Payment may also be made directly from a bank account via Pay.gov through the

SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant ICP Securities may also

pay by certified check, bank cashier's check, or United States postal money order payable to the

Securities and Exchange Commission, which shall be delivered or mailed to: Enterprise Services

Center, Accounts Receivable Branch, 6500 South MacArthur Boulevard, Oklahoma City, OK

73169, and shall be accompanied by a letter identifying the case title, civil action number, and

name of this Court; ICP Securities, LLC as a defendant in this action; and specifying that

payment is made pursuant to this Final Judgment. Defendant ICP Securities shall simultaneously

transmit photocopies of evidence of payment and case identifying information to the

Commission's counsel in this action. By making this payment, Defendant ICP Securities

relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds

shall be returned to it. The Commission may enforce the Court's judgment for disgorgement and

prejudgment interest by moving for civil contempt (and/or through other collection procedures

authorized by law) at any time after 14 days following entry of this Final Judgment. Defendant

ICP Securities shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C.

§ 1961.

12

## XVI.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant Priore

is liable for disgorgement in the amount of $797,337, prejudgment interest in the amount of

$215,045, and a civil penalty in the amount of $487,618 pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and

Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].  Defendant Priore shall satisfy this

obligation by paying pursuant to the terms of the payment schedule set forth in paragraph XVII

below.  Defendant Priore may transmit payment electronically to the Commission, which will

provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made

directly from a bank account via Pay.gov through the SEC website at

http://www.sec.gov/about/offices/ofm.htm.  Defendant Priore may also pay by certified check,

bank cashier's check, or United States postal money order payable to the Securities and

Exchange Commission, which shall be delivered or mailed to: Enterprise Services Center,

Accounts Receivable Branch, 6500 South MacArthur Boulevard, Oklahoma City, OK 73169,

and shall be accompanied by a letter identifying the case title, civil action number, and name of

this Court; Thomas C. Priore as a defendant in this action; and specifying that payment is made

pursuant to this Final Judgment.  Defendant Priore shall simultaneously transmit photocopies of

evidence of payment and case identifying information to the Commission's counsel in this

action.  By making this payment, Defendant Priore relinquishes all legal and equitable right, title,

and interest in such funds and no part of the funds shall be returned to him.  The Commission

may enforce the Court's judgment for disgorgement and prejudgment interest by moving for

civil contempt (and/or through other collection procedures authorized by law) at any time after

14 days following the deadlines for payment of disgorgement and prejudgment interest set forth

13

in paragraph XVII below. Defendant Priore shall pay post judgment interest on any delinquent

amounts pursuant to 28 U.S.C. § 1961.

## XVII.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant Priore

shall pay the total amount due of $1,500,000 in five installments to the Commission according to

the following schedule: (1) $100,000 within 14 days of entry of this Final Judgment;

(2) $350,000 plus post judgment interest of $163 within 100 days of entry of this Final

Judgment; (3) $350,000 plus post judgment interest of $309 within 190 days of entry of this

Final Judgment; (4) $350,000 plus post judgment interest of $454 within 280 days of entry of

this Final Judgment; and (5) $350,000 plus post judgment interest of $587 within 360 days of

entry of this Final Judgment. Payments shall be deemed made on the date they are received by

the Commission and shall be applied first to post judgment interest, which accrues pursuant to 28

U.S.C. § 1961 on any unpaid amounts due under this Final Judgment. All payments made by

Defendant Priore under this judgment (in excess of post judgment interest due) shall be credited

first against the $487,618 civil money penalty until paid in full, thereafter against the $215,045 in

prejudgment interest until paid in full, and thereafter against the $797,337 in disgorgement.

Prior to making the final payment set forth herein, Defendant Priore shall contact the staff of the

Commission for the amount due for the final payment.

If Defendant Priore fails to make any payment by the date agreed and/or in the amount

agreed according to the schedule set forth above, all outstanding payments under this Final

Judgment, including post-judgment interest, minus any payments made, shall become due and

payable immediately at the discretion of the staff of the Commission without further application

to the Court.

