UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 15 Case |
| ICP STRATEGIC CREDIT INCOME FUND LTD., *et al.*, | ) | No. 13-12116 (REG) |
| | ) | |
| Debtors in Foreign Proceedings. | ) | |
| | ) | |
| | ) | |
| ICP STRATEGIC CREDIT INCOME MASTER FUND LTD., | ) | |
| ICP STRATEGIC CREDIT INCOME FUND LTD., and | ) | |
| HUGH DICKSON and STEPHEN AKERS, solely in their | ) | |
| capacity as the Foreign Representatives and Joint Official | ) | Adversary Proceeding |
| Liquidators of ICP Strategic Credit Income Fund Ltd. and ICP | ) | No. 14-01835 (REG) |
| Strategic Credit Income Master Fund Ltd., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| DLA PIPER LLP (US), | ) | |
| Defendant. | ) | |
| | ) | |

DECISION AND ORDER ON
MOTION TO DISMISS

APPEARANCES:

REID COLLINS & TSAI LLP
*Counsel to Plaintiffs Joint Official Liquidators of*
  *ICP Strategic Credit Income Fund Ltd. and*
  *ICP Strategic Credit Income Master Fund Ltd.*
One Penn Plaza, 49th Floor
New York, New York 10119
By:    William T. Reid, IV, Esq. (argued)
       Rachel Fleishman, Esq.

1301 S. Capital of Texas Hwy, C300
Austin, Texas 78746
By:    Craig A. Boneau, Esq.
       Joshua J. Bruckerhoff, Esq.

GIBSON DUNN & CRUTCHER LLP
*Counsel to Defendant DLA Piper LLP (US)*
200 Park Avenue
New York, New York 10166-0193
By:     Kevin S. Rosen, Esq. (argued)
        Craig H. Millet, Esq.
        Matthew S. Kahn, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the jointly administered chapter 15 cases of foreign debtors ICP Strategic Credit Income Fund Ltd. (the "**Feeder Fund**") and ICP Strategic Credit Income Master Fund Ltd. (the "**Master Fund**," and with the Feeder Fund, the "**Funds**"), Plaintiffs Hugh Dickson and Michael Saville,[1] in their capacity as the Foreign Representatives and the Joint Official Liquidators of the Funds (the "**Liquidators**"), and the Funds for whom the Liquidators act,[2] assert claims against DLA Piper LLP (US) ("**DLA Piper**") for (1) aiding and abetting fraud; (2) aiding and abetting breaches of fiduciary duty; and (3) "fraudulent trading" pursuant to section 147 of the Cayman Islands Companies Law (the "**Cayman Fraudulent Trading Claim**").  DLA Piper moves to dismiss the complaint under Fed.R.Civ.P. 12(b)(6).

For the reasons discussed below, the Court concludes that the Liquidators have (though just barely) alleged claims for primary violations (as that expression is used in aiding and abetting jurisprudence) of breach of fiduciary duties owed to the Funds.  But the Liquidators have not done so for fraud or fraudulent trading.  The Court further concludes that

---

[1]     In May 2015, Hugh Dickson and Stephen Akers, the individuals whom this Court had originally recognized as the foreign representatives of the Funds in the umbrella chapter 15 case, advised this Court that Mr. Akers had resigned, and upon order of the Cayman court had been replaced by Michael Saville.  *See* Umbrella Case ECF No. 61.  This Court was not asked to formally amend the caption in this adversary proceeding, but now considers Messrs. Dickson and Saville to be the Liquidators.  Of course, the real parties in interest on the plaintiff side are the Funds.

[2]     For brevity, and consistent with the usage when trustees in the United States bring litigation on behalf of their estates, the Court refers to all of the plaintiffs here as the "Liquidators."

(assuming that the Liquidators could show substantial assistance by the delivery of routine legal services if DLA Piper provided them knowing that it was doing something wrong) the Liquidators have failed to plausibly allege the "knowledge" prong of the claim for aiding and abetting breaches of fiduciary duty—that DLA Piper knew that it was assisting in a violation of duty.  And most obviously, the Liquidators are barred from recovery by the *in pari delicto* defense under New York's "*Wagoner* Rule."

Accordingly, each of the claims must be, and is, dismissed.

<u>Facts</u>

Under familiar principles, for the purposes of determining this motion to dismiss (and for that purpose only), the Court takes the allegations of the Complaint as true.[3]  The material allegations of the Complaint, shorn of unnecessary repetition and conclusory statements, follow.

*1. Overview*

The Liquidators allege that DLA Piper aided and abetted fraud and breaches of fiduciary duty committed by the Funds' investment manager[4] (also referred to as "collateral manager") ICP Asset Management LLC (the "**Manager**"),[5] and Thomas Priore ("**Priore**"), one of the Funds' directors and the Manager's majority owner.  The Liquidators allege that

---

[3]      But that is only as to the underlying facts upon which factual and legal conclusions rest; conclusory statements and labels are not given the same weight, especially "[w]here '[g]eneral conclusory allegations' are belied by more specific allegations of the complaint."  *See, e.g., Buchwald v. The Renco Grp. (In re Magnesium Corp.)*, 399 B.R. 722, 768 (Bankr. S.D.N.Y. 2009) (Gerber, J.) ("***MagCorp***").

[4]      *See* Cmplt. ¶ 1.

[5]      In each of the Complaint and their briefs, the parties refer to ICP Asset Management LLC as " ICP," and the Funds as the "SCIF Funds."  The Complaint was first filed in state court, before the parties knew of the need to comply with this Court's Case Management Orders, and, perhaps, of the difficulties readers face in dealing with unfamiliar acronyms.  In compliance with its Case Management Order in this case ("Parties are not to use acronyms in briefs to describe name of parties … unless their meaning is obvious," Case Management Order #1, ECF No. 8, ¶ 28), the Court substitutes the more descriptive "Manager" and "Funds."

DLA Piper wrongfully assisted Priore and the Manager when Priore caused the Manager to utilize—and the Liquidators allege "misappropriate"—over $36 million from the Funds to meet obligations owed not by the Funds, but by Triaxx Funding High Grade I, Ltd. ("**Triaxx Funding**"), another investment vehicle the Manager also managed.

As alleged in the Complaint, Triaxx Funding was a collateralized debt obligation[6] that purchased and held residential mortgage-backed securities. Barclays Bank PLC ("**Barclays**") funded Triaxx Funding's purchase of those residential mortgage-backed securities. Barclays funded the purchases as a margin lender; Triaxx Funding was required to make payments to Barclays (i.e., was subject to "**margin calls**") if the value of Barclays' collateral—the residential mortgage-backed securities—dipped below a specified level.[7] In the event that Triaxx Funding failed to meet a margin call, Barclays could liquidate the collateral and sell the vast majority of Triaxx Funding's assets to cover the debt.[8]

About half of the Funds' net asset value was invested in Triaxx Funding.[9] As the investment manager of both the Funds and Triaxx Funding, the Manager received management fees in proportion to the assets each had under management.

When the value of its residential mortgage-backed securities declined, Triaxx Funding became subject to margin calls from Barclays. But Triaxx Funding did not have sufficient funds to meet the margin calls. This, the Complaint alleges, led the Manager and Priore to

---

[6]     Cmplt. ¶ 2 ("Triaxx Funding was a collateralized debt obligation…"). Based on the Court's judicial experience in this area and common sense (each of which the Court is required to utilize, *see Ashcroft* v. *Iqbal,* 556 U.S. 662, 679 (2009)) ("*Iqbal*"), the Court believes that to be a misstatement. Rather, the Court believes, Triaxx Funding was the *issuer* of collateralized debt obligations. But the distinction does not materially affect the analysis that follows.

[7]     The converse was also true. If the securities were valued above the threshold level, Barclays was required to pay Triaxx Funding the "margin excess." Triaxx Funding's indenture trustee was responsible for, amongst other things, valuing Triaxx's residential mortgage-backed securities on a daily basis.

[8]     Cmplt. ¶ 2.

[9]     *Id.* ¶ 3 ("approximately 50% of the … Funds' net asset value was invested in Triaxx Funding").

-4-

seek alternative ways for Triaxx Funding to meet the margin payments—in connection with

which the Manager and Priore allegedly "looked to [DLA Piper] for a solution."[10]

## 2. The Players

### (a) Plaintiffs—The Funds and the Liquidators

The Funds were incorporated in 2005 as exempted limited liability companies under

the Cayman Islands Companies Law.  The Feeder Fund invested approximately $174 million

in the Master Fund, which the Master Fund then invested along with the contributions of its

two other shareholders.

About five years after their incorporation, the Funds were put into liquidation

proceedings in the Cayman Islands.  Shareholders of the Feeder Fund filed a winding-up

petition in May 2010.  The Cayman Islands Grand Court appointed Hugh Dickson and

Stephen Akers as the Joint Official Liquidators of the Feeder Fund, and removed the prior

management—the Manager and Priore.  A few months later, the Master Fund's shareholders

placed the Master Fund too in liquidation.  Dickson and Akers again were appointed as Joint

Official Liquidators.  Later, Saville took Akers' place.

About three years after the Funds entered liquidation in the Caymans, the Liquidators

came to this Court seeking recognition of the Funds' Cayman liquidation proceedings as

foreign main proceedings under Chapter 15 of the Bankruptcy Code.  The Court granted

recognition in August 2013.

