UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/9/2017

:
IN RE: :
:
ICP STRATEGIC CREDIT INCOME FUND :
LTD., :
:
     Debtor. :
------------------------------------------------------------X
:
ICP STRATEGIC CREDIT INCOME FUND, :    15-CV-7962 (VSB)
LTD., ICP STRATEGIC CREDIT INCOME :
MASTER FUND, LTD., and HUGH :    **MEMORANDUM & OPINION**
DICKSON, and MICHAEL SAVILLE, in their:
capacity as Joint Official Liquidators of ICP :
Strategic Credit Income Fund, Ltd. and ICP :
Strategic Credit Income Master Fund, Ltd., :
:
     Appellants, :
:
    - v - :
:
DLA PIPER L.L.P. (US), :
:
     Appellee. :
:
------------------------------------------------------------X

Appearances:

William T. Reid
Reid Collins & Tsai LLP
New York, New York

Joshua J. Bruckerhoff
Craig A. Boneau
Diamond McCarthy LLP
Austin, Texas
*Counsel for Plaintiffs-Appellants*

Matthew S. Kahn
Kevin S. Rosen
Gibson, Dunn & Crutcher, LLP
New York, New York
*Counsel for Defendant-Appellee*

1

VERNON S. BRODERICK, United States District Judge:

Appellants ICP Strategic Credit Income Fund, Ltd. (the "Feeder Fund"), ICP Strategic Credit Income Master Fund, Ltd. (the "Master Fund," and, together with Feeder Fund, the "Funds" or the "SCIF Funds"), and Hugh Dickson and Michael Saville in their capacity as the Joint Official Liquidators of the Funds (together, the "Liquidators") appealed the Decision and Order of United States Bankruptcy Judge (Gerber, *B.J.*) dismissing their complaint against Appellee DLA Piper LLP (US) ("DLA Piper" or "DLA"), brought as an adversary proceeding after being removed from New York state court, asserting claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and fraudulent trading under Section 147 of the Cayman Islands Companies Law. Because I find, consistent with the Bankruptcy Court's determination, that New York law applies and requires dismissal on *in pari delicto* grounds, the Bankruptcy Court's decision is AFFIRMED and the appeal is DISMISSED.

# I.    Background[1]

## A.    *Overview*

This case is about certain financial transactions orchestrated by an investment manager, ICP Asset Management ("ICP"), and its President and CEO, Thomas Priore. ICP essentially used money belonging to the SCIF Funds, a hedge fund client, to cover financial obligations owed by Triaxx Funding High Grade I, Ltd. ("Triaxx"), another investment vehicle managed by ICP. The law firm DLA Piper represented Triaxx and ICP, and helped create the documents that facilitated the transfers, which totaled over $36 million dollars over the course of eleven months.

The SCIF Funds were incorporated in 2005 as exempted limited liability companies

---

[1] On a motion to dismiss, I take the facts as alleged in a complaint as true and draw all reasonable inferences in favor of the non-moving party. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).

under Cayman Islands Companies Law. (Compl. ¶¶ 17-18.)[2] The Feeder Fund invested approximately $174 million into the Master Fund, which the Master Fund invested, together with contributions from its two other shareholders, for a total of approximately $245 million. (*Id*.) The Funds had two independent directors in the Cayman Islands, Roger Hanson and Ronan Guilfoyle. (*Id*. ¶ 28.)

Pursuant to an October 25, 2006 Investment Management Agreement, ICP served as SCIF Master's investment manager. (*Id*. ¶ 26.) Under that agreement, "ICP owed SCIF Master the fiduciary duty to invest SCIF Master's assets in good faith and give SCIF Master 'the benefit of its best judgment and efforts in rendering its services,' among other things." (*Id*.) Priore served as director of the Funds. (*Id*. ¶ 27.)

ICP was also the collateral manager of Triaxx, the issuer of certain collateralized debt obligations in which the Funds had invested approximately 50% of its net asset value. (*Id*. ¶¶ 2-3.)

**B.** ***The Triaxx Funding CDO***

In 2007, Triaxx entered into a Master Repurchase Agreement ("MRA") with Barclays Bank PLC. (*Id*. ¶ 31.) Under the MRA, Barclays essentially provided Triaxx with a loan by providing financing to be paid back at a later date, and secured by certain collateral. (*Id*.) Pursuant to the MRA, if the value of the collateral dropped below a certain level, Barclays would issue a "margin call" requiring additional collateral. (*Id*.) Should Triaxx fail to meet the margin call, Barclays could declare default and liquidate the collateral. (*Id*.) If, on the other hand, the value of the collateral increased above a certain point, Barclays would transfer margin excess

---

[2] "Compl." refers to the complaint filed in the Supreme Court of the State of New York on or about December 6, 2013, and is contained along with the Summons in the Appellants' Appendix ("App'x") at A20 through A60.

funds to Triaxx.  (*See id.*)

## C.    *The October 2008 Misappropriation of Funds*

As the mortgage markets began to decline in late 2007, the value of residential mortgage-backed securities ("RMBS") held by Triaxx also decreased, resulting in margin deficits.  (*Id.* ¶ 40.)  Barclays issued margin calls that Triaxx was unable to meet.  (*Id.*)  Between March and October 2008, Triaxx engaged in a number of transfers of bonds, unrelated to the transaction here, to satisfy its obligations to Barclays.  (*Id.* ¶ 41.)  However, by late 2008, Priore and ICP were no longer able to sell additional bonds to cover the margin payments, and were forced to find another source of capital.  (*Id.* ¶ 42.)