14

## XVIII.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Commission

shall hold the funds paid pursuant to paragraphs XIII, XIV, XV, XVI, and XVII above, together

with any interest and income earned thereon (collectively, the "Fund"), pending further order of

the Court. The Commission may propose a plan to distribute the Fund subject to the Court's

approval. Such a plan may provide that the Fund shall be distributed pursuant to the Fair Fund

provisions of Section 308(a) of the Sarbanes-Oxley Act of 2002. The Court shall retain

jurisdiction over the administration of any distribution of the Fund. If the Commission staff

determines that the Fund will not be distributed, the Commission shall send the funds paid

pursuant to this Final Judgment to the United States Treasury. Regardless of whether any such

Fair Fund distribution is made, amounts ordered to be paid as civil penalties pursuant to this

Final Judgment shall be treated as penalties paid to the government for all purposes, including all

tax purposes. To preserve the deterrent effect of the civil penalty, Defendants shall not, after

offset or reduction of any award of compensatory damages in any Related Investor Action based

on Defendants' payment of disgorgement in this action, argue that it or he is entitled to, nor shall

it or he further benefit by, offset or reduction of such compensatory damages award by the

amount of any part of Defendants' payment of a civil penalty in this action ("Penalty Offset"). If

the court in any Related Investor Action grants such a Penalty Offset, Defendants shall, within

30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel

in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair

Fund, as the Commission directs. Such a payment shall not be deemed an additional civil

penalty and shall not be deemed to change the amount of the civil penalty imposed in this Final

Judgment. For purposes of this paragraph, a "Related Investor Action" means a private damages

15

action brought against a Defendant by or on behalf of one or more investors based on

substantially the same facts as alleged in the Complaint in this action.

## XIX.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the annexed

Consent is incorporated herein with the same force and effect as if fully set forth herein, and that

Defendants shall comply with all of the undertakings and agreements set forth therein.

## XX.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall

retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

16

## CONSENT OF DEFENDANTS THOMAS C. PRIORE, ICP ASSET MANAGEMENT LLC, ICP SECURITIES, LLC, AND INSTITUTIONAL CREDIT PARTNERS, LLC

1.      Defendants Thomas C. Priore ("Priore"), ICP Asset Management, LLC ("ICP"),

ICP Securities, LLC ("ICPS"), and Institutional Credit Partners, LLC ("ICP Holdco") each

acknowledges having been served with the complaint in this action, enters a general appearance,

and admits the Court's jurisdiction over him or it and over the subject matter of this action.

2.      Without admitting or denying the allegations of the complaint (except as to

personal and subject matter jurisdiction, which each Defendant admits), each Defendant hereby

consents to the entry of the final Judgment in the form annexed hereto (the "Final Judgment")

and incorporated by reference herein, which, among other things:

>     (a)      permanently restrains and enjoins the Defendants from violating, or aiding
>             and abetting violations of, Section 17(a) of the Securities Act of 1933 (the
>             "Securities Act"), Sections 10(b) and 15(c)(1)(A) of the Securities
>             Exchange Act of 1934 (the "Exchange Act") and Rules 10b-3 and 10b-5
>             thereunder, and Sections 206(1), 206(2), and 206(4) of the Investment
>             Advisers Act of 1940 (the "Advisers Act") and Rule 206(4)-8 thereunder;
>             Defendants Priore and ICP from violating Section 206(3) of the Advisers
>             Act; Defendant ICP from violating Sections 204 and 206(4) of the
>             Advisers Act and Rules 204-2 and 206(4)-7 thereunder; and Defendant
>             Priore from controlling any person who violates Sections 10(b) or
>             15(c)(1)(A) of the Exchange Act and Rules 10b-3 or 10b-5 thereunder;
>     (b)      orders Defendants ICP and ICP Holdco to pay, on a joint and several
>             basis, disgorgement in the amount of $13,916,005 and prejudgment
>             interest of $3,709,028; Defendant ICPS to pay disgorgement in the amount

17

of $1,637,581 and prejudgment interest in the amount of $301,893; and

Defendant Priore to pay disgorgement in the amount of $797,337 and

prejudgment interest in the amount of $215,045; and

(c)    orders Defendant ICP to pay a civil penalty in the amount of $650,000;

Defendant ICPS to pay a civil penalty in the amount of $1,939,474; and

Defendant Priore to pay a civil penalty in the amount of $487,618

pursuant to Section 20(d) of the Securities Act, Section 21(d) of the

Exchange Act, and Section 209(e) of the Advisers Act.

3.    Each Defendant acknowledges that the civil penalty paid pursuant to the Final

Judgment may be distributed pursuant to the Fair Fund provisions of Section 308(a) of the

Sarbanes-Oxley Act of 2002. Regardless of whether any such Fair Fund distribution is made, the

civil penalty shall be treated as a penalty paid to the government for all purposes, including all

tax purposes. To preserve the deterrent effect of the civil penalty, each Defendant agrees that it

or he shall not, after offset or reduction of any award of compensatory damages in any Related

Investor Action based on that Defendant's payment of disgorgement in this action, argue that it

or he is entitled to, nor shall it or he further benefit by, offset or reduction of such compensatory

damages award by the amount of any part of that Defendant's payment of a civil penalty in this

action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty

Offset, each Defendant agrees that it or he shall, within 30 days after entry of a final order

granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount

of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs.