A few months later, the Funds and the Liquidators commenced this action in New

York State Supreme Court.  In January 2014, DLA Piper removed the action to the United

---

[10]      *Id.* ¶ 4.

States District Court for the Southern District of New York.[11]  Shortly after removal, the

District Court referred the case to the Bankruptcy Court.

### (b)  Defendant—DLA Piper

DLA Piper is a law firm with one of its several offices in New York City.  DLA Piper

attorney Lucien White ("**White**"), based out of the firm's New York City office, acted on

DLA Piper's behalf in connection with the alleged wrongful activity.

### (c)  Other Players—Priore, the Manager and the Trustee

Though not named as defendants in this adversary proceeding, the Manager, Priore,

Barclays and the Trustee also had roles in connection with the allegations in the Complaint.

### (i)  The Manager

The Manager, a Delaware corporation, was based in New York.  It was founded by

Priore, who was also the Manager's president and chief investment officer.  The Manager

served as an investment manager and "collateral manager" to both Triaxx Funding and the

Funds.  Pursuant to an October 2006 Investment Management Agreement with the Master

Fund, the Complaint alleges, "[the Manager] owed [the Master Fund] the fiduciary duty to

invest [the Master Fund's] assets in good faith and give [the Master Fund] 'the benefit of its

best judgment and efforts in rendering services'. . . ."[12]

### (ii)  Priore

Priore was a director of each of the Funds, owing each fiduciary duties.  The Funds

also had two independent directors in the Cayman Islands, but these directors, the Complaint

alleges, were "unaware of Priore's and the Manager's wrongful acts" due to the Manager's

and Priore's concealment of them.  If the independent directors had known of the wrongful

---

[11]     *See ICP Strategic Credit Income Master Fund Ltd. et al. v. DLA Piper LLP (US)*, 14-cv-351 (S.D.N.Y. Jan. 17, 2014) (Hellerstein, J.), ECF No. 1.

[12]     Cmplt. ¶ 26.

activity, the Complaint alleges, "they could and would have taken action to stop the fraud on the . . . Funds."[13]  Likewise, the Complaint alleges, the Funds also had innocent investors, also unaware of the Manager's and Priore's wrongdoing, but had they known, they "could and would have taken action to stop the fraud on the . . . Funds."[14]  In fact, it was these innocent shareholders who placed the Feeder Fund, and later the Master Fund, in liquidation proceedings in the Caymans.

### (iii)  Barclays

As noted above, Barclays funded Triaxx Funding's purchase of its residential mortgage-backed securities.  As discussed below, Barclays accepted payment from the Master Fund (in lieu of Triaxx Funding) on the margin call obligations.[15]

### (iv)  The Trustee

A trustee acting in connection with the transactions that are the subject of the Complaint at issue (the "**Trustee**")—originally LaSalle, and later Bank of America—valued the collateral posted by Triaxx Funding, and determined whether the value was below a specified level (thus requiring a payment from Triaxx Funding to Barclays), or above it (thus requiring a payment from Barclays to Triaxx Funding).  Irrespective of a payment's direction, it would flow through the Trustee.  The Trustee also was responsible for declaring events of default, upon which Barclays could liquidate its collateral.

---

[13]    Importantly, with respect to the *in pari delicto* defense discussed below, the Complaint is silent as to what exactly the independent directors could and would have done.

[14]    Again, the Complaint is silent as to what the innocent investors could and would have done.

[15]    The Liquidators have also brought a separate action against Barclays, alleging principally that in receiving payment that came from the Funds when the Funds were not obligors to Barclays, Barclays was the recipient of fraudulent transfers.  Though the complaints in the two actions plainly share common background and in more than a few respects, common facts, they present different factual and, especially, legal issues.  Here the Court expresses no view as to the merits of the claims in the separate Barclays action.

*3. The Transfers*

At the heart of the Complaint are ten transfers, totaling $36.5 million (the

"**Transfers**"), by which the Manager and Priore caused the Funds to satisfy Triaxx Funding's

margin call obligations to Barclays.  As alleged in the Complaint, White acted wrongfully in

advising the Manager and Priore, and negotiating and drafting the documents necessary to

effectuate the Transfers.

Two such documents, referred to in the Complaint (and here) as the "**Waiver Letter**"

and the "**Direction Letter**," were used in each of the ten transfers to secure the agreement of

Barclays (to avoid liquidation of the collateral) and the Trustee (to avoid declaration of an

event of  default).  In particular, the Waiver Letter documented Barclays' agreement to accept

money from the Master Fund in lieu of payment from Triaxx Funding—and, though

conditionally, to waive Triaxx Funding's obligation to pay.  Importantly, the Complaint

asserts, the Waiver Letter reserved Barclay's right to reinstate Triaxx Funding's duty to pay

Barclays if the Master Fund brought a claw-back claim.

But the Waiver Letter solved only part of Triaxx Funding's problem; the Trustee also

had to accept the payment to Barclays as satisfying Triaxx Funding's payment obligation, thus

avoiding the declaration of an event of default.   To this end, the Direction Letter was sent by

the Manager to the Trustee; it directed the Trustee to consider Triaxx Funding's margin

obligation paid as a result of the Master Fund's transfer of funds to Barclays.  Upon execution

of these letters, Barclays and the Trustee agreed to take part in the Transfers.

With the groundwork for the Transfers in place, the Master Fund transferred

$36.5 million to Triaxx Funding, over a period of approximately 11 months, at a time when

the Funds had "tens of millions of dollars" in unpaid redemption requests from investors.[16]

From October 2008 through August 2009, Transfers were made from the Funds for margin

payments (an aggregate of approximately $35.26 million), interest payments to Triaxx

Funding's noteholders (approximately $1.264 million), and DLA Piper's legal fees

(approximately $180,000).[17]

In early 2010, some months after the transfers comprising the Transfers, Triaxx

Funding defaulted and Barclays foreclosed on its collateral anyway.  But the Complaint

asserts that had Triaxx Funding defaulted earlier, before the ten Transfers, the Master Fund

would not have suffered losses as severely as it did in 2010.  Thus, the Complaint alleges, the

Transfers exacerbated the loss suffered by the Funds.

The Complaint also alleges that although the Transfers were characterized at the time

as having been incident to a loan, such characterizations were false.  The Complaint alleges

that "as White knew, there was no agreement from Barclays or Triaxx Funding to repay [the

Funds] and the only means [the Funds] had to seek repayment was litigation."[18]

DLA Piper's allegedly false description of the Transfers as incident to a loan is alleged

to be an important element of DLA Piper's aiding and abetting of Priore's and the Manager's

fraud and breaches of fiduciary duty.  As set out in the Discussion below, key to these

allegations are DLA Piper's knowledge of Priore's and the Manager's alleged wrongdoing,

---

[16]     Cmplt. ¶ 112.

[17]     With respect to the legal fees, the Complaint alleges further that none of DLA Piper's invoices stated
how many hours White or other DLA Piper attorneys worked, or provided any detail of the work
performed (other than a general description that the work was done in connection with the above
Transfers), and that "[DLA Piper] billed Triaxx Funding as much as [the Manager] told [DLA Piper]
that it would pay."  *Id.* ¶ 72.

[18]     Cmplt. ¶ 5.

and DLA Piper's knowing and substantial assistance to them.  The Complaint's allegations in

these respects are discussed in turn below.

*4.  Allegations of DLA Piper Knowledge*

As alleged in the Complaint, White knew that the Manager and Priore caused the

transfer of the $36.5 million from the Master Fund to Barclays without the Master Fund

having an obligation to pay Barclays, and with neither Barclays nor Triaxx Funding[19] having

any obligation to repay the Master Fund.[20]

As also alleged in the Complaint, DLA Piper knew not only that Barclays was not

obligated to repay the Master Fund, but also that Barclays recognized the impropriety of the

Transfers, as evidenced by a Barclays requirement that the Waiver Letter include "claw-back"

language, to protect Barclays from claims that it had received a fraudulent conveyance.  This

language provided, in substance, that Barclays would waive Triaxx Funding's margin

payment for only so long as neither the Master Fund nor any other person or entity made a

"claw-back" claim against Barclays.  Thus, allegedly, DLA Piper knew that the Master Fund

could only seek repayment through litigation, and even then would have to battle the express

waiver obtained by Barclays.[21]

Further, the Complaint alleges, White knew that even if Triaxx Funding were

obligated through litigation or directed by the Manager to repay the Master Fund, Triaxx

Funding did not have the liquidity to do so, and White had no reason to believe that Triaxx

---

[19]        *See* Cmplt. ¶ 105 ("White . . . was not aware of any agreement from Triaxx Funding's trustee to repay [the Master Fund] even if there was excess margin.  White also knew that there was nothing in the Triaxx Funding Indenture that directly gave [the Manager] the authority to direct Triaxx Funding's trustee to make any payments to [the Master Fund] in the event that there was excess margin.").

[20]        *See, e.g., id.* ¶ 5.

[21]        *See id.; see also id.* ¶ 8 ("White was aware that even in the unlikely event that Triaxx Funding got additional capital, the only way [the Funds] could seek repayment was through litigation because there was no agreement in place directing Triaxx Funding, or Barclays for that matter, to repay [the Funds] the principal amount transferred . . . .").