In October 2008, ICP asked DLA Piper attorney Lucien White whether an entity other than Triaxx could satisfy the margin payment.  (*Id.* ¶¶ 43-44.)  On October 28, 2008, an ICP employee asked White if it was "possible to just post [the margin] to [Barclays] in escrow for [Barclays'] benefit if the deal unwinds but otherwise not part of the deal structure?"  (*Id.* ¶ 44.)  The next day, White emailed Barclays' counsel at Cadwalader the following:

> Triaxx Funding needs to post $7.5mm to Barclays today.
>
> We'd like to have an icp affiliate post the cash directly in lieu of Triaxx Funding doing it (to avoid the painful mechanics of issuing new Credit Enhancement Notes, setting up a designed CE with the trustee and all the cash transfer headaches).
>
> Think we can do it by having (I) a short letter agt between Barclays and the funder of the cash and (II) a written waiver of the mra margin requirement by Barclays in favour of Triaxx (which should include acknowledgement that future margin requirement would take into account the fact that Barclays has the $7.5mm in cash).

(*Id.* ¶ 45.)  After sending the email, White told ICP to fund the margin payment "from an entity other than ICP" because DLA wanted "to reduce the argument that [ICP] has implicitly accepted additional obligations under the transaction."  (*Id.* ¶ 46.)  The ICP employee then told White that

"[i]t will be from our Hedge Fund [SCIF Master] not from ICPAM – does that help?" (*Id*.) White responded: "Yep." (*Id*.)

Barclays agreed to the funding deal, and ICP caused SCIF Master to transfer $7,175,455 to Barclays on October 29, 2008. (*Id*. ¶ 47.) DLA then began drafting what would become the Waiver Letter[3] and Direction Letter[4] between Barclays and Triaxx. (*Id*. ¶ 48.) Barclays' counsel told White that it would reserve Barclays' rights "in case there are any claw-back proceedings." (*Id*. ¶¶ 48-49.) Another ICP employee reviewed the draft Waiver Letter and told White, "I am not sure that we see where this margin payment [*i.e.*, the payment from SCIF Master] is senior to other margin in the deal." (*Id*. ¶ 50.) White responded: "That goes in the letter agreement between the fund [SCIF Master] and Barclays that I have to draft. I'd like to keep it out of this document to avoid muddying the waters." (*Id*.)

In the Waiver Letter, Barclays "(i) acknowledged that it 'received, on October 29, 2008, $7,175,455.22 in immediately available funds from [SCIF Master], which amount has been applied by Barclays to meet the margin payment obligations' of Triaxx Funding; and (ii) waived Triaxx Funding's obligations under the MRA." (*Id*. ¶ 51.) The Waiver Letter ultimately included Barclays' reservation of rights in the event that SCIF Master brought a fraudulent transfer claim against Barclays. (*Id*. ¶ 52.)

At the time of this transaction, ICP and DLA Piper knew that the Funds were not represented by counsel in connection with this transaction, and White knew that the Funds had previously been represented by the law firm Schulte Roth. (*Id*. ¶¶ 54, 101.) Despite this, White

---

[3] "Waiver Letter" refers to the letter prepared by White "for Barclays to sign in which it agreed to accept money from SCIF Master and waive Triaxx Funding's margin obligation but reserved the right to reassert the obligation against Triaxx Funding if SCIF Master brought a claw-back claim." (Compl. ¶ 7.)

[4] "Direction Letter" refers to another letter prepared by White "for ICP to send to LaSalle directing LaSalle to consider Triaxx Funding's margin obligation paid as a result of SCIF Master's transfer of funds to Barclays." (*Id*.)

drafted a letter agreement *on behalf of the Funds* between the Funds and Barclays on October 31, 2008. (*Id*. ¶ 56.) The purpose of the letter was to get Barclays' agreement to pay excess margin to the Funds in the event that the RMBS market improved. (*Id*.) However, Barclays refused to sign the letter, and White later told ICP that "[i]f we were to insist on it, they'd want the Issuer [Triaxx Funding] to countersign it, which creates all kinds of problems under the Indenture." (*Id*. ¶ 57.) Priore, ICP, and DLA Piper decided not to insist on Barclays signing the letter agreement. (*Id*.)

### D. *Subsequent Transfers of Funds*

Throughout 2009, DLA documented nine additional payments from the Funds to Barclays. (*Id*. ¶ 58.) During one such transaction, the trustee, Bank of America, requested that White "add a certification in the direction letter that the Noteholders are not materially and adversely affected by the transaction," which White added. (*Id*. ¶ 61.) The transfers totaled approximately $36.5 million over a period of eleven months. (*Id*. ¶¶ 8, 123a.)

At several points, DLA billed Triaxx for legal services, including "negotiating and drafting documents in connection with [SCIF Master] funding of margin payments under the Barclays MRA." (*Id*. ¶¶ 71; 93-99.)

### E. *Representations Made to ICP Employees and Fund Administrators*

On April 23, 2009, Peter Woroniecki, ICP's Director of Fund Operations, who joined ICP in February 2009, emailed White to ask why "SCIF has no note to represent the funding, really has no way to tie in collateral, nor has any documentation in terms of the advances." (*Id*. ¶ 74.) In response, White said that the "only documentation" evidencing the transfers were the Waiver Letters and Direction Letters. (*Id*. ¶ 75.) White said he "asked Barclays to sign a letter agreement with SCIF describing how SCIF would get paid back, but at the last minute they

refused to sign it and we had to fund to avoid an [event of default]." (*Id.*) Woroniecki emailed his concern about the transaction to Priore and others at ICP. (*Id.* ¶ 76.)