Such a payment shall not be deemed an additional civil penalty and shall not be deemed to

change the amount of the civil penalty imposed in this action. For purposes of this paragraph, a

18

"Related Investor Action" means a private damages action brought against a Defendant by or on behalf of one or more investors based on substantially the same facts as alleged in the Complaint in this action.

4.        Each Defendant agrees that he or it shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Each Defendant further agrees that he or it shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that such Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

5.        Each Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

6.        Each Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

7.        Each Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce that Defendant to enter into this Consent.

8.        Each Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

9.        Each Defendant will not oppose the enforcement of the Final Judgment on the

19

ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

10.     Each Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute notice to that Defendant of its terms and conditions. Each Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that such Defendant has received and read a copy of the Final Judgment.

11.     Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against the Defendants in this civil proceeding. Each Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Each Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Each Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, each Defendant understands that he or it shall

20

not be permitted to contest the factual allegations of the complaint in this action.

12.    Each Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance with this policy, each Defendant agrees: (i) not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; and (ii) that upon the filing of this Consent, that Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint. If a Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment as to him or it and restore this action to its active docket. Nothing in this paragraph affects a Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

13.    Each Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by that Defendant to defend against this action. For these purposes, each Defendant agrees that such Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

14.    Each Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

15.    Each Defendant agrees that this Court shall retain jurisdiction over this matter for

the purpose of enforcing the terms of the Final Judgment.

**DEFENDANT THOMAS C. PRIORE**

Dated: August 14th, 2012

Thomas C. Priore

On August 14, 2012, Thomas C. Priore, a person known to me, personally
appeared before me and acknowledged executing the foregoing Consent.

MARIE DE SANTOS
Notary Public, State of New York
No. 01DE6238253
Qualified in New York County
Commission Expires February 28, 2015

Notary Public
Commission expires: 2/28/15

**DEFENDANT ICP ASSET MANAGEMENT,
LLC**

Dated: August 14th, 2012

By:
Thomas C. Priore
Title: President/CEO
Address: 1120 Avenue of the Americas, Suite 1507
New York, NY 10036

On August 14, 2012, Thomas C. Priore, a person known to me,
personally appeared before me and acknowledged executing the foregoing Consent with full
authority to do so on behalf of ICP Asset Management, LLC as its President.

MARIE DE SANTOS
Notary Public, State of New York
No. 01DE6238253
Qualified in New York County
Commission Expires February 28, 2015

Notary Public
Commission expires: 2/28/15

**DEFENDANT ICP SECURITIES, LLC**

Dated: August 14th, 2012

By:
Thomas C. Priore
Title: President/CEO
Address: 1120 Avenue of the Americas, Suite 1507
New York, NY 10036

On August 14, 2012, Thomas C. Priore, a person known to me,
personally appeared before me and acknowledged executing the foregoing Consent with full

22

authority to do so on behalf of ICP Securities, LLC as its _President_ .

*Marie A. De Santos*
MARIE DE SANTOS
Notary Public, State of New York
No. 01DE6236253
Qualified in New York County
Commission Expires February 28, 2015

**DEFENDANT INSTITUTIONAL CREDIT
PARTNERS, LLC**

Dated: August 14th , 2012

By: _Thomas C. Priore_
Thomas C. Priore
Title: President/CEO
Address: 1120 Avenue of the Americas, Suite 1507
New York, NY 10036

On _August 14_ , 2012, _Thomas C. Priore_ , a person known to me,
personally appeared before me and acknowledged executing the foregoing Consent with full
authority to do so on behalf of Institutional Credit Partners, LLC as its _President_ .

Approved as to form:

*Marie A. De Santos*
MARIE DE SANTOS
Notary Public, State of New York
No. 01DE6236253
Qualified in New York County
Commission Expires February 28, 2015

_Margaret A. Keeley /pt gh_
Margaret A. Keeley
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005
Tel: (202) 434-5000
*Attorneys for Defendants Thomas C. Priore,
ICP Asset Management, LLC, ICP Securities, LLC,
and Institutional Credit Partners, LLC*

Dated: _Sept. 5_ , 2012
New York, New York

UNITED STATES DISTRICT JUDGE

23

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ICP STRATEGIC CREDIT INCOME MASTER FUND LTD., ICP STRATEGIC CREDIT INCOME FUND LTD., and HUGH DICKSON and STEPHEN AKERS (solely in their capacities as joint official liquidators of the aforementioned funds),<br><br>Plaintiff(s),<br><br>-against-<br><br>ICP ASSET MANAGEMENT LLC, THOMAS C. PRIORE, and TRIAXX FUNDING HIGH GRADE I, LTD.,<br><br>Defendant(s). | Index No. _____<br><br><br>𝔖𝔲𝔪𝔪𝔬𝔫𝔰 |

To the above named Defendant(s)

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue designated is that Defendants do business in or derive substantial revenue from activities carried out in this County.