Funding would ever have such liquidity, whether by way of a margin excess payment from Barclays or otherwise.[22]

The Complaint also alleges, as relevant to DLA Piper's knowledge, that the Master Fund received no interest or fees for the use of its funds to cover Triaxx Funding's margin obligations;[23] that DLA Piper was unaware whether the Funds had counsel in connection with the Transfers;[24] and that DLA knew that over $1 million of the Transfers went to paying Triaxx Funding's interest due to noteholders, and other expenses.[25]

The Complaint also alleges DLA Piper knew that the Transfers "made no commercial sense,"[26] and lacked "a good commercial reason."[27]

Finally, in further support of its contentions that DLA Piper had the requisite knowledge, the Complaint makes a number of additional, though conclusory and argumentative, allegations:

---

[22]     Cmplt. ¶ 8 ("White knew that Triaxx Funding had no liquidity to repay [the Funds] and he had no reason to believe Triaxx Funding would get any additional funds."). However, the Complaint also says that DLA Piper "believe[d] it would not be unreasonable to take the position that" to "the extent that [the Master Fund's] advances are subsequently transferred by Barclays to the Trustee," the Manager *could*, though it was not obligated to, direct the Trustee "to transfer those advances back to [the Master Fund] outside of the Priority of Payments under the [Triaxx Funding] Indenture." *Id.* ¶ 85. Despite this possible repayment mechanism, DLA Piper could not say it would "be unreasonable for [the Trustee], any Noteholder or other interested party to take the position, either in or out of bankruptcy, that the cash advances are Assets of Triaxx Funding and/or are subject to the Priority of Payments," which would require other creditors to be paid ahead of the Master Fund. *Id.*

[23]     *Id.* ¶¶ 8, 91.

[24]     *See id.* ¶¶ 29, 54, 101 (citing White's SEC testimony in which he states that "[he] wasn't representing [the Funds]" and that he "wasn't focus[ed] on [the Funds'] representation").

[25]     *Id.* ¶¶ 66, 70.

[26]     *See id.* ¶ 8 ("White was aware that it made no commercial sense for [the Funds] to make the transfers.").

[27]     *See id.* ¶ 81 ("White . . . knew there was no loan agreement permitting [the Funds] to be repaid, there was no good commercial reason for the funds to make the transfers, and . . . [the Funds] were faced with protracted litigation to recover the money.").

-11-

- "[DLA Piper] attorney Lucien White . . . knew that Priore and [the Manager] owed fiduciary duties to [the Funds], but nevertheless told them that they could use money from [the Funds] to pay Triaxx Funding's margin obligations."[28]

- "Despite knowing that no loan agreement existed between [the Funds] and Triaxx Funding or Barclays," and that "there was no agreement in place directing Triaxx Funding, or Barclays for that matter, to repay [to the Funds] the principal amount transferred," [DLA Piper] continued to assist "Priore and the Manager in their breaches of fiduciary duty to the Funds."[29]

- At all times, [DLA Piper] was fully aware of the fiduciary duties owed by the Manager and Priore to the [Funds], but chose to . . . facilitate [the Manager's and Priore's] scheme."[30]

*5. Allegations of DLA Piper Substantial Assistance*

The Complaint does not allege that White acted in a role other than as an attorney, but alleges a number of acts that White performed as an attorney that allegedly provided substantial assistance to fraud and breaches of fiduciary duty. In that connection, the Complaint alleges that:

- "White . . . act[ed] as the point person in implementing [the Manager's and Priore's] scheme"[31] by, among other things, "advis[ing the Manager] not to

---

28      *Id.* ¶ 5.

29      *Id.* ¶¶ 5, 8.

30      *Id.* ¶ 16.

31      *Id.* ¶ 6.

use its own funds,"[32] and convincing Barclays and the Trustee "to accept [the

Funds'] money to cover [Triaxx Funding's] margin obligation";[33]

- White then drafted the documents necessary to satisfy the concerns of Triaxx

    Funding's Trustee and Barclays;[34]

- Without White's help, the Manager and Priore would not have been able to

    transfer $36.5 million from the Funds to Triaxx Funding;[35] and

- White made several misrepresentations, most of which involved his description

    of the Transfers as "loans," though, as discussed above, the Complaint alleges

    that there was no right to repayment.[36]

These representations, the Complaint alleges, were made in the process of allegedly

"silenc[ing] a potential whistle-blower"—Peter Woroniecki ("**Woroniecki**"), the Manager's

Director of Fund Operations, who joined the Manager in February 2009 (four months after the

earliest of the Transfers, and six months before the last)—and in response to inquiries made

by an administrator of the Funds, GlobeOp Financial Services (Cayman) Limited (the

---

[32]     *See id.* ¶ 81. DLA Piper argues that it was not DLA Piper that initially suggested or "advised" using
funds of an entity other than the Manager, but the Manager itself.  If this adversary proceeding
continued beyond this point, DLA Piper could make this point, but of course the Court does not decide
disputed facts at this stage of the action.

[33]     *Id.* ¶ 6.

[34]     *Id.* ¶ 7 ("Specifically, White prepared: (i) a letter for Barclays to sign in which it agreed to accept
money from [the Master Fund] and waive Triaxx Funding's margin obligation but reserved the right to
reassert the obligation against Triaxx Funding if [the Master Fund] brought a claw-back claim (the
"Waiver Letter"); and (ii) a letter for the [the Manager] to send to [the Trustee] directing [the Trustee] to
consider Triaxx Funding's margin obligation paid as a result of [the Master Fund's] transfer of funds to
Barclays (the "Direction Letter").")

[35]     *See id.* ¶ 8.

[36]     *See id.* ¶ 5 ("White . . . told Priore and [the Manager] that they could characterize the transfers to
Barclays as a "loan"—meaning that [the Manager] could charge management fees to [the Funds] on the
purported investment—despite knowing that no loan agreement existed between  [the Funds] and
Triaxx Funding or Barclays.").

"**Administrator**").[37]  With respect to both, White, in emails or phone calls, allegedly

misrepresented that the Transfers were loans, eventually satisfying each party's concerns.

The Complaint also alleges that White made misrepresentations to the SEC during the

SEC's investigation of the Manager and Priore, thus assisting the Manager and Priore in

concealing their fraudulent scheme.  To this end, the Complaint alleges, White told the SEC,

among other things, that there was a repayment mechanism embedded in the transactions that

included the Transfers, and that he had not "review[ed] any documents relating to [the Master

Funds'] authority or ability to . . . .  make the loan . . . ." [38]

Finally, the Complaint alleges substantial assistance by reason of DLA Piper's paying

itself using the funds DLA Piper allegedly helped misappropriate.[39]  In this connection, the

Complaint alleges, DLA Piper did not keep hours, and sometimes simply asked the Manager

what it should bill.[40]

*6. The Claims*

   (a)   *Count 1—Aiding and Abetting Breaches of Fiduciary Duty*

Based on those underlying facts, the Complaint asserts claims in its Count 1 for aiding

and abetting breaches of fiduciary duty.  It starts with allegations directed at establishing the

requisite primary violations, alleging that the Manager and Priore breached their fiduciary

duties to the Funds by causing the Master Fund to transfer the $36.5 million to Barclays to

cover Triaxx Funding's obligations.  In connection with their alleged primary breaches of

fiduciary duty, the Complaint also alleges that the Manager and Priore:

---

[37]      Cmplt. ¶ 11–12, 74–88, 89–92.

[38]      Cmplt. ¶ 101, 104.

[39]      Cmplt. ¶ 71.

[40]      Cmplt. ¶ 72.

- made misrepresentations to the Funds' Administrator;

- left innocent stakeholders and independent directors in the dark; and

- left redemption requests to the Funds unpaid while Triaxx Funding's obligations to Barclays were met, Triaxx Funding's expenses (including interest payments to noteholders and DLA Piper's legal fees) were paid, and the Manager received inflated management fees.

Then, the Complaint continues with allegations directed at establishing secondary liability.  It alleges that:

- DLA Piper was aware that the Manager and Priore owed the Funds fiduciary duties;

- DLA Piper had "actual knowledge" of the $36.5 million in transfers to Barclays, despite the Master Fund having no obligation to pay Barclays and having "little to no prospect of repayment"; and

- DLA Piper also was aware of (and, as noted above and below, allegedly complicit in) the Manager's and Priore's misrepresentations of the Transfers to the Funds' Administrator, and the misrepresentation of the Transfers as a "loan" on the Manager's books.

Finally, the Complaint alleges,  having this "actual knowledge" of the Manager's and Priore's breaches of fiduciary duties, DLA Piper "substantially assisted" the Manager and Priore by effectuating the Transfers as discussed above.  In connection with effectuating the Transfers, DLA Piper allegedly created false "loan" documents, "silenced" a whistleblower, and made misrepresentations to the Funds' Administrator.

*(b)   Count 2—Aiding and Abetting Fraud*

The Complaint's Count 2 follows in similar fashion, but charging aiding and abetting *fraud*, as contrasted to breach of fiduciary duty.  The Complaint once again starts with allegations directed at establishing the requisite primary violations, alleging that the Manager and Priore defrauded the Funds, on substantially the same grounds that Count 1 alleges that the Manager and Priore breached fiduciary duties owed to the Funds.  Only a few words change between Count 1 and Count 2 with respect to this; instead of saying that the Manager and Priore "caused" the Master Fund to transfer $36.5 million to Barclays, Count 2 alleges that the Manager and Priore "misappropriated" $36.5 million from the Funds.  And instead of asserting that the funds were used to cover Triaxx Funding's "obligations," Count 2 alleges that the funds were used to pay not only Triaxx Funding's obligations to Barclays, but also interest on Triaxx Funding's notes and other expenses.