On April 29, 2009, White drafted a document describing the transfers as a loan, which was forwarded to Woroniecki. (*Id.* ¶ 79.) Woroniecki responded to White, telling him that the document he drafted was not a loan agreement. (*Id.* ¶ 80.) On May 21, 2009, White emailed reasons why DLA "believe[d] it would not be unreasonable to take the position that" to the "extent that [SCIF Master's] advances are subsequently transferred by Barclays to the Trustee [B of A]," ICP could direct B of A "to transfer those advances back to [SCIF Master] outside of the Priority of Payments under the [Triaxx Funding] Indenture." (*Id.* ¶ 85.) White also stated that "we cannot say that it would be unreasonable for [B of A], any Noteholder or other interested party to take the position, either in or out of bankruptcy, that the cash advances are Assets of T-Funding and/or are subject to the Priority of Payments." (*Id.*) During a discussion between Woroniecki and White, White represented to Woroniecki that there was an "undocumented verbal loan" in place between SCIF Master and Barclays. (*Id.* ¶ 87.) Woroniecki stopped inquiring, and documented the transfers as a loan. (*Id.* ¶ 88.)

**F.    *SEC Investigation***

Barclays ultimately issued a margin call that neither Triaxx nor the Funds could pay, and Barclays declared an event of default. (*Id.* ¶ 13.) The Funds lost their entire investment in Triaxx—over $100 million in losses. (*Id.* ¶¶ 13, 114) The Complaint alleges that, had Barclays foreclosed on Triaxx Funding back in October 2008, the SCIF Funds would have recovered a portion of their Triaxx investment. (*Id.* ¶ 114)

White was deposed by the SEC regarding these transactions and testified that he knew that the Funds had at one point been represented by Schulte Roth, but because he was not

representing the Funds in that transaction and he "wasn't analyzing whether these reps were

something that SCIF could or should make."  (*Id.* ¶ 101.)  He did not "review any documents

relating to SCIF's authority or ability to either make the loan or sign this agreement."  (*Id.*)  It

was his understanding that "this was the agreement that had been made by SCIF and Barclays,

and [he] was representing the issuer in the transaction and wasn't focusing on SCIF's

representation."  (*Id.*)

He also testified that, after he heard that Barclays would not sign the drafted agreement

between the SCIF Funds and Barclays, it was his understanding that "the terms that were written

in this document were the terms that had been agreed by those two parties."  (*Id.* ¶ 102.)  When

asked why he had that understanding in light of Barclays' decision not to sign the letter, White

declined to answer on the basis that it would reveal communications between him and his client,

ICP.  (*Id.*)  At a later deposition, after waiving the privilege, White was asked about his prior

testimony concerning his understanding of the agreement between the SCIF Funds and Barclays.

He testified that, "it changed, in subsequent conversations with Aamer and or Dave, we

discussed the suggestion by Aaron that a transfer of these funds from Barclays to the issuer could

be then subsequently transferred pursuant to an instruction from the collateral manager to SCIF."

(*Id.* ¶ 103.)  He further testified that "[t]he fact of an agreement to repay a loan was always there.

The mechanics of the repayment are what became different."  (*Id.* ¶ 104.)  He also stated that

"it's a method of repayment that anticipates that Barclays is going to transfer funds to the issuer

which are not funds that the issuer owns. . . .  And that therefore the collateral manager [ICP] can

instruct pursuant to the management agreement the trustees to transfer those funds to SCIF."

(*Id.*)

The SEC ultimately brought an action against ICP and Priore for securities fraud.  (*Id.*

¶ 106.)  After the SEC sued ICP and Priore, the Funds were placed into official liquidation by the Grand Court of Cayman Islands.  (*Id*. ¶ 119.)

## II.    **Procedural History**

On June 28, 2013, the Liquidators filed a verified petition in Bankruptcy Court pursuant to Chapter 15 of the Bankruptcy Code, seeking recognition of the Funds' liquidation proceedings pending in the Grand Court of the Cayman Islands.  The Bankruptcy Court entered an order granting recognition to the Cayman Islands liquidation as a foreign proceeding on August 8, 2013.

A few months later, on December 6, 2013, the Liquidators brought claims against DLA Piper in New York State Supreme Court, alleging (1) aiding and abetting breach of fiduciary duty, (2) aiding and abetting fraud, and (3) fraudulent trading.  (App'x 20-60.)  On January 17, 2014, DLA Piper removed the claims to the United States District Court for the Southern District of New York as related to the Chapter 15 bankruptcy proceedings, pursuant to 28 U.S.C. §§ 1334(b) and 1452.  (App'x 10-19.)  Shortly thereafter, the case was referred from the District Court to the United States Bankruptcy Court for the Southern District of New York under 28 U.S.C. § 157 and the January 31, 2012 Standing Order regarding Title 11 cases.  (App'x 9.)