Dated: February 9, 2012

PACHULSKI STANG ZIEHL & JONES LLP
Attorneys for Plaintiff


By: _____John A. Morris_____

John A. Morris
Beth E. Levine
780 Third Avenue
New York, New York  10036
Tel: (212) 561-7760
jmorris@pszjlaw.com

American LegalNet, Inc.
www.FormsWorkflow.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ICP STRATEGIC CREDIT INCOME MASTER FUND LTD., ICP STRATEGIC CREDIT INCOME FUND LTD., and HUGH DICKSON and STEPHEN AKERS (solely in their capacities as joint official liquidators of the aforementioned funds), | Index No. _____ |
| Plaintiffs, | **COMPLAINT** |
| -against- | |
| ICP ASSET MANAGEMENT LLC, THOMAS C. PRIORE, and TRIAXX FUNDING HIGH GRADE I, LTD., | |
| Defendants. | |

Plaintiffs ICP Strategic Credit Income Master Fund Ltd. (the "Master Fund"), ICP

Strategic Credit Income Fund Ltd. (the "Feeder Fund" and together with the Master Fund, the

"Funds"), and Hugh Dickson and Stephen Akers (solely in their capacities as joint official

liquidators of the Funds) (together, the "Liquidators") (the Funds and the Liquidators are referred

to collectively as the "Plaintiffs"), by and through their undersigned counsel of record, as and for

their Complaint against ICP Asset Management LLC ("ICP Management"), Thomas C. Priore

("Priore") and Triaxx Funding High Grade I, Ltd. ("Triaxx Funding") (ICP Management, Priore

and Triaxx Funding are referred to collectively as the "Defendants"), allege as follows upon

knowledge with respect to themselves, and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

1.    Plaintiffs bring this action to recover damages cause by the defendants'

conduct with respect to certain collateralized debt obligations known as the "Triaxx CDOs."

2.     The Funds are Cayman Islands investments funds. Pursuant to a written agreement, ICP Management was the Funds' investment manager. Priore owned and controlled ICP Management, and was a director of each of the Funds. ICP Asset Management was also the Collateral Acquirer of the Triaxx CDOs.

3.     In breach of their fiduciary and contractual obligations owed to the Funds, ICP Management and Priore used approximately $36.5 million of the Funds' assets to satisfy certain margin calls made against one of the Triaxx CDOs, defendant Triaxx Funding.

4.     The unauthorized use of the Funds' assets to satisfy Triaxx Funding's margin calls was without justification and served only to further Defendants' interests. The Funds had no obligation to meet such margin calls, and ICP Management and Priore, acting on both sides of the transaction, took no steps to protect the Funds.

5.     Notably, ICP Management and Priore used the Funds' assets to satisfy Triaxx Funding's margin calls when they knew that the relevant markets were collapsing and the Funds' shareholders were making substantial requests to redeem their shares.

6.     Further, ICP Management and Priore characterized the Funds' payments on behalf of Triaxx Funding as "loans," yet no party was obligated to re-pay the Funds. No consideration was provided to the Funds in exchange for it assets. No term or interest rate was established. And no approval was obtained.

7.     Defendants' conduct constitutes bad faith, gross negligence and willful malfeasance.

8.     Plaintiffs seek compensatory damages in an amount not less than $36.5 million for breach of contract and breach of fiduciary duty. In the alternative, Plaintiffs seek to recover all amounts "loaned" to Triaxx Funding.

## PARTIES

9.      Plaintiff ICP Strategic Credit Income Master Fund Ltd. is a Cayman
Islands corporation, which maintains offices in the Cayman Islands.

10.     Plaintiff ICP Strategic Credit Income Fund Ltd. is a Cayman Islands
corporation, which maintains offices in the Cayman Islands.

11.     Plaintiff Hugh Dickson ("Dickson") is a principal of Grant Thornton
Specialist Services (Cayman) Limited, and a resident of the Cayman Islands.

12.     Plaintiff Stephen Akers ("Akers") is a principal of Grant Thorton UK
LLP, and a resident of London, England.

13.     Upon information and belief, Defendant ICP Management is a limited
liability company formed under the laws of the state of Delaware, and maintains its principal
place of business in New York County, New York.