Then, once again, the Complaint continues with allegations directed at establishing secondary liability for aiding and abetting fraud.  In Count 2, it alleges DLA Piper knew of the Manager's and Priore's alleged fraudulent scheme in ways nearly identically to the way it alleges DLA Piper knew of the Manager's and Priore's breaches of fiduciary duty is alleged in Count 1.  It also alleges DLA Piper's "substantial assistance" to the Manager and Priore in ways nearly identical to those by which it alleges them in Count 1.

*(c)   Count 3—"Fraudulent Trading" Under Cayman Law*
*(Cayman Islands Companies Law § 147)*

The Complaint's Count 3 asserts a cause of action under Cayman Companies Law § 147.[41]  It alleges, after repeating the allegations on which Counts 1 and 2 were based, that

---

[41]   Section 147 of the Cayman Companies Law provides:

(1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of

the Manager and Priore "managed [the Funds] with the intent to defraud their creditors and with fraudulent purposes," causing the Master Fund to pay Triaxx Funding's obligations "knowing there was little to no chance of the money ever returning to [the Funds].[42]  The Complaint asserts this claim in a fashion very similar to a claim for aiding and abetting under U.S. law, by first alleging a primary violation of the Cayman law and then alleging knowledge of fraudulent purposes and substantial assistance.[43]  The Complaint then alleges that because DLA Piper "was a knowing and substantial participant in [the Manager's] and Priore's fraud," "the court may declare that DLA Piper is 'liable to make such contributions' to [the Funds'] assets 'as the Court thinks proper.'"[44]

Discussion

*A. Pleading Standards*

*1. Rule 8 Requirements*

Rule 8 applies to complaints generally.  Fed. R. Civ. P. 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.[45]  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief 'requires

---

[42]   Cmplt. ¶ 134.

[43]   *See id.* ¶ 135.

[44]   *Id.* ¶ 136 (quoting Cayman Law section 147).

[45]   *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("***Twombly***") (internal citations and quotations omitted).

more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'"[46]

Thus, to survive a motion to dismiss, a complaint must contain "allegations plausibly suggesting (not merely consistent with)" an "entitlement to relief."[47]  Unless a complaint "raise[s] a right to relief above the speculative level," it should be dismissed.[48]  Thus, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."[49]

"Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."[50]  However, "a complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense if the defense appears on the face of the complaint."[51]  Furthermore, on a motion to dismiss, a court may consider certain documents in addition to the complaint, including the contents of any documents attached to the complaint or incorporated by reference, matters as to which the court can take judicial notice, and documents in the possession of the non-moving party (the Funds and the Liquidators here) or documents which the non-moving party knew of or relied on in connection with its complaint.[52]

---

[46]    *Id.* (internal citation omitted).

[47]    *Id.* at 557.

[48]    *Id.* at 555.

[49]    *Smith v. Local 819 I.B.T. Pension Plan,* 291 F.3d 236, 240 (2d Cir. 2002) (quoting *Gebhardt v. Allspect, Inc.*, 96 F. Supp. 2d 331, 333) (S.D.N.Y. 2000).

[50]    *Twombly*, 550 U.S. at 563 (citations omitted).

[51]    *Buckley v. Deloitte & Touche USA LLP*, 2007 WL 1491403, *4, 2007 U.S. Dist. LEXIS 37107, *11 (S.D.N.Y. May 21, 2007) (Stein, J.) (citing *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003)) (other internal citations omitted).

[52]    *See ABF Capital Mgmt v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997) (Bernstein, C.J.).

### 2. Rule 9 Requirements

Heightened pleading requirements, set forth in Fed. R. Civ. P. 9(b), apply to "any claim that 'sounds in fraud,' regardless of whether fraud is an element of claim."[53]  Thus Rule 9(b) applies to claims of breaches of fiduciary duty consisting of fraud[54] and, as relevant here, aiding and abetting fraud;[55] aiding and abetting breaches of fiduciary duty (at least when such are premised on fraud);[56] and, by extension, of liability under Cayman Company Act § 147, which, at least under the facts here, has similar conceptual underpinnings.

The more stringent standards of Fed. R. Civ. P. 9(b) require a party alleging fraud or mistake to plead "*with particularity* the circumstances constituting fraud or mistake."[57]  Though under Rule 9(b), knowledge or intent may be alleged generally, it still is necessary "to allege facts that give rise to a strong inference of fraudulent intent."[58]  Since Rule 9(b) is intended "to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit,"[59] the relaxation of Rule 9(b)'s specificity requirement for scienter "must not be mistaken for license to base claims of fraud on speculation and

---

[53]   *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251-52 (S.D.N.Y. 2008) (Buchwald, J.) ("***Matsumura***") (quoting *Rombach v. Chang*, 355 F.3d 164, 166, 170 (2d Cir. 2004).

[54]   *In re Parmalat Sec. Litig.,* 501 F. Supp. 2d 560, 573 (S.D.N.Y. 2007) (Kaplan, J.) *aff'd Pappas v. Bank of Am. Corp.*, 309 Fed. Appx. 536 (2d Cir. 2009); *Matsumura*, 542 F. Supp. 2d at 252.

[55]   *Armstrong v. McAlpin,* 699 F.2d 79, 92–93 (2d Cir. 1983); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-93 (2d Cir. 2006).

[56]   *Matsumura*, 542 F. Supp. 2d at 252 (applying Rule 9(b) to claims against an attorney for allegedly aiding and abetting breach of fiduciary duty).

[57]   Fed.R.Civ.P. 9(b) (emphasis added).

[58]   *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("***Shields***"), *superseded by statute* (Priv. Sec. Lit. Reform Act, 15 U.S.C. § 78u) *on other grounds*, *see Verdi v. Potter*, 2010 WL 502959, at *7, 2010 U.S. Dist. LEXIS 11053, at *26, n.6 (E.D.N.Y. Feb. 9, 2010) (Hurley, J.).

[59]   *Id.* (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (other internal quotations omitted).

conclusory allegations."[60]  To serve the purposes of Rule 9(b), the Second Circuit thus

requires plaintiffs to allege facts that give rise to a *strong inference* of fraudulent intent.[61]

The requisite "strong inference" of fraud may be established either (a) by alleging

facts to show that defendants had both motive and opportunity to commit fraud, or (b) by

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or

recklessness.[62]

## B.  Choice of Law

Choice of law issues arise in four contexts in these cases—with respect to (1) claims

for primary violations of breach of fiduciary duty; (2) claims of primary violations of fraud;

(3) secondary violations of aiding and abetting breaches of fiduciary duty and fraud; and

(4) application of  *in pari delicto*.  The Court considers them in turn.

### 1. Allegations of Fiduciary Duty Primary Violations

For determinations of primary violations of fiduciary duty, the Court would normally

apply the "internal affairs" doctrine.  This is a conflict of laws principle recognizing that the

law of the state (or other jurisdiction) of incorporation should have the authority to regulate a

corporation's internal affairs—*i.e.*, matters peculiar to the relations between the corporation

and, as relevant here, its officers and directors.[63]

The Court agrees with the Liquidators' observation that the "internal-affairs doctrine

would have this Court look to the law of the state of incorporation, here the Cayman Islands,

---

[60]     *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

[61]     *Id.*

[62]     *Shields*, 25 F.3d at 1128.

[63]     *See*, *e.g.*, *Adelphia Commc'ns. Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns. Corp.*), 365 B.R. 24, 39-41 (Bankr. S.D.N.Y. 2007) (Gerber, J.) ("***Adelphia–Bank of America***"), *aff'd as to all but an unrelated issue,* 390 B.R. 80 (S.D.N.Y. 2008) (McKenna, J.).

to analyze the breach of fiduciary duty. . . ."[64]  But the Court also agrees with the Liquidators'

point that on this particular issue, "there is no conflict between Cayman Islands' and New

York's breach of fiduciary duty law."[65]  Thus (and because there was no argument to the

contrary by defendant DLA Piper), the Court considers it unnecessary to undertake the

incremental burden of addressing Cayman law on this point, and applies New York law to the

extent a particular jurisdiction's internal corporate governance law matters.

### 2. Allegations of Fraud Primary Violations

The law applicable to claims of fraud, by contrast, is determined by reference to choice

of law rules governing torts.[66]  "In tort cases, New York courts apply the law of the

jurisdiction with the greatest interest in regulating behavior within its borders or in having its

law applied."[67]  That is often the locale where harm was felt (which here, would be principally

New York).[68]  But in this case one would come to the same conclusion if one were to look at

the locale of the allegedly wrongful conduct—once again, New York.

Here the parties agree that New York law should apply (or at least they rely on New

York law), and the Court sees the interests of New York as predominant with respect to the

claims of fraud.  To the extent it matters, the Court applies New York law.

---

[64]    Pl. Br. n.26.

[65]    *Id.*

[66]    *See Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Servicing Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 17-108 (Bankr. S.D.N.Y. 2001) (Gerber, J.) (discussing choice of law rules for fraud and other tort claims); *see also Rosenberg v. Pillsbury Co.,* 718 F. Supp. 1146, 1150 (S.D.N.Y. 1989) ("While [a choice-of-law] provision is effective as to breach of contract claims, it does not apply to fraud claims, which sound in tort.").

[67]    *LaSala v. UBS, A.G.,* 510 F. Supp. 2d 213, 230 (S.D.N.Y. 2007) (Haight, J.) ("*LaSala*") (internal quotations omitted).