Once before the Bankruptcy Court, DLA Piper filed a motion to dismiss the Liquidators' complaint pursuant to Federal Rules of Civil Procedure 12(b)(6), applicable through Bankruptcy Rule 7012, for failure to state a claim.  (App'x 4.)  On September 15, 2015, the Bankruptcy Court issued an order granting DLA's motion to dismiss, holding, among other things, that the Liquidators had failed to state a claim and that the doctrine of *in pari delicto* barred the New York common law claims.  (App'x 731-70.)  The Liquidators filed their notice of appeal on September 25, 2015.  (App'x 771-72.)  Appellants filed their brief and an appendix on December

4, 2014.  (Doc. 11.)  Appellee DLA filed its opposition and an appendix on January 19, 2016, (Doc. 14), and Appellants filed their reply on February 17, 2016, (Doc. 15).

## III.    <u>Standard of Review</u>

This court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final judgments, orders, and decrees of a bankruptcy court.  On such an appeal, a district court reviews the bankruptcy court's findings of fact for clear error, and any conclusions of law de novo.  *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994).

DLA Piper argues that I should treat the Bankruptcy Court's decision as proposed findings of fact and conclusions of law—to which the Liquidators allegedly failed to timely object—rather than a final order or judgment, because the Bankruptcy Court did not have jurisdiction to decide the "non-core" claims at issue in the case.  (Appellee's Br. 1-2.)  *See* 28 U.S.C. § 157(c)(1) (for non-core proceedings, "the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected"); *see also* Fed. R. Bankr. P. 9033(d); *In re Standing Order of Reference re: Title 11*, 12 Misc. 32 (S.D.N.Y. Feb. 1, 2012).[5]  I will not do so, as it is clear that the Bankruptcy

---

[5] The Southern District of New York standing order is available at
http://nysd.uscourts.gov/rules/StandingOrder_OrderReference_12mc32.pdf.  It states:

> Pursuant to 28 U.S.C. Section 157(a) any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 are referred to the bankruptcy judges for this district.

> If a bankruptcy judge or district judge determines that entry of a final order or judgment by a bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under this order and determined to be a core matter, the bankruptcy judge shall, unless otherwise ordered by the district court, hear the proceeding and submit proposed findings of fact and conclusions of law to the district court. The district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment

Court had jurisdiction over any non-core claims by virtue of DLA Piper consenting to its

jurisdiction. As the Supreme Court recently made clear, "Article III is not violated when the

parties knowingly and voluntarily consent to adjudication by a bankruptcy judge." *Wellness Int'l*

*Network v. Sharif*, 135 S. Ct. 1932, 1939 (2015); *see also In re: FKF 3, LLC*, No. 13-CV-3601

(KMK), 2016 WL 4540842, at *10 n.4 (S.D.N.Y. Aug. 30, 2016) ("The Supreme Court has

recently reaffirmed that parties can consent to final adjudication by a bankruptcy court, even

when the claims at issue are so-called '*Stern* claims,' over which the bankruptcy court would

otherwise lack constitutional authority to finally adjudicate."). Consent to bankruptcy

adjudication need not be express; "the key inquiry is whether 'the litigant or counsel was made

aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the

case' before the non-Article III adjudicator." *Wellness Int'l Network*, 135 S. Ct. at 1948 (quoting

*Roell v. Withrow*, 538 U.S. 580, 590 (2003)). Here, DLA Piper first removed the case from state

court on the basis that it was related to the ongoing bankruptcy, and then moved to dismiss the

case once the adversary proceeding had commenced before the Bankruptcy Court. DLA

therefore chose Bankruptcy Court as the forum in which they wished to litigate the case. This

invocation of the Bankruptcy Court's authority to dismiss the case was a manifestation of

implicit consent to the Bankruptcy Court's jurisdiction. *See In re TPG Troy, LLC*, 793 F.3d 228

(2d Cir. 2015) (concluding that party consented to bankruptcy court jurisdiction by agreeing to

bankruptcy court determining attorney's fees and costs pursuant to Section 303(i)(1)); *see also*

*Stern v. Marshall*, 564 U.S. 462, 481 (2011) ("If Pierce believed that the Bankruptcy Court

lacked the authority to decide his claim for defamation, then he should have said so—and said so

promptly. Instead, Pierce repeatedly stated to the Bankruptcy Court that he was happy to litigate

---

consistent with Article III of the United States Constitution.

there. We will not consider his claim to the contrary, now that he is sad." (internal citation

omitted)). Therefore, the Bankruptcy Court's decision should be treated as a final order rather

than proposed findings. As such, I review the findings of fact for clear error and conclusions of

law de novo.[6] *See In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir.1990).

## IV. Discussion

On appeal, the Liquidators argue that the Bankruptcy Court erred in (1) concluding that

the Complaint failed to allege sufficient facts to state a claim for aiding and abetting breach of

fiduciary duty, (2) applying New York law, rather than Cayman Islands law, to the question of

whether ICP and Priore's conduct is imputed to the Funds under the doctrine of *in pari delicto*,

(3) holding that the ICP and Priore's conduct is imputed to the Funds under New York law, and

(4) holding that the Liquidators had failed to state a claim for fraudulent trading under Section

147 of the Cayman Companies Law.[7]

Because I agree with the Bankruptcy Court's determination that New York law applies

and requires dismissal on *in pari delicto* grounds, I need not and do not reach the question of

whether the Complaint adequately pleads a claim of aiding and abetting breach of fiduciary

---

[6] Even if I were to treat the decision as non-final, the standard of review would be the same, as legal conclusions are reviewed *de novo* in either event. *See In re Coudert Bros. LLP*, App. Case No. 11-2785 (CM), 2011 WL 5593147, at *10 (S.D.N.Y. Sept. 23, 2011). The Bankruptcy Court's decision was rendered on a motion to dismiss, meaning the Bankruptcy Court assumed all facts to be true for purposes of the motion. Therefore, there are only legal issues at stake.