14.     Upon information and belief, Defendant Priore is an individual residing in
Chappaqua, New York and employed in New York County, New York.  Upon information and
belief, Priore is the founder, president and chief investment officer of ICP Management and a
director of each of the Funds.

15.     Upon information and belief, Defendant Triaxx Funding High Grade I,
Ltd. is a corporation formed under the laws of the Cayman Islands, and that did business in the
State of New York, and in the County of New York.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper pursuant to CPLR § 302(a) because the Defendants
transact business in New York, New York.

17.     Venue is appropriate pursuant to CPLR § 503(a).

## STATEMENT OF FACTS

A.     **The Funds Are Wound Up and The
       Liquidators are Appointed**

18.     At all relevant times, the Master Fund had three shareholders (collectively,

the "Shareholders"):  ICP Credit Partners LLC GP ("ICP GP"), ICP Strategic Credit Income

Fund LP ("ICP Income"), and the Feeder Fund.

19.     On or about August 10, 2010, the Cayman Islands Court ordered the

Feeder Fund wound up and that Dickson and Akers be appointed as Official Liquidators of the

Feeder Fund.

20.     On October 22, 2010, Priore executed two written resolutions of the

Master Fund on behalf of two of the Shareholders, ICP GP and ICP Income (the "Priore

Resolutions").

21.     On October 27, 2010, Dickson executed written resolutions of the Master

Fund on behalf of the third Shareholder, the Feeder Fund (the "Dickson Resolution" and together

with the Priore Resolutions, the "Resolutions").

22.     Pursuant to the Resolutions, it was resolved that (a) the Master Fund be

liquidated and wound up voluntarily; and (b) Dickson and Akers be appointed as joint voluntary

liquidators (the "JVLs") of the Master Fund.

23.     On November 25, 2010, Dickson filed, on behalf of the Master Fund, a

petition to continue the Master Fund's liquidation under the supervision of the Cayman Islands

Court, Cause No. FSD: 269 of 2010 (AJJ).

24.     On December 23, 2010, the Cayman Islands Court signed and filed a

"Supervision Order" that provided, among other things, that (a) the liquidation of the Master

Fund "be continued under the supervision of the [CI] Court;" and (b) Dickson and Akers "be

appointed as official liquidators of" the Master Fund.

25.     Priore has previously admitted under oath that, to the best of his

knowledge, and as he intended, the Liquidators "act in the name and on behalf of [the] Master

Fund, and are empowered to marshal [the] Master Fund's assets and otherwise take control of

[the] Master Fund's affairs."

## B.    Priore and ICP Management use the Funds' assets to Satisfy their Affiliates' Obligations

26.     ICP Management managed certain multi-billion dollar collateralized debt

obligations known as the "Triaxx CDOs." The Triaxx CDOs were separate investment vehicles

that issued notes to investors in various tranches, the proceeds of which were to be used to invest

in residential mortgage-backed securities. The mortgage-backed securities were to serve as

collateral for repayment of the notes.

27.     The Triaxx Funding CDOs were issued pursuant to an indenture dated as

of May 16, 2007. On the same day, Triaxx Funding and Barclays Bank PLC ("Barclays")

entered into a master repurchase agreement (the "Repo Agreement").

28.     The Repo Agreement enabled Triaxx Funding to borrow money from

Barclays on "margin" by posting collateral in exchange for loans.

29.     Pursuant to the relevant Indenture and collateral management agreements,

restrictions were placed on ICP Management's ability to buy and sell securities on behalf of the

Triaxx CDOs. Among other things, ICP Management was required to use "reasonable care" and

to conduct all transactions on an "arm's length" basis.

30.     In addition, the Triaxx CDOs was prohibited from re-investing the Triaxx

CDOs' income in additional securities without the approval of the entities that provided

insurance on the CDOs senior notes, AIG Financial Products Corporation ("AIG") and Financial

Guaranty Insurance Company.

31.     Notwithstanding the trading restrictions, upon information and belief, AIG

contended in mid to late 2008 that ICP Management was engaged in unauthorized trades.

32.     AIG's complaints presented a clear and present danger to ICP

Management and Priore because the mortgage market was rapidly deteriorating, and ICP

Management's and Priore's lucrative fees and interest in the Triaxx CDOs depended on the

continued viability of the Triaxx CDOs.

33.     At about the same time AIG raised concerns about ICP Management's

investment activities, Barclays added pressure by protecting its own interests.