[68]    *See id.* at 232.

*3. Allegations of Aiding and Abetting (Secondary Liability)*

Claims of aiding and abetting breaches of fiduciary duty rest in part on underlying primary violations of duty that are subject to the internal affairs doctrine. For that reason, there has been a conflict in the cases as to whether claims for aiding and abetting breaches of fiduciary duty should be decided under the law of the jurisdiction of organization or more traditional tort principles—under which the Court would look to the jurisdiction with the greatest interests in the controversy.

But after analyzing the split of authority on the matter in *Adelphia*, this Court held (for reasons stated at greater length in that opinion) that the conflicts principles applicable to torts should apply.[69] This caused the Court to hold in *Adelphia* that the aiding and abetting claims should be determined under Pennsylvania law, where the injury was suffered, rather than Delaware, under whose law the corporations were organized. The Court adhered to those principles in a later decision, *MagCorp*,[70] and other courts, often citing *Adelphia*, did likewise.[71]

Perhaps for those reasons, the parties do not dispute that the claims of aiding and abetting fraud here should be decided under New York law.[72] And based on its earlier

---

[69]   *See Adelphia-Bank of America*, 365 B.R. at 39-41.

[70]   *See MagCorp.*, 399 B.R. at 742-43 ("The jurisdiction with the greatest interest is that of the principal place of business, where any injury as a consequence of any aiding and abetting would have been suffered.").

[71]   *See LaSala*, 510 F. Supp. 2d at 230-231 & n.9; *Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs., Inc.)*, 387 B.R. 365, 395–96 (Bankr. E.D.N.Y. 2008) (Stong, J.); *Laddin v. Belden (In re Verilink Corp.)*, 405 B.R. 356, 381 (Bankr. N.D. Ala. 2009) (Caddell, J.).

[72]   Both parties cite New York law exclusively when arguing the issues in their respective briefs. *See, e.g.*, Pl. Br. at 9-18; Def. Br. at 21. While the Liquidators stated, during oral argument, that they were not conceding the applicability of New York law to both aiding and abetting claims, they noted no conflict between New York and Cayman Law on the issues. *See* Arg. Tr. at 35 ("[W]e do dispute that New York Law applies to the aiding and abetting claim… But the point is there's no conflict between Cayman and New York law on that point. Both jurisdictions have aiding and abetting claims, there was no need to fight it.").

decisions in *Adelphia* and *MagCorp*, the Court analyzes the aiding and abetting claims accordingly.

### 4. In Pari Delicto

The two sides do, however, dispute the jurisdiction whose law should apply to the consideration of DLA Piper's *in pari delicto* defense. DLA Piper contends that New York law should guide the Court's consideration of *in pari delicto* and imputation. The Liquidators contend that based on the internal affairs doctrine, Cayman, not New York, law should apply.[73] Alternatively, the Liquidators argue that even if the interests analysis test applies, Cayman has a greater interest in the controversy, and thus that Cayman Law should apply.

But as to each of these issues, the Court agrees with DLA Piper. The Liquidators fail to cite any case in which a court applied the law of the jurisdiction of organization, rather than that with the greatest interests, in making an *in pari delicto* determination. And this Court has previously done exactly the opposite. In *Adelphia*, the Court likewise faced issues as to the application of *in pari delicto*. Choice of law there was important, because under the law of Pennsylvania (the place where the injuries were suffered; where most of the wrongful conduct took place; and which thus had the greatest stake in the controversy), *in pari delicto* would not be a conclusive bar to recovery. But under Delaware and other states' law, *in pari delicto* would probably be a defense. This Court utilized interests analysis and then applied Pennsylvania law, not Delaware law, in analyzing the *in pari delicto* defenses on motions to dismiss.[74]

---

[73]   The Liquidators argue that as the predicate for their further contention that the wrongdoing of the agents cannot be imputed to the Funds under Cayman law, and thus that the *in pari delicto* defense fails. Because the Court concludes that Cayman law does not govern the *in pari delicto* defense, the Court does not need to determine whether the Liquidators are right with respect to their reading of the Cayman law.

[74]   *See Adelphia-Bank of America*, 365 B.R. at 25-35.

Similarly, in *MagCorp*, each of the two injured debtors was a Delaware corporation, but (while the Court applied Delaware law to the claims against insiders based on their alleged breaches of fiduciary duty), in analyzing the claims against the company's counsel, accountants and investment banker, the Court applied the *Wagoner* Rule--the *in pari delicto* law of the State of New York.[75]

Finally, but very importantly, "in New York, *in pari delicto* is an affirmative defense. . . ."[76]   And "in this Circuit, the law governing an affirmative defense to a claim is the same as the law governing the claim itself."[77] Since New York law applies to the claims for aiding and abetting fraud and breach of fiduciary duty, the Court must apply New York law to the *in pari delicto* analysis as well.

Nor, once it applies interests analysis, can the Court agree that Cayman has a greater interest in the controversy.  The Cayman court itself recognized that Counts 1 and 2 of the Complaint "assert[ed] causes of action belonging to the Funds which arose under United States law . . . ."[78] And in a somewhat different context (susceptibility to Cayman jurisdiction), the Cayman court made observations relevant to the Cayman interest in the controversy:

> [DLA Piper] carries on its practice in the United States.
> The firm does not have a presence in the Cayman
> Islands.  The damage suffered by the Funds resulted

---

[75]     *See MagCorp.*, 399 B.R. at 742, 758-766.

[76]     *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 459, 912 N.Y.S.2d 512, 513, 938 N.E.2d 941, 946, n.3 (N.Y. 2010) ("***Kirschner***"); *Cobalt Multifamily Investors I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 429 n.5 (S.D.N.Y. 2012) (Wood, C.J.) ("***Cobalt***").

[77]     *Cobalt,* 857 F. Supp. 2d at 434 (citing *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540–41 (2d Cir. 1997)).

[78]     Pls.' Statement of Supplemental Auth. ¶ 2.

from acts committed in New York and advice given by a
lawyer working in the firm's New York office.[79]

Thus, once the Court applies interest analysis doctrine, New York has the greater interest in

this controversy, and New York Law should apply.

### C.  Sufficiency of the Pleadings

#### Count 1—Aiding and Abetting Breaches of Fiduciary Duty

The Complaint's Count 1 charges DLA Piper with aiding and abetting breaches of

fiduciary duty by Priore and the Manager.  The Court finds that Count 1—just barely—

satisfactorily alleges a primary breach of fiduciary duty.  But the remainder of  Count 1

(which must plead the requisite knowledge and substantial assistance) fails to pass muster

under Fed. R. Civ. Proc. Rule 8 or, especially, Rule 9.

#### 1.  Primary Violation

With respect to the requisite primary violation, the Court said the Complaint "just

barely" suffices because of the obvious potential defenses that appears in material part from

the face of the Complaint.  As the Liquidators recognize in their Complaint, "approximately

50% of the … Funds' net asset value was invested in Triaxx Funding."[80]  It takes little in the

way of clairvoyance to anticipate the explanation for the Transfers.  A Barclays liquidation of

its collateral upon Triaxx Funding's default would wipe out 50% of the Funds' net asset

value—a plainly dreadful result, which would demand consideration of preventative action.

With the benefit of its judicial experience,[81] the Court sees the obvious defenses that

would come down the road—whether the Funds' expenditure of $36 million to protect against

---

[79]       *Id.* ¶ 7.

[80]       Cmplt. ¶ 3.

[81]       *Iqbal* stated, expressly, that "[d]etermining whether a complaint states a plausible claim for relief will
          … be a context-specific task that requires the reviewing court to draw on its judicial experience and

an immediate loss of 50% of the Funds' net asset value would be protected under the
"Business Judgment Rule," and whether the documentation of the duty to repay the Funds
after the Transfers actually caused the Funds' losses.

The Business Judgment Rule, as it exists under New York law, "bars judicial inquiry
into actions of corporate directors taken in good faith and in the exercise of honest judgment
in the lawful and legitimate furtherance of corporate purposes."[82]  Thus if, after trial, if the
requirements of the Business Judgment Rule were satisfied, this Court would find it difficult
or impossible to find a primary violation of the breach of fiduciary duty here.[83]  The Court
supposes, however, that to the extent that the Liquidators can show that Priore or the Manager
authorized the transfers in the *absence* of good faith, disinterestedness, or due care, they may
be able to establish the requisite primary violation.[84]

Likewise, with the benefit of its judicial experience, the Court sees a future causation
issue--whether the Funds suffered the losses they did because Triaxx Funding's duty to pay
the Funds back was inadequately documented (and that Triaxx Funding, managed by the same
Manager, might later contend that it really didn't have a duty to pay the money back), on the

---

common sense."  556 U.S. at 679.  This Court has previously observed that "[i]f writing on a clean slate,
the Court would not have come to such a view, as it could lead to different conclusions on 12(b)(6)
motions, which are matters of law, depending on individual judges' experience with the matters in
question."  *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 357 n.16 (Bankr. S.D.N.Y.
2014).  But this Court went on to say that it would of course decide motions then before it in accordance
with the Supreme Court's directions in that regard.  *Id.*  The Court does likewise here.

[82]   *Auerbach v. Bennett*, 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 393 N.E.2d 994 (N.Y.1979)
("***Auerbach***").