DLA Piper also argues that, if the Bankruptcy Court's order was not final, the Liquidators' failure to file written objections within fourteen days constituted a waiver of review of the proposed findings and conclusions. Some judges have concluded that failure to object to proposed findings results in waiver of the right to appeal a bankruptcy court's proposed findings and conclusions. *See Messer v. Peykar Int'l Co., Inc.*, 510 B.R. 31, 38-42 (S.D.N.Y. 2014) (collecting cases). However, others have construed an appellant's brief as objections where it was later determined that the bankruptcy court lacked jurisdiction to enter a final order. *See In re Coudert Bros. LLP*, 2011 WL 5593147, at *13. If I were treating the decision as proposed findings and conclusions, I would nevertheless accept the Liquidators' appellate brief as objections under the circumstances and in light of any ambiguity.

[7] The Liquidators do not appeal the Bankruptcy Court's dismissal of their claim for aiding and abetting fraud. (Appellant's Br. at 2 n.5.)

duty.[8]

## A. *Legal Standard*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

---

[8] However, I make the following observations. A claim for aiding and abetting breach of fiduciary duty requires a plaintiff to allege "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010) (quoting *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 466 (S.D.N.Y. 2009)). The Bankruptcy Court concluded that the Liquidators "just barely" pled a primary violation of breach of fiduciary duty, primarily on the basis that the "expenditure of $36 million to protect against an immediate loss of 50% of the Funds' net asset value would be protected under the 'Business Judgment Rule,'" and because there was a question as to "whether the documentation of the duty to repay the Funds after the Transfers actually caused the Funds' losses." (App'x 755-56.) The Bankruptcy Court therefore assumed that New York's Business Judgment Rule applies to hedge fund managers. New York's "Business Judgment Rule" "bars judicial inquiry into actions of *corporate directors* taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of *corporate purposes*." *Auerbach v. Bennett*, 47 N.Y.2d 619, 629 (1979) (emphasis added). I am aware of no application of the doctrine to hedge fund managers, who do not share the "authority and responsibilities vested in corporate directors both by statute and decisional law." *Id.*; *see also Matter of Levandusky v. One Fifth Ave. Apt. Corp.*, 75 N.Y.2d 530, 537 (1990) (extending rationale to decisions made by residential cooperative corporations). There are also plausible allegations that the transfers may not have occurred at all in the event that sufficient documentation of the "loan" had been demanded. (*See* Compl. ¶ 114.)

With respect to the "actual knowledge" prong, Judge Gerber found significant the fact that the transfers' obvious purpose was to "sav[e] half the Funds' net asset value." (App'x 759.) Even so, this does not explain ICP/Priore's decision to transfer the money with no documentation and no right to repayment, or how such a decision could be seen by White as a legitimate business decision with the Funds' interest in mind. As alleged in the Complaint, White knew that the Funds had not secured a right of repayment, that Barclays had refused an obligation to repay the Funds directly, and that the Funds would be repaid only at the direction of ICP. However, there were no terms by which ICP would transfer the money back to the Funds. White drafted a letter to the Funds' administrator in July 2009, stating that "Repayment of the Loans will occur upon direction of [ICP] to [B of A], pursuant to the terms of the [Triaxx Funding] Indenture, to transfer to [SCIF Master], from time to time, certain funds received by [B of A] from [Barclays] in respect of the Loans. . . . Interest on unpaid amounts accrues at the applicable Federal Funds rate." (Compl. ¶ 90.) But White knew that the Indenture provided no terms by which ICP would repay the Funds. (*Id.* ¶ 91.)

The Bankruptcy Court also believed it "barely plausible" that Triaxx would have "contested a duty to repay indebtedness advanced to it by its affiliate," and uses the example of "inter-company loans" made with "little or no documentation, but . . . nevertheless g[iving] rise to intercompany obligations." (App'x 757-58.) But the relationship between Triaxx and the Funds was not that of intercompany affiliates, and ICP's decision to use millions of dollars of the Funds' money to meet Triaxx's margin obligations—with nothing more than ICP's word that the loan would be repaid—probably support a "strong inference of conscious avoidance" of the fact that ICP was acting against the Funds' interest, "which is sufficient to satisfy the knowledge requirement." *Anwar*, 728 F. Supp. 2d at 443 (concluding that lawyers consciously avoided Madoff scheme given their "familiarity with the Funds, . . . their general experience in providing financial services to funds, and their knowledge of these red flags" as well as allegations that they "were aware of the roles consolidated in Madoff, the lack of transparency into his operations, his family members' involvement in key positions at his firm, his lack of segregation of important functions, his use of an unknown auditing firm, his use of paper trading records, and his implausibly consistent investment returns.").

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  "Plausibility . . . depends on a host of considerations:  the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).  In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Id.*

## B.    *In Pari Delicto*

### 1.    Choice of Law

The Bankruptcy Court concluded that New York law applies to the *in pari delicto* question because, (1) in New York,[9] the law governing an affirmative defense is the same as the law governing the claim itself; and (2) under the interests analysis, New York's interests in applying its law outweigh the interests of Cayman Islands in applying Cayman Islands law.  The

---

[9] The parties agree that New York law governs the conflict-of-law questions.  (Appellant's Br. 38; Appellee's Br. 28-36.)