34.     Upon information and belief, Barclays regularly valued Triaxx Funding's

mortgage-backed securities and, if the value dropped, had the right to require Triaxx Funding to

post additional capital to protect against potential losses.  If Triaxx Funding failed to meet

Barclay's margin call, Barclays had the right to use commercially reasonable efforts to sell

Triaxx Funding's securities and use the proceeds to satisfy Triaxx Funding's obligations under

the Repo Agreement.

35.     Following the Lehman Brothers bankruptcy in September 2008, the

unsteady United States real estate market and the value of mortgage-backed securities collapsed.

In response, Barclays promptly issued a series of substantial margin calls.

36.     With their hands tied by AIG, ICP Management and Priore devised a

scheme to raid the Master Fund's coffers to satisfy Triaxx Funding's margin calls.

37.    Based on documents reviewed to date, ICP Management and Priore
caused the Funds to make the following payments (the "Triaxx Funding Payments") to Barclays
in order to satisfy Triaxx Funding's margin calls:

| DATE | AMOUNT |
|---|---|
| October 29, 2008 | $7,175,455.52 |
| January 28, 2009 | $6,986,230.11 |
| February 4, 2009 | $456,728.66 |
| February 27, 2009 | $10,008,576.32 |
| February 27, 2009 | $731,423.68 |
| March 27, 2009 | $2,434,511.83 |
| April 14, 2009 | $2,179,560.28 |
| April 29, 2009 | $4,298,355.01 |
| May 28, 2009 | $2,027,503.15 |
| August 31, 2009 | $200,000.00 |
| **TOTAL** | $36,498,344.56 |

38.    At or around the time each of the Triaxx Funding Payments were made,
ICP Management sent a letter to LaSalle Bank National Association (or to "Bank of America,
National Association, as successor by merger to LaSalle Bank National Association"), the
Trustee, Valuation Agent, Secured Note Registrar, Transfer Agent and Paying Agent under the
Indenture (together, the "LaSalle Letters").

39.    Each of the LaSalle Letters was signed by Priore (except the initial letter
dated October 30, 2008) and stated, among other things, that the Master Fund had transferred a
specified amount of cash to Barclays for the specific purpose of satisfying Triaxx Funding's
margin calls.

40.    Each of the LaSalle Letters also contained the "irrevocable direction" by
ICP Management to LaSalle to (a) accept the funding by the Master Fund to "cure" Triaxx
Funding's margin obligation; (b) use the Master Fund's payment to make "future calculations

7

required under the Indenture" and Repo Agreement; and (c) accept Barclay's waiver of Triaxx

Funding's obligation to meet the margin calls.

      41.    Upon information and belief, ICP Management and Priore separately

wrote to GlobeOp Financial Services LLC ("Globe Op"), the Master Fund's Administrator, and

informed GlobeOp of each of the Triaxx Funding Payments. In the letters to GlobeOp, ICP

Management and Priore falsely characterized the Triaxx Funding Payments as "collateralized

loans."

      42.    Each of Triaxx Funding Payments was made (a) without authority; (b) at a

time when the residential mortgage market was collapsing; (c) even though the Funds had no

obligation to meet Triaxx Funding's margin calls; (d) without any consideration being paid to the

Funds; and (e) without the Funds receiving any security or even promise of repayment.

      43.    The foregoing is evidenced by internal communications at ICP

Management that demonstrate that the Triaxx Funding Payments were the result of the willful

malfeasance, bad faith and/or gross negligence of ICP Management and Priore.

      44.    On April 28, 2009, Peter Woroniecki (a Director of ICP Capital LLC and,

upon information and belief, an employee of ICP Management) wrote to Priore, among others, as

follows:

> ". . . it is not clear to me that there is a formal loan agreement in
> place between TRIAXX and SCIF [i.e., the Master Fund]. Without
> a formal loan agreement there is no obligation of Triaxx to repay
> the loan. In addition, the direction letters [which were apparently
> created after the Triaxx Funding Payments were made] makes [sic]
> no notation of any interest Triaxx will be paying to SCIF, nor does
> it mention the collateral component.
>
> If we want this booked as a loan we should have something drafted
> which spells out the terms of the loans and the obligation of
> TRIAXX to repay its obligation."

45.    Priore's response was to obfuscate, stating in part that "[t]his is imbedded in the Triaxx document itself as to how the transaction operates." Mr. Woroniecki was unpersuaded, saying that ". . . I did a deep dive into the Triaxx Indenture and was unable to determine an operating structure for this type of occurrence . . ."

46.    As Mr. Woroniecki observed, there was no basis to characterize the Triaxx Funding Payments as "loans." Indeed, the discussion of these issues in late April 2009 -- months after tens of millions of dollars of the Master Fund's assets were used to satisfy Triaxx Funding's margin calls -- demonstrates that the Triaxx Funding payments were not intended to be "loans" at the time such payments were made.