[83]   *See Fox v. Koplik (In re Perry H. Koplik & Sons, Inc.)*, 476 B.R. 746, 795 (Bankr. S.D.N.Y. 2012)
(Gerber, J.) ("***Perry Koplik***"), *objections to proposed factual findings overruled but with adjustments in
factual findings made*, 499 B.R. 276 (S.D.N.Y. 2013) (Castel, J.) (discussing New York's Business
Judgment Rule and *Auerbach* in context of claims that defendants, who were closely held corporation's
officers and directors, violated fiduciary duties owed to the corporation).

[84]   *See id.* at 795-96 (noting scenarios under which the Business Judgment Rule would be inapplicable).  Of
course, the Business Judgment Rule would be inapplicable not because (as we now know with the
benefit of hindsight) Barclays later came to liquidate the collateral anyway, but because the decision,
when made, was undeserving of the deference given under the Business Judgment Rule.

one hand, or because Triaxx Funding later lacked the resources to do so, on the other.[85]  But

once again, the Court supposes that this obvious defense would be better dealt with after the

12(b)(6) stage.

　　For these reasons, the Court has great uncertainty, based on its judicial experience, as

to whether the Liquidators could overcome the Business Judgment Rule defense articulated by

the New York Court of Appeals in *Auerbach*,[86] or the causation defense recognized in *Perry*

*Koplik* and the cases upon which *Perry Koplik* relied.  But the Court believes that it should not

foreclose, at the 12(b)(6) stage, debate as to whether these defenses could be overcome.  The

allegations that Priore and the Manager were conflicted and took the action to protect the 50%

of the Funds' assets at risk to maximize their management fees on the Triaxx Funding side,[87]

or to protect their reputations as skillful managers, are barely plausible at best—both because

of the hugely greater importance of the Funds assets at risk, and because the Manager received

management fees on the Funds' side as well.[88]  And the notion that Triaxx Funding, which

was "another investment vehicle that [the Manager] managed,"[89] would have contested a duty

to repay indebtedness advanced to it by its affiliate (based on the decision of their common

---

[85]　　*See id.,* at 805 (though corporate officers and directors failed to comply with duty of care when they advanced millions to another company, American Tissue, without getting promissory notes, that did not cause the Debtor's loss; the problem resulted from "the inability of American Tissue to pay its indebtedness back, rather than the Debtor's inability to prove the existence of the debt or to present a negotiable instrument to collect upon it."); *accord id.* at 778 n.177 (making same point in Summary of Findings).

[86]　　That is particularly with respect to several of the Liquidators' conclusory allegations, *see* Cmplt. ¶¶ 8, 81, that the transfers made "no commercial sense" and were done for "no good commercial reason."

[87]　　*See* Cmplt ¶ 3 ("Priore knew that if Barclays foreclosed on the collateral, [the Manager] would lose the management fees it received from Triaxx Funding.")

[88]　　*See id.* (because approximately 50% of the Funds' net asset value was invested in Triaxx Funding, "Priore also knew that the foreclosure would diminish the management fees [the Manager] received from the [Funds]").

[89]　　*Id.* ¶ 1.

manager, and of Priore, who was "[the Manager's] majority owner")[90] is barely plausible as

well.  But at this stage the Court is prepared to assume that the Liquidators have, albeit barely,

alleged action by Priore and the Manager that may not be entitled to those obvious defenses.[91]

### 2. Secondary Liability

But even assuming the possibility of a primary violation, and thus a breach, by Priore

or the Manager, of fiduciary duty, the Court finds the Liquidators pleading of the requisite

knowledge of wrongful conduct on the part of White—and hence DLA Piper—to be

inadequate.

### a. Actual Knowledge

Though their Complaint is replete with rhetoric and conclusory allegations (neither of

which, under familiar principles, can be credited when determining the adequacy of a

complaint), the Liquidators essentially make two points.  They contend (1) that the Master

Fund's transfers to Barclays on account of Triaxx Funding's margin obligation were done for

"no good commercial reason," and (2) that the transfers did not result in loans.  Assuming for

---

[90]     *Id.*

[91]     Underlying the entirety of the Complaint are the Liquidators' allegations that the Funds' advances to
Triaxx Funding were not really loans.  Based, once again, on the Court's judicial experience, the Court
finds these allegations difficult to believe, though it will accept them as true, albeit with considerable
skepticism, at this point.  Over the years, the Court has seen numerous instances of corporate affiliates
paying obligations on behalf of other affiliates, or making inter-company loans.  In the Court's
experience, these loans or advances were often made with little or no documentation, but they
nevertheless gave rise to intercompany obligations—sometimes difficult to collect, because of the
insolvency of one of the affiliates, but nevertheless plainly there.  Whether this was likewise the case
here, on the one hand, or was intended to be an exception to that practice, on the other, is something that
would normally not be decided at the 12(b)(6) stage.

One other concern underlies the Court's decision to find the Liquidators' allegations of a primary
violation plausible, albeit barely so.  The Liquidators have made arguably separate and stronger
contentions, at least impliedly, that even if the Transfers were loans or effectively loans and created
indebtedness running from Triaxx Funding to the Master Fund or both of the Funds, repayment of the
indebtedness might be made more difficult by competing priority of payments demands on Triaxx
Funding, *see* Cmplt. ¶85, or by limitations in Triaxx Funding's Indenture or other organizational
documents such that "Triaxx Funding could not accept a loan from [the Manager] or a [Manager]
affiliate," *id.* at ¶ 44, or "painful mechanics."  *Id.* at ¶ 45.  How important such concerns would be is
difficult to determine under Rule 12(b)(6).

now, as the Court has just noted it will do, that these allegations might support claims of

breach of fiduciary on the part of Priore or the Manager, the allegations that surround them

fail adequately to plead that White knew they were doing anything wrong.

With respect to the first, the Liquidators' allegations that White *knew* that the

Transfers "made no commercial sense" and lacked "a good commercial reason"[92]—stated in

conclusory terms, without supporting evidentiary facts[93]—are implausible. *Of course* the

Transfers had a commercial reason—saving half of the Funds' net asset value. What is

debatable is whether, on balance, the Transfers were wise, and in particular, whether putting

more of the Funds' assets at risk to save the 50% of them that were subject to imminent

forfeiture was a smart business decision. But accepting one's client's view as to the business

decision to be made is not knowledge that one's client was doing anything wrong. Nor are

there any evidentiary facts supporting the many conclusory allegations that White knew that

his clients were doing anything wrong.

With respect to the second, there are no allegations supporting the conclusion that

White believed that there was no duty on the part of Triaxx Funding to pay the advances back.

A belief of that nature would be wholly contrary to what one would expect based on judicial

experience and common sense. The Court accepts as satisfactorily pleaded the Liquidators'

allegations that limitations in the documents made common ways of documenting a loan

impractical or impossible, but it is way too much of a jump to draw from that the conclusion

that White never believed there was a loan, or, especially, that he knew of a theft.

Of course, attorneys providing legal services are not immune from claims that they

have aided and abetted breaches of fiduciary duty. But to make assert viable claims for such,

---

[92]     Cmplt ¶¶ 8, 81.

[93]     *See id.* ¶ 81.

the plaintiff must show that the attorney knew more than the facts generally surrounding the transaction,[94] and that the attorney knew of the various steps in the transaction's execution. The allegations must show that the attorney knew that he or she was assisting *something that was wrong*, and how that assistance facilitated wrongful conduct.[95]  Allegations of that character are missing here.

### b.  Substantial Assistance

The issues as to the allegations of substantial assistance are close.  There are no allegations that White—and hence DLA Piper—had any role in the Transfers other than as counsel performing ordinary legal services.  There are no allegations that White *proposed* using the Funds' money for the margin calls (and indeed the Complaint affirmatively alleges that the Manager and Priore made that decision alone[96]), or that White was involved in any fashion with the actual taking of the money from the Funds.

Thus it is highly debatable whether the legal services that were provided here can be regarded as rising to the level of substantial assistance.  Once again, while lawyers are not immune from liability for aiding and abetting wrongful conduct, courts must be wary of regarding the attorney's legal advice, or the attorney's interfacing with others, as substantial

---

[94]     *Compare Oster v. Kirschner*, 77 A.D.3d 51, 52-57, 905 N.Y.S.2d 69, 70-73 (1st Dep't 2010) (failing to dismiss complaint where counsel drafted offering memoranda which failed to disclose investment managers' criminal history, of which counsel was aware).

[95]     *See, generally, Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157, 169 (1st Dep't 2003) ("A person knowingly participates in a breach of fiduciary duty when he or she provides 'substantial assistance' to the primary violator. Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.") (internal citations omitted); *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 623-624 (S.D.N.Y. 2014) (Sweet, J.) ("The tort of aiding and abetting breaches of a common law duty does not encompass a 'should have known' standard; actual knowledge of 'the primary violator's status as a fiduciary and actual knowledge that the primary violator's conduct contravened a fiduciary duty' is required.") (citing *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 393 (S.D.N.Y. 2007) (McKenna, J.).

[96]     *See* Cmplt. ¶¶ 46, 81.

assistance in the absence of allegations establishing something more[97]—as there is a

distinction between rendering "substantial assistance to the breach of duty, [as opposed] to the

person committing the breach."[98]  The Liquidators' calling White the "point person" for the

transaction,[99] as a characterization for his communicating, on behalf of his client, in ways

lawyers routinely do, is difficult to justify as amounting to substantial assistance in the

absence of additional allegations suggesting how the communications to others were known

by the alleged wrongdoer to be assisting in a known breach of duty.[100]

But ultimately, the Court does not need to decide whether providing these routine legal

services rose to the level of providing "substantial assistance" because the requisite

knowledge of breach of duty was inadequately pleaded in any event.