Liquidators do not dispute that New York law applies to the underlying claim for aiding and abetting breach of fiduciary duty. Rather, they argue that the law governing an affirmative defense is not necessarily the same as the law governing the claim itself, and that conflict of laws analysis must be applied on an issue-by-issue, and even element-by-element, basis. (Appellant's Br. 39.) Using this framework, they argue that Cayman law should be applied to the question of imputation under New York's internal affairs doctrine.

*In pari delicto* is an affirmative defense in New York. *See Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 459 n.3 (2010). There is no direct support for the proposition that a New York court would apply the law of one jurisdiction for the underlying claim, and another for an affirmative defense to that claim. Indeed, courts consistently take the opposite view. *See, e.g.*, *Cobalt Multifamily Investors I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 434 (S.D.N.Y. 2012) (rejecting same argument and noting that defendants "offer no legal support for the proposition that a New York court would apply one jurisdiction's law to the underlying claim and apply another jurisdiction's law to an affirmative defense to that claim. Nor could they, because in this Circuit, the law governing an affirmative defense to a claim is the same as the law governing the claim itself"); *see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540-41 (2d Cir. 1997) ("[T]here is no authority for the proposition that New York courts would apply the law of one jurisdiction to a breach of contract claim and the law of another jurisdiction to an affirmative defense to that claim. Nor is there authority suggesting that New York courts would apply contract choice of law principles to determine the applicable law governing a breach of contract claim and tort choice of law principles to determine the applicable law governing an affirmative defense to that claim."). *But see Simon v. Philip Morris Inc.*, No. 99 CV 1988, 2000 WL 1745265, at *28 (E.D.N.Y. Nov. 16, 2000) (explaining that depecage doctrine generally

"permits severance of . . . questions of individual causation, damages, and affirmative defenses in accordance with different states' law").  Although the New York Court of Appeals noted in *Babcock v. Jackson* that "there is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction," 12 N.Y.2d 473, 484 (1963), this language has only been used to support the application of "laws of multiple jurisdictions to *multiple claims* where an interest analysis so dictates."  *FIA Leveraged Fund Ltd. v. Grant Thornton LLP*, No. 651217/2015, 2016 WL 350932, at *7 (N.Y. Sup. Ct. 2016) (rejecting argument that a New York law requires a court to conduct a conflict of laws analysis on an "issue-by-issue basis, a principle known as depacage").

Indeed, courts typically apply New York law of *in pari delicto* after determining that New York law applies to the underlying claim to which the defense is asserted.  *See FIA Leveraged Fund Ltd.*, 2016 WL 350932, *5 (applying New York law to *in pari delicto* defense after determining that New York law applies to underlying claims); *Okimoto v. Youngjun Cai*, No. 13 Civ. 4494(RMB), 2015 WL 3404334, at *3-4 (S.D.N.Y. 2015) (determining choice of law for adverse interest exception of *in pari delicto* defense by examining what law applies to the tort of breach of fiduciary duty under New York's interests analysis); *In re Refco Securities Litig.*, 779 F. Supp. 2d 372, 374 n.1 (S.D.N.Y. 2011) ("Under New York law (which substantively governs the claims here at issue), *in pari delicto* is an affirmative defense as to which a defendant bears the burden of proof."); *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 306 n.16 (1998) (stating that New York law applies to *in pari delicto* defense because its substantive law applies to underlying tort claim); *see also LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 245 (S.D.N.Y. 2007) (declining to consider the applicability of New York defense of *in pari delicto* to action applying Swiss law to underlying claims).

Appellant argues that New York courts, in principle, would apply one jurisdiction's law to the underlying claim and another's to an affirmative defense, by virtue of the fact that New York conflict of laws analysis applies differently to "loss-allocating" rules than it does to "conduct-regulating" rules.[10]  Appellant cites cases that conduct interest analyses on "loss-allocating" rules, but none that actually apply one jurisdiction's laws to the underlying claim, and another jurisdiction's to an affirmative defense to that claim.  *See, e.g.*, *Armstead v. Nat'l R.R. Passenger Corp.*, 954 F. Supp. 111, 113 (S.D.N.Y. 1997) (concluding that "New York law will be applied to the instant case" after determining that New York's comparative negligence rule would apply).

Here, there is no dispute that New York law applies to the claims of aiding and abetting breach of fiduciary duty.  Therefore, New York law applies to the affirmative defense of *in pari delicto* as well.  Nevertheless, if I were to conduct a separate interest analysis, I would conclude that New York law applies, as the Bankruptcy Court did.  The case was brought in New York state court, based on facts alleged to have occurred solely in New York, against a New York law firm.  New York has a significant interest in the types of claims themselves, as they relate directly to the financial industry in New York.  *See Granite Partners*, 17 F. Supp. 2d at 306 ("[D]isposition of the claim—that the Brokers induced and participated in a breach of fiduciary duty by a money manager of investment funds—is vitally important to the financial industry, which is centered in New York.  For these reasons, New York substantive law applies to the

_____

[10] In typical tort cases, New York courts apply an "interests" analysis, which involves the examination of the purposes and policies of the conflicting laws in the context of the facts of a particular case.  *See Brink's Ltd. v. S. African Airways*, 93 F.3d 1022, 1031 (2d Cir. 1996).  Where conduct-regulating laws are at issue, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *Cooney v. Osgood Mach.*, 81 N.Y.2d 66, 72 (1993).  But where "post-event remedial rules," or "loss-allocating rules," are presented, "other factors are taken into consideration, chiefly the parties' domiciles."  *Id.*  The goal is to determine "which State has the greater interest in having its law applied."  *Brink's*, 93 F.3d at 1031 (quoting *Istim, Inc. v. Chem. Bank*, 78 N.Y.2d 342, 348 (1991)).