47.    Upon information and belief, no loan agreement exists; neither a term nor an interest rate was ever established; and the purported collateral was never identified nor was any security interest ever granted to the Master Fund.

48.    In the absence of any indicia that the Triaxx Funding Payments were "loans," ICP Management's and Priore's characterization of the payments as such further demonstrates that they acted in bad faith, were grossly negligent and/or engaged in willful misconduct.

49.    Incredibly, ICP Management and Priore made the Triaxx Funding Payments with the knowledge that the Funds were being inundated with redemption requests by their shareholders.

50.    Before the first Triaxx Funding Payment was made, shareholders sought to redeem over $25 million in the Funds' shares. Nevertheless, ICP Management and Priore made the first Triaxx Funding Payment of over $7 million on October 29, 2008.

51.    By January 22, 2009, before any additional Triaxx Funding Payment was made, the shareholders' redemption requests had ballooned to over $45 million. In complete disregard of the shareholders' requests, ICP Management and Priore plowed ahead with their scheme by subsequently taking almost $30 million from the Master Fund to satisfy Triaxx Funding's margin obligations.

52.    On May 1, 2009, faced with mounting redemption requests, the Funds notified its shareholders that it was forced to "suspend redemption rights." This extraordinary step did nothing to deter ICP Management and Priore: between April 29 and August 31, 2009, three of the Triaxx Funding Payments totaling more than $6.5 million were made.

53.    ICP Management and Priore were grossly negligent, acted in bad faith and/or engaged in willful malfeasance by making the Triaxx Funding Payments when they knew (a) the residential mortgage market was collapsing; (b) shareholders were making substantial requests to redeem their shares; (c) the Master Fund had no obligation to make the Triaxx Funding Payments; and (d) the Master Fund received absolutely nothing in return, not even a promise of repayment.

## C.    The SEC has Already Commenced An
Action Arising from the same Facts

54.    The United States Securities and Exchange Commission (the "SEC") has also investigated ICP Management, Priore and others and commenced an action against them.

55.    On or about June 21, 2010, filed a complaint (the "SEC Complaint") against ICP Management, Priore and others in the United States District Court, Southern District of New York, 10 Civ. 4791 (LAK) (the "SEC Action").

56.    In the SEC Action, the SEC charged the defendants with "repeated violations of the federal securities laws" arising out of the "Triaxx CDOs."

57.    According to the SEC, "Triaxx Funding" was a "market value"
collateralized debt obligation for which ICP served as collateral manager. As the mortgage
market began to collapse in late 2007, Triaxx Funding faced "numerous margin calls from the
counterparty [i.e., Barclays) to its repurchase financing agreement. . ."

58.    The SEC continued, alleging: "If Triaxx Funding failed [to meet
Barclay's margin calls, Barclays] had the right to seize the CDO's bonds and sell them to satisfy
Triaxx Funding's obligations under the repurchase agreement."

59.    The SEC alleges that after ICP Management and Prior were forced to
cease engaging in certain transactions that were enabling Triaxx Funding to meet its margin
calls, they turned to the Master Fund.

60.    Specifically, the SEC alleges that "[t]o keep Triaxx Funding afloat -- and
protect ICP [Management's] reputation and future fee stream -- ICP [Management] caused [the
Master Fund], the largest hedge fund it managed, to make several multi-million-dollar payments
to the Repo Counterparty to meet Triaxx Funding's margin calls."

61.    The SEC further alleges that Priore failed to inform the Funds' inventors
of the payments made to satisfy Triaxx Funding's margin calls or seek their approval and
"repeatedly misrepresented the nature of the payments to the hedge fund's administrator."

62.    In all, the SEC alleges that Priore caused ICP Management to make the
Triaxx Funding Payments to Barclays even though -- and notwithstanding Priore's representation
that the payments were "collateralized loans" – neither Barclays, Triaxx Funding or anyone else
had an obligation to repay the Funds.

## COUNT I

### Breach of Fiduciary Duty
### (against Priore with respect to the Triaxx Funding Payments)

63.    Plaintiffs repeat and reallege each of the allegations set forth above as if
fully set forth herein.

64.    Priore was a director of the Funds at the time each Triaxx Funding
Payment was made.

65.    As a director of the Funds, Priore owed each of the Funds a fiduciary duty.

66.    Priore knew or should have known that the Triaxx Funding Payments
were contrary to the Funds' best interests because no one was obligated to repay the Funds; the
Triaxx Funding Payments were not secured, carried no interest, and had no term; the Funds
received no consideration for the Triaxx Funding Payments; and the Triaxx Funding Payments
were made at a time when the mortgage market was collapsing, and shareholders were clamoring
to redeem their shares.