### Count 2—Aiding and Abetting Fraud

The Complaint's Count 2 charges DLA Piper with aiding fraud by Priore and the

Manager.  Though the Court has found that the Liquidators have alleged, albeit barely, a

primary violation of breach of fiduciary duty, they have not done likewise with a claim of

fraud, especially with the particularity that Rule 9(b) requires.[101]  And once again, the Court

finds deficiencies in the Liquidators' pleading of secondary liability, for failing to allege

---

[97]    *See CRT Invs., Ltd. v. BDO Seidman, LLP,* 85 A.D. 3d 470, 472, 925 N.Y.S. 2d 439 (1st Dep't 2011) (holding that the plaintiffs failed to state a claim against accounting firm for aiding and abetting fraud- "Substantial assistance, a necessary element of aiding and abetting fraud, means more than just performing routine business services for the alleged fraudster. … The complaint fails to plead a factual basis for inferring that BDO Seidman did anything more than perform the routine business of auditing.") (internal citation omitted).

[98]    *Chem-Age Industries, Inc. v. Glover,* 652 N.W.2d 756, 775 (S.D. 2002).

[99]    Cmplt. ¶ 6.

[100]   Likewise, though the Liquidators allege, in conclusory terms, White's assistance in "theft" from the Funds, the Transfers would not be theft if there were a duty of repayment—and White's communications, incident to the services he provided, reflect his belief in that at the time.

[101]   *See Matsumura,* 542 F. Supp. 2d at 252 (applying Rule 9(b) to claim against attorney for aiding and abetting breach of fiduciary duty).

knowledge on the part of White that he was assisting in an ongoing fraud.  Thus this count too must be dismissed.

### 1. Primary Violation

Turning first to the primary allegation of fraud, the Court sees a failure to make several of the allegations necessary for a traditional showing of fraud[102]—most obviously, a representation of material fact, falsity, knowledge of falsity, and reliance.  Nondisclosure[103] is the underlying theory.  But, here too, critical allegations have not been pleaded—most significantly, a duty to disclose and scienter[104]—nor have the fraud claims been pleaded with the particularity that Rule 9(b) requires.

The Complaint alleges that the Manager and Priore "fraudulently caused" and misrepresented the nature of the payments from the Master Fund to Triaxx Funding.  It does so not by particularized facts establishing the existence of an underlying fraud, but by broad and conclusory references to a "fraud," "scheme," "fraudulent scheme," "plan," or a "misappropriation" of funds.[105]  Instead, in a conclusory fashion throughout the Complaint, the Transfers are simply labeled as "fraudulent,"[106]

---

[102]    As stated in *Kaufman v. Cohen*, 307 A.D.2d at 119, "[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury."  No effort was made to make a showing of this character.

[103]    *See id.* at 119-120 ("a fraud may be predicated on acts of concealment where the defendant had a duty to disclose material information . . . , provided the [defendant] fiduciary possesses the requisite intent to deceive").

[104]    *See Dembeck v. 220 Central Park South, LLC*, 33 A.D. 3d 491, 492, 823 N.Y.S.2d 45, 47 (1st Dep't 2006) ("Although a cause of action for fraud may be predicated on acts of concealment, there must first be proven a duty to disclose material information").

[105]    *See, e.g.*, Cmplt. ¶ 8 ("Pursuant to the *plan*, Priore and "[the Manager] caused [the Funds] to make ten transfers to Barclays between October 2008 and August 2009 totaling over $36 million.") (emphasis added); *id.* ¶ 9 ("[I]n 2009, Priore's and [the Manager's] *fraud* broadened. . . . Priore and [the Manager] *misappropriated* over $1 million from [the Master Fund] to pay interest on Triaxx Funding's notes and to [pay] [DLA Piper]'s legal bills.") (emphasis added); *id.* ¶ 13 ("Despite Priore's and [the Manager's] efforts to keep *their scheme* afloat") (emphasis added); *id.* ¶ 55 ([DLA Piper 's actions "permit[ted] Priore and [the Manager] to execute *the scheme* to steal [the Master Fund's] money . . . .") (emphasis

The Complaint does not allege a duty on the part of Priore to make disclosure to the other directors.  Nor does it allege a duty on the part of the Manager to bring the Transfers before the Board.  The Complaint is especially lacking with respect to the Manager's and Priore's alleged fraudulent intent.  No fact or set of facts cited in Count 2 of the Complaint gives rise to an inference, much less a strong inference, fraudulent intent on the part of Priore or the Manager.  Nor do the previous 128 paragraphs that are incorporated into Count 2 sufficiently address the intent of the alleged underlying wrongdoers.

The Complaint does, to be sure, assert that:

- "Priore knew that if Barclays foreclosed on the collateral, [the Manager] would lose the management fees it received from Triaxx Funding"; [107]

- "Priore also knew that the foreclosure would diminish the management fees [the Manager] received"; [108]

- "Priore knew that foreclosure meant that the Manager's overall assets under management would be substantially diminished . . . [as would the Manager's] ability to market itself as a significant player in the CDO market"; [109]

- "Priore and [the Manager] wanted to maintain the appearance that they were successfully managing Triaxx Funding and therefore, decided to

---

added); *id.* ¶ 95 ("[DLA Piper] billed for its role in Priore's and [the Manager's] *scheme to defraud* [the Funds]") (emphasis added); *id.* ¶ 114 ("As a result of [DLA Piper's] knowing and substantial assistance to Priore and [the Manager] to keep *their fraudulent scheme* going . . . .") (emphasis added) .

[106]    *See* Cmplt. ¶¶ 6, 40, 49, 113, 114, 123. As already noted, conclusory labels are insufficient to survive a motion to dismiss.  *See Twombly* 550 U.S. at 555; *MagCorp*, 399 B.R. at 768.

[107]    Cmplt. ¶ 3.

[108]    *Id.*

[109]    *Id.*

misappropriate almost $11 million from [the Funds] to pay Triaxx Funding's

margin and interest obligations;[110] and

- Priore, the Manager and DLA Piper "knowingly carr[ied] on [the Funds']

    business in a fraudulent manner."[111]

But apart from their conclusory nature, these allegations do not make out a showing of fraud.

They do not even say who was defrauded, and what was concealed.

The expenditure of the $36.5 million may have been ill-advised, and Priore and the

Manager could have been conflicted if the alleged motivations for the Transfers—incremental

fees and reputation—trumped the motivation to protect the underlying investment.  But there

are no allegations—especially those with specificity—supporting a claim of related fraud.

### 2. Secondary Liability

The Court further finds the allegations in the Complaint supporting secondary liability

on DLA Piper's part for fraud to be equally, if not more, deficient.  Once again, the Complaint

fails to forth facts underlying the allegation that White knew of a fraud or his participation in

one, or supporting the idea that he knew how his assistance was supporting the perpetration of

a fraud—a matter that is particularly challenging based on the delivery of legal services.[112]

### Count 3—Cayman Islands Companies Law § 147

Though not identical to the claims of aiding and abetting fraud, section 147 of the

Cayman Islands Companies Law has overlapping requirements.  Like the requirement for

---

[110]    *Id.* ¶ 64.

[111]    *Id.* ¶ 114.

[112]    *See Roni LLC v. Arfa*, 72 A.D.3d 413, 414, 897 N.Y.S.2d 421, 422 (1st Dep't 2010), *aff'd*, 15 N.Y.3d
826, 935 N.E.2d 791 (2010) ("[T]he allegation that the attorney defendants structured the transactions at
issue does not, without more, give rise to a reasonable inference that such professionals were aware" of
the fraudulent circumstances surrounding the transactions.); *cf. Eurycleia Partners, LP v Seward &
Kissel, LLP*, 12 N.Y.3d 553, 559-62, 883 N.Y.S.2d 147, 150-152, 910 N.E.2d 976, 979-981 (2009)
(affirming dismissal of complaint on motion based on insufficient factual allegations that law firm had
actual knowledge of fraud).

establishing a primary violation incident to pleading a claim of aiding and abetting, Section

147 requires a showing that the Funds were "carried on with intent to defraud . . . . or for any

fraudulent purpose."  The Court has already discussed the failure to satisfactorily allege fraud.

And there are no allegations, particularly any meeting Rule 9(b) requirements, establishing the

requisite intent to operate the Funds with a "fraudulent purpose."[113]  To the contrary, the

allegations show that the Funds' purpose was benign, and that any wrongful conduct merely

impaired the Funds' ability to achieve their entirely lawful purpose.  And it is only once that

primary violation has been established that section 147 provides that the Court may impose

liability on "any persons who were knowingly parties to the carrying on of the [Funds] in the

manner" just described—similar, once again, to the secondary violation required in an aiding

and abetting claim.  Here too, the Complaint alleges, at most, mismanagement, conflicts of

interest or other breach of fiduciary duty, but neither fraud nor operation with a fraudulent

purpose.[114]

Thus the Liquidators' Cayman Fraudulent Trading Claim must fail as well.

### D.  In Pari Delicto

In its most important—and in some ways, strongest—point, DLA Piper further argues

that even if the Liquidators otherwise had satisfactorily pleaded claims for aiding and abetting

---

[113]   This is so even if, as the Liquidators argue, s*ee* Pl. Br. at 38, "for any fraudulent purpose" is construed
broadly by the English courts.