claim and, therefore, to the applicability of the Brokers' *in pari delicto* defense."). And, as the New York Court of Appeals has made clear, the *in pari delicto* doctrine itself "serves important public policy purposes" in New York. *Kirschner*, 15 N.Y.3d at 464. Finally, contrary to the Liquidators' argument, New York's internal affairs doctrine does not apply to *in pari delicto*. *See New Greenwich Litig. Trustee, LLC v. Citco Fund Services (Europe) B.V.*, 41 N.Y.S.3d 1, 6 (N.Y. App. Div. 1st Dep't 2016) ("[T]he doctrine only 'governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders.'" (quoting *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 817 (Del. Ch. 2009))); *FIA Leveraged Fund Ltd.*, 2016 WL 350932, at *6 ("Plaintiffs fail to cite any cases where a court applied New York's internal affairs doctrine to determine whether *in pari delicto* applies.").

Therefore, the Bankruptcy Court was correct in concluding that New York law applies to DLA Piper's *in pari delicto* defense.

### 2. Applicable Law

Under New York law, the *in pari delicto* doctrine "mandates that the courts will not intercede to resolve a dispute between two wrongdoers." *Kirschner*, 15 N.Y.3d at 464. The defense "bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss." *In re Lehr Constr. Corp.*, 551 B.R. 732, 739 (S.D.N.Y. 2016) (quoting *Rosenbach v. Diversified Grp., Inc.*, 85 A.D.3d 569, 570 (N.Y. App. Div. 1st Dep't 2011)). Its purpose is twofold: "First, denying judicial relief to an admitted wrongdoer deters illegality. Second, *in pari delicto* avoids entangling courts in disputes between wrongdoers." *Kirschner*, 15 N.Y.3d at 464.

As the New York Court of Appeals recently made clear, "traditional agency principles play in important role in an *in pari delicto* analysis," most importantly that "the acts of agents . . . are presumptively imputed to their principals." *Id*. at 465. A corporation is responsible for the acts of its agents, even where those acts were unauthorized. *Id*. Imputation also applies "where the agent acts less than admirably, exhibits poor business judgment, or commits fraud." *Id*. Thus, "all corporate acts—including fraudulent ones—are subject to the presumption of imputation." *Id.* at 466.

There is a "narrow exception" to the presumption of imputation "where the corporation is actually the victim of a scheme undertaken by the agent to benefit himself or a third party personally, which is therefore entirely opposed (i.e., 'adverse') to the corporation's own interests." *Id.* at 467. This "adverse interest" exception applies only where the agent has "*totally abandoned* his principal's interests" and is "acting *entirely* for his own or another's purposes." *Id.* at 466 (emphasis in original). "It cannot be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal." *Id.* at 466 (quoting *Center v. Hampton Affiliates*, 66 N.Y.2d 782, 784 (1985)). The adverse interest exception is reserved for the "most narrow of exceptions for those cases—outright theft or looting or embezzlement— where the insider's misconduct benefits only himself or a third party; *i.e.*, where the fraud is committed *against* a corporation rather than on its behalf." *Id.* at 466-67 (emphasis in original). If the agent is acting "both for himself and for the principal," the exception does not apply. *Id.* at 467. Thus, "if a corporation receives *any* benefit from the [misconduct], the adverse interest exception will not apply, even if the [misconduct] ultimately causes the corporation to suffer harm in the long term, and even where the insider intended to benefit himself at the corporation's expense." *Cobalt Multifamily Investors I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 428 (S.D.N.Y.

2012) (emphasis in original). The New York Court of Appeals has warned that the defense of *in pari delicto* "applies even in difficult cases and should not be 'weakened by exceptions.'" *Kirschner*, 15 N.Y.3d at 479 (quoting *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 470 (1960)).

Although factual development may be required in some cases, a case may be dismissed where it is "plain on the face of the pleadings" that the *in pari delicto* defense applies. *In re MF Global Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 189 (S.D.N.Y. 2014).

### 3. Application

The Bankruptcy Court concluded that the adverse interest exception was inapplicable because the Funds received a benefit from ICP/Priore's actions: the temporary preservation of the Funds' investment in Triaxx. (App'x 767-68.) The Liquidators argue that, unlike the insiders in *Kirschner*, ICP and Priore stole *from* the Funds, rather than *for* them, and that whether a benefit was actually conferred to the Funds is a question of fact. (Appellant's Br. 54-57.) The operative question is whether ICP and Priore "totally abandoned" the Funds' interests at the time of the misconduct.

Approximately $245 million was invested in the Funds, (Compl. ¶ 18), and approximately fifty percent of the Funds' assets were invested in Triaxx, (*id.* ¶ 3). This included at least "tens of millions of dollars in various tranches of Triaxx Funding 'mezzanine' notes." (*Id.* ¶ 33.) Had ICP and Priore not transferred the money and executed the unauthorized loans, Barclays would have foreclosed on the investment. (*Id.* ¶ 31; *see also* App'x 82 (email from DLA attached to Complaint stating that "absent these advances, there was a substantial likelihood that Barclays would have declared an Event of Default . . . , possibly leaving the Noteholders . . . with a principal shortfall").) While the Liquidators may have preferred this

result, they cannot escape the fact that the decision to sustain Triaxx temporarily preserved the Funds' investment. The fact that ICP and Priore's bad business decisions ultimately harmed the Funds is irrelevant to the adverse interest analysis. *See Kirschner*, 15 N.Y.3d at 468 ("Even where the insiders' fraud can be said to have caused the company's ultimate bankruptcy, it does not follow that the insiders 'totally abandoned' the company. . . . [I]t 'is immaterial that it turned out that it would have been better' for the agent to have acted differently.").