67.    Priore's conduct in causing the Triaxx Funding Payments to be made
constitutes a breach of his fiduciary duty to the Funds and was the result of willful malfeasance,
bad faith and/or gross negligence.

68.    As a direct consequence of Priore's breach of fiduciary duty, the Funds
have been damaged in an amount not less than $36.5 million.

## COUNT II

### Breach of Contract
### (against ICP Management)

69.    Plaintiffs repeat and reallege each of the allegations set forth above as if
fully set forth herein.

70.    The Master Fund and ICP Management are parties to the Agreement.

DOCS_NY:24302.12 18454-001                              12

71.    The Agreement is a valid and binding contract governed, by its terms, by the laws of the State of New York.

72.    The Funds have fulfilled their obligations, and are otherwise in compliance with, the Agreement.

73.    The Agreement did not authorize ICP Management to make the Triaxx Funding Payments.

74.    The Agreement required, among other things, that the Master Funds' investments "conform to, and be in accordance with, any requirements imposed by any provisions of applicable law."

75.    The Triaxx Funding Payments did not conform to, and were not made in accordance with, requirements imposed by applicable law because, among other things, (a) the Funds received no consideration; (b) no party was obligated to repay the Funds; (c) Priore caused the Triaxx Funding Payments to be made in breach of his fiduciary duty; (d) the Triaxx Funding Payments were not made on commercially reasonable terms; (e) the Triaxx Funding Payments were not the result of arms' length negotiations; and (f) the nature and purpose of the Triaxx Funding Payments was misrepresented to the Funds' investors and administrator.

76.    ICP Management's decision to use the Master Fund's assets to satisfy Triaxx Funding's margin calls was the result of gross negligence, willful misconduct, and bad faith, and constitutes a breach of the Agreement.

77.    As a result of ICP Management's breach of contract, the Funds have been damaged in an amount not less than $36.5 million.

## COUNT III

### Unjust enrichment
### (against Triaxx Funding)

78.      Plaintiffs repeat and reallege each of the allegations set forth above as if
fully set forth herein.

79.      The Master Fund conferred a benefit upon Triaxx Funding in the form of
the Triaxx Funding Payments.

80.      Triaxx Funding knowingly accepted the benefit conferred by the Master
Fund.

81.      To the extent the Triaxx Funding Payments were "loans," the Master Fund
reasonably expected to have such loans repaid, plus interest.

82.      Triaxx Funding never repaid any portion of the principal of the "loans" or
any interest.

83.      Triaxx Funding's receipt of the Triaxx Funding Payments without
compensation to the Master Fund has unjustly enriched Triaxx Funding in an amount equal to
the Triaxx Funding Payments, plus interest.

84.      Plaintiffs have no adequate remedy at law to recover from Triaxx Funding
the Triaxx Funding Payments.

85.      Accordingly, as a result of Triaxx Funding's unjust enrichment at the
Master Fund's expense, the Master Fund is entitled to restitution from Triaxx Funding in the
amount of $36.5 million.

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

1.      On Count I, damages against Priore in an amount to be determined at trial,
but in no event less than $36.5 million, exclusive of interest or costs;

2.     On Count II, damages against ICP Management in an amount to be determined at trial, but in no event less than $36.5 million, exclusive of interest or costs;

3.     On Count III, restitution from Triaxx Funding in an amount to be determined at trial, but in no event less than $36.5 million, exclusive of interest or costs;

4.     Plaintiffs be awarded pre-judgment and post-judgment interest and all reasonable costs and expenses (including attorneys' fees) associated with this action; and

5.    Such other and further relief that the Court deems just and proper.

Dated: New York, New York                    PACHULSKI STANG ZIEHL & JONES LLP
       February 8, 2012

By: _____
    John A. Morris
    Beth E. Levine
    780 Third Avenue
    New York, New York  10036
    Tel: (212) 561-7760
    jmorris@pszjlaw.com

    Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, GRACE WAGNER, hereby certify, under penalty of perjury pursuant to 28 U.S.C. § 1746, that on this 24th day of January, 2014, I served REQUEST FOR JUDICIAL NOTICE, by United States Mail and E-mail, upon the following counsel of record:

Joshua J. Bruckerhoff, Esq.
Reid Collins & Tsai LLP
1301 S. Capital of Texas Hwy
Building C, Suite 300
Austin, TX 78746

Grace Wagner