[114]   The Court has considered the Liquidators' Notice of  Supplemental Authority calling this Court's
attention to the recent decision by Judge Glenn of this Court in *Hosking v. TPG Capital Mgmt., L.P. (In
re Hellas Telecomms. (Lux.) II SCA),* 2015 Bankr. LEXIS 2756, 2015 WL 4931412 (Bankr. S.D.N.Y.
Aug. 19, 2015) ("**Hellas Communications**").  But *Hellas Communications* dealt with other issues, and
is insufficiently close factually to affect the conclusions here.  While the Court assumes it to be true that
the English statute invoked in *Hellas Communications* was nearly identical to the Cayman statute, the
allegations supporting the English law claims in *Hellas Communications* were not the same.  DLA Piper
was not a party to the carrying on of the Funds' business, and the Funds' business was not alleged, or at
least adequately alleged, to have been carried on with an intent to defraud or any fraudulent purpose.

breach of fiduciary duty or fraud, those claims would have to fail under the doctrine of *in pari delicto* and the New York version of that doctrine, the *Wagoner* Rule. The Court agrees.

### 1. The In Pari Delicto Defense

The *in pari delicto* doctrine prevents a party from suing others for a wrong in which the party participated or is deemed through imputation to have participated. The doctrine "has been wrought in the inmost texture of [New York] law for at least two centuries."[115] The *Wagoner* rule[116] applies this doctrine to successors in interest of wrongdoers, including bankruptcy trustees and foreign liquidators.[117]

Here, unless an applicable exception applies, the alleged misconduct is imputed to the Funds, and then imputed to the Foreign Liquidators.[118] That forecloses the Funds from

---

[115]    *Kirschner*, 15 N.Y.3d at 464 (internal citations omitted).

[116]    This Court previously noted the tendency of *Wagoner* and its progeny to conflate the defense of *in pari delicto* with standing, *see MagCorp*, 399 B.R. at 763, and noted that it would "welcome guidance by the Circuit as to whether it continues to believe, in light of the matters discussed above, that *Wagoner* and its progeny should continue to deny standing or apply *in pari delicto* when an innocent trustee has displaced wrongdoing management." *Id.* at 766. The Court additionally stated that it would similarly welcome the views of the New York Court of Appeals. *Id.* Thereafter, each of the Circuit and the New York Court of Appeals spoke further on the matter, with the latter clarifying that "in New York, *in pari delicto* is an affirmative defense, not a matter of standing"—but is still appropriately "resolved on the pleadings." *Kirschner*, 15 N.Y.3d at 459 n.3. The *Kirschner* court also declined to make an exception to the *in pari delicto* doctrine despite the trustee's urging that proceeds would "benefit blameless unsecured creditors ... and shareholders." After *Kirschner*, the Second Circuit has continued to apply the *Wagoner* Rule to bar a trustee's claims at the pleading stage. *See In re Bernard L. Madoff Inv. Sec. LLC.*, 721 F.3d 54, 65 (2d Cir. 2013) *cert. denied sub nom. Picard v. HSBC Bank PLC*, 134 S. Ct. 2895(2014) ("Early resolution is appropriate where (as here) the outcome is plain on the face of the pleadings.").

[117]    *See Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 825–26 (2d Cir. 1997) ("**Mediators**") (applying the doctrine to bankruptcy trustees). *See also Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000) (regarding the *Wagoner* Rule as potentially applicable to English and Cayman foreign liquidators).

[118]    The Liquidators assert that the *Wagoner* rule is inapplicable here because "a Chapter 15 petition does not establish an estate under section 541 of the Code." Pl. Br. at 28 n.37. But the Court cannot agree. Whether an estate has come into being under section 541 or not, the Liquidators still act as the successors to the Funds, and, as noted above, the Second Circuit has considered the *Wagoner* Rule applicable to Cayman liquidators. *See Wight*, 219 F.3d at 86-87 ("The Liquidators do not dispute that, like the trustees of a bankruptcy estate, they stand in the shoes of the defunct corporation, and they do not have standing to assert claims belonging to BCCI's depositors and creditors. … The rationale underlying the *Wagoner* rule derives from the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation.").

recovering on secondary liability claims (including aiding and abetting) they might otherwise have.[119]

### 2. Adverse Interest Exception

The Liquidators do not dispute that *in pari delicto* and imputation initially apply. Instead, they urge the Court to rely on the "adverse interest exception" to the *in pari delicto* defense.  The Court turns to that exception now.

Preliminarily, however, the Court notes that the New York Court of Appeals is generally loath to apply exceptions to *in pari delicto*,[120] especially in the case of the adverse interest exception.[121]

To come within the exception, the agent must have *totally abandoned* his principal's interests and be acting *entirely* for his own or another's purposes.  The exception cannot be invoked merely because the agent has a conflict of interest or is not acting primarily for his or her principal.  As the *Kirschner* court stated:

> This rule avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases—outright theft or looting or embezzlement—where the insider's misconduct benefits only himself or a third party; i.e., where the fraud is committed *against* a corporation rather than on its behalf.[122]

Here, taking the Liquidators' allegations as true, there was a benefit to both the insider (Priore) and the corporation (the Funds).  The Liquidators argue that Priore and/or the

---

[119]  The *Wagoner* Rule does not impair the Liquidators' rights to proceed against officers or directors who acted wrongfully.  *See*, *e.g.*, *Magcorp*, 399 B.R. at 774.

[120]  *See Kirschner*, 15 N.Y.3d at 464 ("[T]he principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be "weakened by exceptions.") .

[121]  *See id.* at 463-477 (discussing the rationale behind the narrow scope of the adverse interest exception in the context of *in pari delicto* and imputation).

[122]  *Id.* at 466-67 (internal citations omitted) (emphasis in original).

Manager benefited from their conduct because that would protect management fees and their

reputations.  But here the Funds benefited in a much more major way, and for the most part

much more than minimally.  While the Court is inclined to agree that interest on the Funds'

advance to Triaxx Funding was only a modest benefit, the Funds received a very significant

benefit for the very reason the Transfers were made:  the Transfers served to prevent Barclays

from foreclosing on collateral in which the Funds were heavily invested.  The Court is

unpersuaded by the Liquidators' contention that avoiding a foreclosure on a default that would

have destroyed "approximately 50% of the [] Fund's net asset value"[123] was too little of a

benefit to overcome the adverse interest exception.

Since the Funds benefited from the Transfers, the adverse interest exception does not

apply.

### 3. Sole Actor Exception to Adverse Interest Exception

For that reason, in analyzing *Wagoner* Rule issues, the Court does not need to consider

DLA Piper's reliance on an exception to the exception.[124]  The Court notes, for the sake of

completeness, that the adverse interest exception to the *in pari delicto* doctrine contains, in

turn, its own exception, known as the "Sole Actor Rule."  The sole actor rule demands that *in

pari delicto* apply even where a principal's agents totally abandons the interests of the

principal, and takes harmful, entirely unbeneficial, actions, so long as the agent is the sole

decision maker of the principal.[125]

As noted, the adverse interest exception is not applicable here, for reasons the Court

just addressed.  But because the Manager and Priore were the sole decision-making agents of

---

[123]       Cmplt ¶ 3.

[124]       *See* Def. Br. at 2-3, 17-18.

[125]       *Mediators,* 105 F.3d at 827.

-38-

the Funds, and thus were one and the same with the Funds, their bad acts would be imputable to the funds even if the Adverse Interest Exception were to apply.

The Liquidators argue that the Sole Actor Rule here does not apply because the Funds had innocent investors who assertedly could have stopped the alleged fraud.[126]  Though the Court does not need to reach this contention (since it is so clear, given the avoidance of the liquidation and resulting benefit), that the Adverse Interest Exception does not apply, the Court notes, once again for the sake of completeness, that it cannot agree with the Liquidators' contentions in this respect either.  The Liquidators failed to plead, with any specificity, facts showing "how the wrongful conduct could have been stopped."[127]  "The touchstone of the innocent insider exception is control—whether the innocent person or persons inside the corporation had the power to stop the fraud."[128]  And here nothing is alleged in the Complaint to support a finding that any of the investors had sufficient control of the corporation to stop the Manager's and Priore's plans.[129]

Thus the Court concludes that apart from the Liquidators' failure to satisfactorily plead claims for aiding and abetting, DLA Piper must be dismissed, at the pleading stage, under its *in pari delicto* defense.

<u>Conclusion</u>

Accordingly, DLA Piper's motion to dismiss must be, and is, granted as to all three Counts.

---

[126]      *See* Pl. Br. at 34 (citing Cmplt. ¶ 119).

[127]      *MagCorp*, 399 B.R. at 768 n.158.

[128]      *O'Connell v. Pension Fin. Servs (In re Arbco Capital Mgmt., LLP)*, 498 B.R. 32, 48 (Bankr. S.D.N.Y. 2013) (Chapman, J.).

[129]      *See Breeden v. Kirkpatrick & Lockhart (In re Bennett Funding Grp., Inc.)*, 336 F.3d 94, 101 (2d Cir. 2003) ("The trustee seems to believe that the *Wagoner* rule is defeated by a would-a, could-a, should-a test but that is simply not the law.").

SO ORDERED.


Dated: New York, New York
     September 15, 2015

    *s/Robert E. Gerber*
United States Bankruptcy Judge