In *Kirschner*, the Court of Appeals determined that simply keeping a business alive was enough of a benefit to defeat the adverse interest exception. *Id.* at 468 ("So long as the corporate wrongdoer's fraudulent conduct enables the business to survive—to attract investors and customers and raise funds for corporate purposes—this test is not met."); *see also In re Lihua Int'l, Inc. Sec. Litig.*, No. 14-CV-5037 (RA), 2016 WL 1312104, at *16-17 (S.D.N.Y. Mar. 31, 2016) (failure to disclose misconduct in securities filings benefited corporation by allowing it to survive and preserve shareholder confidence); *In re PetroChina Co. Ltd. Sec. Litig*, 120 F. Supp. 3d 340, 362 (S.D.N.Y. 2015) ("[I]t was in [the corporation's] interest for any corruption occurring within the [c]ompany to remain undisclosed in order to preserve its shareholders' confidence."); *Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 277 (S.D.N.Y. 2013) (by hiding certain information from investors, corporation benefited because it "continued 'to survive—to attract investors and customers and raise funds for corporate purposes'" (quoting *Kirschner*, 15 N.Y.3d at 468)). There is no meaningful difference between enabling a business to survive and preserving an investment vehicle. Although the Complaint does not explicitly identify similar collateral benefits to keeping Triaxx alive, such as "attract[ing] investors and customers and rais[ing] funds for corporate purposes," *Kirschner*, 15 N.Y.3d at 468, simply entertaining the possibility that the market would improve and buying additional time for Triaxx to recover

conveyed a benefit to the Funds. Given the nature of market fluctuation, it was not certain that preservation of Triaxx would lead to additional losses. In addition, the Complaint provides facts that suggest other ways in which the Funds benefited from preservation. For example, the Funds could have benefited from the delay of the adverse consequences to the Funds as a result of losing all or substantially all of their investment in Triaxx, including the negative reaction of the so-called "innocent investors"—who eventually placed the Funds in liquidation proceedings in the Cayman Islands—in the form of an increased rate of redemption requests, (*see* Compl. ¶ 112 ("These unpaid redemption requests totalled tens of millions of dollars by April 2009, but instead of paying the SCIF Funds' creditors, Priore and ICP used the SCIF Funds' assets to meet Triaxx Funding's obligations."), or their filing of winding-up proceedings, (*see id.* ¶ 119 ("In fact, even without knowledge of Priore's and ICP's wrongdoing, four shareholders of SCIF Feeder filed a winding-up petition in the Cayman Islands Grand Court in May 2010.").

The same logic applies to the Liquidators' argument that they did not benefit from the subsequent transfers or from the legal fees paid to execute the transactions—ICP and Priore did not "totally abandon" the Funds' interest because transferring the capital had the effect of keeping Triaxx temporarily afloat and staved off adverse consequences for the Funds. Therefore, the adverse interest exception does not apply here, and the Liquidators' claims are barred by the doctrine of *in pari delicto*.

### C. *Cayman Companies Law Section 147*

Section 147 of the Cayman Companies Law provides:

> (1) If in the course of the winding up of a company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

> (2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

(App'x 196-97.)  The Bankruptcy Court concluded that the Liquidators did not plausibly plead that DLA knew of or was a party to an "intent to defraud" or "fraudulent purpose."  The Liquidators do not appeal the Bankruptcy Court's determination that they had failed to plead fraud under New York law.  Yet they argue that knowledge of "intent to defraud" or "fraudulent purpose" under Cayman Companies Law is distinct from knowledge of actual fraud.  They point to English courts' interpretation of the Cayman law, which have said that an intent to defraud can be inferred from carrying on business and incurring debts with the knowledge that there is no reasonable prospect of repayment, and that the phrase "for any fraudulent purpose" should be construed liberally.  (Appellants' Br. 59-60 (citing *R v. Grantham* [1984] 3 All ER 166 at 169).)

I agree with the Bankruptcy Court that there are insufficient allegations of an intent to defraud or fraudulent purpose.  According to Appellants' own foreign law expert, fraud includes "'fraudulently prolonging the life' of a company so that its overall deficiency of assets increases, *if at the time the directors knew 'that there was no prospect . . . that [the company] would ever be in a position or be placed in a position to pay its creditors in full*."  (App'x 198 (quoting *Carman v. Cronos Group SA* [2005] EWHC 2403) (emphasis added).  Here, although not guaranteed, there was at least a prospect that the Funds would be repaid or that the market would improve enough to justify the decision to keep Triaxx alive.  While setting up a "loan" with no right to repayment may have been a breach of fiduciary duty, *see supra* note 8, it was not necessarily fraudulent.  Therefore, DLA could not be expected to be knowing party.

**V.**     **Conclusion**

For the reasons set forth above, the Bankruptcy Court's decision is AFFIRMED and the

case is DISMISSED.  The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Dated: May 9, 2017
       New York, New York

Vernon S. Broderick
United States District Judge